IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RALEIGH WAKE CITIZENS ASSOCIATION, et al. | ) ) ) | |
| *Plaintiffs,* | ) ) | No. 5:15-cv-156 |
| *v.* | ) ) | |
| WAKE COUNTY BOARD OF ELECTIONS, | ) ) | |
| *Defendant.* | ) | |
| | | |
| CALLA WRIGHT, et al. | ) ) | |
| *Plaintiffs,* | ) ) | |
| *vs.* | ) ) | No. 5:13-cv-607 |
| STATE OF NORTH CAROLINA, et al. | ) ) | |
| *Defendant.* | ) ) | |

**DEFENDANT'S PRETRIAL MEMORANDUM OF AUTHORITIES**

Defendant Wake County Board of Elections, pursuant to this Court's Case Management Order of November 30, 2015 (D.E. 45), respectfully submits this Memorandum of Authorities in support of the expected contested issues of law in this case.

**BACKGROUND**

These consolidated cases involve challenges to the new single-member electoral districts enacted by the General Assembly for Wake County Board of Education and the Wake County Board of County Commissioners.

On June 13, 2013, the General Assembly enacted Session Law 2013-110, which divided Wake County into seven single-member districts and two so-called "super-districts" for electing

members to the Wake County Board of Education. On April 2, 2015, the General Assembly enacted Session Law 2015-4, which increased the size of the Wake County Board of Commissioners, switched the method of election from at-large to single-member districts, and adopted the same seven single-member districts and two so-called "super-districts" that it adopted in Session Law 2013-110.

The maximum population deviation among the new districts is within the 10 percent de minimis threshold established by the Fourth Circuit's decision in *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996). Similarly, the population deviation of any new district from the ideal population is within 5 percent, and therefore the deviation is also within the threshold recognized by the North Carolina Supreme Court's decision in *Stephenson v. Bartlett*, 355 N.C. 354, 383, 562 S.E.2d 377, 397 (2002).

Plaintiffs allege that both Session Laws violate the "one person, one vote" rule of the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and Article I, § 19 of the North Carolina Constitution. Plaintiffs further allege that District 4 constitutes a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment as applied to the election of the Wake County Board of County Commissioners. Plaintiffs do not allege, however, that District 4 constitutes a racial gerrymander with respect to the election for the Board of Education.

Defendant does not expect that Plaintiffs will present direct evidence of legislative motivation beyond the statements made by particular legislators in the transcripts of the legislative deliberation of the bill. As a result, Plaintiffs' evidence regarding the partisan or racial motivations of the General Assembly will be largely circumstantial. Defendant contends that such circumstantial evidence will not be sufficient to meet the high burden of proof required for

Plaintiffs to prevail on their claims for violations of the one person, one vote rule or their racial gerrymandering claim. The question whether partisan motivation can be sufficient to constitute a violation of the one person, one vote rule where the maximum deviations among the districts is less than 10 percent may be argued before the Supreme Court tomorrow, December 8, 2015, in *Harris v. Arizona. Independent Redistricting Commission*, Docket No. 14-232.

## ARGUMENT

I. **PLAINTIFFS MUST SHOW THAT THE DISTRICTS AT ISSUE ARE THE PRODUCT OF BAD FAITH, ARBITRARINESS, OR INVIDIOUS DISCRIMINATION.**

> A. **Plaintiffs' burden of proof requires that they demonstrate that the maximum population deviations were the actual or sole product of an unconstitutional motive.**

Where, as here, electoral districts have a maximum population deviation of less than 10 percent, there is a presumption that the apportionment was the result of an honest and good faith effort to construct districts as nearly of equal population as is practicable. *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996). Plaintiffs bear the burden to establish that the apportionment process had "a taint of arbitrariness or discrimination." *Id.*; *see Wright v. North Carolina*, 787 F.3d 256, 264 (4th Cir. 2015).

The "taint" of arbitrariness or discrimination requires more proof than a color or hint of an improper motivation. Rather, the Fourth Circuit requires that plaintiffs must "establish that the apportionment plan at issue here *was the product of* bad faith, arbitrariness, or invidious discrimination." *Daly*, 93 F.3d at 1222 (emphasis added); *id.* at 1228 (requiring a showing that "the districting plan at issue was the *result of* bad faith, arbitrariness, or invidious discrimination." (emphasis added)).

