IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| RALEIGH WAKE CITIZENS ASSOCIATION, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>WAKE COUNTY BOARD OF ELECTIONS,<br><br>*Defendant.* | No. 5:15-cv-156 |
| CALLA WRIGHT, et al.<br><br>*Plaintiffs,*<br><br>*vs.*<br><br>STATE OF NORTH CAROLINA, et al.<br><br>*Defendant.* | No. 5:13-cv-607 |

### DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Wake County Board of Elections, pursuant to this Court's Case Management Order of November 30, 2015 (D.E. 45), respectfully submits the following pretrial Proposed Findings of Fact and Conclusions of Law:

### INTRODUCTION

For the reasons set forth by the Defendant in the parties' proposed pretrial order, Defendant is presenting a limited defense in this action—especially as it relates to pretrial discovery and the presentation of evidence at trial. Although Defendant does not take a position regarding whether the General Assembly should or should not have drawn the electoral districts at issue in these cases, Defendant plans to defend the constitutionality of the districts as a legal matter. It will do

so largely through cross-examination of Plaintiffs' evidence and arguing the sufficiency of Plaintiffs' evidence against the governing legal principles. As a result, Defendant is providing the following limited findings and fact and conclusions of law at this time based on its current understanding of the Plaintiffs' anticipated evidence. Defendant will be prepared to promptly supplement and amend these findings at the conclusion of trial, including full citations to the evidentiary record.

## PARTIES AND JURISDICTION

1. Plaintiffs in these consolidated cases are citizens and registered voters that reside in Wake County or are associations of citizens that promote civic engagement in Wake County.

2. Defendant is the local elections board that is responsible for administering elections in Wake County, North Carolina, including elections for the Wake County Board of Education and the Wake County Board of County Commissioners.

3. The Court has jurisdiction over the parties and the subject matters in these actions.

4. The Court has consolidated these two related cases for trial.

## PROPOSED FINDINGS OF FACT

### Board of Education Districts

5. The Wake County Board of Education is non-partisan. Electoral ballots do not designate the political party of any candidates for the Board of Education.

6. Following the 2010 census, the Board of Education hired an outside law firm to redraw the electoral districts for the Board of Education ("2011 BOE Map").

7. The 2011 BOE Map includes nine single-member electoral districts.

8. The evidence is likely to show that one district (District 4) in the 2011 BOE map currently includes a majority of African-American registered voters.

2

9. In March of 2013, Senators Neal Hunt and Chad Barefoot introduced Senate Bill 325 to change the method of election of the Wake County Board of Education.

10. According to transcripts of the legislative debates during committee hearings and on the floor of the Senate, Senator Hunt stated that the goals of Senate Bill 325 legislation included (1) allowing voters to elect two school board members as opposed to one school board member, and (2) moving Board of Education elections from odd-numbered years to even-numbered years to increase voter turnout.

11. Senate Bill 325, as amended, was passed by both chambers of the General Assembly and was ratified as Session Law 2013-110 on June 13, 2013.

12. Session Law 2013-110 divided the county into 7 single-member electoral districts designated numerically (1-7) and two (2) larger districts designated by letters A and B.

13. Like the 2011 BOE Plan, Session Law 2013-110 included one district (District 4) that includes a majority of registered African American voters and covers geographic areas relatively similar to those areas covered by previous District 4.

14. Beginning in 2016, Session Law 2013-110 provides that voters will elect Board of Education members in all seven (7) single-member districts every four years.

15. Beginning in 2018, Session Law 2013-110 provides that voters will elect Board of Education members from each of the two lettered districts every four years.

16. The population deviations among the numbered districts are less than 10 percent.

17. The population deviations among the lettered districts are less than 10 percent.

18. On August 22, 2013, Plaintiffs filed the first of these consolidated cases, *Wright v. State of North Carolina*, challenging the constitutionality of the districts adopted by the General Assembly in Session Law 2013-110 under the one person, one vote rule under the United States

Constitution and the North Carolina Constitution. Plaintiffs did not allege a racial gerrymandering claim.

19. The United States District Court for the Eastern District of North Carolina dismissed Plaintiffs' Complaint in an order entered on March 17, 2014.

