**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Consolidated Civil Action**

| | |
|---|---|
| RALEIGH WAKE CITIZENS ASSOCIATION, et al. | |
| Plaintiffs, | |
| v. | No. 5:15-cv-156 |
| WAKE COUNTY BOARD OF ELECTIONS, | |
| Defendant. | |

| | |
|---|---|
| CALLA WRIGHT, et al., | |
| Plaintiffs, | |
| v. | No. 5:13-cv-607 |
| THE STATE OF NORTH CAROLINA, et al., | |
| Defendants. | |

**PLAINTIFFS' PRE-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.**      **Proposed Findings of Fact**

     *a.*    *Background Facts Relevant to Board of Education Case*

1. Wake County experienced tremendous growth between 2000 and 2010. During that time period, the total population of the county grew by 43.51 percent, from 627,846 to 900,993. (Stip.; Ex. 442, 2000 Census data for Wake; Ex. 443, 2010 Census data for Wake).

1

2. Similarly, the student population in the Wake County Public School System grew by 46.68 percent, from 97,691 to 143,289. (Stip.; WCPSS student population figures for 2000; WCPSS student population figures for 2010).

3. This rapid growth made school overcrowding a serious concern. This problem was addressed in at least three ways: introduction of year-round schools, continuation of the County's socioeconomic diversity busing program, and increasing the County's magnet school program. (Tr. Test. Bill Fletcher, Rev. Earl Johnson).

4. These approaches, along with the increased funding needed to build new Wake County schools, led to increasing conflict between the Wake County Board of Education ("School Board") and the Wake Board of County Commissioners ("County Commission"). (Tr. Test. Fletcher, Johnson, James West, Rep. Rosa Gill).

5. The School Board is responsible for deciding where new schools should be built and which existing schools should be prioritized for repairs and upgrades, and the County Commission controls school funding. (Tr. Test. Fletcher, West, Christine Kushner, John Burns).

6. Elections for the School Board are non-partisan elections, although the party affiliation of any candidate is publicly available information. (Tr. Test. Fletcher, Kushner, Gill).

7. During most of the decade and historically, while the School Board contained a mix of Republican, Democratic, and unaffiliated members and fluctuated between Republican and Democratic control, School Board members worked together across partisan lines. (Tr. Test. Fletcher, Kushner, Gill).

8. For example, Republican and Democratic members were unified in their support for adopting the socioeconomic diversity assignment policy in 2000. (Tr. Test. Johnson, Fletcher, Gill).

9. The School Board's partisan composition from 2001 through November 2009 was as follows:

| Year | Republican | Democrat | Unaffiliated |
|------|------------|----------|--------------|
| 2001 | 3 | 4 | 2 |
| 2003 | 5 | 4 | 0 |
| 2005 | 4 | 5 | 0 |
| 2007 | 3 | 5 | 1 |

(Tr. Test. Fletcher, Gill; Ex. 445, 2001 School Board election results; Ex. 446, 2001 School Board runoff election results; Ex. 444, 2003 School Board election results; Ex. 66, 2005 School Board election results; Ex. 67, 2005 School board runoff election results; Ex. 64, 2007 School Board election results).

10. However, as pressure mounted on both the School Board and County Commission as a result of the issues of school overcrowding, busing and year-round schools, partisanship increasingly entered both boards' proceedings. (Tr. Test. Fletcher, Gill, Johnson, West).

11. This pressure was also reflected in their two boards' interactions with each other, which turned increasingly hostile on questions of how and where to allocate school funding. *Id.*

12. In 2009, this partisanship came to a head when a slate of Republican candidates overwhelmingly swept the four school board seats up for election, bringing the partisan composition of the Board to five Republicans, three Democrats, and one unaffiliated member. (Tr. Test. Fletcher, Gill, Johnson, Amy Womble).

13. The new Republican majority immediately took steps to replace the socioeconomic diversity assignment plan with a neighborhood student assignment policy based on students' proximity to schools. *Id.*

14. At the same time, because of the tremendous population growth in Wake County since the 2000 Census, by 2010 the overall population deviation of the existing School Board districts had grown to over 40 percent, and the individual election districts were hugely out of balance. (Tr. Test. Fletcher, Womble, Fairfax).

15. The Republican-controlled Board spent $35,000 to hire the Shanahan Law Group to redraw the district lines. (Tr. Test. Fletcher, Womble).

16. The new plan drawn by the law firm and adopted by the board early in 2011 adjusted the boundaries of the existing nine single-member districts to favor election of Republicans, but the plan maintained the current method of election, drew compact districts, and achieved an overall population deviation of just 1.75 percent, with the following deviations for each district:

| District | Deviation | Percentage deviation |
|----------|-----------|----------------------|
| 1 | -434 | -0.43% |
| 2 | 936 | 0.93% |
| 3 | 770 | 0.77% |
| 4 | 16 | 0.02% |
| 5 | -691 | -0.69% |
| 6 | 199 | 0.20% |
| 7 | -816 | -0.82% |
| 8 | 96 | 0.10% |
| 9 | -73 | -0.07% |

(Stip.; Tr. Test. Fairfax; Ex. 43, & Ex. 27 Fairfax Expert Report Table 2).

17. Elections were conducted under the new plan in fall 2011. (Tr. Test. Fletcher, Womble, Johnson).

4

18. Although the new district boundaries favored Republicans, in the fall 2011 election Wake County voters flatly rejected the Board's move away from a priority of socioeconomic diversity in student assignment, ousting the Republican Board chairman who championed the neighborhood schools plan and electing candidates who ran on promises of recommitting to socioeconomic diversity in Wake County schools. (Tr. Test. Fletcher, Kushner, Womble, Johnson).

19. Democrats won four of the five school board races, with unaffiliated incumbent Kevin Hill retaining the fifth seat. (*Id.*; Ex. 58, 2011 School Board election results; Ex. 59, 2011 School Board runoff election results).

20. After these election results, and given the increasing tension between the School Board and County Commission over school funding, the Republican-controlled County Commission in 2013 set as one of its legislative goals seeking local legislation to ensure that a majority of the School Board was elected on an at-large basis. (Ex. 52; Tr. Test. West, Fletcher, Kushner).

21. This legislative priority was set on a partisan basis, with all Democrats on the County Commission opposing the efforts to lobby for such legislation. (Tr. Test. West).

22. The School Board also opposed the County Commission's efforts. (Tr. Test. Fletcher, Kushner).

   b. *Enactment of S.B. 325*

23. Senate Bill 325, short titled "Wake County School Board Districts," was filed in the North Carolina General Assembly on March 13, 2013 by Senator Neal Hunt of Wake County. (Ex. 440, S.B. 325 bill history page).

