IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Consolidated Civil Action

| | |
|---|---|
| RALEIGH WAKE CITIZENS ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WAKE COUNTY BOARD OF ELECTIONS,<br><br>Defendant. | No. 5:15-cv-156 |
| CALLA WRIGHT, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE STATE OF NORTH CAROLINA, et al.,<br><br>Defendants. | No. 5:13-cv-607 |

## PLAINTIFFS' PRE-TRIAL BENCH BRIEF

Pursuant to this Court's Case Management Order, (ECF No. 44 in Case No. 5:15-cv-156), Plaintiffs respectfully submit the following response to Defendant's Pretrial Memorandum of Authorities filed December 7, 2015 (ECF No. 64 in Case No. 5:15-cv-156).

Defendant inaccurately characterizes the claims that Plaintiffs are bringing in these consolidated actions and then attacks the irrelevant straw man. Plaintiffs are not bringing partisan gerrymandering claims, and they are not bringing vote dilution claims. Plaintiffs' claims allege one-person, one-vote violations under the state and federal constitutions, and a

1

racial gerrymandering claim under the federal constitution. Whether or not courts have settled on a justiciable standard for resolving partisan gerrymandering claims has no bearing on this Court's consideration of the case in front of it, and the attempt to analogize the two completely different types of claims essentially seeks to have this court abdicate its role in ensuring that "the only clear limitation on improper districting practices"—the Fourteenth Amendment's equal population requirement—remains meaningful. *Cox v. Larios*, 542 U.S. 947, 950 (2004) (Stevens, J., concurring). And it detracts from the Supreme Court's recent condemnation of districts in which race directs the line-drawing without a compelling justification. *Alabama Legislative Black Caucus v. Alabama,* 135 S. Ct. 1257, 1272, 1274 (2015). The harm to voters on both grounds is real and toxic to our democracy. Beyond that basic misrepresentation of Plaintiffs' case, Defendant makes several errors of law and fact in its brief.

### 1. The *Marylanders* Case Is Not Persuasive Precedent

Defendant relies on *Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022 (D. Md. 1994) for the proposition that plaintiffs in a one-person, one vote case must prove that the asserted arbitrary or discriminatory state goal causes the complained-about deviation. That reliance is unavailing in the instant case. As an overarching matter, *Marylanders*, while a decision by a three-judge panel, is a district court opinion and is not binding on this court.

With respect to the proposition Defendant draws from *Marylanders*, while Defendant correctly quotes the case, the more relevant, and indeed, the binding precedent on what a one person, one vote plaintiff must prove, comes from the Fourth Circuit in *Wright v. North Carolina*, 787 F.3d 256 (4th Cir. 2015). In *Wright*, the court, citing *Daly*, said:

> A plaintiff in a case falling below the 10% population disparity
> may not rely on it alone to prove invidious discrimination or
> arbitrariness. To survive summary judgment, the plaintiff would

> have to produce further evidence to show that the apportionment
> process had a taint of arbitrariness or discrimination.

*Id*. at 264 (internal quotation marks omitted).

The one-person, one-vote claim in *Marylanders*, was decided on summary judgment. To the extent that it required plaintiffs to prove causation or that the challenged deviations "solely" derived from an impermissible justification, *Daly* and *Wright* subsequently overruled *Marylanders*. Neither Fourth Circuit case, controlling on this court, require that level of proof. But even if Plaintiffs were required to prove that impermissible justifications were the sole cause the deviations, Plaintiffs' evidence can and will do so. Through Dr. Chen's testimony and from testimony from individuals who spoke out against the bill, Plaintiffs will prove that arbitrary and discriminatory justifications were the reasons the overall deviation was so high. Thus, although as discussed above, *Marylanders* is not controlling, Plaintiffs' evidence satisfies even the *Marylanders* standard.

### 2. Partisanship Was Not the Only Illegitimate Motivation for the Population Deviations

Plaintiffs' contention that partisan considerations caused the population deviations in the challenged plan, and the wealth of evidence that Plaintiffs will put on to support that contention, is not the sole impermissible motivation driving the challenged plans.[1] Nor does that contention convert their claims into judicially unmanageable partisan gerrymandering claims. Partisanship may play a role in redistricting, but it does not justify or permit discriminatory bias to devalue the weight of certain votes, depending on where the voter lives or how he or she votes.

