IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

RALEIGH WAKE CITIZENS ASSOCIATION, et al.

*Plaintiffs,*

*v.*

WAKE COUNTY BOARD OF ELECTIONS,

*Defendant.*

No. 5:15-cv-156

CALLA WRIGHT, et al.

*Plaintiffs,*

*vs.*

STATE OF NORTH CAROLINA, et al.

*Defendant.*

No. 5:13-cv-607

**DEFENDANT'S RESPONSE TO PLAINTIFFS' PRE-TRIAL BENCH BRIEF**

Defendant Wake County Board of Elections, pursuant to this Court's Case Management Order of November 30, 2015 (D.E. 45), respectfully submits this response to Plaintiffs' Pre-Trial Brief.

## I. ONE PERSON, ONE VOTE CLAIMS

Defendant is entitled to a presumption that the districting plans established under Session Laws 2013-110 and 2015-4 were the result of an honest and good faith effort to construct districts as nearly of equal population as is practicable. *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996). This presumption "permits states to incorporate legitimate state policies into redistricting plans without the burden of justifying the minor population deviations that the incorporation of those

policies might cause." *Marylanders for Fair Rep. v. Schaefer*, 849 F. Supp. 1022, 1032 n.9 (D. Md. 1994) (per curiam). Plaintiffs' attempt to loosen the presumption to fit garden-variety claims of partisan and geographic bias that are an inevitable part of the redistricting process would "invite[] individuals to challenge any minimally deviant redistricting scheme based upon scant evidence of ill will by district planners, thereby creating costly trials and frustrating the purpose of [the Supreme Court's] ten percent rule." *Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1086 (D. Ariz. 2014) (Silver, J., concurring in the judgment) (quotations omitted).

### A. Plaintiffs' burden of proof under *Daly v. Hunt* is unaffected by racial discrimination cases in other contexts.

*Daly v. Hunt*, 93 F.3d at 1220, makes clear that the relevant inquiry for Plaintiffs' one person, one vote claims is whether "the apportionment plan at issue here <u>was the product of</u> bad faith, arbitrariness, or invidious discrimination." *Id.* at 1222 (emphasis added). Plaintiffs try to water down their burden by citing language from a racial discrimination zoning case, *Village of Arlington Heights v. Metro. Hous. Redev. Corp.*, 429 U.S. 252 (1977), which has no relevance in redistricting litigation. Further, the standard of proof in *Arlington Heights*, allowing the plaintiffs to show that race was a "motivating factor," is facially inconsistent with the requirements in redistricting cases to show that the unlawful actions were "the product" or "the result" of arbitrariness, bad faith, or invidious discrimination, as in *Daly*—or, similarly, the "sole[]" or "actual *reason*" for the deviation, as in *Marylanders*, 849 F. Supp. at 1032 (stating that, "in addition," plaintiffs must show that the deviation was "*not* caused by the promotion of legitimate state policies") (emphases in original).

**B. Assuming *arguendo* that geographic or partisan considerations were a factor in drawing the disputed districts, the governing authority does not support a finding that these considerations are *per se* improper.**

Plaintiffs' anticipated evidence of partisan bias appears to include past election results showing that the new plan may include more additional districts that are more favorable to Republicans. This type of evidence, at best, would conform to the Supreme Court's recognitions that that "[p]olitics and political considerations are inseparable from districting and apportionment," *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973), and that political affiliation is a traditional and proper motivation for the construction of districts. *See, e.g., Ala. Black Caucus v. Alabama*, __ U.S. __, __, 135 S. Ct. 1257, 1270 (2015) (listing "political affiliation" among "traditional race-neutral districting principles").

Plaintiffs rely on *Larios v.* Cox, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *summarily aff'd*, 542 U.S. 947 (2004) and *Hulme v. Madison County*, 188 F. Supp. 2d 1041 (S.D. Ill. 2001) to suggest that partisan bias can be evidence of an impermissible motive. Although *Larios* relied more on targeted incumbency protection than isolated evidence of partisan advantage, the direct evidence in *Larios* and *Hulme* was far afield from the anticipated evidence here—both of those cases included direct and explicit evidence that exposed facially bad faith motivations on the part of the map drawers. *See Larios*, 300 F. Supp. 2d at 1326, 1347-48 (N.D. Ga. 2004); *Hulme v. Madison Cnty.*, 188 F. Supp. 2d 1041, 1051 (S.D. Ill. 2001) ("We are going to shove it [the map] up your f___ a__ and you are going to like it, and I'll f___ any Republican I can.").