3

Other courts have applied this standard. In *Marylanders for Fair Representation v. Schaefer*, a three judge panel determined that the plaintiff must prove "that the asserted unconstitutional or irrational state policy is the actual *reason* for the deviation" and "that the minor population deviation is *not* caused by the promotion of legitimate state policies." 849 F. Supp. 1022, 1032 (D. Md. 1994) (per curiam) (emphases in original); *Rodriguez v. Pataki*, 308 F. Supp.2d 346, 365 (S.D.N.Y. 2004) (plaintiff must show that the deviation from the plan "results *solely* from the promotion of an unconstitutional or irrational state policy" (emphasis in original) (quoting *Marylanders*, 849 F. Supp. at 1032)).

The Supreme Court may have an opportunity to address this standard tomorrow in *Harris*, given that the three judge panel in that case could not agree on the proper standard to apply. But unless and until the Supreme Court does so, this Court should apply the "actual" or "sole" reason standard set forth in *Marylanders*. This standard is consistent with the Fourth Circuit's description of the burden in *Daly v. Hunt*, which required the plaintiff to prove that deviation was the "the product of" or "the result of" bad faith, arbitrariness, or invidious discrimination. Even *Larios v. Cox*—a case that Plaintiffs heavily rely upon—supports the application of the sole or actual reason standard. The three judge panel in that case concluded that a violation is established where population deviations "are not supported by *any* legitimate, consistently-applied state interests." 300 F. Supp. 2d 1320, 1352 (N.D. Ga. 2003) (per curiam), *aff'd*, 542 U.S. 947 (2004) (emphasis in original).

As Judge Silver reasoned in *Harris*, any lesser standard of proof would effectively eviscerate the 10 percent de minimis threshold by exposing every redistricting plan with minor population deviations to expensive and time-consuming federal court challenges:

> Adopting a lower standard on this type of claim invites individuals
> to challenge any minimally deviant redistricting scheme based upon

> scant evidence of ill will by district planners, thereby creating costly trials and frustrating the purpose of [the Supreme Court's] ten percent rule." . . . [T]he bright-line standard of requiring plaintiffs establish the actual and sole reason behind redistricting decisions is workable. Under this standard, a court need not engage in the formidable task of divining which reason "predominated" over the myriad of possible reasons presented by those defending a new map. Instead, a court must simply determine whether the map was drawn *solely* for an illegitimate reason. If other reasons were involved, that ends the case.

*Harris*, 993 F. Supp. 2d at 1086 (Silver, J., concurring in the judgment) (emphasis in original) (quotations omitted); *see also Marylander*s, 849 F. Supp. at 1032 n.9.

### B. Political or partisan motivations are legitimate redistricting considerations as long as they do not go too far.

Defendant is not aware of a case holding that partisanship alone is an improper motive in creating districts with population deviations of less than 10 percent. *Larios*, 300 F. Supp. 2d at 1352 ("We need not resolve the issue of whether or when partisan advantage alone may justify deviations in population . . . ."). On the contrary, the Supreme Court has recognized in dicta that partisan advantage is a traditional and proper motivation for redistricting decisions, *e.g., Ala. Black Caucus v. Alabama*, __ U.S. __, __, 135 S. Ct. 1257, 1270 (2015) (listing "political affiliation" among "traditional race-neutral districting principles"); *Miller v. Johnson*, 515 U.S. 900, 914 (1995) ("It is true that redistricting in most cases will implicate a political calculus in which various interests compete for recognition . . . ."). The Supreme Court has further recognized "the reality that districting inevitably has and is intended to have substantial political consequences." *Gaffney v. Cummings*, 412 U.S. 735, 751–54 (1973) ("It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. . . . Politics and political considerations are inseparable from districting and apportionment.").