20. On May 27, 2015, a panel of the United States Court of Appeals for the Fourth Circuit issued an opinion reversing the order dismissing the complaint in *Wright*, and remanding the case for further proceedings.

**Board of County Commissioners**

21. In 1981, the General Assembly established a system of partisan at-large elections for the Wake County Board of County Commissioners that included seven (7) residency districts.

22. In 2011, the Board of County Commissioners adopted a new set of residency districts ("2011 BOCC Map").

23. One of the residency districts in the 2011 BOCC Map (District 5) includes a majority of African-American voters.

24. On March 4, 2015, Senator Chad Barefoot introduced Senate Bill 181 to change the method of election of the Board of County Commissioners.

25. Senate Bill 181, as amended, was passed by both members of the General Assembly and was ratified as Session Law 2015-4 on April 2, 2015.

26. Session Law 2015-4 increased the number of Wake County Commissioners from seven (7) to nine (9).

27. Session Law 2015-4 divided the county into 7 single-member electoral districts designated numerically (1-7) and two (2) larger, regional districts designated by letters A and B.

28. Session Law 2015-4 adopts the same 7 single-member numbered electoral districts that are used for the Wake County Board of Education elections as enacted by Session Law 2013-110.

29. Session Law 2015-4 adopts the same 2 lettered districts that are used for the Wake County Board of Education elections as enacted by Session Law 2013-110.

30. Beginning in 2016, Session Law 2015-4 provides that voters will elect Wake County Board of Commissioners members in the two lettered districts every four years.

31. Beginning in 2018, Session Law 2015-4 provides that voters will elect Wake County Board of Commissioners members from each of the seven (7) single member districts every four years.

32. According to transcripts of the legislative debates, Senator Barefoot and Representative Paul Stam stated that SB 181 adopted the districts used by the Board of Education elections because, at the time the bill was enacted, those districts had been upheld by an order of the United States District Court for the Eastern District of North Carolina in the *Wright* case.

33. In the *Wright* case, Plaintiffs allege that the "clear . . . intent [of the new districts is] to disfavor incumbents who are registered Democrats and support progressive education policies." Plaintiffs further allege that the "only" goal the new plan accomplishes is to further Republican interests and advance conservative agenda policies. (Compl. ¶¶ 62, 66).

34. In the *RWCA* case, Plaintiffs allege that the motivation for the new districts was to "give greater weight to the voting strength of rural and suburban voters in Wake County in elections for the Board of Commissioners, and to disadvantage urban voters," and "to give disproportionate and unfair weight to the voting strength of voters who support Republican

candidates compared to the voting strength of voters who support Democratic candidates, and to disadvantage Democratic voters." (Compl. ¶¶ 61–62).

35. Plaintiffs are expected to proffer evidence that President Obama would have won a majority of the vote in 5 of the 9 Board of Education districts under the 2011 BOE Map, but that President Obama would have won a majority of the vote in only 4 of the 9 Board of Education Districts under the new plan.

36. The evidence also will likely show that, in terms of voter registration, there are more registered Democratic voters than registered Republican voters in 5 of the 9 new districts to be used by the Board of Education and the Board of County Commissioners.

37. Plaintiffs are expected to proffer evidence from lay and expert witnesses regarding the ability to create districts that plaintiffs contend would create lower population deviations.

38. Plaintiffs are expected proffer evidence from lay and expert witnesses regarding the ability to create districts that Plaintiffs contend would be more consistent with traditional districting criteria, including compactness, less irregular shape, and maintaining more communities of interest.

39. Plaintiffs are expected to proffer evidence that the new districts would pit certain incumbents against each other.

40. Plaintiffs' expert, Dr. Jowei Chen, is expected to proffer testimony based on a report concluding that (a) the enacted districts "create a partisan distribution of seats falling completely outside the range of outcomes that are possible under a non-partisan districting process that creates equally populated districts while maximizing compactness and preserving precinct and municipal boundaries," and (b) that "racial packing, not partisanship motivations, predominated in the . . . drawing of District 4." Expert Report of Jowei Chen, Ph.D ("Chen Report"), at 1-2.

41. Dr. Chen undertook a computer simulation study that drew a sampling of districts that could result from the application of certain criteria: relatively strict population equality, maximizing the number of municipalities kept intact, keeping all precincts intact, and maximizing geographical compactness. Chen Report at 3–6.