24. The bill calls for redistricting the School Board using seven numbered single-member districts and two lettered single-member "super districts" that overlap the seven numbered districts, splitting Wake County into a doughnut shape with most of Raleigh in the center.  (Ex. 438, S.B. 325).

25. Under the new district plan, effective in January 2016, each voter will vote for two School Board representatives: one from the numbered district in which the voter resides, and one from the lettered district in which the voter resides.  *Id.*

26. The plan splits 21 precincts, as compared to zero split precincts in the previous plan, with an overall population deviation of 9.8 percent, as compared to 1.66 percent in the previous plan.  (Tr. Test. Anthony Fairfax; Ex. 27, Fairfax Report).

27. Population deviations in each district under Senate Bill 325 are as follows:

| District | Deviation | Percentage deviation |
|----------|-----------|----------------------|
| 1 | -523 | -0.41% |
| 2 | -1,350 | -1.05% |
| 3 | 4.678 | 3.63% |
| 4 | 1,591 | 1.24% |
| 5 | -1,971 | -1.53% |
| 6 | 2,061 | 1.60% |
| 7 | -4,484 | -3.48% |
| A | 22,088 | 4.90% |
| B | -22,089 | -4.90% |

*Id.*

28. Senate Bill 325 further prohibits the School Board from altering its own structure as would otherwise be permitted under state law.  (Ex. 438, S.B. 325).

29. The School Board is not authorized to make changes to its districts until 2021, and then only to correct population imbalances.  *Id.*

6

30. The bill specifies that all nine members' terms will be either lengthened by one year or shortened by one year to expire on December 1, 2016.  *Id*.

31. In November 2016 and quadrennially thereafter, School Board representatives for the seven numbered districts will be elected for four-year terms.  *Id*.

32. Representatives for the two lettered districts will be elected to a two-year term in 2016, and to four-year terms in 2018 and quadrennially thereafter.  *Id*.

33. Senate Bill 325 was wildly unpopular with Wake County residents and elected officials. In a public hearing hosted by the county's legislative delegation on March 25, 2013, every member of the public who addressed the bill spoke against it.  (Tr. Test. Gill, Rep. Darren Jackson, Sen. Josh Stein, Sen. Dan Blue).

34. The next month, the School Board adopted a resolution reaffirming its support for the current election process for its members and detailing why that process should be retained.  (Ex. 437, School Board 4/23/13 resolution; Tr. Test. Fletcher, Kushner).

35. Comments from members of the public during legislative committee hearings were also overwhelmingly in opposition to the bill.  (*See generally* Ex. 2, 4-17-13 transcript; Ex. 250, 5-29-13 transcript: Tr. Test. Gill, Jackson, Stein, Blue).

36. Despite the public outcry, the bill passed the Senate on April 22, 2013 and, after two amendments from Republican Representative Paul Stam of Wake County, passed the House on June 10, 2013.  (Ex. 440, S.B. 325 bill history page).

37. Amendments proposed by Democratic Wake County legislators to add a public referendum to the bill, make the two lettered districts truly at large, or add two truly at-large districts to the current nine districts failed.  (*Id.*; Tr. Test. Gill, Jackson).

7

38. On June 13, 2013, the bill was ratified and chaptered as Session Law 2013-110. (Ex. 440, S.B. 325 bill history page).

39. No Democratic member of the General Assembly had voted for Senate Bill 325, nor had any African-American legislator. (Tr. Test. Gill, Jackson, Stein, Blue).

   c. *Effects of S.B. 325*

       i. The plan and the deviations therein favor suburban/rural voters over urban voters

40. S.B. 325 systematically underpopulates and overpopulates certain districts, thus creating inequality in the weight of votes. In the super district, the inner core district (District A) that is comprised primarily of Raleigh and more "urban" voters is 4.9% overpopulated when compared to the ideal population. The outer doughnut district (District B) that is comprised of primarily non-Raleigh jurisdictions and unincorporated areas is 4.9% underpopulated when compared to the ideal population. (Ex. 27, Fairfax Report; Tr. Test. Fairfax).

41. In the seven single-member part of the plan, District 3, comprised primarily of Raleigh and other urban areas, is 3.63% overpopulated. In comparison, District 7, which is comprised of parts of Apex, Fuquay-Varina, and Morrisville, is 3.48% underpopulated. These population deviations operate to weight more heavily the votes of voters living in the underpopulated districts, areas outside of Raleigh and the more urban areas of the county. *Id.*

       ii. The plan and the deviations therein favor candidates who are registered Republicans and target incumbents who are registered Democrats

42. The 7-2 plan created by S.B. 325 ensures that Republican voters will be able to control and elect their preferred candidates in a majority of the seats on the School Board. In the

8

2008 presidential election, the Republican candidate John McCain would have won in 5 out of the 9 districts in the enacted 7-2 plan. All districts that are overpopulated in the enacted 7-2 plan are Democrat-leaning or Democrat-performing, as measured by the 2004 and 2008 presidential elections. Four out of five of the underpopulated districts were won by the Republican candidate in the 2008 presidential election. (Ex. 27, Fairfax Report; Tr. Test. Fairfax).

43. This advantaging of Republican voters could not have been accomplished without the population deviations in the enacted plan. Dr. Jowei Chen, a renowned political scientist at the University of Michigan, has developed computer simulation programming techniques that allow him to randomly produce a large number of alternative districting plans in any given state or county. He can then use those simulations produced to compare to enacted plans to test for electoral bias or racial gerrymandering. Dr. Chen's analysis in this case shows that when he set one of the simulation criteria to be equal population (that is, plus or minus 1% deviation), it was not possible to produce a redistricting plan that had the same partisan distribution of seats. That is, the General Assembly's enacted plan creates an advantage for Republican voters that falls completely outside the range of outcomes that are possible using a redistricting process that creates approximately equally-populated districts. (Ex. 18, Chen Report; Tr. Test. Chen).

44. Finally, it is clear that the lines in S.B. 325 were drawn to disadvantage incumbents who were registered Democrats and who favored progressive policies. For example, in District 6, a district in which the Republican candidate solidly won in both the 2004 and 2008 presidential elections, two incumbents, Susan P. Evans and Dr. Jim Martin, both

registered Democrats, were drawn into that district with appointed Republican Bill Fletcher.  (Tr. Test. Fairfax, Kushner, Fletcher).