---

[1] Defendant claims that Plaintiffs may not prove that partisanship motivated the deviations in S.B. 325 because School Board elections are non-partisan. Plaintiffs will put on a substantial amount of evidence that despite this fact, School Board elections leading up to the enactment of S.B. 325 had become highly partisan. *See* Pl. Br. 6-8.

3

Defendant's brief lists a number of categories of Plaintiffs' evidence, although it is far from complete, and then argues that "considered separately" each type of evidence fails to establish a one-person, one-vote violation. Def. Br. 9-11. But Plaintiffs do not argue that any one of these factors alone creates a one-person, one-vote violation. For example, it is true that Plaintiffs will produce evidence of the bizarre shapes and lack of compactness of the enacted districts, the Court will hear testimony from opponents of the bill, and there will be evidence about the impact of the plan on incumbents. Each of these factors is relevant to the question of whether the population deviations in the challenged plans were motivated by improper purposes and whether District 4 is a racial gerrymander. *See, e.g., Shaw v. Reno*, 509 U.S. 630, 645-46 (1993) (holding that a district's non-compact shape, when only understandable on racial grounds, gives rise to a Fourteenth Amendment violation claim); *Karcher v. Daggett*, 462 U.S. 725, 755 (1983) (Stevens, J., concurring) ("One need not use Justice Stewart's classic definition of obscenity - `I know it when I see it' - as an ultimate standard for judging the constitutionality of a gerrymander to recognize that dramatically irregular shapes may have sufficient probative force to call for an explanation"); *Arizona v. California*, 373 U.S. 546, 583 n.85 (1963) ("We recognize, of course, that statements of opponents of a bill may not be authoritative, but they are nevertheless relevant and useful, especially where, as here, the proponents of the bill made no response to the opponents' criticisms.") (internal citations omitted).

As discussed in Plaintiffs' Trial Brief at 33, the evidence of the taint of arbitrariness and discrimination that infects the challenged plans ought to be viewed cumulatively, *Vill. of Arlington Heights v. Metro. Housing Redevelopment Corp.,* 429 U.S. 252, 266-68 (1977), and when viewed as such, leads to the undeniable conclusion that the plans must be invalidated.

4

### 3. *Larios* is Directly On Point and Plaintiffs Will Present Direct Evidence of Discriminatory Motivations Causing Larger Than Necessary Population Deviations

Defendant also tries mightily to distinguish the *Larios* case, despite the Fourth Circuit stating that the case was "notably" similar to the instant case. "Even if *Larios* does not control this case (though neither Defendants nor the district court point to anything else squarely on point and controlling, either), we nevertheless find it persuasive." *Wright*, 787 F.3d at 267. They further noted that, "[h]ere, Plaintiffs allege that, as in *Larios*, a state legislature designed a redistricting plan with a maximum deviation in population of just under 10%, designed to pit rural and urban voters against one another, and intended to favor incumbents of one political party over those of another."

It is true that in *Larios*, state legislators and mapdrawers made themselves available to testify, 300 F. Supp. 2d 1320, 1325, 1342 (N.D. Ga. 2004), where here, lawmakers supporting the plan and their staffers are cloaking themselves in legislative immunity and privilege, denying plaintiffs and the public from making any meaningful inquiry into their motivations.[2] But it is incorrect to say that with the contemporaneous record of legislator's statements in this case, the direct statements needed to support plaintiffs' claims do not exist. For example, Senator Chad Barefoot admitted that a primary goal of the bill was to reduce Raleigh voters' voice in county elections while increasing the voice of those who live elsewhere in the county. (Ex. 251, 3-31-15 transcript at 3-4, 75-76 (Barefoot)). There are many permissible steps the General Assembly might take in fashioning an election system to give voice to rural voters, but they step over into unconstitutional territory when they seek to do so by under-populating rural districts and over-

---

[2] Defendant's argument that without direct evidence Plaintiffs cannot carry their burden of proof, combined with their argument that only the motivations of legislators supporting the law are relevant, effectively means that the assertion of legislative privilege would bar any challenge under either a one-person, one-vote or racial gerrymandering theory. It is simply not the law that legislators who enact a discriminatory redistricting plan can insulate that plan from meaningful constitutional scrutiny by insisting on legislative privilege. Indeed, where legislative privilege has been asserted, the Plaintiffs' indirect evidence should be accorded greater weight.