Plaintiffs' two other cases concerning partisan motivation are also inapposite. In *Perez v. Perry*, No. 5:11-cv-360, 2012 U.S. Dist. LEXIS 190609 (W.D. Tex. Mar. 19, 2012), the court was not called upon to adjudicate an Equal Protection claim but to identify any possible issues with an interim plan pending clearance of the enacted plan under Section 5 of the Voting Rights Act. And

in *Troxler v. St. John the Baptist Parish Police Jury*, 331 F. Supp. 222 (E.D. La. 1971), the district court considered a plan with deviations greater than 10 percent. In any event, the *Troxler* court mistakenly relied on *Kirkpatrick v. Preisler*, 394 U.S. 526 (1968)—a congressional redistricting case in which strict numerical equality among districts was required—for the proposition that "[t]he courts have steadfastly rejected the proposition that there is a fixed numerical or percentage population variance small enough to be considered *de minimis* and to satisfy without question the 'as nearly as practicable standard.'" (quotations omitted).

With respect to so-called regional or geographic bias, the *Abate v. Mundt*, 403 U.S. 182 (1971), decision cited by Plaintiffs upheld population deviations of 11.9 percent against a claim of geographic bias with respect to districts anchored by each major town in the county. The only case Plaintiffs appear to cite in which geographic bias was a factor in finding a one person, one vote violation within the 10 percent deviation is *Larios*. But *Larios* is a true outlier that involved specific evidence that the legislature unequivocally intended to manipulate population deviations to transfer electoral districts to entire regions of the State of Georgia that otherwise would not have them. *See Larios*, 300 F. Supp. 2d at 1343 (citing statements by the district designer that she "took all of southern Georgia [and] 'lassoed it in as if it were one big district'" and worked to maximize the number of seats for that region at the expense of other areas of the state).[1]

The type of geographic bias alleged here does not involve specific local communities (*Abate*) or whole regions of a state (*Larios*). Rather, it involves the division of "Raleigh" and "non-Raleigh" voters in a general way that provides equal representation to Raleigh and non-

[1] Although Plaintiffs suggest that this court is somehow "bound" by *Larios* because it was summarily affirmed by the Supreme Court, "the precedential effect of a summary affirmance can extend no further than the precise issues presented and necessarily decided by those actions." *Wright v. North Carolina*, 787 F.3d 256, 267 (4th Cir. 2015) (quotations omitted).

Raleigh residents through two so-called super-districts. Dividing the county into two districts inevitably and necessarily will create potential demographic distinctions based loosely on geography. For example, even a "north/south" division could divide the high-tech, RTP areas and surrounding suburbs from more rural southern Wake County. Plaintiffs' authorities do not support a finding of an unconstitutional geographic bias based on these types of divisions solely because they result in de minimis population deviations.

### C. The existence of an alternative plan does not mean that the districts are invalid.

Plaintiffs also incorrectly suggest that they can prove a lack of legitimate motivation by demonstrating the existence of "an alternative plan" that would have achieved the General Assembly's stated goals and would have "diminished the deviations when compared to the challenged plan." Pls.' Br. at 33 (quoting *Mahan v. Howell*, 410 U.S. 315, 328 (1973)). First, *Mahan* does not suggest that the ability to draw "better" districts than the enacted districts would mean that the enacted districts do not advance legitimate state policies. Accepting Plaintiffs' contrary position would ignore clear precedent that "drafting a 'better' plan alone is [in]sufficient" to establish a one person, one vote claim. *Daly*, 93 F.3d at 1221. Second, in *Mahan*, the state was required to justify a districting plan's maximum deviation of 16.4% among the districts. 410 U.S. at 319, 329. Accordingly, the analysis undertaken in *Mahan*—an examination of whether the redistricting plan effectively achieved its stated goals without unnecessary population deviations—is simply not applicable in this case, where the districts are presumptively lawful.