5

In his dissent in *Cox v. Larios*, 542 U.S. 947, 952 (2004), Justice Scalia cited the Court's decision in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), as a case in which "all but one of the Justices agreed that ['politics as usual'] *is* a traditional criterion, and a constitutional one, so long as it does not go too far." (Scalia, J., dissenting) (emphasis in original). In *Vieth*, the Supreme Court rejected a political gerrymandering claim on the grounds that there were no judicially discernable or manageable standards to adjudicate the use of political affiliation in the redistricting plan. 541 U.S. at 281–306 (Scalia, J.) (plurality opinion); 541 U.S. at 308–09 (Kennedy, J., concurring). A plurality of the court agreed that political gerrymandering claims were nonjusticiable. Justice Kennedy allowed for the possibility of a viable political gerrymandering claim in the future, but he confessed that "[o]ur attention has not been drawn to statements of principled, well-accepted rules of fairness that should govern districting, or to helpful formulations of the legislator's duty in drawing district lines." *Id.* at 308 (Kennedy, J., concurring).

Lower courts in the Fourth Circuit also have rejected political gerrymandering claims after *Vieth* as either nonjusticiable, *see Gorrell v. O'Malley*, Civil No. WDQ-11-2975, 2012 U.S. Dist. LEXIS 6178, at *11 (D. Md. Jan. 19, 2012), or failing to offer a "reliable standard by which to adjudicate" such a claim, *see Fletcher v. Lamone*, 831 F. Supp. 2d 887, 904 (D. Md. 2011), *aff'd*, 133 S.Ct. 29 (2012). And in a subsequent challenge to Georgia's districts drawn in the wake of the *Larios v. Cox*, the district court rejected allegations of political motivation to support a one person, one vote claim. *See Kidd v. Cox*, Civil Action No. 1:06-CV-0997-BBM, 2006 U.S. Dist. LEXIS 29689, at *34 (N.D. Ga. May 16, 2006) (reasoning that "the presence of partisan considerations in redistricting does not necessarily equate with bad faith on the part of the Georgia General Assembly in passing S.B. 386").

Far from being the landmark case to allege such a workable standard, this case more accurately reflects just how judicially "unmanageable" any standard would be. The *Vieth* plurality accurately reasoned that ever-shifting partisan allegiances, split voting, and wide discrepancies in the quality of candidates make it "impossible to assess the effects of partisan gerrymandering, to fashion a standard for evaluating a violation, and finally to craft a remedy" for the "lawful and common practice" of partisan districting. 541 U.S. at 286–87; *see also Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("The reality is that districting invariably has and is intended to have substantial political consequences."). Further, Justice Kennedy highlighted the lack of any discernible limits:

> A decision ordering the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process. . . . When presented with a claim of injury from partisan gerrymandering, courts confront two obstacles. First is the lack of comprehensive and neutral principles for drawing electoral boundaries. No substantive definition of fairness in districting seems to command general assent. Second is the absence of rules to limit and confine judicial intervention. With uncertain limits, intervening courts—even when proceeding with best intentions—would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust.

*Vieth v. Jubelirer*, 541 U.S. at 306–07 (Kennedy, J., concurring).

That the question of partisan bias in this case arises from a "one person, one vote" claim rather than a political gerrymandering claim does not make it any easier for courts to determine judicially manageable standards to resolve claims of partisanship. Indeed, if evidence of partisanship may constitute evidence of "bad faith," "arbitrariness," or "invidious discrimination" under *Daly v. Hunt*, then the 10 percent threshold would be of little or no practical value because every population deviation, no matter how small, could trigger a claim that the deviation was the result of an impermissible of political motivation. *See Davis v. Bandemer*, 478 U.S. 109, 134

7

(1986) (plurality opinion) ("Reapportionment cases involving the one person, one vote principle such as *Gaffney v. Cummings* . . . provide support for . . . a requirement . . . . [of] allegations and proof that the challenged legislative plan has had or will have effects that are sufficiently serious to require intervention by the federal courts in state reapportionment decisions.").

Further, Plaintiffs' claim of political bias appears to be that the districts were created to advantage Republicans and disadvantage Democrats in a way that is not reflective of the voting preferences of Wake County voters. But the Supreme Court has consistently rejected claims that a plan does not provide sufficiently proportionate representation to members of a political party or other political or demographic groups of voters. In *Davis v. Bandemer*, a plurality of the Court explained that that "[o]ur cases . . . clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be." 478 U.S. at 130 (plurality opinion). And in *Vieth v. Jubelirer*, 541 U.S. at 287–88, a plurality of the Court stated that

> [A]ppellants' test would invalidate the districting only when it prevents a majority of the electorate from electing a majority of representatives. . . . [T]his standard rests upon the principle that groups (or at least political-action groups) have a right to proportional representation. But the Constitution contains no such principle. It guarantees equal protection of the law to persons, not equal representation in government to equivalently sized groups. It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers."