42. To examine possible partisan motivations in drawing the enacted Districts, Dr. Chen used prior election data to measure and compare the level of partisanship (i.e., relative share of Democrat- versus Republican-favoring vote) of the enacted districts against the partisanship of the simulated districts. Chen Report at 9–14.

43. Dr. Chen's simulation method excludes, *a priori*, any districting plan that exceeds a maximum population deviation of 2% among the seven districts and 0.6% among the two super districts and any districting plan that divides any electoral precincts, and maximizes adherence to traditional districting criteria that the General Assembly was not required to apply. The method does not sample simulations of other possible districting plans that could be created by a good-faith effort to equalize population among districts, but only a limited subset of such districting plan simulations selected by Dr. Chen. Accordingly, the simulations do not show a reasonable range or sample of possible alternative plans, but rather, demonstrate that a number of allegedly "better" redistricting plans were possible. It is not only unsurprising, but was mathematically impossible, for the enacted districting plan to fall within the range of outcomes simulated by Dr. Chen.

44. Accordingly, Dr. Chen's methodology is not probative of the questions the Court is asked to resolve regarding Plaintiffs' one person, one vote claims.

45. To examine the predominance of racial, as opposed to partisan, motivations for drawing District 4, Dr. Chen compared the relative African-American population of District 4 against the "blackest of the seven simulated districts" in each of the 500 seven-district simulations,

7

Case 5:15-cv-00156-D   Document 49   Filed 12/07/15   Page 7 of 17

which "represent alternative versions of how District 4 would have been drawn under a race-neutral, non-partisan districting process." Chen Report at 16.

46. The same methodological flaws that limit the usefulness of Dr. Chen's report with regard to the one person, one vote claims are propagated to the racial gerrymandering analysis. See Chen Report at 16 ("I begin with the same 500 simulations of seven-district plans presented previously . . . ."). Dr. Chen's failure to sample an appropriate population of alternative districting plans renders irrelevant any statistical conclusions regarding the predominance of racial considerations in the drawn of District 4. *E.g.*, Chen Report at 18.

47. In any event, Dr. Chen explains that his analysis of what a partisan-motivated General Assembly could have done is based on "alternative versions of how District 4 would have been drawn under a . . . non-partisan districting process." Chen Report at 16–18. It is unclear how Dr. Chen draws any conclusions about what districts may have been drawn by a partisan-motivated legislature by examining those drawn without regard for partisanship. Therefore, contrary to Dr. Chen's stated goal, his report does not appear to examine how District 4 might have been racially composed if it had been primarily motivated by partisan goals.

48. Accordingly, Dr. Chen's methodology is not probative of the questions the Court is asked to resolve regarding Plaintiffs' racial gerrymandering claim.

## CONCLUSIONS OF LAW

### A. Plaintiffs' Federal and State "One Person, One Vote" Claims

49. The maximum population deviation among the districts challenged in this case is less than 10%. Accordingly, Defendant is entitled to a presumption that the apportionment plan was the result of an honest and good faith effort to construct districts as nearly of equal population as is practical. *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996).

50. Plaintiffs bear the burden of proving that the apportionment process had "a taint of arbitrariness or discrimination." *Id.*; *see Wright v. North Carolina*, 787 F.3d 256, 264 (4th Cir. 2015). To meet this burden, Plaintiffs must "establish that the apportionment plan at issue here was the product of bad faith, arbitrariness, or invidious discrimination." *Daly*, 93 F.3d at 1222. More specifically, Plaintiffs must prove "that the asserted unconstitutional or irrational state policy is the actual *reason* for the deviation" and "that the minor population deviation is *not* caused by the promotion of legitimate state policies." *Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1032 (D. Md. 1994) (per curiam) (emphases in original).

51. Plaintiffs have failed to prove that the redistricting plans enacted in Session Laws 2013-110 and 2015-4 are the product of bad faith, arbitrariness, or invidious discrimination.