45. Independent Kevin Hill, who has supported Wake County's socioeconomic diversity plan, was drawn into a district with registered Republican John Tedesco, in District 1, again a district in which the Republican candidate solidly won in both the 2004 and 2008 presidential elections.  (Tr. Test. Fairfax, Kushner, Fletcher).

      iii.  The plan does not improve school board representation by aligning electoral districts with school assignment districts

46. Wake County legislators noted, and the bill sponsors did not dispute, that during consideration of Senate Bill 325 they had heard of no parents who said the bill was needed because they were dissatisfied with the quality of education their children were receiving in the public school system.  (Ex. 5, 6-10-13 transcript at 37-41 (Gill, Stam); Ex. 3, 4-22-13 transcript at 2-3 (Hunt)).

47. No parents testified during the legislative process that they felt their elected School Board representatives were inattentive, nor did any parent state that S.B. 325 would better ensure that their children's school was physically located within the district where the parents voted.  Indeed, given the enormous number of students in Wake County's magnet school and school choice program, there is a great likelihood that parents have children in schools that are nowhere near where the family lives.  (Tr. Test. Fletcher, Kushner, Womble).

48. Parents sending their children to magnet schools understand and accept that they might not vote in an election district where their child's school is physically located.  (Ex. 3, 4-22-13 transcript at 5 (Stein); Ex. 5, 6-10-13 transcript at 13 (D. Hall); Tr. Test. Gill, Womble, Fletcher, Kushner).

10

49. School board members from both parties directly addressed this concern, telling legislators that the job of elected school board members was to support not just parents and students in their election districts, but in the school system as a whole. (Ex. 3, 4-22-13 transcript at 5-6 (Stein); Ex. 5, 6-10-13 transcript at 13 (D. Hall); Tr. Test. Gill, Womble, Fletcher, Kushner).

50. Nonetheless, to effectively achieve the bill sponsors' stated goal of increasing representation on the school board, the bill sponsors could have made the two lettered districts truly at-large or simply added two truly at-large districts to the existing plan. (Ex. 3, 4-22-13 transcript at 2-3, 11-12 (Stein, Hunt); Ex. 5, 6-10-13 transcript at 5, 30, 40 (Stam, Jackson, Gill); Tr. Test. Jackson, Stein, Gill).

51. However, proposed amendments to accomplish this goal failed in both the House and Senate. (Ex. 5, 6-10-13 transcript at 35, 44 (Jackson, Gill)).

52. Instead of increasing the quality of representation, the plan separates high and middle schools and their feeder middle and elementary schools into separate districts, resulting in fragmented representation for communities of interest. (Ex. 3, 4-22-13 transcript at 9 (Stein); Tr. Test. Womble, Kushner, Fletcher; *compare, e.g.*, Ex. 231, 2013-14 Broughton High School attendance zone map *and* Ex. 199, 2013-14 Daniels Middle School attendance zone map, *with* Ex. 258, 2016 School Board numbered election district map).

53. In the previous plan, drawn by the school board, there was more attention to keeping feeder with their associated upper level schools in the same electoral district. (Tr. Test. Womble, Fletcher, Kushner).

54. In fact, the bill's non-compact districts make it substantially more likely that a voter will not live in the school board district where the voter's child attends school. (Ex. 3, 4-22-

11

13 transcript at 8-9 (Stein); Ex. 5, 6-10-13 transcript at 12-13 (D. Hall); Tr. Test. Stein, Womble, Kushner).

55. Rather than making it easier for voters to know who represents them, the bill makes it harder.  (Ex. 5, 6-10-13 transcript at 15 (Martin); Tr. Test. Womble, Johnson, Gill, Stein, Blue, Jackson).

      *a.  Background Facts Relevant to County Commission Case*

56. Like the School Board, the County Commission fluctuated between Democratic and Republican control from 2000 through 2010.  Running in partisan elections in even-numbered years, the Board members during that time were affiliated as follows:

| Year | Republican | Democrat | Unaffiliated |
|------|-----------|----------|--------------|
| 2000 | 2 | 5 | 0 |
| 2002 | 5 | 2 | 0 |
| 2004 | 5 | 2 | 0 |
| 2006 | 4 | 3 | 0 |
| 2008 | 3 | 4 | 0 |
| 2010 | 4 | 3 | 0 |

(Ex. 70, 2000 County Commission election results; Ex. 69, 2002 County Commission election results; Ex. 68, 2004 County Commission election results; Ex. 65, 2006 County Commission election results; Ex. 63, 2008 County Commission election results; Ex. 60, 2010 County Commission election results).

57. After the 2010 Census, because of the tremendous growth in Wake County, the Republican-controlled Commission adjusted the boundaries of its seven residency districts, even though not required by law.  (Tr. Test. West).

58. In November 2012, the three incumbents up for election, all Democrats, easily retained their seats.  (Ex. 57, 2012 general election results; Tr. Test. West).

12

59. In November 2014, following passage of Senate Bill 325 and continued conflict between the Commission and School Board, Democratic candidates easily swept all four commission races. (Ex. 55, 2014 general election results).

60. Wake County voters rejected three Republican incumbents, including Commission chairman Joe Bryan, a four-term incumbent who had been the only commissioner to publicly support Senate Bill 325. (Tr. Test. West, Fletcher, Kushner, Gill).

    a. *Enactment of S.B. 181*

61. Senate Bill 181, short titled "Wake County Commissioner Districts," was filed in the North Carolina General Assembly on March 4, 2015 by Senator Chad Barefoot of Wake and Franklin counties. (Ex. 441, S.B. 181 bill history page).

62. The bill called for establishing a County Commission district system identical to the School Board's system, with seven numbered single-member districts and two lettered single-member "super districts" that overlap the seven numbered districts, splitting Wake County into a doughnut shape with most of Raleigh in the center. (Ex. 439, S.B. 181; *see also* Ex. 438, S.B. 325).

63. Under the bill, the new districts would take effect when candidate filing opened for the 2016 primary election,[1] and as with Senate Bill 325, commissioners were prohibited from redrawing their district boundaries until the return of the 2020 Census. (Ex. 439, S.B. 181; *see also* Ex. 438, S.B. 325).

64. As they had in 2013, Wake County residents and elected officials overwhelmingly opposed the redistricting map proposed in Senate Bill 181. Comments from members of the public during legislative committee hearings were overwhelmingly in opposition to

---

[1] On September 30, 2015, the governor signed Session Law 2015-258, which set the 2016 primary election for March 15, 2016, with candidate filing from December 1-21, 2015. Until that bill was signed into law, candidate filing had been scheduled for February, with the primary election in May.

13

the bill. (*See generally* Ex. 251, 3-31-15 transcript; Ex. 9, 3-10-15 transcript; Ex. 6, 3-5-15 transcript; Tr. Test. Gill, Jackson, Stein, Blue).