5

populating urban districts. The very clear one-person, one-vote principle is that such over or under-weighting of votes is not permissible unless it is the result of neutral redistricting criteria such as the desire to follow precinct lines. Senator Barefoot's statement is an admission of an arbitrary and discriminatory reason for the population deviations in the district plans.

Likewise, it is also incorrect that without legislators or staffers testifying, plaintiffs are unable to establish their case on arbitrariness and discrimination. The Supreme Court in *Arlington Heights* recognized that, because direct evidence of intent may not always be available, circumstantial evidence can suffice to establish unconstitutional discriminatory intent. *Vill. of Arlington Heights v. Metro. Housing Redevelopment Corp.,* 429 U.S. 252, 266 (1977); *see also*, Pl. Br. at 28-30.

Furthermore, the court in *Larios* credited heavily the "circumstantial evidence of the plans themselves" and concluded that such evidence strongly supported its conclusion that the legislature had employed "a deliberate and systematic policy of favoring rural and inner-city interests at the expense of suburban areas north, east, and west Atlanta." *Larios*, 300 F. Supp. 2d at 1327. The types of circumstantial evidence presented in *Larios* are exactly the types of circumstantial evidence in the instant case. Further, the nature of this challenged re-redistricting, mid-decade, only increases the reasonableness of the arbitrariness inference. And here, as in *Larios*, the direct and circumstantial evidence combined ultimately warrants the invalidation of the challenged plans.

Finally, Defendant tries to distinguish *Larios* in that Plaintiffs' proffered evidence of geographic bias "does not move large numbers of electoral seats from one geographic area to another." Def. Br. at 12. Plaintiffs are not required to prove that large numbers of seats were moved, but beyond that, that claim is incorrect. An electoral seat was moved—the donut district.

6

There was previously no district comprised of the rural parts of Wake County, and the population in those areas does not support a district without deviations nearly ten percent. Just as in *Larios*, a district was moved, created to advantage a geographic area of the county that does not have the population to warrant the district. This only further supports the *Wright* court's conclusion that *Larios* was highly persuasive precedent in this case.

### 4. Direct Admissions of Racial Predominance Are Not Required in Racial Gerrymandering Cases

Plaintiffs do not need to present direct admissions of racial intent to succeed in proving a racial gerrymandering case. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Despite this legal truism, Plaintiffs do have the evidence that Defendant says Plaintiffs lack: direct evidence that districts were created to "enhanc[e] the opportunity of minority voters to elect minority representatives." Def. Br. at 14 (citing *Bush v. Vera*, 517 U.S. 952, 960-61 (1996).

During the legislative process, Rep. Stam, one of the leading proponents of S.B. 181, repeatedly stated that at-large systems submerge racial minorities. (Ex. 251, 3-31-15 transcript at 7, 55-56 (Stam); Ex. 13, 4-1-15 transcript at 6 (Stam). Thus, one of the justifications for implementing this plan for elections for the County Commission was to avoid diluting the voting strength of black voters which they claimed occurred in at-large districts. This is direct evidence of race predominating in the decision to draw District 4 as a majority-black district, and, when viewed cumulatively with all the circumstantial evidence that Plaintiffs will present, amply supports a conclusion that race predominated and strict scrutiny must be applied to District 4.