## II. RACIAL GERRYMANDERING CLAIM

Plaintiffs' brief skirts quickly past their burden of proof on racial predominance required of their racial gerrymandering claim. Race must *predominate*, not merely influence, the creation of a disputed district. *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

Plaintiffs appear to rely on selected statements from Representative Paul Stam that the decision to move from at-large districts to single-member districts was made because, among other things, he felt at-large districts submerge minority voting as a general matter. Ex. 251, 3-31-15 transcript at 7 (Stam), 55-56; Ex. 13, 4-1-15 transcript at 6 (Stam). But this was one of several criticisms of at-large voting by the bill sponsors. Another reason repeatedly cited by both the bill sponsors was to allow voters in different areas of the County to have the power to elect a representative from that defined area—and to prevent a result where a County Commissioner could lose the vote in their own district but win the at-large election. *See, e.g.*, Ex. 251, 3-31-15 transcript at 3-5 (Barefoot); 56-57 (Stam); 57-58 (Barefoot); Ex. 10, 3-11-15 transcript at 3-4 (Barefoot). The sponsors also stated that they were seeking to reduce the costs of running countywide in a large county like Wake County. *See, e.g.*, Ex. 251, transcript at 3-4 (Barefoot); 62-63 (Stam); Ex. 13, 4-1-15 transcript at 6-7 (Stam); Ex. 10, 3-11-15 transcript at 4) (Barefoot). Representative Stam also pointed out that, with respect to submerging minority views, the problem applied to "any kind of minority. Whether it's racial, gender, political, rural, urban." Ex. 13, 4-1-15 transcript at 4 (Stam).

More importantly, Representative Stam's statement that at-large voting submerges the views of minorities (of all types) does not relate in any way to Plaintiffs' claim that District 4 in particular was drawn with race as the predominate motive. Plaintiffs must prove a racial gerrymander as to District 4 itself. The Supreme Court made clear in *Alabama* that a claim for racial gerrymander must be directed to the "drawing of the boundaries of "specific electoral districts" and not a redistricting plan as a whole. __ U.S. at __, 135 S. Ct. at 1265 (emphasis in original). Representative Stam's statement—even taken in isolation—only relates to an alleged

flaw in at-large voting generally and makes no reference to why District 4 itself was drawn the way it was in 2013 and adopted for the Board of County Commissioners election in 2015.

Instead, Representative Stam stated that the bill intentionally adopted the districts previously drawn for the Board of Education elections in SB 325 because those districts had (at that time) recently been upheld in federal court. Ex. 13, 4-1-15 transcript at 5–6 (Stam) ("[T]he reason we chose these districts is because these districts have already been approved one year ago by the Federal District Court for the Eastern District of North Carolina."). Those districts, including District 4, were drawn in 2013, and Plaintiffs do not allege racial gerrymandering as to the drawing of those districts originally.

Without such evidence of direct testimony of racial predominance in the drawing of District 4 and its subsequent adoption in SB 181, Plaintiffs must rely on indirect or circumstantial evidence. But the shape of District 4 is not highly irregular. It does not connect highly minority communities with a "land bridge," *Miller v. Johnson*, 515 U.S. at 908, nor resemble a "sacred Mayan bird," *Bush v. Vera*, 517 U.S. 952, 974 (1996), nor a "Rorschach ink-blot test," *Shaw v. Reno*, 509 U.S. 630, 635 (1993), nor follow such a narrow path that "if you drove down the interstate with both car doors open, you'd kill most of the people in the district." *Id.* at 636. Moreover, Plaintiffs' own expert refers to District 4 as "moderately non-compact." Chen Report at 16. *See Shaw*, 509 U.S. at 647 (noting there is no constitutionally required level or degree of compactness, contiguity, or respect for political subdivisions).

Finally, even looking at the plan as a whole, Plaintiffs' own claims allege non-racial reasons for the drawing of the districts in general—including partisan and geographic bias—which further their undermine any claim that a finding that race predominated the creation of District 4 or even in the redistricting process in general.

## CONCLUSION

For the foregoing reasons, Defendant contends that Plaintiffs will not carry their burden of proof on the one person, one vote claims, or their claim for racial gerrymandering with respect to the use of District 4 in the election for Board of County Commissioners.

Respectfully submitted the 9th day of December, 2015.


/s/ Charles F. Marshall
Charles F. Marshall
Matthew B. Tynan
BROOKS, PIERCE, McLENDON,
HUMPHREY & LEONARD, L.L.P.
1600 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, NC 27601
cmarshall@brookspierce.com
mtynan@brookspierce.com

*Counsel for Wake County Board of Elections*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9th, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using the CM/ECF system to the following:

Anita S. Earls
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
919-323-3380 x115
Fax: 919-323-3942
Email: anita@southerncoalition.org
*Counsel for Plaintiffs*

Respectfully Submitted,

/s/ Charles F. Marshall
Charles F. Marshall
Matthew B. Tynan
BROOKS, PIERCE, McLENDON,
HUMPHREY & LEONARD, L.L.P.
1600 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, NC 27601
cmarshall@brookspierce.com
mtynan@brookspierce.com

*Counsel for Wake County Board of Elections*