*Vieth*, 541 U.S. at 287–88; *see id.* at 338 (Stevens, J., dissenting) ("The Constitution does not, of course, require proportional representation of racial, ethnic, or political groups.").

Finally, the lack of judicially manageable standards for resolving allegations of partisan bias becomes even starker when applied to Plaintiffs' allegations that partisanship improperly

8

motivated districts used in the *non-partisan* election for Wake County Board of Education. As Judge Motz noted in her dissent in *Wright*, the plaintiffs in this case are attempting to establish not just that partisan affiliation impacted the redistricting process, but that *policy preferences*—e.g., school-assignment policies—did as well. *Wright*, 787 F.3d at 270–71 (Motz, J., dissenting). But given that policy preferences can be more difficult to evaluate and isolate as evidence of voting patterns, the ability for any court to formulate a workable standard to resolve claims of policy bias is even more unmanageable than fashioning a test to resolve partisan bias.

For these reasons, the same policies that have prevented the Supreme Court from announcing a workable standard for resolving political gerrymandering claims in general should prevent the Court from fashioning and applying such a standard in this case.

### C. Plaintiffs' other anticipated evidence is not sufficiently probative to establish a "one person, one vote" violation.

Plaintiffs are anticipated to present certain other categories of evidence that, considered separately, do not establish a one person, one vote violation.

First, "[t]he Supreme Court has expressly rejected the argument that the possibility of drafting a 'better' plan alone is sufficient." *Daly*, 93 F.3d at 1221. Plaintiffs will likely proffer evidence from lay and expert witnesses regarding alternative plans that would have resulted in districts that they believe more faithfully hew to traditional districting principles or certain partisan or racial balances. But in *Daly*, the Fourth Circuit cited *Gaffney v. Cummings*, 412 U.S. 735, 740–41, 750–51 (1973) in refraining to measure a challenged plan against an alleged "better" plan:

> Furthermore, the *Gaffney* Court stated that judicial involvement in the inherently legislative process of apportionment "must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' when measured against a rigid and unyielding population-equality standard. The point is, that such involvements should never begin."

9

*Daly,* 93 F.3d at 1221.

Second, the apparent oddity of a district's shape and lack of compactness are not sufficient to establish a one person, one vote violation. *Gaffney*, 412 U.S. at 752 n. 18 ("[C]ompactness or attractiveness has never been held to constitute an independent federal constitutional requirement for state legislative districts."). Nor is conformance to other traditional districting criteria required. *Shaw v. Reno*, 509 U.S. 630, 647 (1993) ("*Shaw I*") (noting there is no constitutionally-required level or degree of compactness, contiguity, or respect for political subdivisions). Thus, Plaintiffs cannot avoid the problem with their "better plan" evidence by claiming that the challenged plans do not sufficiently confirm to certain shapes, sizes, or groupings of communities.

Third, the opinions of legislative opponents of a redistricting plan carry very little, if any, weight in determining the legislative motives for or intent of the plan. *See, e.g.*, *Veasey v. Abbott*, 796 F.3d 487, 502 (5th Cir. 2015) ("Conjecture by the opponents of SB 14 as to the motivations of those legislators supporting the law is not reliable evidence."); *Dowell v. Bd. of Educ.*, 890 F.2d 1483, 1503 (10th Cir. 1989) ("[D]iscriminatory intent cannot be ascertained by eliciting opinion testimony from witnesses, often out of context and accumulating those responses as substantive evidence of the motive for the Plan."), *rev'd on other grounds sub nom. Bd. of Educ. of Okla. City Pub. Sch., Indep. Sch. Dist. No. 89 v. Dowell*, 498 U.S. 237 (1991); *Butts v. New York*, 779 F.2d 141, 147 (2d Cir. 1985) ("[T]he legislative debates surrounding § 6-162 are filled with lengthy speeches by the law's proponents attesting to its legitimate ideological purpose; there is not a single remark by any proponent of the legislation that so much as hints at any improper purpose. We conclude that the speculations and accusations of the run-off law's few opponents simply do not support an inference of . . . racial animus . . . ."); *Page v. Va. State Bd. of Elections*, Civil Action No. 3:13cv678, 2015 U.S. Dist. LEXIS 73514, *42 (E.D. Va. June 5, 2015) ("The Supreme Court

10

has made it clear, however, that the views of legislative opponents carry little legal weight in characterizing legislation. . . . The rationale for this authority is patent: a bill's opponents have every incentive to place a competing label on a statute they find objectionable." (citations omitted)).