52. Plaintiffs rely heavily on evidence that goes only to show that a better redistricting plan could have been adopted. But the existence of a "better" plan is not sufficient to establish a violation of the one person, one vote claim. *Daly*, 93 F.3d at 1221 (citing *Gaffney v. Cummings*, 412 U.S. 735, 740–41 (1973)). Nor is it sufficient to show that the law could have been more faithful to traditional districting criteria. *Shaw v. Reno*, 509 U.S. 630, 647 (1993) ("We emphasize that these criteria are important not because they are constitutionally required—they are not . . . ." (citing *Gaffney*, 412 U.S. at 752 n. 18)). Dr. Chen's analysis is not persuasive because it compares

the enacted redistricting plan only to hypothetical districting plans drawn under strict adherence to standards that the General Assembly was not required to follow. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 263 (4th Cir. 2005) (affirming the exclusion of statistical analysis that "was based on comparisons that were not relevant to [the plaintiff's] claims").

53. Plaintiffs' proffered evidence that the population deviations between Districts A and B allegedly favors non-Raleigh voters at the expense of Raleigh voters does not rise to the level of a constitutional violation. The use of geographic or regional considerations into the redistricting plan does not *per se* result in an Equal Protection violation. *Abate v. Mundt*, 403 U.S. 182, 185–86 (1971) ("[O]ur statements have reflected the view that the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality."). Plaintiffs have the power to elect precisely the number of representatives that he would have under a districting system with perfectly equal population distribution.

54. The allegations of geographic bias with respect to Districts A and B are distinguishable from the evidence in *Larios v. Cox*, 300 F. Supp. 2d 1320, 1352 (N.D. Ga. 2003) (per curiam), *summarily aff'd*, 542 U.S. 947 (2004). The *Larios* court examined testimony and statements by the Georgia legislature and found a specific intent to achieve and maintain a level of electoral power for rural southern Georgia and inner-city Atlanta not justified by their population at the expense of other areas of the state. *Id.* at 1325, 1327 ("Both the explicit admissions of witnesses for the defendant and the circumstantial evidence of the plans themselves leaves no doubt that a deliberate and systematic policy of favoring rural and inner-city interests at the expense of suburban areas north, east, and west of Atlanta led to a substantial portion of the 9.98% population deviations . . . . Much of the testimony at trial centered around the distinction between 'the two Georgias': namely, the predominantly rural areas of south Georgia and the urban

and suburban areas surrounding Atlanta in north Georgia."); *id.* at 1328 ("[T]he plans' drafters intentionally drew the state legislative plans in such a way as to minimize the loss of districts in the southern part of the state. . . . In other words, the drafters redrew the majority of south Georgia's districts, which were generally very underpopulated . . . by taking on only as much area as was needed to get within a -5% population deviation."); *see id.* at 1326–27 ("Notably, ninety of the 180 House seats (50.00%) are in districts with population deviations greater than +/- 4%. Sixty seats (33.33%) are in districts with deviations greater than +/- 4.5%, and twenty seats (11.11%) are in districts with deviations greater than +/-4.9%. . . . [In the] 2002 Senate Plan . . . [t]hirty-seven of the fifty-six districts (66.07%) have population deviations greater than +/-4%. Thirty-one districts (55.36%) have deviations greater than +/- 4.5%. and sixteen districts (28.57%) have deviations greater than +/- 4.9%.").

55. In this case, Plaintiffs' proffered evidence of geographic bias does not move large numbers of electoral seats from one area of the county to another. Rather, Districts A and B divide the county into two districts and each elects a single representative to the Board of County Commissioners and Board of Education, respectively. *See Reynolds v. Sims*, 377 U.S. 533, 56 n. 40 (1964) (noting that the Constitution requires electoral plans "to give <u>approximately</u> equal weight to each vote cast" (quotation omitted) (emphasis added)). Further, unlike in *Larios*, Plaintiffs presented no direct evidence of legislative intent regarding geographic bias. Accordingly, Plaintiffs' evidence is insufficient to support a conclusion that the drafters of the redistricting plans undertook the redistricting process with the intent to establish a bias in favor of any particular geographic location in an unconstitutional manner.