65. A poll of Wake County voters, conducted and released prior to the passage of S.B. 181, found strong bipartisan opposition to the bill, which did not have majority support in any legislative district in the county. (Ex. 14, Public Policy Polling poll results; Tr. Test. Stein, Tom Jensen).

66. Wake County residents, officials, and members of the business community also complained about the legislative process used to move the bill through the General Assembly, with public hearings scheduled on short notice and limited public comment permitted, particularly in the Senate. (Ex. 6, 3-5-15 transcript at 16 (West); Ex. 9, 3-10-15 transcript at 66-67, 85, 88, 103 (Edwards, Sullivan, Hanchette, Blue); Ex. 251, 3-31-15 transcript at 25, 45 (Schmitt, Rhodes); Ex. 13, 4-1-15 transcript at 19-21 (Martin)).

67. Legislators also noted that the full Wake County delegation was not made aware of the bill before its contents were made public, and that the bill was repeatedly added to legislative committee agendas for public hearings on unreasonably short notice. (Ex. 6, 3-5-15 transcript at 2-5 (McKissick); Ex. 251, 3-31-15 transcript at 76 (Gill)).

68. Current commissioners unsuccessfully pleaded with legislative leadership for additional time to complete a collaborative, objective process that had begun on the county level in response to the bill to consider redistricting plans that would fairly accommodate any population growth since 2010. (Ex. 6, 3-5-15 transcript at 17 (West, Sullivan); Ex. 9, 3-10-15 transcript at 85 (Sullivan); Ex. 251, 3-31-15 transcript at 19 (Burns)).

69. Democratic legislators' attempts to extend the legislative process for the bill to allow more study and input were unsuccessful. (Ex. 6, 3-5-15 transcript at 2-5 (McKissick); Ex. 13, 4-1-15 transcript at 19 (Martin)).

70. After this abbreviated legislative process, the bill passed the Senate on March 12, 2015 and passed the House on April 1, 2015. (Ex. 441, S.B. 181 bill history page).

71. On April 2, 2015, the bill was ratified and chaptered as Session Law 2015-4. *Id.*

72. No Democratic member of the General Assembly voted for Senate Bill 181, nor did any African-American legislator. (Tr. Test. Gill, Jackson, Stein, Blue).

    a. *Effects of S.B. 181*

        i. The plan and the deviations therein favor suburban/rural voters over urban voters

*73.* Senator Chad Barefoot expressly said that a primary goal of the bill was to reduce Raleigh voters' voice in county elections while increasing the voice of those who live elsewhere in the county. (Ex. 251, 3-31-15 transcript at 3-4, 75-76 (Barefoot)).

*74.* The bill does just that. Exactly as with S.B. 325, in the super district, the inner core district (District A) that is comprised primarily of Raleigh and more "urban" voters is 4.9% overpopulated when compared to the ideal population. The outer doughnut district (District B) that is comprised of primarily non-Raleigh jurisdictions and unincorporated areas, is 4.9% underpopulated when compared to the ideal population. (Ex. 27, Fairfax Report; Tr. Test. Fairfax).

*75.* In the seven single-member part of the plan, District 3, comprised primarily of Raleigh and other urban areas, is 3.63% overpopulated. In comparison, District 7, which is comprised of parts of Apex, Fuquay-Varina, and Morrisville is 3.48% underpopulated. And again, these population deviations operate to weight more heavily the votes of voters

15

living in the underpopulated districts, areas outside of Raleigh and the more urban areas of the county. *Id.*

76. And while the plan certainly does favor the voters living in underpopulated districts, the plan cannot even be said to increase representation for voters living in the actual suburban/rural towns in the county. First, the bill splits incorporated towns including Knightdale, Garner, Wendell, and Zebulon across multiple districts, while combining disparate communities such as Zebulon and Holly Springs into unified districts where those communities' voices would be submerged. (Ex. 9, 3-10-15 transcript at 64 (Fitzsimmons); Ex. 251, 3-31-15 transcript at 20, 47-48, (Womble, Burns, Jackson); Ex. 277, Womble map).

77. Additionally, the bill does not improve representation for residents who live outside Raleigh because, whereas three of the seven current commissioners live outside Raleigh, eight of the nine districts in Senate Bill 181 overlap parts of Raleigh, which could limit residents outside Raleigh to one of nine Commission seats. (Ex. 251, 3-31-15 transcript at 40 (Calabria); Tr. Test. Stein, Jackson).

78. Further, because the districts in the bill snake across the county and are less compact than the current districts, commissioners would inevitably live far away from many of their constituents, whether those constituents live in or outside Raleigh. (Ex. 9, 3-10-15 transcript at 71-73, 90 (Coby, Hanchette)).

79. Wake County legislators and the president of the Raleigh Chamber of Commerce also expressed concern that rather than improving representation and collaboration across the county, the proposed districts would exacerbate the divide between residents living inside and outside the beltway by pitting urban and rural voters against each other and giving

16

unequal value to their votes. (Ex. 13, 4-1-15 transcript at 10-12, 28-29 (Gill, Holley); Ex. 251, 3-31-15 transcript at 25 (Schmitt); Ex. 9, 3-10-15 transcript at 101-02 (Smith-Ingram)).

80. To remedy these issues, Representative Rosa Gill of Wake County proposed a substitute district map for the bill, which would modify the seven numbered and two lettered districts to be more compact, split zero precincts, and reduce overall population deviation to less than one percent. (Ex. 251, 3-31-15 transcript at 84-85; Ex. 13, 4-1-15 transcript at 10-12).

81. Representative Gill's map also set Interstate 40 as the boundary line between the lettered districts to achieve her stated goals of making the districts equal in population, ensuring that representatives live near their constituents, and allowing voters to tell at a glance which districts they live in and for which candidates they are eligible to vote. (Ex. 251, 3-31-15 transcript at 95; Ex. 13, 4-1-15 transcript at 18).

82. Democratic members of the Wake County legislative delegation supported Representative Gill's map, saying that the amendment would ensure "almost to a mathematical certainty" that rural and suburban areas would have dedicated representatives while eliminating confusion. (Ex. 251, 3-31-15 transcript at 90 (Jackson)).

83. The amendment failed. (Ex. 251, 3-31-15 transcript at 101; Ex. 13, 4-1-15 transcript at 19).

    i. The plan and the deviations therein create an advantage for Republican
       voters and candidates

84. The 7-2 plan created by S.B. 181 ensures that Republican will win a majority of the seats on the County Commission. Again, in the 2008 presidential election, the Republican

17

candidate John McCain would have won in 5 out of the 9 districts in the enacted 7-2 plan. All districts that are overpopulated in the enacted 7-2 plan are Democrat-leaning or Democrat-performing, as measured by the 2004 and 2008 presidential elections. Four out of five of the underpopulated districts were won by the Republican candidate in the 2008 presidential election. (Ex. 27, Fairfax Report; Tr. Test. Fairfax).