### 5. Partisan Concerns Dictated the Population Deviations in the Challenged Plans, District 4 Lines Were Based on Race, Not Partisanship

The evidence at trial will demonstrate that mapdrawers do not have access to reliable political data at the sub-precinct level. (Tr. Test. Fairfax). Thus, when mapdrawers split

7

precincts, they are doing so based on the only data available at the census block level—population and racial demographics produced by the Census Bureau. Ten precincts were split to form the boundaries of District 4. (Tr. Test. Fairfax, Chen). These split precincts create the bizarrely-shaped protrusions from the district, and when imposed over data indicating racial density, are clearly split to pull black voters into the district. (Ex. 27, Fairfax Report; Tr. Test. Fairfax, Chen).

Moreover, Dr. Chen's analysis demonstrates that the goal of achieving a partisan outcome—packing District 4 with Democratic voters—does not and cannot explain the drawing of the district up to 54.3% black voting age population. (Ex. 15, Chen Report; Tr. Test. Chen). A mapdrawer can achieve the same anticipated political outcome, using whole precincts, with a black voting age population as low as 45%. *Id*. Thus, race predominated in drawing the district boundaries, and was not simply a by-product of seeking to pack Democratic voters in the district.

### 6. Defendant Misunderstands the Relevance of the Alternative Plans

While Defendant is correct that presenting a "better" plan alone is insufficient to establish a one-person, one-vote violation, Defendant misunderstands the relevance of alternative plans. The plan proffered by Rep. Gill during the S.B. 181 legislative process—that creates a 7-2 method of election and achieves the alleged goals of the legislative interference in local politics—is not relevant because it is a "better" plan. Instead it is relevant to prove that arbitrary and discriminatory factors motivated the population deviations in the enacted plan, and that District 4 is not narrowly tailored to achieve a compelling governmental interest. It is relevant under Arlington Heights as it relates to the process of S.B. 181's enactment. It is relevant because it undermines and reveals as pretextual the asserted justifications offered by the bill proponents. The Gill alternative proves that it was possible to achieve the alleged legitimate

8

goals of the General Assembly's re-redistricting process without the extreme deviations that so differentially weight the voting strength of Wake County voters. In short, the Gill plan alone does not establish the constitutional violation, but it is powerful evidence of several of the elements of Plaintiffs' proof that the General Assembly's discriminatory intent in enacting districts with larger than necessary population deviations is unconstitutional.

Defendant also misunderstands the purpose of Dr. Chen's report and the program he uses to simulate potential redistricting plans. The 500 simulations run by Dr. Chen were not intended to demonstrate that there were 500 "better" plans that the General Assembly ought to have enacted. Instead, Dr. Chen's simulations demonstrate that the legislature could not have drawn a plan with the desired political bias with minimal deviations (that is, deviations near the benchmark deviation of 1.75%). Such an outcome could only be achieved by maximizing population deviations to near 10%. That is causation in a nutshell.

## Conclusion

Under the controlling precedent on Plaintiffs' claims correctly understood, the entirety of Plaintiffs' evidence in this case demonstrates that Plaintiffs' constitutional rights are being violated by the enacted plans and they are entitled to relief on their one-person, one vote and racial gerrymandering claims.

Respectfully submitted this 9th day of December, 2015.

/s/ Allison J. Riggs
Anita S. Earls
Allison J. Riggs
George E. Eppsteiner
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 W. Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380

9

Case 5:15-cv-00156-D   Document 51   Filed 12/09/15   Page 9 of 11

Facsimile: 919-323-3942
anita@southerncoalition.org
allison@southerncoalition.org
george@southerncoalition.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has on this day electronically filed the foregoing **Plaintiffs' Response to Defendant's Pretrial Brief** in the above-titled action with the Clerk of the Court using the CM/ECF system, which on the same date sent notification of the filing to the following:

Charles F. Marshall
Matthew B. Tynan
BROOKS, PIERCE, McLENDON,
HUMPHREY & LEONARD, LLP
1600 Wells Fargo Capitol Center
150 Fayetteville St.
Raleigh, NC 27601
cmarshall@brookspierce.com
mtynan@brookspierce.com

*Counsel for Wake County Board of Elections*


This the 9th day of December, 2015.

                                                  /s/ Allison J. Riggs
                                                  Allison J. Riggs

                                                  *Counsel for Plaintiffs*