Fourth, the impact that redistricting has on candidates or incumbents is not probative of a one person, one vote claim. Rather, the one person, one vote principle protects "an individual's right to vote." *League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 725 (7th Cir. 2014) (noting that the fact that a redistricting plan hands "the short end of the proverbial stick" to certain incumbents "is not enough to overcome a presumptively constitutional map"). The impact of a plan on incumbents is essentially intertwined with claims of partisan motivation, which, as discussed above, does not lend itself to judicially manageable standards.

Finally, the use of geographic or "regional" considerations into a redistricting plan does not *per se* result in an Equal Protection violation. *Abate v. Mundt*, 403 U.S. 182, 185–86 (1971) ("[O]ur statements have reflected the view that the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality."). In particular, a plaintiff may not complain about a one person, one vote violation where he has the power to elect precisely the number of representatives that he would have under a districting system with perfectly equal population distribution. *Marylanders*, 849 F. Supp. at 1035 n.12; *see Reynolds v. Sims*, 377 U.S. 533, 562–63 & n. 40 (1964) ("[The] constitutionally guaranteed right to vote and the right to have one's vote counted clearly imply the policy that state election systems, no matter what their form, should be designed to give *approximately* equal weight to each vote cast. . . ." (quoting *Colegrove v. Green*, 328 U.S. 549, 569–71 (1946) (Black, J., dissenting) (emphasis added)).

In *Larios v. Cox*, the district court held that "states cannot seek to protect certain geographic interests by allotting them more seats in the state legislature, and thus more legislative influence, than their population would otherwise allow." *Larios*, 300 F. Supp. 2d at 1343 (articulating "this basic principle of constitutional jurisprudence"). The district court found that in redrawing the electoral districts, the legislature purposefully "took all of south Georgia and lassoed it in as if it were one big district" and worked to maximize the number of seats for that region at the expense of other areas of the state. 300 F. Supp. 2d. at 1328. As the court explained:

> Linda Meggers, the principal drafter of the House Plan, unambiguously said that an effort to allow rural south Georgia to keep as many seats as possible was a basic cause of the population deviations in the House. Meggers testified, "We knew that at a minimum [rural Georgia was] going to lose seven seats, and my job was to keep from doing that." Test. of Linda Meggers, Tr. at 729; see also *id.* at 730 (describing how she intentionally took all of southern Georgia, "lassoed it in as if it were one big district," and created a series of districts with negative population deviations in the region); *id.* at 739 ("They didn't want to lose any more representation out of rural south Georgia than they had to"); *id.* at 743 ("[The negative deviations] are in south Georgia because those folks wanted to minimize their loss of power.").

*Id.* at 1342 (alterations in original).

The evidence of geographic bias expected to be proffered by Plaintiff involves the population deviation between the two lettered districts A and B that Plaintiffs allege is designed to further the interests of non-Raleigh voters. But Plaintiffs are not expected to proffer the type of direct evidence of legislative intent at issue in *Larios*, and the redistricting plan does not move large numbers of electoral seats from one geographic region to another. Rather, Districts A and B simply divide the county into two districts and each elects a single representative to the Board of County Commissioners and the Board of Education. Such a plan does constitute a violation of the one person, one vote rule.

12

Defendant anticipates that Plaintiffs' evidence will focus on the possibility of partisan motivations for the drawing of the districts and statistical evidence comparing the challenged districts with alternative districts that Plaintiffs' claim would conform better to traditional districting principles. But those facts, even if established, do not rise to the level of bad faith, arbitrariness, or invidious discrimination. If they did, given the inevitably of both partisanship and population deviations in local districting plans, Defendant would face litigation every time the General Assembly, the Board of Education, or the Board of County Commissioners adopted districts that contained any degree of population deviation—a result especially problematic for Defendant in cases like these where the party charged with the allegedly unconstitutional action is not a party to the lawsuit.