56. Plaintiffs also proffered testimony from a number of Democratic legislators and other political opponents of the redistricting plans, but the Court does not attribute significant

11
Case 5:15-cv-00156-D   Document 49   Filed 12/07/15   Page 11 of 17

weight to their criticisms of the redistricting plans. *Page v. Va. State Bd. of Elections*, Civil Action No. 3:13cv678, 2015 U.S. Dist. LEXIS 73514, *42 (E.D. Va. June 5, 2015) ("The Supreme Court has made it clear, however, that the views of legislative opponents carry little legal weight in characterizing legislation. . . . The rationale for this authority is patent: a bill's opponents have every incentive to place a competing label on a statute they find objectionable." (citations omitted)); *see, e.g., Veasey v. Abbott*, 796 F.3d 487, 502 (5th Cir. 2015) ("Conjecture by the opponents of SB 14 as to the motivations of those legislators supporting the law is not reliable evidence."); *Dowell v. Bd. of Educ.*, 890 F.2d 1483, 1503 (10th Cir. 1989) ("[D]iscriminatory intent cannot be ascertained by eliciting opinion testimony from witnesses, often out of context and accumulating those responses as substantive evidence of the motive for the Plan."), *rev'd on other grounds sub nom. Bd. of Educ. of Okla. City Pub. Sch., Indep. Sch. Dist. No. 89 v. Dowell*, 498 U.S. 237 (1991); *Butts v. New York*, 779 F.2d 141, 147 (2d Cir. 1985) ("[T]he legislative debates surrounding § 6-162 are filled with lengthy speeches by the law's proponents attesting to its legitimate ideological purpose; there is not a single remark by any proponent of the legislation that so much as hints at any improper purpose. We conclude that the speculations and accusations of the run-off law's few opponents simply do not support an inference of . . . racial animus . . . .").

57.     Finally, Plaintiffs proffered evidence of possible partisan motivations in the design of the redistricting plans. But such motivations are neither surprising nor unlawful. Every decision in the redistricting process that impacts politics is a political decision. *Gaffney v. Cummings*, 412 U.S. 735, 751–54 (1973) ("It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it."); *see Ala. Black Caucus v. Alabama*, __ U.S. __, __, 135 S. Ct. 1257, 1270 (2015) (listing "political affiliation" among "traditional race-neutral districting principles"); *Miller v. Johnson*, 515 U.S.

900, 914 (1995) ("It is true that redistricting in most cases will implicate a political calculus in which various interests compete for recognition . . . .").

58. The Supreme Court rejected a political gerrymandering claim in *Vieth v. Jubelirer*, 541 U.S. 267 (2004). The *Vieth* plurality reasoned that ever-shifting partisan allegiances, split voting, and wide discrepancies in the quality of candidates make it "impossible to assess the effects of partisan gerrymandering, to fashion a standard for evaluating a violation, and finally to craft a remedy" for the "lawful and common practice" of partisan districting. 541 U.S. at 286–87; *see also Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("The reality is that districting invariably has and is intended to have substantial political consequences.").

59. The same difficulty discerning judicially manageable standards to resolve claims of partisan bias in redistricting is present in this case. The Court has no grounds to distinguish the challenge of evaluating claims of partisan bias in one person, one vote claims from the challenge of evaluating claims of partisan bias in traditional political gerrymandering claims. On the record before this court, there is insufficient evidence to find that any evidence of partisan motivations underlying the new districts went too far.

60. The lack of any judicially manageable standards to resolve claims of partisan motivation is even more prevalent in the *Wright* case because the election for the Board of Education is a nonpartisan one. Plaintiffs failed to present sufficient evidence that any particular policy preference. Such preferences are often more difficult to evaluate and isolate as proxies for voting patterns than partisan bias.

61. As a result, Plaintiffs have failed to carry their burden to show that the redistricting plans at issue are the product of bad faith, arbitrariness, or invidious discrimination

because partisan motivations were involved must fail. Accordingly, Plaintiffs' claims under the United States Constitution and the North Carolina Constitution must fail.

**B.     Plaintiffs' Racial Gerrymandering Claim**

62.     Plaintiffs bear the burden of proving that race was the "predominant factor" motivating the legislature in the construction of District 4. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995). "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.*

63.     Plaintiffs failed to prove that race was the predominant factor motivating the legislature in creating District 4. *See Shaw v. Hunt*, 517 U.S. 899, 905 (1995).