85. And as with S.B. 325, this advantaging of Republican voters could not have been accomplished without the population deviations in the enacted plan. (Ex. 15, Chen Report, Tr. Test. Chen).

> i.   The plan minimizes the voice of minority voters

86. The proponents of S.B. 181 explicitly explained that one of the justifications for implementing this plan for elections for the County Commission was a racial one—to avoid the use of at-large elections, which alleged submerge minority voters and dilute minority voting strength. (Ex. 251, 3-31-15 transcript at 7 (Stam), 55-56; Ex. 13, 4-1-15 transcript at 6 (Stam).

87. In order to create District 4 as a majority-black district, with a population of 54.3% black voting age population, the district had to be drawn as a non-compact district that disregarded traditional redistricting criteria such as keeping precincts and communities of interest whole. (Ex. 15, Chen Report, Tr. Test. Chen).

88. It is non-compact, and its district lines correspond with capturing heavily black census blocks. (Tr. Test. Fairfax, Chen).

89. District 4 splits ten precincts, and there is no reliable political data on the sub-precinct level, which means that partisan interests did not dictate the line-drawing. (Tr. Test. Fairfax, Chen).

18

90. District 4 packs African-American population to an extent that is not possible under a race-neutral districting process that follows traditional districting criteria. (Ex. 15, Chen Report, Tr. Test. Chen).

91. Even under a partisan-motivated but race-neutral district-drawing process, District 4 would only have emerged with a 45% to 53% black population. (Ex. 15, Chen Report, Tr. Test. Chen).

92. District 4's 54.3% black voting age population is a statistical outlier falling completely outside of the simulated distribution, demonstrating that racial packing, not partisanship, predominated in the drawing of District 4. (Ex. 15, Chen Report; Tr. Test. Chen).

93. District 4 completely disregards communities of interest, further evidencing that race predominated. District 4 combines parts of Knightdale and Fuquay-Varina with parts of downtown Raleigh. In fact, the district lines split precincts to grab black population out of Knightdale and Fuquay-Varina, pull those populations into District 4, and turn it into a majority-black district. (Tr. Test. Jannet Barnes).

94. The splitting of precincts will make voter education, get out the vote efforts, and political organizing more difficult in the district and in the surrounding districts. *Id.*

95. Wake County elected officials and voters argued that creating a majority-black district was unnecessary because voters in Wake County have consistently been able to elect the candidates of choice of black voters both in countywide elections and in single-member district elections. (Ex. 251, 3-31-15 transcript at 30-31 (Johnson); Tr. Test. West, Blue, Barnes).

96. Since 2000, African-American representatives have been regularly elected to the county commission by increasing margins:

| Year | Candidate | Margin of Victory |
|------|-----------|-------------------|
| 2000 | Vernon Malone | 3.66% |
| 2004 | Harold Webb | 5.24% |
| 2006 | Lindy Brown | 6.3% |
| 2008 | Harold Webb | 17.32% |
| 2012 | James West (unopposed) | 100.0% |
| 2014 | Jessica Holmes | 12.7% |

(Ex. 70, 2000 general election results; Ex. 68, 2004 general election results; Ex. 65, 2006 general election results; Ex. 63, 2008 general election results; Ex. 57, 2012 general election results; Ex. 55, 2014 general election results).

97. Current commissioners warned the bill sponsors and other legislators that the bill would decrease racial diversity on the commission, on which two of the seven current members are people of color. (Tr. Test. West; Ex. 6, 3-5-15 transcript at 20-21 (Hutchinson); Ex. 9, 3-10-15 transcript at 86 (Ward)).

98. A Democratic Wake County legislator proposed amending the district lines to prevent packing black voters into District 4; that amendment failed. (Ex. 13, 4-1-15 transcript at 10-11, 19 (Gill)).

        i. The plan reduces each voter's representation on the County Commission

99. Despite expanding the Commission from seven to nine members, Senate Bill 181 reduced from seven to two the number of commissioners for whom each Wake County voter is entitled to vote. (Ex. 438, S.B. 325).

100.     Legislators pointed out that this change reduced the number of commissioners who were directly accountable to each voter, which was internally inconsistent with the original goal of the district map as introduced in Senate Bill 325: to increase the number

of representatives who were directly accountable to each voter in the county. (Ex. 9, 3-10-15 transcript at 98 (McKissick)).

101.    County officials suggested that if population growth supported mid-decade redistricting, the bill sponsors could increase representation by simply adding two at-large seats to the current seven-member commission. . (Ex. 6, 3-5-15 transcript at 21, 23 (Hutchinson, Burns)).

102.    A Democratic member of the Wake County delegation proposed amending Senate Bill 181 to make the two lettered districts truly at large, increasing the number of commissioners for whom each voter was entitled to vote from two to three; that amendment failed. (Ex. 251, 3-31-15 transcript at 61-62, 71 (Jackson)).

            i.  The plan ignores the will of Wake County voters

103.    A poll of Wake County residents conducted in March 2015 by the Raleigh-based polling firm Public Policy Polling showed that the majority of Wake County voters opposed Senate Bill 181. (Tr. Test. Jenson; Ex. 14, PPP poll results).

104.    The poll results showed that two-thirds of Democratic and unaffiliated voters opposed the bill, and less than 40 percent of Republicans supported the bill. *Id.*

105.    The opposition was geographically consistent throughout Wake County, with no more than 47 percent of voters in any of the 11 state House districts in the county responding that they supported the plan. *Id.*

106.    Public comments made before the legislative committees considering Senate Bill 181 supported the poll findings and were heavily skewed in opposition to the bill. (*E.g.*, Ex. 9, 3-10-15 transcript at 65-66, 69 (Ingalls, Womble); Ex. 251, 3-31-15 transcript at 15, 17-18, 21-22, 29-30 (Fitzsimmons, Burns, Johnson, Moxley)).

107.     Several attempts to add a public referendum to the bill failed along partisan lines after the bill sponsors stated they were opposed to holding a referendum on the plan. (Ex. 251, 3-31-15 transcript at 71-72, 77 (Rosa Gill); Ex. 13, 4-1-15 transcript at 21, 25 (Grier Martin)).

   i.  The plan will not decrease election or campaign costs

108.     Several current commissioners told legislators that although campaign costs are not currently a barrier to running for election to the commission, Senate Bill 181 would not reduce campaign costs because, in a county like Wake, campaigns in single-member districts would not be less expensive than countywide campaigns. ((Ex. 6, 3-5-15 transcript at 24-25 (Calabria); Ex. 9, 3-10-15 transcript at 86 (Ward); Ex. 251, 3-31-15 transcript at 19-20 (Burns); Ex. 12, Burns Letter).