Plaintiffs' claim under the North Carolina Constitution is also governed by a *de minimis* standard of a 5 percent population deviation from the ideal district (as opposed to measuring the maximum difference between the deviations between two districts). *See Stephenson*, 355 N.C. at 383, 562 S.E.2d at 397. The *Stephenson* court appears to have adopted this standard to assure compliance with the 10 percent threshold required by federal law. *Id.* ("In forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal 'one person, one vote' requirements"). Just as Plaintiffs' anticipated evidence will not be sufficient to establish a violation of the Federal Equal Protection Clause, the evidence will not be sufficient to establish a violation of the North Carolina Constitution.

## II. PLAINTIFFS MUST ESTABLISH THAT DISTRICT 4 CONSTITUTES A RACIAL GERRYMANDER AS APPLIED TO THE ELECTION FOR BOARD OF COUNTY COMMISSIONERS.

Plaintiffs' burden of proof to establish a racial gerrymandering claim is a "demanding one." *Cromartie*, 532 U.S. 234, 241, 121 S. Ct. 1452, 1458 (2001) (quoting *Miller*, 515 U.S. at 928). Because "the legislature 'must have discretion to . . . balance competing interests'" when redistricting, "courts must 'exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race.'" *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (emphasis in original) (quoting *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995)).

As a result, Plaintiffs must prove that race was the "predominant factor" motivating the legislature to place certain voters within the disputed district. *Miller*, 515 U.S. at 916. "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.*

A plaintiff may prove a race-based motive through either direct evidence of legislative purpose or circumstantial evidence of a district's shape and demographics. *Shaw v. Hunt*, 517 U.S. 899, 905 (1995) ("*Shaw II*") (citation omitted). The case law, however, reflects that plaintiffs who have successfully shown that race was the "predominant factor" have done so through direct evidence of legislative purpose. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 960–61 (1996) (finding direct evidence of racial motivation through, *inter alia*, concessions from the state that the districts were created to "enhanc[e] the opportunity of minority voters to elect minority representatives to Congress"); *Shaw II*, 517 U.S. at 906 (noting that the state's submission for preclearance of the districts under the Voting Rights Act identified the creation of two majority-minority districts as its "*overriding* purpose"); *Miller*, 515 U.S. at 917–19 (noting with approval the district court's

14

finding that race predominated because, in addition to the shape and demographics of the district, the state conceded that it would not have included certain communities in the disputed district but for its attempt to create a majority black district); *see also Alabama*, __ U.S. at __, 135 S. Ct. at 1271 (citing record testimony that the legislators in charge of creating the redistricting plan were "direct[ly] and significant[ly]" impacted by a goal of maintaining racial percentages). *But see Bethune-Hill v. Va. State Bd. Of Elections*, 2015 U.S. Dist. LEXIS 144511, at **65–68 (citing *Alabama* for the proposition that "racial thresholds constitute evidence, not dispositive proof, of racial predominance," because "[s]ubordination requires a balancing of degree to determine whether non-racial criteria or racial criteria predominated").

Where, as here, plaintiffs are not likely to offer direct evidence of legislative intent, the burden is considerably higher. "[W]here the district is not so bizarre on its face that it discloses a racial design, the proof will be more 'difficult.'" *Miller*, 515 U.S. at 914 (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1996) ("*Shaw I*")). For purposes of this analysis, evidence of less-than-perfect boundaries, without more, will not suffice:

> In some exceptional cases, a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to segregate . . . voters on the basis of race. . . . So, too, would be a case in which a State concentrated a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions. We emphasize that these criteria are important not because they are constitutionally required—they are not . . . but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines.

*See Shaw I*, 509 U.S. at 646–47 (quotations and citations omitted).