64.     First, Plaintiffs have not introduced any direct evidence in support of a legislative intent to emphasize race at the expense of traditional districting principles. Nothing in the legislative transcripts indicates that the legislators were primarily, if at all, motivated by race in introducing or passing Senate Bill 181. *Cf. Alabama*, __ U.S. at __, 135 S. Ct. at 1271 (citing record testimony that the legislators in charge of creating the redistricting plan were "direct[ly] and significant[ly]" impacted by a goal of maintaining racial percentages); *Bush v. Vera*, 517 U.S. 952, 960–61 (1996) (finding direct evidence of racial motivation through, *inter alia*, concessions from the state that the districts were created to "enhance[e] the opportunity of minority voters to elect minority representatives to Congress").

65.     Second, Plaintiffs also have not proven predominance of race-based motives through the use of indirect evidence of legislative intent. The shape of the district is not so irregular on its face to "disclose[] a racial design." *Miller*, 515 U.S. at 914 (quoting *Shaw I*, 509 U.S. at

646).  Further, the fact that racial minorities comprise a large percentage of District 4 also is not dispositive.  *See, e.g.*, *Easley v. Cromartie*, 532 U.S. 234, 249 (2001) ("After all, the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority.  It simply imposes an obligation not to create such districts for predominantly racial, as opposed to political or traditional, districting motivations.") (emphasis in original).

66. Plaintiffs proffered evidence that the district maps were originally drawn to achieve a partisan bias, to favor voters who supported certain school assignment policies, and to favor non-Raleigh voters.  Plaintiffs' expert evidence that District 4 reflected a high concentration of Obama voters suggests that partisanship or other factors, rather than race, could have driven the creation of District 4.  Plaintiffs' evidence also shows that District 4 covers an area similar to the area in District 4 that was adopted in the 2011 map for the Board of Education, and that communities with higher populations of African American in that District exist within a relatively compact geographic area.

67. The Court concludes that a balanced review of the evidence presented by Plaintiffs fails to establish that race predominated in the creation of District 4. Accordingly, Plaintiffs have failed to meet their burden of proof on their racial gerrymandering claim.

## **CONCLUSION**

The evidence presented at trial reveals that Plaintiffs have failed to carry their burden of proof on their one person, one vote claims under Federal and state law, and have also failed to carry their burden of proof with respect to their claim that District 4 as adopted for use in the elections for Board of County Commissioners constituted a racial gerrymander.

IT IS THEREFORE ORDERED that judgment be entered for the Defendant in *Wright et al. v. State of North Carolina et al.* on Plaintiffs' one person, one vote claims under (i) the 14th Amendment to the United States Constitution, and (ii) Article 1, § 19 of the North Carolina Constitution.

IT IS FURTHER ORDERED that that judgment be entered for the Defendant in *Raleigh Wake Citizens Association et al. v. Wake County Board of Election* on Plaintiffs' one person, one vote claims under the equal protection clauses of (i) the 14th Amendment to the United States Constitution, and (ii) Article 1, § 19 of the North Carolina Constitution, and it IS FURTHER ORDERED that judgment be entered for the Defendant on Plaintiffs' racial gerrymandering claim under the 14th Amendment to the United States Constitution.

Respectfully submitted the 7th day of December, 2015.

/s/ Charles F. Marshall
Charles F. Marshall
Matthew B. Tynan
BROOKS, PIERCE, McLENDON,
  HUMPHREY & LEONARD, L.L.P.
1600 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, NC 27601
(919) 839-0300
cmarshall@brookspierce.com
mtynan@brookspierce.com

*Counsel for Wake County Board of Elections*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 7, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using the CM/ECF system to the following:

> Anita S. Earls
> Southern Coalition for Social Justice
> 1415 West Highway 54, Suite 101
> Durham, NC 27707
> 919-323-3380 x115
> Fax: 919-323-3942
> Email: anita@southerncoalition.org
> *Counsel for Plaintiffs*

Respectfully Submitted,

/s/ Charles F. Marshall
Charles F. Marshall
Matthew B. Tynan
BROOKS, PIERCE, McLENDON,
  HUMPHREY & LEONARD, L.L.P.
1600 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, NC 27601
cmarshall@brookspierce.com
mtynan@brookspierce.com

*Counsel for Wake County Board of Elections*