109.     The districts in the plan are so non-compact as to make it almost impossible for candidates to see any reduction in campaign costs because of the distances they would still have to cover both physically and through advertising, and the voter education efforts they would have to undertake. (Ex. 251, 3-31-15 transcript at 60 (Jackson); Ex. 13, 4-1-15 transcript at 8 (Gill); Tr. Test. Burns).

110.     Additionally, the bill would not effectively reduce the administrative costs of elections. To the contrary, Senate Bill 325 had demonstrably created new administrative costs associated with implementing a new election system, preparing to staff and print multiple ballots for 21 split precincts, and updating election databases to reflect the complex lettered and numbered district system. (Tr. Test. Stein; Ex. 13, 4-1-15 transcript at 27-28 (Martin); Ex. 82-84).

111.     Addressing the notion of modest administrative savings from using identical maps for the school board and commission elections, which has not historically been the practice in Wake County, current Commission Chair James West cautioned against analogies between the two boards.  (Ex. 251, 3-31-15 transcript at 43 (West)).

112.     Because the county commission has much broader responsibilities, its electoral system must be tailored to reflect broader considerations.  (Ex. 251, 3-31-15 transcript at 43 (West)).

## II.     Proposed Conclusions of Law

### A.  One Person, One Vote Claims – Fourteenth Amendment

1. "[T]he right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.  *Reynolds v. Sims*, 377 U.S 433, 562-63 (1964).

2. The "one person, one vote" requirement of the Fourteenth Amendment to the Constitution demands that the votes of citizens be weighted equally, and prohibits the differential weighting of votes depending on where the voter lives.  *Id.* at 560-61; *see also Wright v. North Carolina*, 787 F.3d 256, 264 (4th Cir. May 27, 2015).

3. This requirement also mandates that a redistricting body make a good faith effort to achieve population equality amongst districts.  *Reynolds*, 377 U.S. at 577.

4. Mathematical exactitude not required except in congressional redistricting, but that does not relieve the redistricting jurisdiction of the duty to engage in honest and good

23

faith effort to get as close to equal population as is practicable. *Daly v. Hunt,* 93 F.3d 1212, 1217 (4th Cir. 1996).

5.  The one person, one vote requirement also applies to state and local governments, including school boards and county commissions. *Avery v. Midland Cnty.*, 390 U.S. 474, 480 (1968).

6.  "To determine compliance with the one person, one vote principle courts usually analyze the apportionment plan in terms of the maximum population deviation among the districts." *Daly*, 93 F.3d at 1215 n.2. To determine that maximum deviation, a court first calculates the hypothetical ideal district size by dividing the total population of the political unit (in this case, the county) by the total number of representatives who serve that population. In a system such as the one at issue here, the ideal population in the single member districts would be calculated by dividing the county population by seven, and the ideal population for the super districts would be calculated by dividing the county population by two. "Then, the court determines how much the actual population of each district varies from the population of the ideal district. This deviation is expressed as a percentage of the ideal population. Maximum deviation is the sum of the absolute value of the deviation of the district with the smallest population and that of the district with the largest population." *Id.*

7.  Because some flexibility will be needed in state legislative and local redistricting, the general rule that has emerged is that a redistricting plan with a total deviation under 10% will not, without other evidence, be enough to establish an equal protection violation. *Daly*, 93 F.3d at 1217 (citing *Brown v. Thompson*, 462 U.S. 835, 842-43 (1983)).

24

8. The "10% threshold does not, however, 'insulate' a state or local redistricting plan from attack." *Wright v. North Carolina*, 787 F.3d at 264 (4th Cir. May 27, 2015) (quoting *Daly*, 93 F.3d at 1220).

9. The Fourth Circuit has clarified that the 10% mark "serves as the determining point for allocating the burden of proof in a one person, one vote case." *Daly*, 93 F.3d at 1220.

10. To succeed in its claims that a redistricting plan with a less than 10% deviation unconstitutionally weights the votes of some residents greater than others, a plaintiff has to produce evidence beyond the population disparities themselves to show that the redistricting process had a "taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. 695, 710 (1964).

11. Legislative justifications that may legitimately excuse slight deviations from population equality, if consistently applied include: "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher v. Dagett*, 462 U.S. 725, 740 (1983).

12. There is no case law that suggests that justifications might be legitimate in congressional redistricting but not state legislative or local redistricting, and vice versa.

13. Regional favoritism has never been recognized as a legitimate interest justifying population deviations—in fact, the Supreme Court has repeatedly condemned regionalism when contributing to the unequal weighting of votes. *Reynolds*, 377 U.S. at 566.

14. Favoring suburban or rural voters over urban voters is not a legitimate justification for violating the rights of individual voters to have their vote equally weighted to that of all other voters.

15. Conferring a partisan advantage on one political party is not a legitimate justification for violating the rights of individual voters to have their vote equally weighted to that of all other voters.

16. Targeting incumbents of one political party for defeat is not a legitimate justification for violating the rights of individual voters to have their vote equally weighted to that of all other voters.

17. To demonstrate that discrimination motivated the deviations, plaintiffs are not required "to prove that the challenged action rested solely on [] discriminatory purposes." *Vill. of Arlington Heights v. Metro. Housing Redevelopment Corp.*, 429 U.S. 252, 265 (1977).

18. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266; *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.").

19. Relevant circumstantial factors to be considered in determining legislative intent include "[t]he historical background of the decision … particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. Courts should also take account of "[t]he specific sequence of events leading up the challenged decision," including any "[d]epartures from the normal procedural

26

sequence" in the legislature's consideration of a bill. *Id.* In addition, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268.

20. "[T]he fact, if it is true, that the law bears more heavily" on one group when compared to another is relevant to the determination of whether there was an "invidious discriminatory purpose." *Davis*, 426 U.S. at 242; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) (disproportionate impact of legislation "is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions").