Similarly, racial disparity among districts will not necessarily establish that race predominated over other, neutral factors in the legislature's analysis—especially when any alleged

15

disparity could also reflect political or partisan motivations. *See, e.g.*, *Cromartie*, 532 U.S. at 242, 249 ("After all, the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority. It simply imposes an obligation not to create such districts for predominantly racial, as opposed to political or traditional, districting motivations."). In *Cromartie*, the Supreme Court determined that evidence of an irregularly shaped, heavily minority district that fell in between municipal boundaries did not support a finding of predominant intent because "racial identification is highly correlated with political affiliation in North Carolina." *Id.* at 243; *see also Vera*, 517 U.S. at 967–68 ("[T]he fact that, as it happens, . . . many of the voters being fought over . . . were African-American . . . would not, in and of itself, convert a political gerrymander into a racial gerrymander, no matter how conscious redistricters were of the correlation between race and party affiliation." (citations and quotations omitted)); *Miller*, 515 U.S. at 920 ("A State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests.").[1]

Defendant anticipates that Plaintiffs evidence will show that District 4 includes a majority of African American voters that reside in the southeast section of Raleigh. But Plaintiffs' evidence also likely will show that precincts in District 4 with a high population of African American voters are some of the most reliably Democratic precincts in the county, and that District 4 shares similarities with the District 4 adopted in the 2011 redistricting plan. Plaintiffs also are expected to proffer evidence to purport to show that the overall redistricting plan was designed to create

---

[1] If, and only if, the plaintiff is able to show that race was the legislature's predominant consideration in creating the disputed districts, the burden then shifts to the government to show that the districts meet strict scrutiny by being narrowly tailored to meet a compelling state interest. *Alabama*, __ U.S. __, 135 S. Ct. at 1274.

16

more competitive districts for Republicans and to favor non-Raleigh voters. These and other related facts would bring back Plaintiffs' claim full circle into a claim regarding partisan bias:

> [S]trict scrutiny would not be appropriate if race-neutral, traditional districting considerations predominated over racial ones. We have not subjected political gerrymandering to strict scrutiny. *See Davis v. Bandemer*, 478 U.S. 109, 132, 92 L.Ed. 2d 85, 106 S. Ct. 2797 (1986) (White, J., plurality opinion) ("Unconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole"); *id.*, at 147 (O'Connor, J., concurring in judgment) ("Purely political gerrymandering claims" are not justiciable.) And we have recognized incumbency protection, at least in the limited form of "avoiding contests between incumbent[s]," as a legitimate state goal.

*Vera*, 517 U.S. at 964.[2] Plaintiffs' anticipated evidence, therefore, will not prove that race was the predominant motivation of the General Assembly in using the Board of Education electoral districts—including District 4—for as the new electoral districts for the Board of County Commissioners.

## **CONCLUSION**

For the foregoing reasons, Defendant contends that Plaintiffs' anticipated evidence at trial will not be sufficient to carry their burden of proof on their one person, one vote claim, or their racial gerrymandering claim.

---

[2] To the extent that this distinction is premised on the shift from at-large electoral districts single-member electoral districts, Plaintiffs' claim is closer to a voter dilution claim—although Plaintiffs have not, and cannot, prevail on that claim either. Typically, voter dilution claims are made in the reverse: that shifting from single-member districts to at-large districts serve to dilute the votes of a minority population. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) ("This Court has long recognized that multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'") (citations omitted)).

17

Case 5:15-cv-00156-D   Document 47   Filed 12/07/15   Page 17 of 19

Respectfully submitted the 7th day of December, 2015.

/s/ Charles F. Marshall
Charles F. Marshall
Matthew B. Tynan
BROOKS, PIERCE, McLENDON,
  HUMPHREY & LEONARD, L.L.P.
1600 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, NC 27601
(919) 839-0300
cmarshall@brookspierce.com
mtynan@brookspierce.com

*Counsel for Wake County Board of Elections*

## CERTIFICATE OF SERVICE

I hereby certify that on December 7th, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using the CM/ECF system to the following:

>Anita S. Earls
>Southern Coalition for Social Justice
>1415 West Highway 54, Suite 101
>Durham, NC 27707
>919-323-3380 x115
>Fax: 919-323-3942
>Email: anita@southerncoalition.org
>*Counsel for Plaintiffs*

>Respectfully Submitted,
>
>/s/ Charles F. Marshall
>Charles F. Marshall
>Matthew B. Tynan
>BROOKS, PIERCE, McLENDON,
>   HUMPHREY & LEONARD, L.L.P.
>1600 Wells Fargo Capitol Center
>150 Fayetteville Street
>Raleigh, NC 27601
>(919) 839-0300
>cmarshall@brookspierce.com
>mtynan@brookspierce.com
>
>*Counsel for Wake County Board of Elections*