21. Courts have invalidated redistricting plans whose districts depart from population equality for discriminatory or illegitimate reasons or have otherwise identified illegitimate reasons for deviating from population equality. *Perez v. Perry*, 2012 U.S. Dist. LEXIS 190609, March 19, 2012, at *55-56; *Hulme v. Madison County*, 188 F. Supp. 2d 1041 (S.D. Ill. 2001); *see also Harris v. Arizona Ind. Red. Committee*, 993 F. Supp. 2d 1042, 1047 (D. Ariz. Apr. 29, 2014) (assuming that unequally apportioning state legislative districts to gain a partisan advantage was not a legitimate reason justifying population deviations); *Troxler v. St. John the Baptist Parish Police Jury*, 331 F. Supp. 22 (E.D. La. 1971) (rejecting defendant jurisdiction's remedial plan based on illegitimate justifications for population deviations); *Morris v. Board of Estimate*, 647 F. Supp. 1463, 1470 (1986) (rejecting arguments that population deviations in New York City were justified where they

were designed to ensure that the smaller boroughs had equal voting power on the board).

22. One recent case, summarily affirmed by the U.S. Supreme Court, is highly instructive and analogous to the current case. *See Wright*, 787 F.3d at 266-68 (citing *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd mem.*, 542 U.S. 947 (2004)).

23. In *Larios*, a three-judge panel held that Georgia's legislative reapportionment plan with just less than 10 percent overall population deviation was arbitrary and discriminatory in violation of the Equal Protection Clause.

24. The district court struck down the plans because it found that two primary motivations for the deviations in the plans—regional favoritism and Democratic incumbency favoritism—were impermissible causes for the population deviations. 300 F. Supp. 2d at 1322.

25. Just as in the instant case, the *Larios* court recognized that the 2001 Georgia legislative plans were an attempt by state Democrats to maintain majorities in both state houses despite the fact that a Republican majority in the state had been developing in recent decades. *Id*. at 1347-48. In order to hold onto as many seats as possible in the state legislature, Democrats in control of the legislature systematically and deliberately underpopulated most of the districts in rural and inner-city areas, and overpopulated districts in the Republican-leaning suburbs. *Id*. at 1326-27. Similarly, Republicans in the legislature have impermissibly used population deviations in the challenged plans in order to try to grab power in a county that has demonstrated a trend, over the years, toward progressive preferences. And the means of executing

that power play is weighting more heavily Republican voters in the more rural and suburban parts of the county.

26. Even an allegedly benign or corrective intent does not excuse such justification. The court in *Larios* was correct in noting that "[i]f the southern and inner-city Atlanta areas of the State of Georgia are in need of some political protection in order to ensure that their economic and other interests are recognized on a statewide basis, that need must be met in some way that does not dilute or debase the fundamental right to vote of citizens living in other parts of the state." *Id*. at 1347. The same principle applies here. If the suburban towns in Wake County are in need of some political protection in order to ensure that their interests are cognized on a county basis, that need must be met in some way that does not involve deviations from population equality.

27. The court also found that the shape of the districts suggested an intent to favor Democratic incumbents and disfavor Republican incumbents. Districts in which Democratic incumbents resided were underpopulated so that those incumbents would not have to take in additional potentially-hostile constituents. Half of all Republican incumbents were placed in new districts in which at least one other incumbent lived, and these incumbent-pairing districts were often oddly-shaped and overpopulated. *Id*. at 1329-30. The court noted that while incumbency protection generally is a legitimate traditional redistricting criterion, the one-sided partisan protection of certain incumbents and the targeting of others was not a legitimate state interest because it was not consistently applied. *Id*. at 1349. Likewise, the 7-2 plan drawn in 2013 for the School Board evidenced a clear intent to target unfavorably incumbents

29

who were registered Democrats or were otherwise supportive of progressive school board policies. That is an illegitimate state justification for deviations in the instant plan, too.

28. Any one of these illegitimate motivations for the deviations in the enacted is alone enough to uphold the challenges, but viewed cumulatively, Plaintiffs arguments that no state justification warrant the population deviations in the enacted plan are on even firmer ground.

29. If an alternative plan would have satisfactorily embraced the legitimate considerations advanced and also diminished the deviations when compared to the challenged plan, the challenged plan cannot "reasonably be said to advance" the asserted goals. *Mahan v. Howell*, 410 U.S. 315, 328 (1973).

**B. Racial Gerrymandering Claim – Fourteenth Amendment**

30. When race is a predominant motivating factor in the drawing of electoral district lines, this Court must apply exacting scrutiny. *Bush v. Vera*, 517 U.S. 952, 958 (1996).

31. Direct evidence that race predominated in the drawing of a challenged district can include state concessions, including statements by lawmakers asserting or conceding that the design of the plan was driven by race. With such evidence, a court may not even need to use the inferential analysis of district shape employed by the Supreme Court in Shaw. *Johnson v. Miller*, 864 F. Supp. 1354, 1374 (1994).

32. Indirect evidence that race predominated in the drawing of a challenged district can include a district shape so contorted that it can only be explained by race or by a disregard for traditional redistricting criteria. *Id*. at 1374. The availability and use of

30

incredibly detailed racial data may also support the conclusion that race was an overriding consideration. *Vera*, 517 U.S. at 962.

33. After a court concludes that race was the predominant factor in the drawing of a challenged the court must next determine whether the challenged district survives strict scrutiny. This analysis is two- pronged: the first inquiry is whether a compelling state interest justifies the racial remedy, and the second inquiry is whether the racial remedy is narrowly tailored to satisfying the compelling state interest. *Miller*, 515 U.S. at 904.

34. Also, at this point in the analysis, the burden shifts to Defendants to demonstrate that the district was narrowly tailored to advancing the identified compelling government interest. *Id.*

35. When governmental action is based on race, even in a benign fashion, that action can be upheld only on the basis of an "extraordinary justification." *Id.* at 911; *see also*, *Alabama Legislative Democratic Caucus v. Alabama*, 135 S. Ct. ___, (2015). Even assuming that compliance with the Voting Rights Act can constitute a compelling governmental interest, a legally incorrect interpretation of the Voting Rights Act cannot provide such a justification.

36. Section 2 of the Voting Rights Act is violated when, "[b]ased on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State are political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity to than other members of the electorate to participate

31

in the political process and to elect representatives of their choice. 42 U.S.C. § 1973(b).

37. Nothing about the use of at-large elections is inherently violative of Section 2, because Section 2 concerns are only triggered where minority voters do not have the opportunity to elect their candidates of choice.

38. In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the United States Supreme Court clarified what proving this violation involved when it first identified the "necessary preconditions" for an actionable Section 2 claim. The first necessary prong or precondition requires that the minority group in question be "sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50-51. The second precondition is that the minority group be "politically cohesive." *Id.* The third precondition is that the majority must vote "sufficiently as a bloc to enable it…usually to defeat the minority's preferred candidate." *Id.* But the analysis of potential Section 2 liability does not end there—after establishing all three preconditions, a Section 2 plaintiff must also demonstrate that a violation has occurred based on the totality of the circumstances. *Id.* at 79.

39. The Senate Report that accompanied the 1982 Amendment to Section 2 identified nine factors to be considered in an application of the totality of the circumstances test to measure racial vote dilution. These factors are: (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political

subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. S. Rep. No. 417, at 28-29, reprinted in 1982 U.S.C.C.A.N. at 206-07.

40. The use of a race-based remedy in the redistricting process, pursuant to Section 2, is restricted to those areas where all the preconditions are present in order to reasonably conclude that a race-based remedy is absolutely necessary to avoid liability. *Gingles*, 478 U.S. at 49.

41. "[R]acial bloc voting and minority-group political cohesion never can be assumed, but specifically must be proved in each case in order to establish that a redistricting plan dilutes minority voting strength in violation of § 2. *Growe v. Emison*, 507 U.S.

33

25, 40-41 (1993) ("Unless these points are established, there neither has been a wrong nor can be a remedy").

42. Finally, when strict scrutiny is applied, a challenged district must be narrowly tailored to advance a compelling governmental interest.

43. The essence of narrow tailoring in the redistricting context has been described with the following analogy: "just as a homicide defendant may not use excessive force to stop an aggressor, neither may a state burden the rights and interests of its citizens more than is reasonably necessary to further the compelling governmental interest advanced by the state." *Hays v. Louisiana*, 839 F. Supp. 1188, 1206-07 (W.D. La. 1993), *appeal dismissed*, 18 F.3d 1319 (5th Cir. La. 1994). The state or jurisdiction engaged in redistricting must affirmatively provide evidence and argument demonstrating that it did not go further than necessary in imposing a racial remedy, and that it considered race-neutral alternatives.

44. A proper narrow tailoring inquiry must examine whether, in a racial gerrymander purportedly devised to avoid liability under Section 2 of the Voting Rights Act, the legislature has placed more black voters into a district, thus being over-inclusve and painting a remedy with too broad a brush, than is necessary to avoid running afoul of the Act.

45. A racial classification in redistricting must be "remedial in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct'"). *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) (quoting *Milliken v. Bradley*, 433 U.S. 267, 280-281 (1977)) (emphasis added).

34

46. Where, as here, no party is defending the alleged racial gerrymander, plaintiffs succeed in their claim after establishing that race predominated.

**C. One Person, One Vote Claims – Article I, Section 19, North Carolina Constitution**

47. Article I, Section 19, of the state constitution provides that "no person shall be denied the equal protection of the laws." N.C. Const. art. I, § 19.

48. It is well settled in this state that "the right to vote on equal terms is a fundamental right." *Northampton Cty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 746, 392 S.E.2d 352, 355 (1990); *James v. Bartlett*, 359 N.C. 260, 269-70, 607 S.E.2d 638, 644 (2005); *State ex rel. Martin v. Preston*, 325 N.C. 438, 454, 385 S.E.2d 473, 481 (1989); *Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 12, 269 S.E.2d 142, 149 (1980).

49. Like the federal constitution, the state constitution creates a one person, one vote guarantee. *Northampton Cty.*, 326 N.C. at 747, 392 S.E.2d at 356.

50. However, the one person, one vote protection in the state constitution is stronger than the protection federal courts have deemed appropriate through the federal constitution. *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377; *Blankenship v. Bartlett,* 363 N.C. 518, 681 S.E.2d 759.

51. In *Stephenson*, the North Carolina Supreme Court read the North Carolina Constitution to require that legislative districts to be drawn within plus or minus 5% of the ideal district population without exception, which is a more stringent restriction on the state's redistricting authority than is the 10% federal burden-shifting rule. 355 N.C. at 354, 562 S.E.2d at 377. The court also went further than federal courts in holding that the state cannot use multimember districts and single-member districts in

35

the same state legislative redistricting plan because it "creates an impermissible distinction among similarly situated citizens based upon the population density of the area in which they reside." 355 N.C. at 379, 562 S.E.2d at 395. Finally, the court declared that the state constitutional equal protection guarantees are a check on partisan considerations in drawing state legislative districts. 355 N.C. at 371-72, 562 S.E. 2d at 390.

52. Thus, *Stephenson* supports Plaintiffs' one person, one vote claims, and the state constitution provides independent grounds for striking down the challenged plans.

53. In *Blankenship*, the court applied the state constitutional one person, one vote guarantee to state judicial elections. The North Carolina Supreme Court so held even after acknowledging that "federal courts have articulated that the 'one-person, one-vote" standard is inapplicable to state judicial elections." 363 N.C. at 522, 681 S.E. 2d at 763. The court further explained that because the right to vote is fundamental, heightened scrutiny was warranted under the state equal protection clause when an election scheme unequally weighted votes. 363 N.C. at 523-24, 681 S.E.2d at 763-64. This is further proof that the state constitutional one person, one vote guarantee is more protective than the federal one.

54. It follows from these cases that the expansive state constitutional guarantee of substantially equal voting power extends to local governing bodies, *cf. Blankenship*, 363 N.C. at 525, 681 S.E. 2d at 765 (once the legal right to vote has been established, equal protection requires that the right be administered equally"), and that laws that infringe on that guarantee are subject to heightened scrutiny. *Id.*

36

55. Thus, under the state constitution, geographic favoritism, partisan bias and the goal of giving certain voters more weight in the electoral process because of their policy preferences are not neutral redistricting principles that justify population deviations of nearly 10% among election districts for the Wake County School Board and Board of County Commissioners.

Respectfully submitted this 7th day of December, 2015.

/s/ Allison J. Riggs
Anita S. Earls
Allison J. Riggs
George E. Eppsteiner
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 W. Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Facsimile: 919-323-3942
anita@southerncoalition.org
allison@southerncoalition.org
george@southerncoalition.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

       This is to certify that the undersigned has on this day electronically filed the foregoing **Plaintiffs' Pretrial Proposed Findings of Fact and Conclusions of Law** in the above-titled action with the Clerk of the Court using the CM/ECF system, which on the same date sent notification of the filing to the following:

       Charles F. Marshall
       Matthew B. Tynan
       BROOKS, PIERCE, McLENDON,
       HUMPHREY & LEONARD, LLP
       1600 Wells Fargo Capitol Center
       150 Fayetteville St.
       Raleigh, NC 27601
       cmarshall@brookspierce.com
       mtynan@brookspierce.com

       *Counsel for Wake County Board*
       *of Elections*

       This the 7th day of December, 2015.

                                   /s/ Allison J. Riggs_____
                                   Allison J. Riggs

                                   *Counsel for Plaintiffs*

38