IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Consolidated Civil Action

RALEIGH WAKE CITIZENS                )
ASSOCIATION, et al.,                 )
                                     )
                    Plaintiffs,      )
                                     )
            v.                       )        No. 5:15-CV-156-D
                                     )
WAKE COUNTY BOARD OF ELECTIONS,      )
                                     )
                    Defendant.       )


CALLA WRIGHT, et al.,                )
                                     )
                    Plaintiffs,      )
                                     )
            v.                       )        No. 5:13-CV-607-D
                                     )
STATE OF NORTH CAROLINA,             )
                                     )
                    Defendant.       )

## ORDER

Plaintiffs, individual voters registered in Wake County, North Carolina and the Raleigh Wake

Citizens Association ("RWCA"), an organization dedicated to the interests of African-Americans

in Wake County, (collectively "plaintiffs") challenge the North Carolina General Assembly's

("General Assembly") 2013 redistricting plan for electing the Wake County School Board ("2013

Wake County School Board Plan") and the General Assembly's 2015 redistricting plan for electing

the Wake County Board of Commissioners ("2015 Wake County Commissioners Plan"). Plaintiffs

contend that the 2013 Wake County School Board Plan and the 2015 Wake County Commissioners

Plan violate the one person one vote principle in the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, § 19 of the North Carolina Constitution. Plaintiffs concede that the maximum population deviation in the 2013 Wake County School Board Plan and the 2015 Wake County County Commissioners Plan is below 10% and concede that such a deviation is a "minor deviation" under governing Supreme Court precedent. Specifically, in both redistricting plans, the maximum population deviation in the seven single-member districts is 7.11% and in the two super districts is 9.8%. Nonetheless, plaintiffs contend that the two redistricting plans resulted from the General Assembly's invidious discrimination, arbitrariness, or bad faith. As for the 2013 Wake County School Board Plan, plaintiffs contend that the plan resulted from the General Assembly's partisan desire (1) to disadvantage incumbents on the non-partisan Wake County Board of Education ("Wake County Board of Education" or "Wake County School Board") who are registered Democrats who support "progressive" education policies and (2) to favor suburban and rural voters over urban voters. As for the 2015 Wake County Commissioners Plan, plaintiffs contend that the plan resulted from the General Assembly's partisan desire (1) to favor suburban and rural voters over urban voters and (2) to favor voters who favor Republican candidates over voters who favor Democratic candidates on the Wake County Board of Commissioners ("Wake County Commission", or "County Commission", or "Commission"). Plaintiffs also contend that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan and thereby violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

Defendant Wake County Board of Elections ("defendant" or "Wake County Board of Elections") is the local election board responsible for administering elections in Wake County, North

2

Carolina, including elections for the Wake County Board of Education and the Wake County Board of Commissioners. The Wake County Board of Elections had nothing to do with the General Assembly's decision to enact the 2013 Wake County School Board Plan or the 2015 Wake County Commissioners Plan, but the United States Court of Appeals for the Fourth Circuit has held that the Wake County Board of Elections is the proper defendant. See Wright v. North Carolina, 787 F.3d 256, 261–63 (4th Cir. 2015). Moreover, although the Wake County Board of Elections does not take a position on whether the General Assembly should have adopted the 2013 Wake County School Board Plan or the 2015 Wake County Commissioners Plan, the Wake County Board of Elections has defended the constitutionality of the redistricting plans as a legal and institutional matter.

On December 16–18, 2015, the court held a bench trial in this consolidated action. In their complaints and at the end of the trial, plaintiffs asked this court to declare the 2013 Wake County School Board Plan and the 2015 Wake County Commissioners Plan unconstitutional, to enjoin the Wake County Board of Elections from administering elections under either plan, to hold elections under a court-ordered remedial plan that adopts the redistricting plans in effect before the General Assembly enacted the 2013 and 2015 plans, and to give the General Assembly another opportunity to redistrict the Wake County School Board and Wake County Board of Commissioners consistent with the United States and North Carolina Constitutions.

The court has reviewed the entire record and enters these findings of fact and conclusions of law. As explained below, the court concludes that the population deviations in the 2013 Wake County School Board Plan and the 2015 Wake County Commissioners Plan do not violate the one person one vote principle in the United States Constitution or North Carolina Constitution. The court finds that the General Assembly did not engage in invidious discrimination, act arbitrarily, or act in

3

bad faith in enacting the 2013 Wake County School Board Plan or the 2015 Wake County Commissioners Plan. The court also finds that the 2015 General Assembly did not racially gerrymander District 4 in the 2015 Wake County Commissioners Plan and concludes that District 4 does not violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Because plaintiffs have not met their burden of proof, the court enters judgment for the Wake County Board of Elections and declines to enjoin the Wake County Board of Elections from administering elections under either the 2013 Wake County School Board Plan or the 2015 Wake County Commissioners Plan.

I.

The court has jurisdiction over the parties and the subject matter. See 28 U.S.C. §§ 1331, 1367(a). On August 22, 2013, thirteen individual plaintiffs and two associations filed the first of these two consolidated cases. See Wright v. North Carolina, No. 5:13-CV-607 [D.E. 1] Compl. (E.D.N.C.) ("Wright Compl."). In Wright, plaintiffs named the State of North Carolina and the Wake County Board of Elections as defendants. See id. Plaintiffs allege that the 2013 Wake County School Board Plan violates the one person one vote principle of the United States and North Carolina Constitutions. See id. ¶¶ 69–82. Essentially, plaintiffs allege that the "clear . . . intent [of the 2013 Wake County School Board Plan is] to disfavor incumbents who are registered Democrats and support progressive education policies." Id. ¶ 62. Plaintiffs also allege that the "only" goal the new plan accomplishes is to further "Republican interests" and advance "conservative" education policies. Id. ¶¶ 62, 66. Plaintiffs do not allege a racial gerrymandering claim concerning any district in the 2013 Wake County School Board Plan, including District 4 which is a majority African-American district. Plaintiffs request a declaratory judgment that the 2013 Wake County School

4

Board Plan violates the one person one vote principle in the Equal Protection Clause of the United States and North Carolina Constitutions. See id. (prayer for relief). Plaintiffs also request preliminary and permanent injunctions enjoining the Wake County Board of Elections from enforcing the 2013 Wake County School Board Plan. See id. Plaintiffs also request the court to adopt a court-ordered remedial plan and to permit the General Assembly the opportunity to promulgate a lawful method of electing the Wake County Board of Education. See id. Finally, plaintiffs request costs and reasonable attorney's fees. See id.

On November 4, 2013, defendants moved to dismiss plaintiffs' complaint in Wright for failure to state a claim upon which relief can be granted. See [D.E. 27, 29]; Fed. R. Civ. P. 12(b)(6). On November 19, 2013, plaintiffs requested leave to file an amended complaint in order to add as defendants, in their official capacities, North Carolina's Governor, Speaker of the House, and President Pro Tempore of the Senate. See [D.E. 33]. On November 23, 2013, plaintiffs responded in opposition to defendants' motion to dismiss. See [D.E. 35].

On March 17, 2014, the court dismissed the State of North Carolina as a defendant due to North Carolina's Eleventh Amendment immunity, denied plaintiffs' motion to amend to add the three defendants as futile, and granted defendants' motion to dismiss for failure to state a claim upon which relief can be granted. See Wright v. North Carolina, 975 F. Supp. 2d 539, 542–47 (E.D.N.C. 2014). Plaintiffs appealed.

On May 27, 2015, the United States Court of Appeals for the Fourth Circuit affirmed in part, reversed in part, and remanded. See Wright, 787 F.3d at 259, 270. The Fourth Circuit held that the district court properly denied, as futile, plaintiffs' motion to amend their complaint to add as defendants, in their official capacity, the Speaker of the House and President Pro Tempore of the

5

Senate. See id. at 261–63.[1] The Fourth Circuit also held that the district court erred in dismissing the complaint for failure to state a claim upon which relief can be granted. Id. at 264–70. Judge Diana G. Motz dissented from the majority's conclusion that plaintiffs plausibly alleged a one person one vote claim under the United States and North Carolina Constitutions. See id. at 270–73 (Motz, J., dissenting).

On April 19, 2015, the RWCA and fourteen individual plaintiffs filed RWCA v. Barefoot, No. 5:15-CV-156-D [D.E. 1] Compl. (E.D.N.C.), concerning the 2015 Wake County Commissioners Plan. On June 5, 2015, plaintiffs filed an amended complaint naming only the Wake County Board of Elections as the defendant. See RWCA Am. Compl. [D.E. 22] ¶¶ 81–94. Essentially, plaintiffs allege that the 2015 Wake County Commissioners Plan arbitrarily attempts to "give greater weight to the voting strength of rural and suburban voters in Wake County in elections for the Board of Commissioners, and to disadvantage urban voters," and to "give disproportionate and unfair weight to the voting strength of voters who support Republican candidates compared to the voting strength of voters who support Democratic candidates, and to disadvantage Democratic voters." RWCA Compl. ¶¶ 63–64. Plaintiffs contend that the 2015 Wake County Commissioners Plan violates the one person one vote principle of the United States Constitution and the North Carolina Constitution. See id. ¶¶ 81–94. Plaintiffs also allege that District 4 in the 2015 Wake County Commissioners Plan (which is identical to District 4 in the 2013 Wake County School Board Plan and which the Wright plaintiffs do not challenge as a racial gerrymander) is an unconstitutional racial gerrymander that violates the Equal Protection Clause of the Fourteenth Amendment. See id. ¶¶ 95–98.

---

[1] On appeal, plaintiffs did not challenge the district court's dismissal of the State of North Carolina as a defendant. Wright, 787 F.3d at 261 n.2. On appeal, plaintiffs also conceded that the Governor was not a proper defendant. See id.

6

In RWCA, plaintiffs request a declaratory judgment that the 2015 Wake County Commissioners Plan violates the one person one vote principle of the Equal Protection Clauses of the United States and North Carolina Constitutions and that District 4 in the 2015 Wake County Commissioners Plan constitutes a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs also request preliminary and permanent injunctions enjoining the Wake County Board of Elections from enforcing the 2015 Wake County Commissioners Plan, and that the court adopt a court-ordered remedial plan for the 2016 election and permit the General Assembly the opportunity to promulgate a lawful method of electing the Wake County Commission. See id. (prayer for relief). Plaintiffs also request costs and reasonable attorney's fees. Id.

On July 17, 2015, the Wright case and the RWCA case were reassigned to the undersigned. See [D.E. 27]. On October 1, 2015, the court held a scheduling conference, consolidated Wright and RWCA, approved the parties' joint discovery plan, and set an expedited trial date of December 16, 2015. See [D.E. 36]. On December 16–18, 2015, the court held a bench trial. See [D.E. 59, 61, 62].

During the trial, the court received 481 exhibits, see Wright [D.E. 77], and heard testimony from 15 witnesses. See Wright [D.E. 78, 79]; RWCA [D.E. 59, 61, 62]. The witnesses were Reverend Dr. Earl C. Johnson (President of the RWCA), Senator Dan Blue, Plaintiff Amy Womble, Board of Education Member Bill Fletcher, Board of Education Member Christine Kushner, Anthony Fairfax, Representative Rosa Gill, Representative Darren Jackson, Pollster Thomas Jensen, Plaintiff Brian Fitzsimmons, Commissioner James West, Commissioner John Burns, Senator Josh Stein, Dr. Jowei Chen, and Janet Barnes (former President of the RWCA).

Having reviewed the entire record, considered all of the testimony, read each exhibit, and assessed the credibility of the witnesses, the court enters these findings of fact and conclusions of

7

law. See Fed. R. Civ. P. 52(a). To the extent any finding of fact should be designated as a conclusion of law, it should be considered a conclusion of law. Similarly, to the extent any conclusion of law should be designated a finding of fact, it should be considered a finding of fact.

II.

A.

Wake County includes the City of Raleigh and thirteen other municipalities, geographically distributed as follows:



See Amended First Joint Stipulation of Facts ("Stipulations") [D.E. 56] ¶ 1. In 2000, the population of Wake County was 627,846, and Wake County had 384,365 registered voters. Id. ¶ 2. In 2010, the population of Wake County was 900,993, and Wake County had 586,237 registered voters. Id.

8

¶ 3; Tr. Ex. 273.[2]

The Wake County School Board is non-partisan. Although voters in Wake County elect the School Board in nine single-member districts, ballots do not designate the political party of any candidates for the School Board. See Tr. Ex. 438. Elections for the Wake County School Board historically have been held in October of odd-numbered years with any runoffs in November, and Board members are elected to four-year terms. See Tr. Exs. 58, 61, 62, 64, 66, 67, 444, 445; cf. Tr. Ex. 438.

Wake County School Board members elected from 1999 through 2013 and their political party registrations are as follows:

| Year | Name | Political Party Registration |
|------|------|------------------------------|
| 1999 | Beverley Clark | Democrat |
| 1999 | Rosa Gill | Democrat |
| 1999 | Tom Oxholm | Unaffiliated |
| 1999 | Susan Parry | Democrat |
| 1999 | Wray Stephens | Unaffiliated |
| 2001 | Bill Fletcher | Republican |
| 2001 | Patti Head | Republican |
| 2001 | Kathryn Quigg | Democrat |
| 2001 | Amy White | Republican |
| 2003 | Beverley Clark | Democrat |
| 2003 | Rosa Gill | Democrat |
| 2003 | Ron Margiotta | Republican |
| 2003 | Carol Parker | Republican |
| 2003 | Susan Parry | Democrat |
| 2005 | Eleanor Goettee | Democrat |
| 2005 | Patti Head | Republican |
| 2005 | Lori Millberg | Democrat |

---

[2] To put Wake County's population in perspective, the 2010 census reveals that Wake County has a larger population than six states: Wyoming (population 563,626), Vermont (population 625,741), North Dakota (population 672,591), Alaska (population 710,231), South Dakota (population 814,180), and Delaware (population 897,934). See Resident Population Data, United States Census 2010 (Feb. 25, 2016), http://www.census.gov/2010census/data/apportionment-dens -text.php.

9

| 2005 | Horace Tart | Republican |
| 2007 | Beverley Clark | Democrat |
| 2007 | Rosa Gill | Democrat |
| 2007 | Kevin Hill | Unaffiliated |
| 2007 | Ron Margiotta | Republican |
| 2007 | Anne McLaurin | Democrat |
| 2009 | Debra Goldman | Republican |
| 2009 | Chris Malone | Republican |
| 2009 | Deborah Prickett | Republican |
| 2009 | John Tedesco | Republican |
| 2011 | Susan Evans | Democrat |
| 2011 | Kevin Hill | Unaffiliated |
| 2011 | Christine Kushner | Democrat |
| 2011 | Jim Martin | Democrat |
| 2011 | Keith Sutton | Democrat |
| 2013 | Tom Benton | Democrat |
| 2013 | Zora Felton | Democrat |
| 2013 | Bill Fletcher | Republican |
| 2013 | Monika Johnson-Hostler | Democrat |

Stipulations ¶ 7.

In the 1999–2000 school year, the student population in the Wake County Public School System was 98,772. Id. ¶ 4. In 2010, the student population in the Wake County Public School System was 143,289. Id. ¶ 5. The growth in student population led to the need for school construction, year-round schools, and more magnet schools. The Wake County School Board is responsible for prioritizing school construction and school repair, but the Wake County Commission controls capital funding for such projects. The Wake County School Board has no taxing authority. Instead, it receives 100% of its capital budget from the Wake County Commission and about one-third of its total budget from the Wake County Commission. Thus, a natural political tension exists between the Wake County School Board and the Wake County Commission because the Wake County Commission has the power to tax and the School Board does not. Moreover, the Wake County Commission has to determine spending priorities among requests not only from the School

10

Board but also from other constituents seeking Wake County Commission funding for such projects as the county courthouse, the county jail, county libraries, county bike trails, county landfills, and county transit.

The Wake County School Board also regulates student assignment and, in 2000, adopted a socioeconomic-diversity policy as part of its student-assignment policy. Under the socioeconomic-diversity component of the overall thirteen-factor student-assignment policy, the Wake County School Board moved away from being race-conscious in student assignment. Instead, as one of the thirteen factors to consider concerning student assignment, Wake County included an assessment of the socioeconomic status of a student. As for socioeconomic status, the Wake County School Board desired to have no more than 40% of the student body at any given school categorized as economically disadvantaged, as measured by the student's eligibility for free or reduced-price lunch. The Wake County School Board also desired to have no more than 25% of students at one school scoring below grade level on state-wide reading tests.

As Wake County grew and more students enrolled in the Wake County School District, some parents became upset that their children were assigned to schools that were not geographically close to their residences and that their children sometimes had longer bus rides than they otherwise would have had if they had been assigned to schools closer to their residence. Moreover, some parents became upset with where schools were built or how quickly schools were repaired.

Education issues such as student assignment, school construction, and school repair do not divide along political party lines. Parents (regardless of whether they are voters or registered members of a political party) are concerned about where their children go to school, how their children get to school, what their children experience at school, and the consequences to their child

11

and their family arising from student assignment. Parents and non-parents express concerns that they

have about the Wake County Public School System to the Wake County School Board.

After the 2010 census, the population deviations for the existing nine single-member districts

of the Wake County School Board were as follows:

| District | Ideal Population | Actual Population | Deviation | Percentage Deviation |
|----------|------------------|-------------------|-----------|---------------------|
| 1 | 100,110 | 111,884 | 11,774 | 11.76% |
| 2 | 100,110 | 115,915 | 15,805 | 15.79% |
| 3 | 100,110 | 106,036 | 5,926 | 5.92% |
| 4 | 100,110 | 96,953 | -3,157 | -3.15% |
| 5 | 100,110 | 87,055 | -13,055 | -13.04% |
| 6 | 100,110 | 71,910 | -28,200 | -28.17% |
| 7 | 100,110 | 119,849 | 19,739 | 19.72% |
| 8 | 100,110 | 118,908 | 18,798 | 18.78% |
| 9 | 100,110 | 72,483 | -27,627 | -27.60% |

See Stipulations ¶ 8.[3]

After the 2010 census, pursuant to N.C. Gen. Stat. § 115C-37(i), the Wake County School

Board redistricted the boundaries of its nine single-member districts. As part of that process, the

Wake County School Board hired the Shanahan Law Group in 2011 to assist the Wake County

---

[3] In one person one vote cases, two terms frequently appear: "ideal population" and "maximum population deviation." See, e.g., Bd. of Estimate v. Morris, 489 U.S. 688, 700 & n.7 (1989); Connor v. Finch, 431 U.S. 407, 416–18 (1977); Daly v. Hunt, 93 F.3d 1212, 1215 n.2 (4th Cir. 1996). "Ideal population" is the population that each district would have if population were evenly distributed across all districts. See Daly, 93 F.3d at 1215 n.2. For example, if a county's population were 1,000,000 people and the legislature were creating 10 single-member districts, the "ideal population" in each district would be 100,000 people. See id. "Maximum population deviation" (also sometimes called "overall population deviation") involves calculating "how much the actual population of each district varies from the population of the ideal district." Id.; see Morris, 489 U.S. at 700 & n.7; Connor, 431 U.S. at 416–17. The "maximum population deviation" is "expressed as a percentage of the ideal population." Daly, 93 F.3d at 1215 n.2. The "maximum population deviation" is the "sum of the absolute value of the deviation of the district with the smallest population and that of the district with the largest population." Id.; see Morris, 489 U.S. at 700 & n.7; Connor, 431 U.S. at 416–17.

12

School Board in drafting new district boundaries for the Board's nine single-member districts. Id. ¶ 9.

In May 2011, the Wake County School Board adopted nine single-member districts, effective for the fall 2011 elections. Id. ¶ 10. The boundaries for the nine single-member districts that the Wake County School Board adopted in the 2011 BOE Redistricting Plan are shown below:



Id. ¶ 11.

Population deviations in the nine single-member districts in the 2011 BOE Redistricting Plan are as follows:

| District | Ideal Population | Actual Population | Deviation | Percentage Deviation |
|----------|------------------|-------------------|-----------|----------------------|
| 1 | 100,110 | 99,676 | -434 | -0.43% |
| 2 | 100,110 | 101,046 | 936 | 0.93% |
| 3 | 100,110 | 100,880 | 770 | 0.77% |
| 4 | 100,110 | 100,126 | 16 | 0.02% |
| 5 | 100,110 | 99,419 | -691 | -0.69% |
| 6 | 100,110 | 100,309 | 199 | 0.20% |
| 7 | 100,110 | 99,294 | -816 | -0.82% |
| 8 | 100,110 | 100,206 | 96 | 0.10% |
| 9 | 100,110 | 100,037 | -73 | -0.07% |

See Tr. Ex. 43; Tr. Ex. 27 Fairfax Report Table 2. The 2011 BOE Redistricting Plan includes nine single-member electoral districts with a maximum population deviation of 1.75%. See Tr. Ex. 43.

In the fall of 2011, elections were held in Wake County under the 2011 BOE Redistricting Plan. See Tr. Ex. 58. Approximately 12% of Wake County's registered voters voted in the fall 2011 non-partisan School Board elections. See id. Kevin Hill (District 3), Keith Sutton (District 4), Jim Martin (District 5), Christine Kushner (District 6), and Susan Evans (District 8) were elected. See Stipulations ¶ 7.[4] Sutton, Martin, Kushner, and Evans are all registered Democrats. See id.

On March 13, 2013, Republican Senators Neal Hunt and Chad Barefoot of Wake County filed Senate Bill 325 in the North Carolina General Assembly. See id. ¶ 12. Senate Bill 325 proposed to change the method of electing the Wake County School Board. Senator Hunt stated that the goals of Senate Bill 325 included (1) allowing voters to elect two school board members as opposed to one school board member in order to improve School Board representation, and (2) moving School Board elections from odd-numbered years to even-numbered years to increase voter turnout. See, e.g., Tr. Ex. 1, p. 3.

_____

[4] In District 3, Hill received 8,116 votes. In District 4, Sutton received 8,513 votes. In District 5, Martin received 6,212 votes. In District 6, Kushner received 11,810 votes. In District 8, Evans received 7,129 votes. See Tr. Ex. 58.

14

Senate Bill 325 restructures and redistricts the Wake County School Board using seven numbered (1–7) single-member districts and two lettered (A & B) single-member "super districts" that overlap the seven numbered districts. Stipulations ¶ 13. The 2013 Wake County School Board Plan includes one district (District 4 centered in southeast Raleigh) that includes a majority of registered voters who are African-American and covers a geographic area similar to the area covered by District 4 in the 2011 BOE Map. See Tr. Ex. 252. Specifically, District 4 has an African-American population of 54.26% and an African-American voting population of 53.54%. See id.

A map of the seven numbered districts under Senate Bill 325 follows:



Id. ¶ 14.

A map of the two super districts (A & B) under Senate Bill 325 follows:



Id. ¶ 15.

Senate Bill 325 extends the term of office of those Board members elected in 2011 from four years to five years (i.e., service until December 2016). See Tr. Ex. 438. Senate Bill 325 provides that the four Board members elected in 2013 under the 2011 BOE Redistricting Plan will serve until December 2016. See id. Under Senate Bill 325, no elections are to be held for the Wake County Board of Education in 2015. See id. Senate Bill 325 provides that, beginning in 2016, voters will elect Board of Education members in all seven single-member districts every four years and members will serve four-year terms. See id. Senate Bill 325 provides that in 2016, voters will elect

16

two Board of Education members in the two lettered districts to two-year terms. See id. Senate Bill 325 provides that, beginning in 2018, voters will elect Board of Education members from each of the two lettered districts every four years and members will serve four-year terms. See id.

Population deviations in the seven numbered and two lettered districts under Senate Bill 325 as introduced were as follows:

| District | Ideal Population | Actual Population | Deviation | Percentage Deviation |
|---|---|---|---|---|
| 1 | 128,713 | 132,263 | 3550 | 2.76% |
| 2 | 128,713 | 123,315 | -5398 | -4.19% |
| 3 | 128,713 | 133,391 | 4,678 | 3.63% |
| 4 | 128,713 | 130,304 | 1,591 | 1.24% |
| 5 | 128,713 | 128,952 | 239 | 0.19% |
| 6 | 128,713 | 128,539 | -174 | -0.14% |
| 7 | 128,713 | 124,229 | -4,484 | -3.48% |
| A | 450,497 | 472,585 | 22,088 | 4.90% |
| B | 450,497 | 428,408 | -22,089 | -4.90% |

See id. ¶ 17.

On April 17, 2013, the Senate Redistricting Committee heard public comment on Senate Bill 325 and voted to report the bill to the full Senate for consideration. See id. ¶ 18. During the meeting, Senator Hunt explained that Senate Bill 325 did two things. Tr. Ex. 1, p. 3. First, "in several cases throughout Wake County, a parent may live in one school district and his child may go to school in another school district and the parent needs to be able to vote for the school board member that represents the school that his child attends. The bill would allow voters to vote for two school board members instead of one." Id. Second, the bill "moves the election from odd years to even numbered years to increase voter turnout. The reason for that is the school board voting record over the past few years has been dismal because it is an off year." Id. The Committee also discussed that the proposal for the Wake County School Board was similar to the model that the Durham

17

County School Board used. Id. pp. 4–5. During the meeting, some people spoke in favor of Senate Bill 325 and some against it. See Tr. Ex. 2, pp. 1–41. The incumbent School Board opposed changing how its members were elected. See Tr. Ex. 437.

On April 22, 2013, the Senate debated and passed Senate Bill 325. Stipulations ¶ 19. During the floor debate, Senator Hunt of Wake County spoke in favor of the bill and again expressed the same two purposes of the bill. See Tr. Ex. 3, pp. 2–3. Democratic Senator Josh Stein of Wake County and Democratic Senator Dan Blue of Wake County spoke against the bill. See id. pp. 3–23.

The North Carolina Senate contains fifty members. Thirty-three Republicans voted in favor of Senate Bill 325, and seventeen Democrats voted against Senate Bill 325. See Stipulations ¶ 20.

On May 29, 2013, the House Elections Committee heard public comment on Senate Bill 325 and voted to report a committee substitute bill to the full Senate for consideration. Id. ¶ 21. During the meeting, some people spoke in favor of the bill, and some people spoke against it. See Tr. Exs. 4, 250. Republican Representative Stam of Wake County spoke in support of the bill as a means to increase voter turnout for School Board elections. Representative Stam also stated that the bill sought to address the "feeling for a long time" that "if your child went to [school in] one district and you lived in another district, that you just weren't being represented." Tr. Ex. 250, p. 7. Senator Hunt also expressed the same concerns. See id. pp. 16–17. The House Elections Committee substitute bill to Senate Bill 325 did not change the district boundaries in the original bill. Stipulations ¶ 22.

On June 10, 2013, the House debated and passed Senate Bill 325, with two amendments from Representative Stam. Id. ¶ 23. The two amendments adjusted the candidate filing period and slightly changed the district boundaries in the original bill. Id. ¶ 24.

18

During the floor debate, Representative Stam spoke in support of the bill. Representative Stam noted that the Wake County School District was very large. See Tr. Ex. 5, p. 2.[5] Representative Stam explained that the bill sought to do three main things. Id. p. 3. First, the bill sought to increase voter turnout by holding even-year elections. See id. Representative Stam noted that in recent odd-year School Board elections, Wake County had a "five, ten, or fifteen percent turnout." Id. Second, Representative Stam explained that the bill extended the terms of School Board members elected in 2011 from four years to five years. See id. p. 4. Third, Representative Stam explained that, given the size of the Wake County School District, children were often assigned to a school in a School Board member's district where a child's parent or parents did not live and that parents sometimes found it difficult to get responsive representation from a Wake County School Board member where their child attended school. Id. By having two School Board members represent each person in Wake County, Representative Stam hoped that each parent in Wake County would have a School Board member who represented him or her and who each parent could contact if the parent had an issue concerning the Wake County School District. Id. p. 5.

Representative Stam also explained his two amendments. Representative Stam explained that the first amendment changed the filing period at the suggestion of the Wake County Board of Elections so that the filing period for the non-partisan Wake County School Board would coincide with the filing period of the non-partisan Wake County Soil and Water Conservation District candidates. Id. p. 6. That amendment passed 113–0. Id. p. 7. Next, Representative Stam explained that the second amendment "put two members who are incumbents in districts that they have a decent chance of winning instead of putting them in a district that they can't win or it would be

---

[5] The Wake County School District is the 16th largest school district in the United States. See Tr. Ex. 51.

difficult to win." Id. p. 8. Thus, Representative Stam's second amendment "was to maintain continuity on the School Board for two very highly respected members." Id. The two members that Representative Stam referenced were Board Member Christine Kushner (a registered Democrat first elected in 2011) and Board Member Deborah Prickett (a registered Republican first elected in 2009). The amendment placed Kushner in District 6 and Prickett in District 7 under the 2013 Wake County School Board Plan. Democratic Representative Gill then spoke in favor of the second amendment. Id. pp. 9–10. That amendment passed 112–0. Id. p. 10.

During the House debate on Senate Bill 325, Democrats spoke against the bill and Republicans spoke in support. During the House debate on Senate Bill 325, proposed amendments from Democratic Representative Yvonne Holley (to add a referendum), Democratic Representative Darren Jackson (to add two at-large districts to the existing nine numbered districts), and Democratic Representative Rosa Gill (to make the two lettered districts at-large districts) were defeated in the House. See Stipulations ¶ 25. Likewise, during the House debate, Democrats spoke in favor of their amendments, and Republicans spoke against the Democratic amendments. See Tr. Ex. 5, pp. 10–51.

The North Carolina House contains 120 members. Sixty-nine Republicans voted in favor of Senate Bill 325 on second reading, four Republicans voted against it, and two Republicans abstained. See Stipulations ¶ 28. Forty Democrats voted against Senate Bill 325. See id. Four Republicans and one Democrat were absent. See id.

In 2013, all African-Americans in the North Carolina Senate and House were Democrats, and all African-American legislators voted against Senate Bill 325. See id. ¶ 29; Ans. to Wright Compl. [D.E. 30].

On June 13, 2013, Senate Bill 325 was ratified and chaptered as Session Law 2013-110.

20

Stipulations ¶ 26; see Tr. Ex. 438, 481.

Population deviations in the numbered and lettered districts under Senate Bill 325 as enacted were as follows:

| District | Ideal Population | Actual Population | Deviation | Percentage Deviation |
|---|---|---|---|---|
| 1 | 128,713 | 128,190 | -523 | -0.41% |
| 2 | 128,713 | 127,363 | -1,350 | -1.05% |
| 3 | 128,713 | 133,391 | 4,678 | 3.63% |
| 4 | 128,713 | 130,304 | 1,591 | 1.24% |
| 5 | 128,713 | 126,742 | -1,971 | -1.53% |
| 6 | 128,713 | 130,774 | 2,061 | 1.60% |
| 7 | 128,713 | 124,229 | -4,484 | -3.48% |
| A | 450,497 | 472,585 | 22,088 | 4.90% |
| B | 450,497 | 428,408 | -22,089 | -4.90% |

See Stipulations ¶ 27. The maximum population deviation for the seven single-member districts is 7.11% and for the two super districts is 9.8%.

B.

In 1981, the General Assembly established a system of partisan at-large elections for the Wake County Commission that included seven residency districts. See 1981 N.C. Sess. Laws, ch. 983. Under the law, a Wake County Commission candidate had to live in the residency district to be eligible to run, but each of the seven candidates for the Wake County Commission ran countywide and was elected countywide. See id. Once elected, a Commissioner served a four-year term. See id.

Members of the Wake County Board of Commissioners elected from 2000 through 2014, and their political party registrations, are as follows:

| Year | Name | Political Party Registration |
|---|---|---|
| 2000 | Kenn Gardner | Republican |

21

| 2000 | Vernon Malone | Democrat |
|------|---------------|----------|
| 2000 | Betty Lou Ward | Democrat |
| 2002 | Joe Bryan | Republican |
| 2002 | Herb Council | Republican |
| 2002 | Tony Gurley | Republican |
| 2002 | Phil Jeffries | Republican |
| 2004 | Kenn Gardner | Republican |
| 2004 | Betty Lou Ward | Democrat |
| 2004 | Harold Webb | Democrat |
| 2006 | Lindy Brown | Democrat |
| 2006 | Joe Bryan | Republican |
| 2006 | Paul Coble | Republican |
| 2006 | Tony Gurley | Republican |
| 2008 | Stan Norwalk | Democrat |
| 2008 | Betty Lou Ward | Democrat |
| 2008 | Harold Webb | Democrat |
| 2010 | Joe Bryan | Republican |
| 2010 | Paul Coble | Republican |
| 2010 | Tony Gurley | Republican |
| 2010 | Phil Matthews | Republican |
| 2012 | Caroline Sullivan | Democrat |
| 2012 | Betty Lou Ward | Democrat |
| 2012 | James West | Democrat |
| 2014 | John Burns | Democrat |
| 2014 | Matt Calabria | Democrat |
| 2014 | Sig Hutchinson | Democrat |
| 2014 | Jessica Holmes | Democrat |

See Stipulations ¶ 30.

From 2000 through November 2014, African-American candidates were elected to the Wake

County Board of Commissioners by the following margins:

| Year | Candidate | Margin of Victory |
|------|-----------|-------------------|
| 2000 | Vernon Malone | 3.66% |
| 2004 | Harold Webb | 5.24% |
| 2006 | Lindy Brown | 6.30% |
| 2008 | Harold Webb | 17.32% |
| 2012 | James West (unopposed) | 100.00% |
| 2014 | Jessica Holmes | 12.70% |

Id. ¶ 31.

22

After the 2010 census, pursuant to N.C. Gen. Stat. § 153A-22, the Wake County Board of Commissioners redistricted the boundaries of its seven residency districts in 2011. See Stipulations ¶ 33. Under a residency-district system, a candidate must live in the district from which the candidate wishes to run, but all voters in the jurisdiction may vote for all candidates. See, e.g., Dallas Cty. v. Reese, 421 U.S. 477, 477–81 (1975) (per curiam); Dusch v. Davis, 387 U.S. 112, 115–17 (1967). Residency districts need not have substantially equal population, and no one person one vote problem exists because all voters in the jurisdiction may vote for the same candidates. See, e.g., Reese, 421 U.S. at 479–81.

On March 4, 2015, Senator Chad Barefoot introduced Senate Bill 181 to change the method of electing the Wake County Board of Commissioners. See Stipulations ¶ 34. Senate Bill 181 redistricts the Wake County Board of Commissioners using seven numbered single-member districts and two lettered single-member super districts that overlap the seven numbered districts. Id. ¶ 35. Senate Bill 181 uses the same numbered and lettered districts contained in the 2013 Wake County School Board Plan. See id. ¶ 36. Under Senate Bill 181, in November 2016, a candidate from Districts 4, 5, and 6 will be elected under the 2011 BOCC Redistricting Plan and will serve a two-year term. See Tr. Ex. 6, p. 3. In the November 2016 election and every four years thereafter, two members must reside and run in the two super districts established and used in the 2013 Wake County School Board Plan. Id. Those elected in the two super districts in 2016 will serve four-year terms. Id. In the 2018 election and every four years thereafter, seven members must reside and run in the seven numbered districts established and used under the 2013 Wake County School Board Plan. Id.; Tr. Ex. 439. After the 2020 census, the Wake County Commission may redistrict. See Tr. Ex. 439.

23

On March 5, 2015, the Senate Redistricting Committee held a non-voting meeting to hear public comment on Senate Bill 181. See Stipulations ¶ 37. During the meeting, Senator Barefoot explained that the purpose of Senate Bill 181 was "to increase representation and geographic diversity on the Wake County Board of Commissioners and to ensure every Wake County voter has a voice." Tr. Ex. 7, p. 5. Senator Barefoot explained:

> Wake County is the state's most populous county and is part of one of the fastest growing metropolitan areas in the country. Currently, the Commission is made up of seven members, five of which live within a 15-mile radius within the City of Raleigh. 75 percent of towns in Wake County don't have a single representative on the County Commission. Keep in mind more than half of the residents of Wake County live outside of Raleigh.
>
> This bill gives my constituents and all Wake County residents a much-needed voice within their county government. Citizens from suburban and rural communities within Wake County, like my constituents in Wake Forest, Rolesville, Knightdale, Zebulon, Wendell, Garner, work hard and contribute greatly to our tax base, yet have virtually no representation on the Board, and that's just not right.
>
> So what does this bill do? This bill increases representation on the Wake County Board of Commissioners from seven members to nine. One of the new member districts will represent the city and one of the new member districts will represent the county communities.
>
> The bill changes the current at-large election process to a residential election process to ensure geographical diversity on the Board. The bill also aligns the Wake County Commission Districts to the Wake County School Board Districts, which have been upheld by the courts, to provide for increased accountability and transparency between our elected officials.
>
> The current archaic system was developed over 30 years ago when Wake County's population was only roughly 300,000 people. It requires candidates to run outrageously expensive campaigns countywide, limiting the pool of those who are financially able to run and forces our commissioners to serve almost 1 million constituents each, more than all the members of congress.
>
> This is a local office, but let me assure you there is nothing local about representing 1 million people. It is time to increase representation for the Wake County Commission for the citizens of Wake County.

24

Id. pp. 5–7.

On March 10, 2015, the Senate Redistricting Committee heard public comment on Senate Bill 181 and voted to report the bill to the full Senate for consideration. Stipulations ¶ 38. During the hearing, Senator Barefoot again stated that the "purpose of this bill is to increase representation and geographic diversity on the Wake County Board of Commissioners to insure that every Wake County voter has a voice." Tr. Ex. 9, p. 54. Senator Barefoot then discussed communities of interest outside the City of Raleigh that he hoped would have a greater voice if the bill passed. See id. pp. 54–56. Senator Barefoot noted that Senate Bill 181 aligned the districts for the Wake County Commission with those already adopted in the 2013 Wake County School Board Plan, "which have been upheld by the Courts." Id. p. 55 (referencing this court's decision in Wright v. North Carolina, 975 F. Supp. 2d 539 (E.D.N.C. 2014)). During the hearings, some citizens spoke in favor of Senate Bill 181, and some spoke in opposition. Tr. Ex. 9, pp. 58–93.

On March 11 and 12, 2015, the Senate debated and passed Senate Bill 181. See Stipulations ¶ 39. During the debate, Senator Barefoot again stated that the bill's purpose was "to increase representation and geographic diversity and to insure that every Wake County voter has a voice." Tr. Ex. 10, p. 2. Senator Barefoot noted the size and diversity of the communities of interest within Wake County but that five of the seven Wake County Commissioners lived in Raleigh. Id. Senator Barefoot explained that the bill sought to ensure better representation of communities of interest throughout Wake County. See id. pp. 2–4. Senator Barefoot also noted that sometimes running countywide meant that a Commissioner who did not win a majority of votes in his own residency district could still win the election due to the countywide vote. See id. pp. 4–5. Senator Barefoot made the analogy in support of electing Commissioners from single-member districts that the members of the General Assembly are not elected based on a statewide vote. Rather, voters within

25

single-member districts elect General Assembly members. Id. p. 5.

During the debate, Senator Blue asked Senator Barefoot about the maximum population deviation of 4.9% in Districts A and B, and Senator Barefoot responded that "[t]he purpose of this bill is not to open up the line drawing process." Tr. Ex. 10, p. 25. Rather, the bill simply adopts the same structure and map "from the School Board bill that was passed two years ago by this body and has been upheld by the Courts." Id. pp. 25–26.

During debate on Senate Bill 181, a proposed amendment from Senator Stein of Wake County for a referendum was tabled in the Senate. Stipulations ¶ 40; Tr. Ex. 10, pp. 11–12. During the debate, Senator Stein spoke in opposition to the bill. See Tr. Ex. 10, pp. 6–21. Democratic Senator Floyd McKissick of Durham and Granville Counties also spoke in opposition. Id. pp. 28–33. Senator McKissick opined that the districts probably would result in the election of five Republican Commissioners and four Democratic Commissioners. See id. p. 30. Senator Blue also spoke in opposition to the bill. See id. pp. 34–46. Republican Senator Tom Apodaca of Buncombe, Henderson, and Transylvania Counties spoke in favor of the bill. See id. pp. 46–48.

As for individual Senate votes on Senate Bill 181 on second reading, 31 Republican Senators voted in favor, 16 Democratic Senators voted against, and 3 Republican Senators were absent. See Tr. Ex. 11; Stipulations ¶ 41.

On March 31, 2015, the House Elections Committee heard public comment on Senate Bill 181 and voted to report the bill to the full House for consideration. See Stipulations ¶ 42. At the meeting, the Committee heard from some people who supported the bill and some who opposed it. See Tr. Ex. 12; Tr. Ex. 251, pp. 9–54. During the meeting, Senator Barefoot spoke in support of the bill. See Tr. Ex. 251, pp. 3–6, 57–58, 92. He described the communities of interest within rural

26

and suburban Wake County and his hope that the bill would give a voice on the Wake County Commission to those communities of interest. See id. Representative Stam also spoke in favor of the bill, stating his support for having Commissioners elected from single-member districts, giving a voice on the Wake County Commission to communities of interest within rural and suburban Wake County, and using the same electoral districts for the School Board and County Commission to lower costs, lessen voter confusion, and avoid litigation. See id. pp. 6–8, 55–57, 67, 88, 94–95. During the debate, Representative Jackson and Representative Gill spoke in opposition to the bill. See id. pp. 59–66, 68–86.

On April 1, 2015, the House debated and passed Senate Bill 181. Stipulations ¶ 43. During the debate, Representative Stam spoke in support of the bill. See Tr. Ex. 13. Representative Stam explained that the bill increased the Commission's size from seven to nine members. Id. p. 3. He also explained that, in 2016, candidates for Districts 4, 5, and 6 under the 2011 BOCC Redistricting Plan would run under that plan and those elected would serve two-year terms. Id. Likewise, candidates for Districts A and B would run under the new plan in 2016, and those elected in Districts A and B would serve four-year terms. In 2018, all seven single-member districts would be up for election under the new plan, and those elected would serve four-year terms. See id.

Representative Stam explained that Wake County has over 1,000,000 residents and spoke in support of having Commissioners elected in single-member districts instead of having Commissioners elected countywide. Id. pp. 3–4. He then explained:

> What Wake does is we have residential, districts where the seven Commissioners live, but they're voted on countywide and I believe Representative Pendleton was the first person in 100 years from his party to be elected under that scenario back a few years ago when he was younger, but at large elections are just a bad idea unless it's a small town or a small county because at large elections submerge the views of any kind of minority.

27

Whether it's racial, gender, political, rural, urban, they're just a bad idea, because they don't give the representation close to the voters and frankly I have heard very little objection to the fact that . . . this bill proposes district elections for Wake County.

Id. p. 4.

Representative Stam then explained the districts and said:

[W]e didn't become innovative, the drafters of the bill, Senator Barefoot, myself, Representative Pendleton. We said, let's not be innovative[;] let's just do exactly the same districts that we have for our School Board.

Id. pp. 4–5.[6] Representative Stam explained that "there will be a line." Id. p. 5. "[P]eople will much more easily know who their representative is or is not." Id. Moreover, "it will be much easier for the Board of Elections to administer" the 2015 Wake County Commissioners Plan because it is the same as the 2013 Wake County School Board Plan. Id.

Representative Stam stated that he, Senator Barefoot, and Representative Pendelton supported the 2015 Wake County Commissioners Plan because "these districts have already been approved one year ago by the Federal District Court for the Eastern District of North Carolina . . . as complying with the law." Id. pp. 5–6. Representative Stam acknowledged the pending appeal, but did not believe that the appeal would be successful. Id. p. 6. Representative Stam also explained that "after the return of the next census the Wake County Board of Commissioners is free to go ahead and do its own redistricting." Id. Representative Stam did not view the 2015 Wake County Commissioners Plan "as a permanent change." Id.

Representative Stam then again spoke in support of having candidates run in single-member districts instead of running countywide. Id. He noted that the ACLU's website contained articles

_____

[6] Representative Gary Pendleton is a Republican member of the North Carolina House. Representative Pendleton served on the Wake County Commission from 1992 through 1996. In 1992, he was the first Republican elected to the Wake County Commission.

28

explaining why the ACLU "attack[s] at large districts all over the country." Id. According to Representative Stam, the ACLU attacks at large districts because at-large districts "submerge all types of minorities whether they're political, racial, or whatever." Id.

Representative Stam then discussed running countywide versus in a single-member district in Wake County. "It's also the case that if you run countywide in a county like Wake, which has over a million people, which is more than the population of several of the states and is more than a congressional district, it is very expensive for each candidate." Id. p. 7. "Going to direct elections means that a candidate can actually concentrate on one-seventh of the county and . . . if they do direct mail, cut the expense by . . . six-seventh[s]. Of course, T.V. will be the same, but the amount of money people can raise for County Commissioner races is not going to do much T.V. in this kind of media market, maybe a little radio." Id.

During the debate, Representative Gill (id. pp. 9–18), Representative Martin (id. pp. 27–28), and Representative Holley (id. pp. 28–29) spoke in opposition to the bill. During the debate, the House defeated proposed amendments from Representative Gill (to substitute an alternative district map), Representative Jackson (to eliminate the two lettered districts or make them at-large and to move elections to even-numbered years), and Representative Martin (to add a referendum). See Stipulations ¶ 44; Tr. Ex. 12, pp. 3–6; Tr. Ex. 13, pp. 8–33.

As for individual House members' votes on Senate Bill 181 on second reading, 64 Republicans voted in favor, 2 Democrats voted in favor, 41 Democrats voted against, 5 Republicans voted against, 1 Unaffiliated voted against, 5 Republicans were absent, and 2 Democrats were absent. See Stipulations ¶ 45.

In the 2015 General Assembly, all African-Americans in the North Carolina Senate and

29

House were Democrats, and all African-American legislators voted against Senate Bill 181. See id. ¶ 46; compare RWCA Am. Compl. ¶ 69 with Ans. [D.E. 29] ¶ 69.

On April 2, 2015, Senate Bill 181 was ratified and chaptered as Session Law 2015-4. Stipulations ¶ 47. Session Law 2015-4 increases the number of Wake County Commissioners from seven to nine. Session Law 2015-4 divides the county into seven single-member electoral districts designated numerically (1–7) and two regional districts designated by letters A and B. Session Law 2015-4 adopts the same seven single-member numbered electoral districts that are in the 2013 Wake County School Board Plan and also adopts the same two lettered districts that are in the 2013 Wake County School Board Plan. See Tr. Ex. 439. Session Law 2015-4 provides that, beginning in 2016, voters will elect the Wake County Board of Commissioners from the two lettered districts every four years. Id. Session Law 2015-4 provides that, beginning in 2018, voters will elect the Wake County Board of Commissioners from each of the seven single-member districts every four years. Id. Finally, Session Law 2015-4 provides that the structure of the Wake County Board of Commissioners shall not be altered until after the return of the 2020 census. Id.

## III.

## A.

Redistricting state legislative entities is a core, sovereign legislative responsibility which federal courts should make every effort not to preempt. See, e.g., Abrams v. Johnson, 521 U.S. 74, 101 (1997); Miller v. Johnson, 515 U.S. 900, 915 (1995); Voinovich v. Quilter, 507 U.S. 146, 156–57 (1993); Wise v. Lipscomb, 437 U.S. 535, 539 (1978); Chapman v. Meier, 420 U.S. 1, 27 (1975). "Electoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests." Miller, 515

U.S. at 915. State policies and preferences are for a state's elected representatives to decide, and unless the state legislature's policies and preferences violate the United States Constitution, federal courts have no authority to interfere. See, e.g., White v. Weiser, 412 U.S. 783, 794–95 (1973).

Until 1962, the Supreme Court largely deemed state reapportionment and redistricting issues to be nonjusticiable political questions. See, e.g., Colegrove v. Green, 328 U.S. 549, 552–56 (1946).[7] In 1962, however, the Supreme Court decided Baker v. Carr, 369 U.S. 186, 187–88 (1962), and held that a federal court had jurisdiction to consider a Fourteenth Amendment Equal Protection Clause challenge to the apportionment of the Tennessee legislature and that the Equal Protection Clause includes a one person one vote principle. In 1964, in Reynolds v. Sims, 377 U.S. 533 (1964), the Supreme Court expounded on the one person one vote principle and rejected the malapportionment of the Alabama legislature, which continued to have members of its House and Senate elected based on the redistricting plans derived from the 1900 census and the 1900 apportionment. The Supreme Court held that using the 1900 apportionment to allocate seats in the Alabama House and Senate violated the Equal Protection Clause due to the substantial population growth and population shifts that had occurred in Alabama since 1900. See id. at 568, 583–87. For example, the Alabama Senate had 35 members, yet one Senator represented a Senate district with a population of 15,417 while another Senator represented a Senate district with a population of 634,864. See id. at 546.

The Equal Protection Clause of the Fourteenth Amendment requires that state legislative

---

[7] "[A]pportionment refers to the allocation of a legislative body's representatives to existing geographical areas, such as when the members of the United States House of Representatives are apportioned to the various states based on state population . . . ." Daly, 93 F.3d at 1214 n.1. "[D]istricting refers to the actual drawing of geographical boundaries to define a representative's constituents and electors." Id.

31

districts "be apportioned on a population basis" and demands "substantial" population equality, not perfect equality. Id. at 577, 579. The same principles apply to districts for electing subsidiary state government entities exercising "general governmental powers over the entire geographic area served by the body," such as an elected Board of County Commissioners or an elected School Board. See, e.g., Hadley v. Junior Coll. Dist., 397 U.S. 50, 53, 56 (1970) (quotation omitted); Avery v. Midland Cty., 390 U.S. 474, 484–85 (1968); Dusch, 387 U.S. at 114–15.

States must "make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable," but the Supreme Court realizes "that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." Reynolds, 377 U.S. at 577.

The one person one vote principle applies to both congressional districts and state government districts, but the Supreme Court has adopted a much more stringent population-equality standard for congressional districts. As for congressional districts, the Supreme Court has interpreted Article I, § 2 of the Constitution to mandate that "as nearly as is practicable one [person's] vote in a congressional election is to be worth as much as another's." Wesberry v. Sanders, 376 U.S. 1, 7–8 (1964).[8] The Supreme Court's "'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality" of the population in each congressional district. See Kirkpatrick v. Preisler, 394 U.S. 526, 530–31 (1969) (emphasis added). "Unless population variances among congressional districts are shown to have resulted

_____

[8] Under Article I, Section 2, members of the House of Representatives are chosen every two years "by the People of the several States" and apportionment of seats within the House of Representatives is to be based on population, with each state having at least one Representative. U.S. Const. art. I, § 2.

32

Case 5:15-cv-00156-D   Document 64   Filed 02/26/16   Page 32 of 108

despite such [good-faith] effort, the State must justify each variance, no matter how small." Id.; see Tennant v. Jefferson Cty. Comm'n, 133 S. Ct. 3, 5–8 (2012) (per curiam) (holding that West Virginia had justified the 0.79% maximum population deviation between West Virginia's largest and smallest congressional districts); Karcher v. Daggett, 462 U.S. 725, 728, 735–42 (1983) (holding that New Jersey had not justified the 0.69% maximum population deviation between New Jersey's largest and smallest congressional districts); Weiser, 412 U.S. at 755, 790–93 (holding that Texas had not justified the 4.13% maximum population deviation between Texas's largest and smallest congressional districts).

In contrast to the strict population-equality standard that applies to the population of congressional districts, the Supreme Court has held that the Fourteenth Amendment permits larger population deviations in state government districts than in congressional districts so long as the population deviations in state districts are based on "legitimate considerations incident to the effectuation of a rational state policy." Reynolds, 377 U.S. at 579; see Brown v. Thomson, 462 U.S. 835, 842–43 (1983); Mahan v. Howell, 410 U.S. 315, 321–22 (1973).

1.

As for the population-equality standard that applies to state government districts, the Supreme Court has made two principles clear. First, if the maximum population deviation in a state government redistricting plan is under 10%, such a deviation is considered a "minor deviation" and does not "substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation." White v. Regester, 412 U.S. 755, 764 (1973); see Brown, 462 U.S. at 842–43. Accordingly, a state has no obligation to justify such "minor deviations." Brown, 462 U.S. at 842–43 ("Our decisions have established, as a general

33

matter, that an apportionment plan with a maximum population deviation under 10% falls within [the] category of minor deviations."); Gaffney v. Cummings, 412 U.S. 735, 749 (1973) ("We doubt that the Fourteenth Amendment requires repeated displacement of otherwise appropriate state decisonmaking in the name of essentially minor deviations from perfect census-population equality that no one, with confidence, can say will deprive any person of fair and effective representation in his state legislature."); Regester, 412 U.S. at 764 (same). Where the maximum population deviation in a state redistricting plan is under 10%, the Supreme Court presumes that the legislature's plan resulted from an honest and good faith effort to construct districts as nearly of equal population as practical. See, e.g., Brown, 462 U.S. at 842; Gaffney, 412 U.S. at 745, 749–51; Regester, 412 U.S. at 763–64; Daly, 93 F.3d at 1220. The Supreme Court adopted the presumption of good faith in order to avoid unwarranted federal intervention in state redistricting decisions. See, e.g., Brown, 462 U.S. at 842–43; Gaffney, 412 U.S. at 748–51; Regester, 412 U.S. at 761–64.

Consistent with this first principle concerning redistricting plans with maximum population deviations under 10%, the Supreme Court and lower courts consistently have upheld such plans, finding that such minor deviations do not violate the Equal Protection Clause. See, e.g., Gaffney, 412 U.S. at 750–51, 754 (upholding reapportionment plan with 7.83% maximum population deviation); Regester, 412 U.S. at 761, 763–64 (upholding reapportionment plan with 9.9% maximum population deviation); League of Women Voters of Chi. v. City of Chi., 757 F.3d 722, 723–28 (7th Cir. 2014) (upholding reapportionment plan with 8.7% maximum population deviation); Moore v. Itawamba Cty., 431 F.3d 257, 258–61 (5th Cir. 2005) (per curiam) (upholding reapportionment plan with 9.38% maximum population deviation); Rodriguez v. Pataki, 308 F. Supp. 2d 346, 365, 370–71 (S.D.N.Y.) (three-judge court) (upholding reapportionment plan with 9.78% maximum population

34

deviation), summarily aff'd, 543 U.S. 997 (2004); Cecere v. Cty. of Nassau, 274 F. Supp. 2d 308, 311, 318 (E.D.N.Y. 2003) (upholding reapportionment plan with 8.94% maximum population deviation); Marylanders for Fair Representation, Inc. v. Schaefer, 849 F. Supp. 1022, 1033–36 (D. Md. 1994) (three-judge court) (per curiam) (upholding reapportionment plan with 9.84% maximum population deviation); Holloway v. Hechler, 817 F. Supp. 617, 623–24 (S.D. W. Va. 1992) (three-judge court) (upholding reapportionment plans with 9.97% maximum population deviation), summarily aff'd, 507 U.S. 956 (1993); Fund for Accurate & Informed Representation, Inc. v. Weprin, 796 F. Supp. 662, 668 (N.D.N.Y.) (upholding reapportionment plan with 9.43% maximum population deviation), summarily aff'd, 506 U.S. 1017 (1992). But see Larios v. Cox, 300 F. Supp. 2d 1320, 1339–53 (N.D. Ga.) (three-judge court) (per curiam) (invalidating reapportionment plan with 9.98% maximum population deviation), summarily aff'd, 542 U.S. 947 (2004).

2.

Second, if the maximum population deviation in a state government redistricting plan exceeds 10%, then the plan "creates a prima facie case of discrimination and therefore must be justified by the State." Brown, 462 U.S. at 842–43. In order to justify a maximum population deviation above 10%, the state must (1) articulate a rational state policy that justifies the population deviation; (2) explain how the redistricting plan "may reasonably be said to advance" the rational state policy; and (3) demonstrate that the resulting maximum population deviation does not "exceed constitutional limits." Mahan, 410 U.S. at 328; see Voinovich, 507 U.S. at 161–62; Brown, 462 U.S. at 842–43; Swann v. Adams, 385 U.S. 440, 446 (1967). Thus, pursuant to this second principle, the Supreme Court and lower courts have upheld redistricting plans where the maximum population deviation exceeded 10%, the state properly justified the population deviation, and the population

35

deviation was within acceptable constitutional limits. See, e.g., Mahan, 410 U.S. at 319, 321–22, 326–28 (holding that Virginia had properly justified a 16.4% maximum population deviation between Virginia's most-populated state delegate district and least-populated state delegate district based on Virginia's adherence to a state policy of respecting county lines in fashioning state delegate districts); Abate v. Mundt, 403 U.S. 182, 184–87 (1971) (holding that a local government had properly justified a local government reapportionment plan with a 11.9% maximum population deviation due to a desire to preserve political subdivisions); see also Deem v. Manchin, 188 F. Supp. 2d 651, 654, 658 (N.D. W. Va. 2002) (three-judge court) (holding that West Virginia had properly justified a reapportionment plan with a 10.92% maximum population deviation due to West Virginia's desire to preserve political subdivisions); Marylanders for Fair Representation, Inc., 849 F. Supp. at 1036–37 (holding that Maryland had properly justified a reapportionment plan with a 10.67% maximum population deviation due to Maryland's desire to preserve political subdivisions).

As for the constitutional limits of a maximum population deviation in a state government redistricting plan, in Mahan, the Supreme Court stated that the 16.4% maximum population deviation in Virginia's redistricting plan "may well approach tolerable [constitutional] limits." Mahan, 410 U.S. at 329; cf. Connor, 431 U.S. at 418 ("The maximum population deviations of 16.5% in the Senate districts and 19.3% in the House districts can hardly be characterized as de minimis; they substantially exceed the 'under-10%' deviations the Court has previously considered to be of prima facie constitutional validity only in the context of legislatively enacted apportionments."); Chapman, 420 U.S. at 24 ("We believe that a population deviation of [20.14%] in a court-ordered plan is constitutionally impermissible in the absence of significant state policies or other acceptable considerations that require adoption of a plan with so great a variance.");

36

Kilgarlin v. Hill, 386 U.S. 120, 122 (1967) (per curiam) ("[I]t is quite clear that unless satisfactorily justified . . . population variances of the size and significance evident here [26.48%] are sufficient to invalidate an apportionment plan."); Swann, 385 U.S. at 444 ("De minimis deviations are unavoidable, but variations of 30% among senate districts and 40% among house districts can hardly be deemed de minimis and none of our cases suggest[ ] that differences of this magnitude will be approved without a satisfactory explanation grounded on acceptable state policy."). Moreover, although the Supreme Court has not announced a per se rule concerning the outer, permissible maximum population deviation in a state government redistricting plan, the Supreme Court has observed that "no case of ours has indicated that a deviation of some 78% could ever be justified." Morris, 489 U.S. at 702; see Regensburger v. City of Bowling Green, 278 F.3d 588, 596–97 (6th Cir. 2002) (rejecting reapportionment plan with a maximum population deviation of 66.85% as beyond the constitutional limit).

As for what rational state policies may justify population deviations over 10%, the Supreme Court has stated that such rational state policies include (but are not limited to) compactness, contiguity, respect for political subdivisions, respect for communities defined by actual shared interests, preserving the core of prior districts, and incumbency protection. See, e.g., Tennant, 133 S. Ct. at 5–8; Voinovich, 507 U.S. at 161–62; Brown, 462 U.S. at 842–43; Karcher, 462 U.S. at 740; Weiser, 412 U.S. at 795–97.[9]

_____

[9] In Gaffney, the Supreme Court upheld a reapportionment plan with a maximum population deviation of 7.83% where Connecticut asserted that the population deviations were due to an attempt to achieve "rough political fairness" between Republicans and Democrats. See Gaffney, 412 U.S. at 752–54. In Regester, the Supreme Court upheld a reapportionment plan with a maximum population deviation of 9.9% and reversed a three-judge district court's holding that Texas's failure to explain the standards or rational state policies that Texas used to create the plan and the resulting population deviations violated the Fourteenth Amendment. See Regester, 412 U.S. at 763–64.

37

As for rational state policies concerning population deviations in local government redistricting plans, the Supreme Court has held that "viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs." Abate, 403 U.S. at 185; see Dusch, 387 U.S. at 117 (recognizing that defendant's municipal election plan properly "seems to reflect a detente between urban and rural communities that may be important in resolving the complex problems of the modern megalopolis in relation to the city, the suburbia, and the rural countryside"). Furthermore, "the facts that local legislative bodies frequently have fewer representatives than do their state and national counterparts and that some local legislative districts may have a much smaller population than do congressional and state legislative districts, lend support to the argument that slightly greater percentage deviations may be tolerable for local government apportionment schemes." Abate, 403 U.S. at 185.

3.

The Supreme Court has not addressed whether partisan advantage alone is a rational state policy for deviating from population equality in districts. See Cox v. Larios, 542 U.S. 947, 951–52 (2004) (Scalia, J., dissenting). In Larios, a three-judge district court in the Northern District of Georgia analyzed a 2001 reapportionment plan for the 180-member Georgia House and 56-member Georgia Senate. Larios, 300 F. Supp. 2d at 1322–27. Plaintiffs alleged that the plan violated the one person one vote principle even though the maximum population deviation in both the House and Senate plan was 9.98%, and the three-judge court agreed. Id. at 1322.

In Larios, Georgia Democratic legislative leaders admitted that they "made no effort to make the districts as nearly of equal population as was practicable" and believed that any redistricting plan with a maximum population deviation under 10% was within an absolute "safe harbor." Id. at 1325,

38

1341. As a result, in preparing the 2001 reapportionment plan, the Georgia Democratic legislative leaders did not consider any "traditional redistricting criteria [such] as district compactness, contiguity, protecting communities of interest, and keeping counties intact." Id. at 1325. Instead, the Georgia Democratic legislative leaders systematically underpopulated Democratic-leaning districts to allow rural Democrats in southern Georgia and urban Democrats in inner-city Atlanta to retain their legislative influence at the expense of people in mostly Republican suburban Atlanta, even though the population in inner-city Atlanta and southern Georgia was substantially lower than the population of suburban Atlanta. See id. at 1325–28, 1341–42. The Georgia Democratic legislative leaders systematically overpopulated Republican-leaning districts and underpopulated Democratic-learning districts in order to increase the Democratic majority in the Georgia Legislature. The Georgia Democratic leaders also deliberately paired over forty House Republican incumbents against one another and deliberately paired six Senate Republican incumbents against one another in order to reduce the number of Republicans in the Georgia Legislature. See id. at 1329–31, 1347–49. As part of their systematic partisan efforts, the Georgia Democratic legislative leaders completely ignored traditional districting principles of compactness of districts, protecting communities of interest, and contiguity. As for contiguity, the Democratic legislative leaders used devices such as "water contiguity" and "touch-point contiguity" in order to make each district functionally contiguous.[10] Furthermore, as part of an effort to maintain a partisan advantage in the Georgia Legislature, the Georgia Democratic legislative leaders tried to maintain the core of

___

[10] "[W]ater contiguity . . . is predicated on the assumption of line-of-sight across a lake or other body of water." Larios, 300 F. Supp. 2d at 1332. "[T]ouch-point contiguity . . . is predicated on facing corners in a checker-board like fashion." Id. Georgia Democratic legislative leaders used water contiguity to make six House districts contiguous and to make seventeen Senate districts contiguous. Id. Georgia Democratic legislative leaders used touch-point contiguity to make five House districts contiguous and one Senate district contiguous. Id.

39

Democratic-leaning districts but not of Republican-leaning districts. Id. at 1332–34, 1350.

Ultimately, the House plan in Larios had a maximum population deviation of 9.98% and an average deviation of 3.47%. Id. at 1326. Ninety of the 180 House districts had population deviations greater than +/- 4%. Sixty of the 180 House districts had population deviations greater than +/- 4.5%, and 20 of the 180 House districts had population deviations greater than +/- 4.9%. Id. As for the Senate plan, the maximum population deviation was 9.98% with an average deviation of 3.78%. Id. at 1327. Thirty-seven of the 56 Senate districts had population deviations greater than +/- 4%. Thirty-one of the 56 Senate districts had population deviations greater than +/- 4.5%, and 16 of the 56 Senate districts had population deviations greater than +/- 4.9%. Id. at 1327.

During the Larios trial, the Georgia Legislature's only defense was the purported absolute "safe harbor" of a plan with a maximum population deviation under 10%. See id. at 1340–42, 1349. The three-judge court rejected that legal argument. Id. Furthermore, the three-judge court held that it did not have to resolve "whether . . . partisan advantage alone may justify deviations in population, because . . . the redistricting plans [were] plainly unlawful." Id. at 1352. Specifically, plaintiffs proved that the Georgia Legislature did not make any effort to construct districts as nearly of equal population as is practicable, that it ignored all traditional districting criteria, and that the 9.98% maximum population deviations in the House and Senate plans were "not supported by any legitimate, consistently applied state interest but, rather, resulted from the arbitrary and discriminatory objective of increasing the political power of southern Georgia and inner-city Atlanta at the expense of voters living in other parts of the state, and from the systematic favoring of Democratic incumbents and the corresponding attempts to eliminate as many Republican incumbents as possible." See id. at 1352–53. Thus, the three-judge court held the population deviations in the

40

2002 House and Senate plans violated the Equal Protection Clause. Id.

Georgia appealed, and the Supreme Court summarily affirmed. See Larios, 542 U.S. at 947–50. "Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance cannot be gleaned solely from the opinion below." Mandel v. Bradley, 432 U.S. 173, 176 (1977) (per curiam). When the Supreme Court summarily affirms, it affirms "the judgment but not necessarily the reasoning by which it was reached." Id. (quotation omitted). "[N]o more may be read into [a summary affirmance] than was essential to sustain [the] judgment." Anderson v. Celebrezze, 460 U.S. 780, 784 n.5 (1983). A "summary affirmance settles the issues for the parties, and is not to be read as a renunciation by [the] Court of doctrines previously announced in [its] opinions after full argument." Mandel, 432 U.S. at 176 (quotation omitted); see Wright, 787 F.3d at 266–67.

In dissenting from the Supreme Court's summary affirmance in Larios and urging the Supreme Court to set the case for argument, Justice Scalia observed that a "series of our cases establish the principle that minor deviations among districts—deviations of less than 10%—are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." Larios, 542 U.S. at 951 (Scalia, J., dissenting) (quotations omitted) (citing Voinovich, Brown, and Gaffney). According to Justice Scalia, "politics as usual" is a "traditional redistricting criterion," and "a constitutional one, so long as it does not go too far." Id. at 952 (discussing Vieth v. Juberlirer, 541 U.S. 267 (2004)).[11]

---

[11] In Vieth, the Supreme Court rejected as nonjusticiable a political gerrymandering claim because there were no judicially discernable and manageable standards under the Constitution to adjudicate a legislature's use of political affiliation in a redistricting plan and to discern when such use violated the Constitution. See Vieth, 541 U.S. at 281–306 (plurality opinion); id. at 308–09 (Kennedy, J., concurring). Justice Kennedy remained open to the justiciability of a political gerrymandering claim, but stated that "[a] decision ordering the correction of all election district

41

Furthermore, Justice Scalia opined that "[i]t is not obvious to me that a legislature goes too far when it stays within the 10% disparity in population our cases allow." Id. "To say that it does is to invite allegations of political motivation whenever there is a population disparity, and thus to destroy the 10% safe harbor our cases provide." Id. According to Justice Scalia, "[f]erreting out political motives in minute population deviations seems to me more likely to encourage politically motivated litigation than to vindicate political rights." Id.

In 2006, a Supreme Court plurality stated that Larios "does not give clear guidance" on whether partisan advantage alone may justify minor population deviations. See League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 422–23 (2006) (plurality opinion).[12] Furthermore, on December 8, 2015, in Harris v. Arizona Independent Redistricting Commission, 993 F. Supp. 2d 1042 (D. Ariz. 2014) (three-judge court) (per curiam), probable jurisdiction noted, 135 S. Ct. 2926 (2015), as amended, 135 S. Ct. 2946 (2015), the Supreme Court heard oral argument, and one of the questions presented was, "Does the desire to gain partisan advantage for one political party justify

_____

lines for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process." Id. at 306 (Kennedy, J., concurring). Justice Kennedy also observed that "[o]ur attention has not been drawn to statements of principled, well-accepted rules of fairness that should govern districting, or to helpful formulations of the legislature's duty in drawing district lines." Id. at 308. Moreover, the plurality and Justice Kennedy opined that recognizing a political gerrymandering claim without judicially discernable and manageable standards would endlessly insert federal and state courts into redistricting and thereby thwart the political process and bring "partisan enmity" upon the courts. Id. at 301 (plurality opinion); see id. at 317 (Kennedy, J., concurring).

[12] The Supreme Court has held that political affiliation is a traditional race-neutral districting principle that can defeat a claim of racial gerrymandering. See, e.g., Ala. Legislative Black Caucus v. Ala., 135 S. Ct. 1257, 1270 (2015) (stating that traditional race-neutral districting principles include "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation") (quotation and citation omitted); Bush v. Vera, 517 U.S. 952, 964, 968 (1996) (plurality opinion) (recognizing political affiliation as a traditional race-neutral districting principle); Easley v. Cromartie, 532 U.S. 234, 257–58 (2001) (Cromartie II) (same).

intentionally creating over-populated legislative districts that result in tens of thousands of individual voters being denied Equal Protection because their individual votes are devalued, violating the one-person, one-vote principle?" Jurisdictional Statement at i, Harris v. Ariz. Indep. Redistricting Comm'n, No. 14-232, 2014 WL 4294959 (U.S. Aug. 25, 2014).

In Harris, individual voters challenged the redistricting plan that the Arizona Independent Redistricting Commission ("Commission") adopted for Arizona's House and Senate districts. See Harris, 993 F. Supp. 2d at 1046. The maximum population deviation in the Commission's redistricting plan was 8.8%. See id. at 1050. The Harris plaintiffs recognized that such a maximum population deviation was a "minor deviation" under governing Supreme Court one person one vote precedent. See id. at 1050, 1060; see also Brown, 462 U.S. at 842. Nonetheless, the Harris plaintiffs argued that the Commission systematically underpopulated Democratic-leaning districts and systematically overpopulated Republican-leaning districts, and the Commission's redistricting plan thereby allegedly violated the Fourteenth Amendment's one person one vote principle. See Harris, 993 F. Supp. 2d at 1046. The Commission responded that it based the population deviations on its effort to comply with Section 5 of the Voting Rights Act and to obtain preclearance of the redistricting plan from the Department of Justice on the "first attempt." Id. at 1046–47, 1055.

In Harris, a three-judge district court in the District of Arizona held a trial in March 2013. See id. at 1068 n.9. On April 29, 2014, the three-judge court issued its opinion. See id. at 1042. In a fractured 2–1 per curiam opinion, the three-judge court upheld the Commission's redistricting plan and rejected plaintiffs' one person one vote claim. Judge Roslyn Silver wrote an opinion concurring in part, dissenting in part, and concurring in the judgment. See id. at 1080–90 (Silver, J., concurring in part, dissenting in part, and concurring in the judgment). Judge Neil Wake

43

concurred in part and dissented in part. See id. at 1090–1109 (Wake, J., concurring in part and dissenting in part). Judge Richard Clifton also was on the panel. See id. at 1046.

In Harris, the three-judge court "assume[d] without deciding that partisanship is not a legitimate reason to deviate from population equality." Id. at 1047 (per curiam opinion).[13] The three judges, however, disagreed on the appropriate burden of proof where plaintiffs challenge a redistricting plan that contains minor deviations. Judge Clifton opined that plaintiffs had to prove that partisanship predominated over legitimate considerations. Id. at 1072 n.10. Judge Silver opined that plaintiffs had to prove that partisanship was the "actual and sole reason for the [challenged] population deviations." Id. at 1085 (Silver, J., concurring in part, dissenting in part, and concurring in the judgment). Judge Wake opined that devising an appropriate mixed-motive standard is very difficult, but that "the valid motive must fairly cover the entirety of the otherwise wrongful inequality [in population]." Id. at 1106 (Wake, J., concurring in part and dissenting in part). Nonetheless, because Judge Silver agreed with Judge Clifton that plaintiffs had failed to prove that partisanship predominated over legitimate considerations in creating the minor population deviations in the Commission's redistricting plan, plaintiffs necessarily failed to prove that partisanship was the "actual and sole reason" for the minor population deviations in the Commission's redistricting plan.

_____

[13] In Judge Silver's concurring opinion, Judge Silver stated that she doubted that a maximum population deviation "below ten-percent, motivated by partisanship[,] offend[s] the Equal Protection Clause." Id. at 1083 (Silver, J., concurring in part, dissenting in part, and concurring in the judgment). Judge Silver acknowledged that redistricting "always" has been "recognized as a profoundly partisan process," explained at length why Larios "cannot bear nearly the weight" that the Harris plaintiffs "wish," and urged the Supreme Court to decide "[i]f plaintiffs' theory is viable, and maps containing minor deviations can be challenged as attempts to give one political party an electoral advantage." Id. at 1084–85. Judge Silver then stated that if "plaintiffs' theory is viable," federal courts should prepare "to be deluged with challenges to almost every redistricting map" and lamented the "tremendous expenditure of resources" that it takes to resolve such a one person one vote claim. Id. at 1085.

44

See id. at 1072 n.10.

As for whether partisanship played any role in the minor population deviations in the Commission's redistricting plan, Judge Silver did not believe that plaintiffs proved that partisanship played any role in the minor population deviations in the Commission's redistricting plan. See id. at 1046 n.1. Judge Clifton and Judge Wake disagreed, finding that plaintiffs did prove that partisanship played some role in some of the minor population deviations in the Commission's redistricting plan. Id.

Ultimately, Judges Clifton and Silver found that the minor population deviations in the Commission's redistricting plan primarily resulted from the Commission's good-faith effort to comply with the Voting Rights Act, that compliance with the Voting Rights Act is a rational state policy, and that the Supreme Court's decision in Shelby County v. Holder, 133 S. Ct. 2612, 2631 (2013) (holding that Section 4(b) of the Voting Rights Act is unconstitutional), did not invalidate the Commission's reliance on the Voting Rights Act to justify the minor population deviations in the Commission's redistricting plan. See Harris, 993 F. Supp. 2d at 1046, 1073–76, 1080. Accordingly, the Harris majority upheld the Commission's redistricting plan and rejected plaintiffs' one person one vote challenge to the "minor deviations" in the Commission's redistricting plan. Judge Wake dissented and concluded that partisanship aimed at helping Democrats motivated the minor population deviations in the Commission's redistricting plan, that such a motive was improper, and that compliance with Section 5 of the Voting Rights Act and obtaining preclearance is not a legitimate state policy after Shelby County. Id. at 1090–1109 (Wake, J., concurring in part and dissenting in part). To date, the Supreme Court has not decided Harris.

45

B.

Here, plaintiffs challenge the 2013 Wake County School Board Plan and the 2015 Wake County Commissioners Plan and concede that the maximum population deviation in each plan is under 10%. When plaintiffs challenge a redistricting plan with an overall population deviation under 10%, the Supreme Court initially requires plaintiffs to prove a prima facie case of invidious discrimination. See, e.g., Gaffney, 412 U.S. at 740–41; Regester, 412 U.S. at 759, 763–64.[14] Moreover, the Supreme Court requires plaintiffs to prove such a prima facie case even where there has been a trial. See, e.g., Gaffney, 412 U.S. at 738–51 (reversing judgment for plaintiffs after trial

---

[14] The Supreme Court's one person one vote jurisprudence discusses both "invidious discrimination" and "arbitrariness." See, e.g., Brown, 462 U.S. at 843; Gaffney, 412 U.S. at 741, 745, 751; Regester, 412 U.S. at 764; Roman v. Sincock, 377 U.S. 695, 710 (1964); Reynolds, 377 U.S. at 561. The Supreme Court has used arbitrariness and invidious discrimination interchangeably in equal-protection analysis. See, e.g., City of New Orleans v. Dukes, 427 U.S. 297, 303–04 (1976) (applying rational-basis review under the Equal Protection Clause and noting that "it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment"). In Daly, the Fourth Circuit added "bad faith" as an independent limit on population deviations in a state redistricting plan. See Daly, 93 F.3d at 1222; see also Wright, 787 F.3d at 266.

This court has not located any case where the Supreme Court has used "bad faith" in its equal-protection analysis. Of course, the concept of "bad faith" arises in state tort law. See, e.g., Polikoff v. Fin. Serv. Co., 205 N.C. 631, 633, 172 S.E. 356, 358 (1934) ("Bad faith cannot be defined with mathematical precision. The ultimate definition of the term would depend upon the facts and circumstances of a given controversy. Certainly, it implies a false motive or a false purpose, and hence it is a species of fraudulent conduct. Technically, there is, of course, a legal distinction between bad faith and fraud, but for all practical purposes bad faith usually hunts in the fraud pack.") (quotation omitted)). Presumably, the Fourth Circuit added the concept of "bad faith" in Daly due to the Supreme Court's reference in its one person one vote jurisprudence to a legislature's obligation to "make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable" while recognizing "that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." Reynolds, 377 U.S. at 577; see Brown, 462 U.S. at 842–43. In any event, to the extent that the Fourth Circuit's reference to "bad faith" in Daly and Wright is distinct from invidious discrimination and arbitrariness as used in Supreme Court one person one vote jurisprudence, the prima facie case requirement still applies.

46

because plaintiffs failed to prove a prima facie case of invidious discrimination in case involving redistricting plan with a maximum population deviation of 7.83%); Regester, 412 U.S. at 759, 763–64 (reversing judgment for plaintiffs after trial because plaintiffs failed to prove a prima facie case of invidious discrimination in case involving redistricting plan with a 9.9% maximum population deviation). The Supreme Court, however, has not expressly articulated how a plaintiff challenging a redistricting plan with a maximum population deviation under 10% proves a prima facie case of invidious discrimination.

Under Title VII of the Civil Rights Act of 1964, the Supreme Court has stated that "[t]he prima facie case serves an important function in . . . litigation" by "eliminat[ing] the most common nondiscriminatory reasons" for the challenged action. Tex. v. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253–54 (1981); see Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977) (holding that plaintiffs must "at least" negate the "most common legitimate reasons" that could explain the employer's action); Miles v. Dell, Inc., 429 F.3d 480, 488 n.5 (4th Cir. 2005). This court concludes that the prima facie case requirement in a one person one vote challenge serves the same purpose as the prima facie case requirement in a Title VII case. Thus, in order to prove a prima facie case in a one person one vote challenge, plaintiffs must "at least" negate the "most common legitimate reasons" that could explain the legislature's action. See Int'l Bhd. of Teamsters, 431 U.S. at 358 n.44.

Notwithstanding the Supreme Court's reference to a prima facie case requirement in both Title VII cases and one person one vote cases, the Supreme Court has made clear that the review of the prima facie case where a plaintiff challenges a redistricting plan with a maximum population deviation under 10% is different than the review of the prima facie case in a Title VII case.

47

Specifically, even after a trial on the merits concerning a one person one vote claim with a maximum population deviation under 10%, a court must determine whether a plaintiff established a prima facie case. See, e.g., Gaffney, 412 U.S. at 750–51 (reversing a three-judge district court's invalidation of Connecticut's redistricting plan for its House with a maximum population deviation of 7.83%, holding that plaintiffs had not proven a prima facie case at trial, and stating that federal judicial involvement in analyzing Connecticut's justifications for its redistricting plan "should never [have] beg[un]" because plaintiffs failed to prove a prima facie case of invidious discrimination); Regester, 412 U.S. at 759, 763–64 (reversing a three-judge district court's invalidation of Texas's redistricting plan for its House with a maximum population deviation of 9.9% and holding that plaintiffs had not even proven a prima facie case of invidious discrimination at trial). In contrast, in Title VII cases, the Supreme Court has held that, after a trial on the merits, it "is no longer relevant" whether plaintiff proved a prima facie case because the burden-shifting prima facie framework is "merely a sensible, orderly way to evaluate the evidence." U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) (quotation omitted). The distinction in one person one vote cases where the maximum population deviation is under 10% arises due to the profound, sovereign responsibility of each state concerning reapportionment and because a state need not justify minor population deviations in a state reapportionment plan. See, e.g., Gaffney, 412 U.S. at 739–51; Regester, 412 U.S. at 759, 763–64.

The prima facie case requirement in one person one vote cases where the maximum population deviation is under 10% comports with the procedural posture of most one person one vote cases. In most one person one vote cases, plaintiffs allege that a redistricting plan violates the Fourteenth Amendment and seek a preliminary injunction and a permanent injunction concerning

48

the state's use of the redistricting plan in an impending election. The preliminary injunction hearing often will follow the denial of a motion to dismiss but precede a motion for summary judgment. As a practical matter, many preliminary injunction hearings are materially indistinguishable from a bench trial, and courts have the authority to consolidate the preliminary injunction hearing with a trial on the merits. See Fed. R. Civ. P. 65(a); Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). Moreover, given the expedited nature of most redistricting challenges and the inevitable request from plaintiffs to a federal court to enjoin the use of a redistricting plan in an impending state election, federal courts routinely expedite such cases. For example, in this case, in light of the request for both a preliminary injunction and a permanent injunction and the impending 2016 elections, the parties and the court sought to avoid having two bench trials (one concerning the preliminary injunction and one on the merits). Thus, no party filed a motion for summary judgment, and the court expedited the case and held a bench trial on December 16–18, 2015.

## C.

As part of a prima facie case, plaintiffs who challenge a state redistricting plan with a maximum population deviation under 10% must overcome the presumption of constitutionality that attaches to such a redistricting plan. See Brown, 462 U.S. at 842–43; Gaffney, 412 U.S. at 748–51; Regester, 412 U.S. at 761–64. Of course, in evaluating the evidence, even if a plaintiff proves a prima facie case, a plaintiff in the Fourth Circuit ultimately must prove by a preponderance of the evidence that the redistricting plan "was the product of bad faith, arbitrariness, or invidious discrimination." Daly, 93 F.3d at 1222; see Wright, 787 F.3d at 266.[15]

_____

[15] The court recognizes the extraordinary tension between Vieth's holding that there are no judicially discernable standards to adjudicate a partisan gerrymandering claim that districts are "politically unfair" versus adjudicating a one person one vote claim under Larios that partisanship has gone "too far." See Vieth, 541 U.S. at 281–306 (plurality opinion); id. at 308–09 (Kennedy, J.,

49

Given the "sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments," Miller, 515 U.S. at 916, courts must exercise considerable restraint before inferring that a state legislative entity intentionally departed from equal-population principles due to invidious discrimination, arbitrariness, or bad faith. See, e.g., Brown, 462 U.S. at 842–43; Gaffney, 412 U.S. at 748–51; Regester, 412 U.S. at 761–64. "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." Miller, 515 U.S. at 915. Thus, states do not have to justify "minor deviations" to the federal judiciary absent a strong initial evidentiary showing of invidious discrimination, arbitrariness, or bad faith. See, e.g., Gaffney, 412 U.S. at 748–51; Regester, 412 U.S. at 761–64; Daly, 93 F.3d at 1217–18. The Supreme Court's prima facie case requirement in one person one vote cases where the maximum population deviation is under 10% ensures against "repeated displacement of otherwise appropriate state decisonmaking in the name of essentially minor deviations from perfect census-population equality" and against federal courts becoming "bogged down in a vast, intractable apportionment slough . . . when there is little, if anything, to be accomplished by doing so." Gaffney, 412 U.S. at 749–50; see Regester, 412 U.S. at 759, 763–64.

Plaintiffs concede that partisanship can play a role in redistricting, including a role in "minor" population deviations in a redistricting plan. See, e.g., Gaffney, 412 U.S. at 753 ("The very essence of districting is to produce a different—a more 'politically fair'—result than would be reached with

---

concurring). The fractured opinion in Harris concerning the proper burden of proof to apply to a partisanship challenge to minor population deviations highlights the tension. Compare Harris, 993 F. Supp. 2d at 1072 n.10, with id. at 1085 (Silver, J., concurring in part, dissenting in part, and concurring in the judgment), and id. at 1106 (Wake, J., concurring in part and dissenting in part). The Fourth Circuit in Daly and Wright did not address this tension. Cf. Wright, 787 F.3d at 266–67; Daly, 93 F.3d at 1222. Nonetheless, this court has focused on whether plaintiffs proved that each challenged plan "was the product of bad faith, arbitrariness, or invidious discrimination." Daly, 93 F.3d at 1222; Wright, 787 F.3d at 266.

50

elections at large, in which the winning party would take 100% of the legislative seats. Politics and political considerations are inseparable from districting and apportionment."); Weiser, 412 U.S. at 795–96 ("Districting inevitably has sharp political impact and inevitably political decisions must be made by those charged with the task."). Nevertheless, plaintiffs allege that the General Assembly took partisanship "too far" when it enacted the 2013 Wake County School Board Plan and the 2015 Wake County Commissioners Plan. Essentially, plaintiffs contend that the 2013 Wake County School Board and the 2015 Wake County Commissioners Plan resulted from "excess" partisanship aimed at Democratic incumbents who support "progressive" education policies on the non-partisan Wake County School Board, urban voters, and voters who favor Democratic candidates for the partisan Wake County Commission. See Wright Compl. ¶¶ 62, 66; RWCA Am. Compl. ¶¶ 63–64. As such, plaintiffs contend that each plan was the product of the General Assembly's invidious discrimination, arbitrariness, or bad faith.

In Harris, the Solicitor General addressed the relationship between the prima facie case standard in the Supreme Court's one person one vote jurisprudence and a claim that minor deviations in a redistricting plan resulted from "excess" partisanship. See Brief of the United States as Amicus Curiae, Harris v. Ariz. Indep. Redistricting Comm'n, No. 14-232, 2015 WL 6690030 (U.S. Nov. 2, 2015) ("Solicitor General's Brief"). In the Solicitor General's Brief in Harris, the Solicitor General wrote:

As the Gaffney Court recognized, '[t]he reality is that redistricting inevitably has and is intended to have substantial political consequences.' 412 U.S. at 753. The Court accordingly has not interpreted constitutional standards to require the 'impossible task of extirpating politics from what are the essentially political processes of the sovereign states.' Id. at 754. Recognizing that '[p]olitics and political considerations are inseparable from districting and apportionment,' Gaffney deemed it 'idle *** to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it' – even where the map contains

51

minor population deviations. Id. at 752–53.

Id. at *17 (alterations in original). The Solicitor General continued in his brief in Harris:

Indeed, if minor deviation coupled with allegations of partisanship sufficed to make out a prima facie constitutional violation, the risk of federal court over involvement would skyrocket. 'District lines are rarely [politically] neutral phenomena,' Gaffney, 412 U.S. at 73, so a challenger may always credibly contend that lines in a map with minor disparities were motivated in some part by partisanship. If that allegation suffices to require justification by the state, virtually no state legislative map will be immune from challenge.

See id. at *17–18 (alterations in original). The Solicitor General continued:

States will have no choice but to seek perfect population equality to avoid intrusive judicial inquiries into districting decisions and possible federal-court control of the districting process. That is precisely the result this Court has repeatedly sought to avoid. See, e.g., Brown, 462 U.S. at 842; Gaffney, 412 U.S. at 749–51.

Id. at *18.

The institutional concerns that the Solicitor General expressed in Harris are reflected in the legal position of the defendant Wake County Board of Elections. The Wake County Board of Elections must administer whatever redistricting plan that the General Assembly (or its local government designee) enacts.[16] However, the Wake County Board of Elections (or the 99 other County Boards of Elections in North Carolina) plays no role in enacting such redistricting plans.

_____

[16] Under the North Carolina Constitution, counties, cities, and towns are creatures of the state. See N.C. Const. art. VII, § 1. The North Carolina Constitution gives the General Assembly the power to "provide for the organization and government and the fixing of boundaries of counties, cities, and towns." Id. Thus, "[m]unicipalities have no inherent powers; they have only such powers as are delegated to them by legislative enactment." In re Ordinance of Annexation No. 1977-4, 296 N.C. 1, 16–17, 249 S.E.2d 698, 707 (1978); see Ramsey v. Rollins, 246 N.C. 647, 651, 100 S.E.2d 55, 57 (1957); O'Neal v. Jennette, 190 N.C. 96, 129 S.E. 184, 185–86 (1925); Jones v. Madison Cty. Comm'rs, 137 N.C. 579, 50 S.E. 291, 297 (1905); Comm'rs of Dare Cty. v. Comm'rs of Currituck Cty., 95 N.C. 189, 192 (1886). Accordingly, the General Assembly can (and sometimes does) delegate the authority to enact redistricting plans to local government units within North Carolina's 100 counties or can redistrict itself via a local bill. See N.C. Gen. Stat. §§ 115C-37(i), 153A-22; Tr. Ex. 447.

Case 5:15-cv-00156-D   Document 64   Filed 02/26/16   Page 52 of 108

Thus, a County Board of Elections has no access to witnesses or evidence from which to "justify" population deviations (or anything else) in a redistricting plan. Furthermore, if a plaintiff successfully challenges a redistricting plan with "minor deviations" as "too partisan" and prevails, the County Board of Elections will be the entity from which plaintiffs will seek to recover costs and attorney's fees under 42 U.S.C. § 1988. See, e.g., Lefemine v. Wideman, 133 S. Ct. 9, 10–12 (2012) (per curiam); Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 550–55 (2010); Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 602–04 (2001). Accordingly, not enforcing the prima facie case requirement in a one person one vote challenge to a plan with a maximum population deviation under 10% will incentivize a County Board of Elections to either (1) quickly concede constitutional liability in order to avoid defense costs and a potentially large attorney's fee award against it under 42 U.S.C. § 1988 if plaintiffs prevail or (2) defend a redistricting plan with minor population deviations, but face the prospect of incurring both sizeable defense costs and a sizeable attorney's fees award against it under 42 U.S.C. § 1988 if a court concludes that a plan with "minor deviations" violates the Equal Protection Clause. Furthermore, if a County Board of Elections admits during litigation to the unconstitutionality of a redistricting plan with minor population deviations that it did not create, a federal court then (inevitably) must decide whether to enjoin the enforcement of that redistricting plan in an impending election and whether to order the legislative entity that enacted the redistricting plan to engage (again) in redistricting without stating precisely to the legislative entity how it violated the Constitution. Cf. Vander Linden v. Hodges, 193 F.3d 268, 275–81 (4th Cir. 1999) (explaining precisely how South Carolina's county legislative delegation system, under which each state legislator was a member of a legislative delegation and had statutory authority over certain aspects

53

of local government in counties within that legislator's district, violated the Fourteenth Amendment's one person one vote principle and how the South Carolina legislature could remedy the constitutional deficiency).

Federal courts have the power to enjoin an election under a duly enacted but unconstitutional state redistricting plan. Nonetheless, such a remedy is extraordinary, particularly when an election is imminent. See, e.g., Upham v. Seamon, 456 U.S. 37, 44 (1982); Ely v. Klahr, 403 U.S. 108, 113–15 (1971); Whitcomb v. Chavis, 396 U.S. 1055 (1970); Kilgarlin, 386 U.S. at 121; Reynolds, 377 U.S. at 585–86; accord Purcell v. Gonzalez, 549 U.S. 1, 4–6 (2006); Williams v. Rhodes, 393 U.S. 23, 34–35 (1968). Moreover, given that North Carlina's population now exceeds 10,000,000 people and that its 100 counties contain countless local government entities such as county commissions, city councils, town councils, and school boards that regularly have to be reapportioned, the inevitable result of not enforcing the prima facie case requirement where a plaintiff challenges a redistricting plan with minor population deviations would be a de facto requirement of perfect population equality in each local government district in order to avoid federal judicial intervention and attorney's fees. As the Solicitor General made clear in his brief in Harris, such an outcome contradicts the Supreme Court's one person one vote jurisprudence. See Solicitor General's Brief at *18. Such an outcome also tramples the Supreme Court's decision in Gaffney. See Gaffney, 412 U.S. at 748–51.

In Gaffney, the Supreme Court evaluated "whether the population variations among the election districts" for Connecticut's General Assembly "made out a prima facie case of invidious discrimination under the Equal Protection Clause and whether an otherwise acceptable reapportionment plan is constitutionally vulnerable where its purpose is to provide districts that

54

would achieve 'political fairness' between the political parties." Id. at 735–36. The maximum population deviation in Connecticut's 36-member Senate plan was 1.81%. Id. at 737. The maximum population deviation in Connecticut's 151-member House plan was 7.83%. Id.

In Gaffney, a three-judge district court in the District of Connecticut held a trial concerning the plaintiffs' one person one vote challenge to Connecticut's House and Senate redistricting plans. Plaintiffs argued that the population deviation in the House and Senate redistricting plans violated the Equal Protection Clause and alleged that the redistricting plans contained a "built-in bias in favor of the Republican Party." Id. at 739 (quotation omitted). After the trial, the three-judge court invalidated Connecticut's redistricting plans for the House and Senate and permanently enjoined Connecticut from using the plans in future elections. See id. The three-judge court held that the deviations from population equality in the House districts "[were] not justified by any sufficient state interest" and that the redistricting plans "denie[d] equal protection of the law to voters in the districts of greater population." Id. at 739–40 (quotation omitted). In support of its conclusion, the three-judge court noted that the enacted 151-member House plan included 39 House districts with a population deviation above 3% and 73 House districts with a population deviation above 2%. See Cummings v. Meskill, 341 F. Supp. 139, 142 (D. Conn. 1972) (three-judge court) (opinion below). Moreover, the enacted House plan cut the boundary lines of 47 of Connecticut's 169 towns, 29 of the 47 towns were cut more than once, and the plan created 78 segments of towns in the 151 House districts. See id. Furthermore, at trial, plaintiffs presented an alternative House plan with a maximum population deviation of 2.61%. See Gaffney, 412 U.S. at 738–39 & n.6. The three-judge court also held that Connecticut's "policy of partisan political structuring [to achieve rough political fairness between Democrats and Republicans] cannot be approved as a legitimate reason for

Case 5:15-cv-00156-D   Document 64   Filed 02/26/16   Page 55 of 108

violating the requirement of numerical equality of population in districting." Id. at 740 (citations and quotations omitted).

After reviewing the trial record, the Gaffney Court reversed the three-judge court and held that plaintiffs failed to prove a prima facie case of invidious discrimination. Id. at 740–41. In reaching this conclusion, the Gaffney Court acknowledged the overall maximum population deviations of approximately 2% in the Connecticut 36-member Senate plan and approximately 8% in Connecticut's 151-member House plan and acknowledged that the record contained other redistricting plans that had much lower maximum population deviations than the adopted plans. See id. at 737–39. The Gaffney Court also acknowledged that the plan drafters "consciously and overtly adopted and followed a policy of 'political fairness,' which aimed at a rough scheme of proportional representation of the two major political parties." Id. at 738. Thus, the Connecticut plan drafters structured the House and Senate districts to reflect "as closely as possible the actual (statewide) plurality of vote on the House or Senate lines in a given election." Id. (quotation and alterations omitted). "Rather than focusing on party membership in the respective districts, the [plan drafters] took into account the party voting results in the preceding three statewide elections, and, on that basis, created what was thought to be a proportionate number of Republican and Democratic legislative seats." Id. Moreover, the trial record reflected that the plan for the Connecticut House resulted in "approximately 70 safe Democratic seats, 55 to 60 safe Republican seats, with the balance characterized as probable or swing Democratic or Republican or just plain swing." Id. at 738 n.4 (quotation omitted). Furthermore, the plan drafters also cut 47 out of 169 Connecticut towns. Id. at 738 & n.3. The plan drafters also rejected alternative plans which either cut fewer town boundaries or resulted in much lower population deviations from perfect population equality. Id.

56

In reversing the three-judge court, the Gaffney Court held that plaintiffs' evidence failed to establish a prima facie case of invidious discrimination. Id. at 740–51. Furthermore, although at trial Connecticut had offered justifications for the minor population deviations in the redistricting plans, the Gaffney Court held that Connecticut had no obligation to justify the minor population deviations in the House and Senate plans and that the federal court's deep involvement in Connecticut's redistricting process "should never" have begun. Id. at 741–43, 751–54. In reaching this conclusion, the Gaffney Court acknowledged the trial record and the maximum population deviations of "about 8%" in the Senate plan and "about 2%" in the House plan, but it held that the challengers had failed to prove a prima facie case of invidious discrimination. See id. at 740–43, 751–54.

In explaining its decision, the Gaffney Court emphasized that state redistricting plans only require "substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." Id. at 744 (quotation omitted). The Gaffney Court explained that census "figures may be as accurate as such immense undertakings can be, but they are inherently less than absolutely accurate." Id. at 745. Thus, "it makes little sense to conclude from relatively minor 'census population' variations among legislative districts that any person's vote is being substantially diluted." Id. at 745–46. "The 'population' of a legislative district is just not that knowable to be used for such refined judgments." Id. at 746. Furthermore, "total population, even if absolutely accurate as to each district when counted, is nevertheless not a talismanic measure of the weight of a person's vote under a later adopted reapportionment plan." Id. After all, "[d]istrict populations are constantly changing" and people

57

counted in the census do not equate to voters. Id. For example, the census counts those people who are too young to vote, those disqualified to vote (such as felons and non-citizens), and transient members of a given district at a given time (such as students, military personnel, or prisoners). Id. at 746–47. Likewise, census population figures in a given district at a given moment in time reveal nothing "at all about the proportion of all those otherwise eligible individuals whose vote cannot be counted or weighed because they either failed to register or failed to vote." Id. at 747–48 (footnote omitted). Accordingly, the Gaffney Court held that plaintiffs' proof at trial concerning the significant role that politics played in crafting the redistricting plans, the minor population deviations in the redistricting plans, and the other proof in the trial record of alternative plans that split fewer towns and had lower population deviations from perfect population equality did not establish a prima facie violation of the Fourteenth Amendment. See id. at 748–51. Therefore, the three-judge court in Gaffney erred in invalidating the House and Senate plans and erred in becoming "bogged down in [the] vast, intractable . . . slough" of redistricting. Id. at 750; see Regester, 412 U.S. at 761–64 (same).

D.

The Gaffney Court's analysis of a prima facie case in a one person one vote challenge concerning minor population deviations comports with how a federal court typically reviews an Equal Protection Clause challenge to duly enacted legislation that does not employ a suspect classification or impinge on a fundamental right. In such cases, federal courts apply rational-basis review. See, e.g., FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313–15 (1993); U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 178–79 (1980). Voting, of course, is a fundamental right. See, e.g., Reynolds, 377 U.S. at 561–62; Wesberry, 376 U.S. at 17. Nevertheless, a redistricting plan that

meets the one person one vote requirement does not impinge on this fundamental right. Moreover, a redistricting plan with a maximum population deviation under 10% is presumed constitutional, and a state legislative entity need not justify such a minor deviation. See, e.g., Brown, 462 U.S. at 842–43; Gaffney, 412 U.S. at 748–51; Regester, 412 U.S. at 761–64. Thus, the Supreme Court's rational-basis standard helps inform how to analyze whether a plaintiff has proven a prima facie case where a plaintiff challenges a state redistricting plan with minor population deviations. See League of Women Voters of Chi. v. Wolf, 965 F. Supp. 2d 1007, 1015–16 (N.D. Ill. 2013), aff'd, 757 F.3d 722 (7th Cir.), cert. denied, 135 S. Ct. 688 (2014).[17]

---

[17] In Daly, the Fourth Circuit acknowledged that strict scrutiny does not apply to a one person one vote challenge. See Daly, 93 F.3d at 1218 n.8. In Daly, however, the Fourth Circuit did not address whether the rational-basis standard helps inform how to analyze whether a plaintiff has proven a prima facie case when challenging a redistricting plan with a minor population deviation. See id. Likewise, in Wright, the Fourth Circuit did not address the issue. See Wright, 787 F.3d at 266.

The Supreme Court also has not addressed whether the rational-basis standard helps inform the prima facie case analysis when a court analyzes a redistricting plan with a maximum population deviation under 10%. In Kilgarin, 386 U.S. at 122, the Supreme Court invalidated a redistricting plan with a maximum population deviation of 26.48% and held that the three-judge district court erred in applying rational-basis review to Texas's justification for the "significant" population deviation in the plan. See also Abate, 403 U.S. at 184–87 (not applying rational-basis review but upholding a redistricting plan with a maximum population deviation of 11.9% where the local government had justified the population deviation with "legitimate state considerations"); Mahan, 410 U.S. at 326–29 (not applying rational-basis review but upholding a redistricting plan with a maximum population deviation of 16.4% where Virginia had justified the deviation with the state policy of respecting political boundaries).

In Regester, 412 U.S. at 764, the Supreme Court introduced the prima facie case into its one person one vote jurisprudence, upheld a redistricting plan with a maximum population deviation of 9.9%, held that plaintiffs challenging the plan had not established a prima facie case of invidious discrimination at trial, and held that Texas did not have to justify the "minor" population deviations in the plan. In Gaffney, 412 U.S. at 741–51, the Supreme Court upheld a redistricting plan with a maximum population deviation of 7.83% and held that plaintiffs challenging the plan had not established a prima facie case of invidious discrimination at trial and that Connecticut did not have to justify the "minor" population deviations in the plan. In Regester and Gaffney (which the Supreme Court decided on the same day), the Supreme Court addressed redistricting plans with "minor deviations" and rejected plaintiffs' Equal Protection Clause challenges, but did not address whether the rational-basis standard of review helped inform how to analyze a plaintiff's prima facie

59

Under the rational-basis standard, "a classification in a [state law] . . . comes . . . bearing a strong presumption of validity." Beach Commc'ns, Inc., 508 U.S. at 314; cf. Brown, 462 U.S. at 842–43 (holding that a redistricting plan with a maximum population deviation under 10% constitutes a minor deviation, is presumed constitutional, and does not require justification; however, a plan with maximum population deviation above 10% "creates a prima facie case of discrimination and therefore must be justified by the State"); see also Town of Lockport v. Citizens for Cmty. Action at the Local Level, Inc., 430 U.S. 259, 268, 271–73 (1977) (applying rational-basis review and upholding a New York law permitting a new county charter to go into effect only if the new charter was approved in a referendum election by separate majorities of voters who live in the cities within the county and voters who live outside the cities). Under the rational-basis standard,

Where, . . . there are plausible reasons for [the legislature's] action, our inquiry is at an end. It is, of course, constitutionally irrelevant whether this reasoning in fact

_____

case where a plaintiff challenges a state redistricting plan with "minor deviations."

In Brown, 462 U.S. at 842–43, the Supreme Court synthesized its one person one vote jurisprudence and held that "as a general matter, . . . an apportionment plan with a maximum population deviation under 10% falls within the category of minor deviations" and that such minor deviations "are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." Id. at 842 (quotation omitted). In contrast, a redistricting plan with a maximum population over 10% "creates a prima facie case of discrimination and therefore must be justified by the State." Id. at 843.

In Brown, the Supreme Court described the governing equal-protection standard where a court was reviewing a redistricting plan with a maximum population deviation over 10% as "whether the legislature's plan 'may reasonably be said to advance [a] rational state policy' and, if so, 'whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits." Id. (quoting Mahan, 410 U.S. at 328) (alteration in original). Because the redistricting plan at issue in Brown had a maximum population deviation that far exceeded 10%, the Supreme Court did not address whether the rational-basis standard helps inform how to analyze a state redistricting plan with a maximum population deviation under 10%. Moreover, since Brown, the Supreme Court has not issued an opinion analyzing a redistricting plan with a maximum population deviation under 10%. Thus, the Supreme Court has never addressed whether the rational-basis standard helps inform how to analyze a plaintiff's prima facie case where a plaintiff challenges a state redistricting plan with a maximum population deviation under 10%.

underlay the legislative decision . . . because this Court has never insisted that a legislative body articulate its reasons for enacting a statute. This is particularly true where the legislature must necessarily engage in a process of line-drawing.

Fritz, 449 U.S. at 178–79 (citation and quotation omitted); see Tennant, 133 S. Ct. at 8 (holding that a state legislature is not required to make legislative findings explaining variances from perfect population equality in congressional districts). Moreover, under rational-basis review, any conceivable legislative purpose is sufficient and "those attacking the rationality of the legislative classification have the burden to [negate] every conceivable basis which might support it." Beach Commc'ns, Inc., 508 U.S. at 315 (quotation omitted). Furthermore, because the Supreme Court

never require[s] a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. Thus, the absence of legislative facts explaining the distinction on the record has no significance in rational-basis analysis. In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.

Id. (quotations and citations omitted); cf. Gaffney, 412 U.S. at 751 (holding that where plaintiffs failed to establish a prima facie case, a federal court's "involvement[ ] [in analyzing a state's justification for a redistricting plan] should never begin"); Regester, 412 U.S. at 764 (same).

IV.

Plaintiffs argue that the 2013 Wake County School Board Plan "was the product of bad faith, arbitrariness, or invidious discrimination." Wright, 787 F.3d at 266 (quotation omitted); see Daly, 93 F.3d at 1222. In support, plaintiffs contend that one of the stated goals of the legislative leaders in the General Assembly in support of the 2013 Wake County School Board Plan was pretextual. Specifically, plaintiffs contend that the stated goal of improving School Board representation via the

61

2013 Wake County School Board Plan was pretextual.[18] Moreover, plaintiffs contend that the 2013 Wake County School Board Plan in fact resulted from the General Assembly's (1) partisan desire to disadvantage incumbents on the non-partisan Wake County School Board who are registered Democrats who support "progressive" education policies and (2) desire to favor suburban and rural voters over urban voters in Wake County.

The court has examined the evidence collectively and individually. The court finds that plaintiffs have not proven that the 2013 Wake County School Board Plan "was the product of bad faith, arbitrariness, or invidious discrimination." Wright, 787 F.3d at 266 (quotation omitted); Daly, 93 F.3d at 1222; see Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64.

A.

During the legislative process, Senators Hunt and Barefoot stated that one of the goals of Senate Bill 325 was to allow voters to elect two School Board members as opposed to one School Board member in order to improve School Board representation. See Tr. Ex. 1, p. 3; Tr. Ex. 3, pp. 2–3; Tr. Ex. 250, pp. 7–8, 16–17. Representative Stam explained that, given the size of Wake

---

[18] Plaintiffs do not dispute the other legislative goal of increasing voter turnout by having School Board elections in even-numbered years instead of odd-numbered years. The record confirms that Wake County voters historically vote in much greater number in even-numbered years than in odd-numbered years. See, e.g., Tr. Ex. 57 (2012 Wake County election results); Tr. Ex. 58 (2011 Wake County election results); Tr. Ex. 60 (2010 Wake County election results); Tr. Ex. 61–62 (2009 Wake County election results); Tr. Ex. 63 (2008 Wake County election results); Tr. Ex. 64 (2007 Wake County election results); Tr. Ex. 65 (2006 Wake County election results); Tr. Ex. 66–67 (2005 Wake County election results ); Tr. Ex. 68 (2004 Wake County election results); Tr. Ex. 69 (2002 Wake County election results); Tr. Ex. 70 (2000 Wake County election results). For example, in 2012, approximately 75% of Wake County voters voted. In 2010, approximately 48% of Wake County voters voted. In 2008, approximately 75% of Wake County voters voted. In 2006, approximately 41% of Wake County voters voted. In 2004, approximately 74% of Wake County voters voted. In 2002, approximately 55% of Wake County voters voted. In 2000, approximately 67% of Wake County voters voted. In contrast, in 2011, 2009, 2007, and 2005, voter turnout in Wake County during the October elections was approximately 10% to 15%.

County, children in Wake County were often assigned to a school in a School Board member's district where the child's parent did not live and that parents sometimes found it difficult to get responsive representation from a School Board member where the child attended school. See, e.g., Tr. Ex. 5, p. 4. By having two School Board members represent each person in Wake County (one in a single-member district and one in a super district), Representative Stam and Senator Hunt believed that each parent likely would have a Board member who represented them and who the parent could contact if the parent had an issue concerning the School Board. See id.; Tr. Ex. 250, pp. 7–8, 16–17.

The General Assembly's legislative goal of improving School Board representation via the 2013 Wake County School Board Plan is a rational state policy. See, e.g., Beach Commc'ns, Inc., 508 U.S. at 315; Fritz, 449 U.S. at 178–79; League of Women Voters of Chi., 965 F. Supp. 2d at 1015–16; cf. Reynolds, 377 U.S. at 579 (recognizing that some population deviations are permissible when "based on legitimate considerations incident to the effectuation of a rational state policy"); Regensburger, 278 F.3d at 595–96 (recognizing that providing efficient and economic city services is a rational state policy and that the apportionment plan advanced that policy, but holding that a 66.85% maximum population deviation exceeded constitutional limits). Moreover, having examined the record concerning the seven single-member districts and the two super districts, the demographics and locations of the Wake County public schools, and the base attendance area maps for the Wake County public schools, the court finds that the 2013 Wake County School Board Plan is rationally related to improving School Board representation. See, e.g., Tr. Exs. 51, 88–249, 256–57, 278–436, 453, 455; Beach Commc'ns, Inc., 508 U.S. at 315; Fritz, 449 U.S. at 178–79; League of Women Voters of Chi., 965 F. Supp. 2d at 1015–16; cf. Reynolds, 377 U.S. at 579; Regensburger, 278 F.3d at 595–96.

In opposition, plaintiffs contend that the 2013 Wake County School Board Plan does not improve School Board representation. In support, plaintiffs rely on (1) the anecdotal opinion testimony of Amy Womble and Board Member Kushner concerning the non-alignment of five schools under the 2013 Wake County School Board Plan (see, e.g., Tr. Exs. 331, 361); (2) the opinion testimony of Senator Stein, who opposed the 2013 Wake County School Board Plan, concerning the alleged non-alignment; (3) the opinion testimony of Board Member Fletcher and Board Member Kushner that they always tried to be responsive to a parent even if the parent did not live in their School Board district; and (4) the absence of any "proof" or "analysis" in the legislative record that the 2013 Wake County School Board Plan will improve School Board representation.

The court does not credit the anecdotal opinion testimony of those who opined that the 2013 Wake County School Board Plan will not improve School Board representation. In support of their testimony, Womble and Kushner discussed five schools. Wake County, however, has 171 schools. Similarly, the court does not credit the opinion testimony of Senator Stein, particularly given his strong legislative opposition to the 2013 Wake County School Board Plan. Senator Stein's opinion testimony at trial fits within the line of precedent giving no weight to statements made by opponents of legislation. See, e.g., Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19, 29 (1998); NLRB v. Fruit & Vegetable Packers, 377 U.S. 58, 66 (1964); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394–95 (1951); Veasey v. Abbott, 796 F.3d 487, 502 (5th Cir. 2015). Additionally, although the court believes that Board Member Fletcher and Board Member Kushner always try to do their best to be responsive to any parent who calls with a concern even if that parent does not live in his or her district, such sentiments do not undermine the rational basis for the 2013 Wake County School Board Plan. See, e.g., Beach Commc'ns, Inc., 508 U.S. at 315; Fritz, 449 U.S. at 178–79.

64

Furthermore, the General Assembly had no legal obligation to present an "analysis" during the legislative process "proving" that the 2013 Wake County School Board Plan advanced the stated rationale. See, e.g., Tennant, 133 S. Ct. at 8; Beach Commc'ns, Inc., 508 U.S. at 315. Accordingly, the court finds that plaintiffs have failed to prove that the 2013 Wake County School Board Plan does not improve School Board representation.

B.

Plaintiffs contend that the two rationales for the 2013 Wake County School Board Plan were pretextual and that the 2013 Wake County School Board Plan resulted from the General Assembly's partisan desire to disadvantage incumbents on the School Board who are registered Democrats who support "progressive" education polices. In support, plaintiffs presented the testimony of Amy Womble, who identified the Wake County School Board's socioeconomic-diversity policy as a "progressive" education policy and recounted the 2011 results of the non-partisan Wake County School Board race, the testimony and expert report of Dr. Jowei Chen concerning partisanship tied to political party, the testimony and expert report of Anthony Fairfax concerning partisanship tied to political party, and evidence concerning the three-month legislative process preceding the enactment of the 2013 Wake County School Board Plan.

1.

First, plaintiffs allege that the 2013 Wake County School Board Plan resulted from the General Assembly's partisan desire to disadvantage incumbents on the non-partisan School Board who are registered Democrats who support "progressive" education polices. See Wright Compl. ¶¶ 62, 66. The Wake County Board of Elections denied this allegation in its answer;[19] therefore,

---

[19] See Wright, Def. Ans. [D.E. 30] ¶¶ 62, 66.

plaintiffs needed to present evidence to prove this allegation, including proving what "progressive" education polices are.

In support of their "progressive" education policies contention, plaintiffs presented the testimony of Amy Womble. Womble testified that in 2010, five members of the Wake County School Board who were registered Republicans voted to change the socioeconomic-diversity policy concerning student assignment in favor of a student-assignment policy favoring neighborhood schools. The record is unclear on how the Wake County School Board began implementing that change in its student-assignment policy during 2010 or 2011. In October 2011, however, Susan Evans, Kevin Hill, Christine Kushner, Jim Martin, and Keith Sutton were elected to the Wake County School Board and reversed the policy change in 2012. The record also is unclear regarding how the Wake County School Board implemented that policy change in 2012 or thereafter. Nonetheless, in support of plaintiffs' theory of the case, Womble identified the socioeconomic-diversity policy as a "progressive" education policy and support for neighborhood schools as a "conservative" education policy.

Nothing in the General Assembly's 2013 legislative debates mentions the socioeconomic-diversity policy or the neighborhood-schools policy, identifies either as "progressive" or "conservative," or suggests that the 2013 General Assembly even considered either "policy" in enacting the 2013 Wake County School Board Plan. Additionally, Bill Fletcher (a registered Republican School Board member) and Christine Kushner (a registered Democratic School Board member) testified at trial that each supported the continued use of the socioeconomic-diversity policy as part of the student-assignment plan, but that such support does not correlate with political party registration. Kushner also testified that parental views on student-assignment policies do not correlate with political party registration.

66

The court finds that parental views on student-assignment policies (including any change to the socioeconomic-diversity policy) cannot fairly be characterized as "progressive" or "conservative." Furthermore, the court finds that plaintiffs did not prove the difference between a "progressive" education policy and a "conservative" education policy. Is wanting more magnet schools "progressive" or "conservative"? Is wanting children to attend higher performing schools "progressive" or "conservative"? Is wanting children from the same family to attend schools on the same track "progressive" or "conservative"? Is wanting more year-round schools "progressive" or "conservative"? Does the latter question turn on a voter's intent? Are those voters who favor more year-round schools to increase student academic performance advocating a "progressive" or "conservative" policy? Are those voters who favor more year-round schools to reduce the fiscal impact of spending more money on school construction and instead spending money on classroom teaching advocating a "progressive" or "conservative" policy? When a parent complains to the School Board about the effect that a student-assignment policy has on his or her family, is the complaint "progressive" or "conservative"? And, yes, is supporting or opposing any change to Wake County's socioeconomic-diversity policy "progressive" or "conservative"?

The court does not know the answers to these questions. The court knows, however, that plaintiffs have failed to provide a judicially discernable standard on how to distinguish a "conservative" education policy from a "progressive" education policy. Cf. Vieth, 541 U.S. at 281–306. Moreover, assuming without deciding that continuing the socioeconomic-diversity policy is a "progressive" education policy, plaintiffs did not prove that the 2013 General Assembly targeted that "policy" or any other "progressive" education policy in enacting the 2013 Wake County School Board Plan.

67

2.

Dr. Jowei Chen testified and submitted a report in support of plaintiffs' pretext argument concerning partisanship tied to political party. Dr. Chen opined that the enacted districts in the 2013 Wake County School Board Plan create a partisan distribution of seats falling completely outside the range of outcomes that are possible under a non-partisan districting process that creates equally populated districts while maximizing compactness and preserving precinct and municipal boundaries. Tr. Ex. 15, Expert Report of Jowei Chen, Ph.D. ("Chen Report").

In support of his opinion, Dr. Chen explained that he prepared a computer simulation study in which an algorithm that he created drew a sampling of districts that could result from applying certain criteria: relatively strict population equality (i.e., a maximum population deviation of 2%), maximizing the number of municipalities kept intact, keeping all precincts intact, and maximizing geographical compactness. See Chen Report 3–6. To examine possible partisan motivations in drawing the 2013 Wake County School Board Plan, Dr. Chen used election data from the 2012 presidential election, the 2012 Wake County Commission election, and the 2014 Wake County Commission election to measure and compare the level of partisanship (i.e., the relative share of Democratic-versus Republican-favoring vote) of the enacted districts in the 2013 Wake County School Board Plan with the partisanship in the simulated districts. See Chen Report 9–16.

Cross-examination and this court's review of the record revealed several material flaws in Dr. Chen's analysis that lead this court to reject his opinion. See, e.g., Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143–47 (1997) (holding that a trial court has discretion to credit all, some, or none of an expert's testimony); F.C. Wheat Mar. Corp. v. United States, 663 F.3d 714, 722–25 (4th Cir. 2011) (holding that a trial court in a bench trial has discretion to credit all, some, or none of an expert's testimony); accord United States v. Baptiste, 596 F.3d 214, 224–25 (4th Cir. 2010) (holding that a

68

jury in a jury trial has discretion to credit all, some, or none of an expert's opinion).

First, Dr. Chen's simulation method excludes, a priori, any redistricting plan that exceeds a maximum population deviation of 2% among the districts and any redistricting plan that divides any electoral precinct. In addition, Dr. Chen's simulation method maximizes keeping municipalities intact and maximizes geographical compactness.[20] However, neither North Carolina law nor the Fourteenth Amendment required the General Assembly to enact a redistricting plan with a maximum population deviation of 2% or less. See, e.g., Brown, 462 U.S. at 842–43; Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 763–64. Likewise, neither North Carolina law nor the Fourteenth Amendment required the General Assembly to maximize municipalities kept intact or to maximize each district's geographical compactness. See, e.g., Vera, 517 U.S. at 962 ("The Constitution does not mandate regularity of district shape . . . ."); Gaffney, 412 U.S. at 740–54 (holding that the Fourteenth Amendment does not require a state to maximize the number of municipalities kept intact). Furthermore, Dr. Chen purported to build a non-partisan algorithm, but neither North Carolina law nor the Fourteenth Amendment required the General Assembly completely to ignore partisanship. See Gaffney, 412 U.S. at 740–51, 753; cf. Tr. Ex. 5, pp. 8–9 (Representative Stam explaining that changes to Districts 6 and 7 in the 2013 Wake County School Board Plan were designed to assist the electoral chances of Christine Kushner (a registered Democratic incumbent) and Deborah Prickett (a registered Republican incumbent)). Thus, as revealed on cross-examination, Dr. Chen's methodology contains a vast number of simulated districting plans built on a non-partisan

_____

[20] "[C]ompactness is surprisingly ethereal given its seemingly universal acceptance as a guiding principle for districting. All of the expert testimony provided reveals one deep conceptual dilemma: no one can agree what it is or, as a result, how to measure it. There are at least 20 measures, not one of which can claim any greater legitimacy than its peers." Bethune-Hill v. Va. State Bd. of Elections, No. 3:14CV852, 2015 WL 6440332, at *26 (E.D. Va. Oct. 22, 2015) (three-judge court) (quotations and citations omitted).

69

basis and limited by the four parameters that Dr. Chen used, but that the law does not require. Cf. Chen Report 11, Figure 4. Simply put, Dr. Chen's methodology does not sample simulations of other possible redistricting plans that could be created by a good-faith effort to equalize population among districts, but only a very limited subset of such redistricting plans. Thus, Dr. Chen's simulations do not show a reasonable range or sample of possible alternative redistricting plans. Instead, the court finds that Dr. Chen's simulations simply show that "better" (or, at least, "better" in Dr. Chen's mind) redistricting plans were possible, but "better" plans do not equate to the unconstitutionality of the 2013 Wake County School Board Plan. See, e.g., Tennant, 133 S. Ct. at 5–8; Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 763–64; Daly, 93 F.3d at 1221.

Dr. Chen also did not satisfactorily explain why election data from the 2012 presidential election, the 2012 Wake County Commission election, and the 2014 Wake County Commission election can permit any rational inference of partisan motivation concerning the 2013 Wake County School Board Plan or non-partisan Wake County School Board elections in 2016 and beyond. See, e.g., Frank v. Forest Cty., 336 F.3d 570, 575–76 (7th Cir. 2003); cf. Chen Report 13, Figure 6. For example, the Wake County Board of Elections website contains election results in Wake County concerning myriad non-partisan elections over the past ten years, including election results for the non-partisan Wake County School Board, non-partisan judicial races, and non-partisan Soil and Water Conservation District races. Logically, the court would have expected Dr. Chen to have used candidate political affiliation data from these non-partisan races (particularly the School Board races) and input that election-result data into the nine districts under the 2013 Wake County School Board Plan in order to assess whether the districts were Democratic-performing, Democratic-leaning, Republican-leaning, or Republican-performing. He did not do this analysis.

Likewise, if Dr. Chen believed that the 2012 presidential election, the 2012 Wake County

70

Commission election, and the 2014 Wake County Commission data were relevant to assess partisanship concerning the 2013 Wake County School Board Plan, he could have tested his hypothesis by comparing the School Board election results in 2011 and 2013 with the result that he, using the three partisan elections that he selected (i.e., the 2012 presidential election and the 2012 and 2014 Wake County Commission elections), would have predicted for a non-partisan election under the 2011 BOE Redistricting Plan. He did not do this analysis.[21]

Furthermore, if Dr. Chen were going to select a partisan election to assess an alleged partisan motivation of the General Assembly concerning the 2013 Wake County School Board Plan, the court would have expected Dr. Chen to select the election of the North Carolina State Superintendent of the Public Schools as the best partisan election to predict how the districts in the 2013 Wake County School Board Plan will perform in a non-partisan School Board race. After all, at least that partisan election concerns education. Moreover, the record contains the "statistical package" of elections that the General Assembly had in 2013. See Tr. Ex. 252. Those election results reveal that the 2008 Democratic candidate for North Carolina State Superintendent of the Public Schools carried six of the nine districts in the 2013 Wake County School Board Plan (i.e., Districts 1, 2, 3, 4, 5, and A). See id. Additionally, the record contains the 2012 election results for the North Carolina State Superintendent of the Public Schools, and these results reveal that the Democratic candidate June Atkinson won 62% of the vote in Wake County against her Republican opponent John Tedesco (who

_____

[21] Senator Blue and Senator Stein testified that, in their opinion, the 2011 BOE Redistricting Plan was drawn to favor Republican candidates for the non-partisan Wake County School Board. Nonetheless, in 2011, under that plan, Wake County voters elected five Board members, four of whom were registered Democrats, and one of whom was registered Unaffiliated. See Tr. Ex. 58; Stipulations ¶ 7. In 2013, under that plan, Wake County voters elected four Board members: three were registered Democrats and one was a registered Republican. See Tr. Ex. 56; Stipulations ¶ 7. Those election results show the disconnect in Wake County of attempting to use partisan election results to predict election results in a non-partisan School Board election.

71

was then a member of the Wake County School Board). See Tr. Ex. 57 (2012 Wake County election results). Both pieces of election data concerning those two partisan races for North Carolina State Superintendent of the Public Schools materially undermine Dr. Chen's reliance on the 2012 presidential election, the 2012 Wake County Commission election, and the 2014 Wake County Commissioner election returns concerning partisanship and the 2013 Wake County School Board Plan. See, e.g., Frank, 336 F.3d at 575–76.

Having reviewed and considered Dr. Chen's report and testimony, the court finds that Dr. Chen is not credible, and that his report and his testimony are materially flawed and unhelpful. Thus, the court does not credit Dr. Chen's report or testimony, including his opinion that partisanship motivated the General Assembly to enact the 2013 Wake County School Board Plan. See, e.g., Joiner, 522 U.S. at 143–47; F.C. Wheat Mar. Corp., 663 F.3d at 722–25; Baptiste, 596 F.3d at 224–25.

3.

In support of plaintiffs' pretext argument concerning partisanship tied to political party, plaintiffs also rely on the expert testimony and report of Anthony Fairfax. See Tr. Ex. 27, Expert Report of Anthony Fairfax ("Fairfax Report"). Fairfax examined four aspects of three different redistricting plans: the 2013 Wake County School Board Plan, the 2011 BOE Redistricting Plan, and Representative Gill's Alternative Plan. The four aspects that Fairfax examined were (1) population deviations in the three plans; (2) split precincts in the three plans; (3) split municipalities in the three plans; and (4) geographic compactness in the three plans, using three measures of compactness. See Fairfax Report. Fairfax also examined partisan impact on incumbent Democrats under the 2013 Wake County School Board Plan and predicted partisan results under the 2013 Wake County School Board Plan using the 2004 and the 2008 presidential election returns. See id. pp.

72

11–14, 19.

Fairfax opined that the 2013 Wake County School Board Plan had higher population deviations than the 2011 BOE Redistricting Plan or the Gill Alternative Plan. See id. pp. 8–10. Fairfax also opined that the 2013 Wake County School Board Plan split 31 precincts, the 2011 BOE Redistricting Plan split 10 precincts, and the Gill Alternative Plan split zero precincts. See id. p. 19. Fairfax also opined that the 2013 Wake County School Board Plan split 8 towns, the 2011 BOE Redistricting Plan spilt 10 towns, and the Gill Alternative Plan split 3 towns. See id. p. 20. Fairfax also opined that the districts in the 2013 Wake County School Board Plan were less geographically compact than the districts in the 2011 BOE Redistricting Plan or the Gill Alternative Plan. See id. pp. 7, 20.

Fairfax opined that the 2013 Wake County School Board Plan resulted in pairing in District 6 of two Democratic School Board incumbents. See id. p. 20. Fairfax also opined that Districts 3, 4, 5, and A are all "Democratic-performing districts" and that Districts 3, 4, and A are overpopulated. See id. pp, 7, 19. Fairfax opined that Districts 1, 2, 6, 7, and B are Republican-performing districts and that Districts 1, 2, 7, and B are underpopulated. See id. pp. 7, 19. Fairfax conceded that District 5 (a Democratic-performing district) is underpopulated and District 6 (a Republican-performing district) is overpopulated. See id. Fairfax based his opinion concerning predicted election outcomes in the nine districts in the 2013 Wake County School Board Plan on the 2004 and 2008 presidential election results in Wake County. See id. p. 7.

Cross-examination and this court's review of the record revealed several material flaws in Fairfax's report and testimony. Thus, the court finds that Fairfax is not credible, and the court rejects Fairfax's report and testimony as unhelpful. Furthermore, the court rejects as unsupported any partisan inferences that plaintiffs seek to draw from Fairfax's report and testimony concerning the

73

2013 Wake County School Board Plan. See, e.g., Joiner, 522 U.S. at 143–47; F.C. Wheat Mar. Corp., 663 F.3d at 722–25; Baptiste, 596 F.3d at 224–25.

As for Fairfax's opinion concerning population deviations, compactness measures, split precincts, and split municipalities when comparing the 2013 Wake County School Board Plan, the 2011 BOE Redistricting Plan, and the Gill Alternative Plan, the court declines to infer partisanship from such evidence. Rather, the court finds that such evidence simply shows that "better" plans can be drawn, but "better" plans do not equate to unconstitutionality. See, e.g., Tennant, 133 S. Ct. at 5–8; Gaffney, 412 U.S. at 740–51; Regester, 412 U.S. at 763–64; Daly, 93 F.3d at 1221.

As for Fairfax's opinion that District 6 in the 2013 Wake County School Board Plan pairs Susan Evans and Jim Martin (registered Democrats), the 2013 Wake County School Board Plan does pair Evans and Martin in District 6. Fairfax's opinion, however, ignores how the 2013 Wake County School Board Plan treats all incumbents.[22] For example, District 1 paired John Tedesco (a registered Republican) and Tom Benton (a registered Democrat), but Fairfax failed to note that Tedesco lost a 2012 statewide race for North Carolina State Superintendent of the Public Schools and did not seek reelection to the Wake County School Board in 2013.[23] Thus, Benton will be the only incumbent if he seeks reelection in District 1. As for District 2, the 2013 Wake County School Board Plan paired Kevin Hill (a registered Unaffiliated) and Deborah Pricket (a registered Republican). However, Fairfax's report fails to note that in 2013, Prickett ran for reelection in District 7 of the

---

[22] Fairfax admitted on cross-examination that he did not do any incumbent-pairing analysis under the 2011 BOE Redistricting Plan or the Gill Alternative Plan. Fairfax's failure to do such an analysis undermines his opinion and any partisan inferences concerning incumbent pairing in the 2013 Wake County School Board Plan. Representative Gill testified that she ignored incumbency in preparing the Gill Alternative Plan.

[23] See Tr. Ex. 56, 57.

74

2011 BOE Redistricting Plan and lost to Zora Felton.[24]  As for District 3, no incumbent lives in District 3. As for District 4, Keith Sutton (a registered Democrat) is the sole incumbent in District 4. As for District 5, Christine Kushner (a registered Democrat) is the sole incumbent in District 5. As for District 6, Martin and Evans live in District 6, but each also live in District B.  One Democratic incumbent could run in District 6, and the other could run in District B.[25]  Thus, the Democratic incumbents in District 6 could run in a district under the 2013 Wake County School Board Plan without a Democratic incumbent opponent, yet Fairfax's analysis ignores this information. As for District 7, under the 2013 Wake County School Board Plan, there is no incumbent. Accordingly, having reviewed how all incumbents are treated under the 2013 Wake County School Board Plan, this court rejects any partisan inference from Democratic incumbent pairing in District 6. See, e.g., League of Women Voters of Chi., 757 F.3d at 725–26.

The court also rejects Fairfax's use of 2004 or 2008 presidential election data to draw any partisan inference concerning the 2013 Wake County School Board Plan. See, e.g., Frank, 336 F.3d at 575–76. Fairfax never persuasively explained how using only the presidential election data from 2004 and 2008 in Wake County logically could allow this court to draw a reasonably permissible partisan inference or to predict voter performance in 2016, and beyond, in a non-partisan School Board election in Wake County. See id. Like Dr. Chen, Fairfax's opinion and report did not test his hypothesis of relying on the 2004 and 2008 presidential election results in Wake County by

---

[24] See Tr. Ex. 56.

[25] Fairfax's report also fails to note that Susan Evans is running for the North Carolina Senate in 2016. See Consolidated Candidate Listing, NCSBE (Feb. 25, 2016), ftp://alt.ncsbe.gov/ Candidate_Filing ("Consolidated Candidate Listing").  Thus, Evans will not be running for reelection to the School Board, but could have.  Moreover, Martin, if he runs, will be the sole incumbent Democrat in District 6.

75

examining how that 2004 and 2008 presidential election data corresponded with non-partisan School

Board election results in 2005, 2007, 2009, 2011, or 2013 under the then-governing School Board

redistricting plans. Likewise, Fairfax's expert report and opinion did not analyze federal or state

election results in Wake County from 2004, 2006, 2008, 2010, 2012, or 2014, even though such

results were available on the Wake County Board of Elections website concerning partisan and non-

partisan elections (such as school board races, judicial races, and soil and water conservation district

races) in Wake County. Similarly, like Dr. Chen, Fairfax did not analyze the 2008 or 2012 North

Carolina State Superintendent of the Public Schools race to test his hypothesis concerning projected

election results in a non-partisan School Board race under the 2013 Wake County School Board

Plan. Cf. Tr. Exs. 57, 252.

Fairfax's report and testimony also failed to analyze voter registration data in Wake County,

including the large number of Unaffiliated voters in Wake County. For example, in November 2012,

there were 654,777 voters registered in Wake County. See Wake County VR Statistics by Precinct

November 1, 2012, Wake County Board of Elections (Feb. 25, 2016), http://www.wakegov.com/

elections/data/Registration%20Statistics/2012/PDF%20Files/20121101stats.pdf.[26] According to the

Wake County Board of Elections, in November 2012, 263,332 voters were registered Democrats

(i.e., approximately 40%), 197,722 voters were registered Unaffiliated (i.e., approximately 30%),

and 189,398 were registered Republicans (i.e., approximately 29%). Id. Under the 2013 Wake

County School Board Plan, there are more registered Democrats than registered Republicans in 5

---

[26] Such historical registration data exists for all years from 2004 through 2015 on the Wake
County Board of Elections website, yet Fairfax's report does not mention it. Of course, the court
recognizes that registration statistics and party preferences do not always correspond; therefore, a
court should not necessarily rely solely on registration statistics to draw inferences about partisanship
or lack of partisanship. See, e.g., Cromartie II, 532 U.S. at 245.

of the 9 districts (i.e., Districts 1, 3, 4, 5, and A). See, e.g., Tr. Ex. 252. Given the large number of Unaffiliated voters in Wake County, the absence of a proven correlation between the 2004 and 2008 presidential election results in Wake County and the results in the non-partisan Wake County School Board elections, and the independence of the Wake County voters in sometimes preferring candidates who are Democrats and sometimes preferring candidates who are Republicans,[27] the court rejects as unsupported plaintiffs' proposed inference from Fairfax's report and opinion that the 2013 Wake County School Board Plan ensures that voters will elect candidates in five of the nine School Board districts who are registered Republicans. See, e.g., Joiner, 522 U.S. at 143–47; F.C. Wheat Mar. Corp., 663 F.3d at 722–25; Baptiste, 596 F.3d at 224–25.

Having reviewed and considered Fairfax's report and testimony, the court finds that Fairfax is not credible, and that his report and testimony are materially flawed and unhelpful. Thus, the court does not credit Fairfax's report or testimony, including any inference that partisanship motivated the General Assembly to enact the 2013 Wake County School Board Plan. See, e.g., Joiner, 522 U.S. at 143–47; F.C. Wheat Mar. Corp., 663 F.3d at 722–25; Baptiste, 596 F.3d at 224–25.

4.

Plaintiffs also argue that the three-month legislative process from introduction of Senate Bill 325 until its enactment evidences bad faith, arbitrariness, or invidious discrimination. See Vill. of Arlington Heights v. Metro. Hous. & Dev. Corp., 429 U.S. 252, 267–68 (1977) (listing non-exhaustive factors that courts may consider in discerning intent of official action, including the historical background of the decision, the sequence of events leading to the decision, and contemporaneous legislative history). In support, plaintiffs cite the testimony of Senator Blue, who

---

[27] Representative Gill testified at trial concerning the independence of the Wake County electorate.

77

opined that it was fairly uncommon for a local bill to be enacted over the objection of the county delegation,[28] Representative Jackson, who opined that the bill moved more quickly than the 2011 statewide redistricting bill, and Senator Stein, who opined that the bill was a departure from how the General Assembly usually treats a local bill. Plaintiffs also cite some April and June 2013 emails between Donna Williams (who identifies herself as the Wake County "GOP Chair") and members of the General Assembly's legislative staff and Senator Hunt. See Tr. Exs. 466, 468.

It is difficult to discern standards for assessing the process concerning the sui generis topic of redistricting legislation within a part-time state legislature. Cf. Vieth, 541 U.S. at 284–305. Nonetheless, the court need not do so. Rather, Senator Blue, Representative Jackson, and Senator Stein were all legislative opponents of Senate Bill 325. As such, the court declines to give weight to their testimony. See, e.g., Shell Oil Co., 488 U.S. at 29; Fruit & Vegetable Packers, 377 U.S. at 66; Schwegmann Bros., 341 U.S. at 394–95; Veasey, 796 F.3d at 502.

Plaintiffs also cite as "direct evidence" of partisan motive emails from April and June 2013 from Donna Williams to the General Assembly's legislative staff and Senator Hunt expressing concerns about potential adverse political implications for registered Republican candidates under the 2013 Wake County School Board Plan. See, e.g., Tr. Exs. 466, 468. Plaintiffs argue that the emails are direct evidence that some members of the 2013 General Assembly had a partisan motive in enacting the 2013 Wake County School Board Plan. Specifically, plaintiffs argue that the emails show a partisan motive to have registered Republican candidates who support "conservative" education policies win five of the nine seats on the non-partisan Wake County School Board.

---

[28] In 2013, the Wake County delegation in the General Assembly had eleven House members (six Democrats and five Republicans) and five Senators (three Republicans and two Democrats). The Republicans all supported the 2013 Wake County School Board Plan. The Democrats all opposed the 2013 Wake County School Board Plan. See Stipulations ¶¶ 20, 28.

The court rejects plaintiffs' arguments and inferences concerning the emails. First, evidence that a non-legislator wrote to the General Assembly's staff or to Senator Hunt concerning the perceived political impact of the 2013 Wake County School Board Plan is not "direct evidence" of the General Assembly's motive for enacting 2013 Wake County School Board Plan. "Direct evidence" is evidence from which no inference is required. See, e.g., Hunt v. Cromartie, 526 U.S. 541, 548–49 (1999) ("Cromartie I"); Gallick v. Balt. & Ohio R.R., 372 U.S. 108, 114–15 (1963); Shirvinski v. U.S. Coast Guard, 673 F.3d 308, 320–21 (4th Cir. 2012); Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc., 367 F.3d 212, 226 (4th Cir. 2004). For example, in an antitrust case, direct evidence would include an express written agreement to divide the relevant market. See, e.g., Am. Chiropractic Ass'n, Inc., 367 F.3d at 226–27. Williams's emails, however, are not direct evidence that the General Assembly enacted the 2013 Wake County School Board Plan to disfavor incumbents who are registered Democrats who support "progressive" education policies. See, e.g., Am. Chiropractic Ass'n, Inc., 367 F.3d at 226–27. Rather, Williams's emails are, at best, circumstantial evidence that would permit the court to draw inferences about motive.

In considering Williams's emails and the issue of motive, the court declines to infer that Williams's emails suggest that the 2013 Wake County School Board Plan resulted from partisanship in general or a specific desire to disfavor incumbents on the non-partisan Wake County School Board who are registered Democrats who support "progressive" education policies. Rather, the court infers that Williams's emails reflect Williams's concern that the 2013 Wake County School Board Plan will not result in registered Republican candidates winning five of the nine seats on the Wake County School Board and will benefit registered Democratic candidates. See Tr. Exs. 466, 468. Furthermore, in light of the record, Williams's concerns that the 2013 Wake County School Board Plan will not result in registered Republicans winning five of nine seats on the Wake County School

79

Board appear to be justified.

In sum, the court has reviewed the entire legislative process, including the historical background and contemporaneous legislative history. Having considered the entire record, the court finds that the three-month legislative process does not evince that the General Assembly acted in bad faith, arbitrarily, or with invidious discrimination. See, e.g., Gaffney, 412 U.S. at 740–51; Regester, 412 U.S. at 761–64; League of Women Voters of Chi., 757 F.3d at 725–27; Moore, 431 F.3d at 260–61; cf. Hulme v. Madison Cty., 188 F. Supp. 2d 1041, 1045–55 (S.D. Ill. 2001).

## C.

Plaintiffs have failed to prove that the 2013 Wake County School Board Plan was the product of bad faith, arbitrariness, or invidious discrimination. Plaintiffs also did not prove that seeking partisan advantage predominated over rational state policy in enacting the 2013 Wake County School Board Plan. Nonetheless, and alternatively, assuming without deciding that partisanship played some role in enacting the 2013 Wake County School Board Plan, the court finds that the 2013 Wake County School Board Plan fits comfortably within the "rough political fairness" rationale that the Supreme Court approved in Gaffney. See Gaffney, 412 U.S. at 740–54.[29]  First, one of the alleged Democratic-performing districts (i.e., District 5) is underpopulated and one of the alleged Republican-leaning districts (i.e. District 6) is overpopulated. This evidence belies a systematic under-population of districts to harm incumbents on the non-partisan Wake County School Board

---

[29] The General Assembly did not have to seek to intervene to justify the minor population deviations. See, e.g., Brown, 462 U.S. at 842–43; Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64. Thus, the fact that the General Assembly did not seek to intervene to assert a "rough political fairness" rationale does not matter. Rather, because seeking "rough political fairness" is among the "legitimate reasons" that could explain the action, Int'l Bhd. of Teamsters, 431 U.S. at 358 n.44, this court may analyze that possible rationale under Gaffney. See Gaffney, 412 U.S. at 740–54; see also Regester, 412 U.S. at 761–64.

who are registered Democrats who support "progressive" education policies. Second, the party registration data shows that Democrats are in a majority in 5 of the 9 districts in the 2013 Wake County School Board Plan. On the other hand, some evidence suggests, in a partisan race, that 5 of the 9 districts appear to lean Republican (i.e., Districts 1, 2, 6, 7, and B), and 4 of the 9 districts appear to be safe Democratic districts (i.e., Districts 3, 4, 5, and A). See, e.g.,Tr. Ex. 252.[30] However, the statistical package accompanying the 2013 Wake County School Board Plan shows that, in the 2008 partisan race for the North Carolina State Superintendent of the Public Schools, the Democratic candidate won six of the nine districts in the 2013 Wake County School Board Plan. See id. Moreover, in 2004, the statistical package shows that the Democratic candidate for Governor carried all seven of the numbered districts. See id. Additionally, in 2008, the Democratic candidate for Attorney General carried all nine of the districts. See id. Thus, the evidence supports a finding of, at most, an attempt for "rough political fairness" in the 2013 Wake County School Board Plan. See Gaffney, 412 U.S. at 740–54. Furthermore, although Senators Stein and Blue opined at trial that the 2011 BOE Redistricting Plan was designed to favor Republicans, the resulting elections in 2011 and 2013 did not yield that outcome. See Tr. Ex. 58 (2011 Wake County election results); Tr. Ex. 56 (2013 Wake County election results); Stipulations ¶ 7. Instead, in 2014, the non-partisan Board had one registered Unaffiliated member, one registered Republican member, and seven registered Democratic members. See Stipulations ¶ 7. Thus, the 2011 and 2013 School Board election results further demonstrate the disconnect in Wake County of attempting to use partisan election results to predict election results in a non-partisan School Board election. Moreover, assuming without deciding that the General Assembly did have a partially partisan motivation, the evidence reflects,

---

[30] The Democratic candidate prevailed in Districts 3, 4, 5, and A in each partisan race contained in the statistical package. See Tr. Ex. 252.

81

at most, an attempt for "rough political fairness" in the 2013 Wake County School Board Plan. See Gaffney, 412 U.S. at 740–54.[31]

Under Gaffney, assuming without deciding that partisanship partially motivated the General Assembly to enact the 2013 Wake County School Board Plan, plaintiffs did not prove that partisanship went "too far." See, e.g., Gaffney, 412 U.S. at 740–54. Instead, the 2013 Wake County School Board Plan fits comfortably within the "rough political fairness" rationale approved in Gaffney. See id. Likewise, plaintiffs have not proven that the 2013 Wake County School Board Plan resulted from the General Assembly's partisan desire to disadvantage incumbents on the non-partisan Wake County School Board who are registered Democrats who support "progressive" education policies. Similarly, plaintiffs have not proven that the 2013 Wake County School Board Plan substantially dilutes individual voting strength of voters in Wake County's more populated districts. Accordingly, the court finds that the 2013 Wake County School Board Plan reflects, at

---

[31] This court recognizes the difficulty in assessing evidence that purports to predict electoral outcomes. For example, as discussed in Vieth, in 1994, a judge on this court held a political gerrymandering trial concerning the longstanding North Carolina electoral practice of having North Carolina superior court judges elected statewide as opposed to in districts. See Vieth, 541 U.S. at 287 n.8. The trial included "311 stipulations by the parties, 132 witness statements, approximately 300 exhibits, and 2 days of oral argument." Id. After the trial, the district court held "that North Carolina's system of electing superior court judges on a statewide basis had resulted in Republican candidates experiencing a consistent and pervasive lack of success and exclusion from the electoral process as a whole and that these effects were likely to continue unabated into the future." Id. (quotation omitted). However, "[i]n the elections for superior court judges conducted just five days after this pronouncement, every Republican candidate standing for the office of superior court judge was victorious on the state level." Id. (quotation omitted). On appeal, the Fourth Circuit remanded the case to the district court because the 1994 election results were "directly at odds" with the district court's prediction. See id. (quotation omitted); see also Harris, 993 F. Supp. 2d at 1087–88 (Silver, J., concurring in part, dissenting in part, and concurring in the judgment) (noting that plaintiffs alleged that the Arizona Redistricting Commission used minor population deviations in the Arizona House and Senate reapportionment plan to harm voters who preferred Republican candidates, but the 2012 elections under the allegedly illegal reapportionment plan resulted in the election of 17 Republican Senators out of 30 total seats (i.e., 56.6%) and 36 Republican House Members out of 60 total seats (i.e., 60%)).

most, an attempt for "rough political fairness," leaving the ultimate outcome of who is elected to the non-partisan School Board squarely in the hands of Wake County voters. See Gaffney, 412 U.S. at 740–54.[32]

D.

Plaintiffs also contend that the General Assembly enacted the 2013 Wake County School Board Plan to favor rural and suburban voters over urban voters. In making this argument, plaintiffs argue that this case is materially indistinguishable from Larios and that this court should reach the same conclusion as the three-judge court in Larios.

The court has discussed Larios at length and will not repeat that discussion. Unlike Larios, plaintiffs did not prove at trial that the General Assembly believed that a maximum population deviation under 10% provided an absolute safe harbor, that the General Assembly disregarded all districting principles in creating the 2013 Wake County School Board Plan, or that the 2013 Wake County School Board Plan is not rationally related to a permissible, rational state policy of improving School Board representation. Thus, unlike Larios, plaintiffs have failed to prove that the 2013 Wake County School Board Plan resulted from a desire to favor suburban and rural voters over urban voters. Likewise, unlike Larios, plaintiffs have failed to prove that the 2013 Wake County School Board Plan substantially dilutes the individual voting strength of Wake County's urban voters.

_____

[32] As mentioned, in 2013, the Wake County Senate delegations in the 2013 General Assembly consisted of 3 Republican Senators and 2 Democratic Senators and the Wake County House delegation consisted of 6 Democratic House members and 5 Republican House members. These figures also reflect the "rough political" balance in Wake County between voters who favor Democratic candidates and voters who favor Republican candidates.

E.

In sum, the court finds that plaintiffs have failed to prove a prima facie case that the 2013 Wake County School Board Plan "was the product of bad faith, arbitrariness, or invidious discrimination." Wright, 787 F.3d at 266 (quotation omitted); Daly, 93 F.3d at 1222; see Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64. Plaintiffs also have failed to prove that the General Assembly's 2013 Wake County School Board Plan "was the product of bad faith, arbitrariness, or invidious discrimination." Wright, 787 F.3d at 266 (quotation omitted); Daly, 93 F.3d at 1222; see Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64. The court also finds that the General Assembly acted in good faith in enacting the 2013 Wake County School Board Plan. See Dean v. Leake, 550 F. Supp. 2d 594, 605 (E.D.N.C. 2008) (three-judge court). The court finds that the General Assembly did not act arbitrarily or with invidious discriminatory intent in enacting the 2013 Wake County School Board Plan. Moreover, the court finds that the population deviations in the 2013 Wake County School Board Plan were not the product of bad faith, arbitrariness, or invidious discrimination and do not substantially dilute the voting strength of voters in Wake County's more populated districts, of Wake County's urban voters, or of voters who support registered Democrats who support "progressive" education policies.

V.

Plaintiffs argue that the 2015 Wake County Commissioners Plan "was the product of bad faith, arbitrariness, or invidious discrimination." Wright, 787 F.3d at 266 (quotation omitted); Daly, 93 F.3d at 1222. In support, plaintiffs contend that the stated goal of improving representation on the Wake County Commission and enhancing geographical diversity on the Commission in light of the diverse urban, rural, and suburban communities of interest within Wake County was pretextual. Instead, plaintiffs contend that the 2015 Wake County Commissioners Plan (1) impermissibly

84

reduces citizen representation on the Wake County Commission because members will be elected from single-member districts within Wake County instead of being elected countywide; (2) ignores the "will" of the voters; (3) will not reduce election costs for those who seek to run for Wake County Commissioner; (4) will not reduce administrative costs for the Wake County Board of Elections or reduce voter confusion by using the same districts for the Wake County School Board and the Wake County Commission; (5) impermissibly favors suburban and rural voters over urban voters; and (6) impermissibly favors voters who support Republican candidates over voters who support Democratic candidates.

The court has examined the evidence collectively and individually. The court finds that plaintiffs have not proven that the 2015 Wake County Commissioners Plan "was the product of bad faith, arbitrariness, or invidious discrimination." Wright, 787 F.3d at 266 (quotation omitted); Daly, 93 F.3d at 1222; see Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 763–64.

A.

During the legislative process, Senator Barefoot and Representative Stam explained that Senate Bill 181 would eliminate the countywide election of Wake County Commissioners from residency districts and replace that system with the election of Wake County Commissioners from seven single-member districts and two super districts. According to the sponsors, the legislative goal was to improve representation of citizens in Wake County on the Commission and to enhance geographic diversity on the Commission in light of the diverse urban, rural, and suburban communities of interest within Wake County. The legislative sponsors proposed using the same districts that the General Assembly had adopted in the 2013 Wake County School Board Plan in order (1) to avoid litigation, since the Eastern District of North Carolina had upheld the districts in the 2013 Wake County School Board Plan, (2) to reduce administrative costs for the Wake County

85

Board of Elections, and (3) to reduce voter confusion. The legislative sponsors also believed that having candidates run in single-member districts would reduce campaign costs. See, e.g., Tr. Ex. 7 pp. 5–7; Tr. Ex. 9, pp. 54–55; Tr. Ex. 10, pp. 2–5, 25–26; Tr. Ex. 251, pp. 3–6, 6–8, 55–57, 57–58, 67, 88, 92, 94–95; Tr. Ex. 13, pp. 3–7. On April 2, 2015, the General Assembly enacted Senate Bill 181. See Stipulations ¶ 47; Tr. Ex. 439.

The General Assembly's legislative goals of improving representation of citizens in Wake County on the Wake County Commission and enhancing geographic diversity on the Wake County Commission in light of the diverse urban, rural, and suburban communities of interest within Wake County are rational state policies. See, e.g., Beach Commc'ns, Inc., 508 U.S. at 315; Fritz, 449 U.S. at 178–79; League of Women Voters of Chi., 965 F. Supp. 2d at 1015–16; cf. Reynolds, 377 U.S. at 579; Regensburger, 278 F.3d at 595–96. Furthermore, it was rational for the 2015 General Assembly to use the same districts from the 2013 Wake County School Board Plan in order to seek to avoid litigation, to reduce administrative costs, and to reduce voter confusion. See, e.g., Beach Commc'ns, Inc., 508 U.S. at 315; Fritz, 449 U.S. at 178–79; League of Women Voters of Chi., 965 F. Supp. 2d at 1015–16; cf. Reynolds, 377 U.S. at 579; Regensburger, 278 F.3d at 595–96.

B.

In opposition, plaintiffs note that under the 2011 BOCC Redistricting Plan, seven Commissioners were elected countywide from residency districts, and each Commissioner then represented each person in Wake County. Plaintiffs argue that the 2015 Wake County Commissioners Plan impermissibly reduces citizen representation on the Wake County Commission because the Commissioners will no longer be elected countywide and no longer represent each person in Wake County.

86

The General Assembly had the constitutional authority to increase the size of the Commission from seven members to nine members and to have Commissioners elected from seven single-member districts and two super districts. See, e.g., Sixty-Seventh Minn. State Senate v. Beens, 406 U.S. 187, 199–200 (1972); see also Gaffney, 412 U.S. at 753. Moreover, the record reflects that North Carolina's 100 counties have a wide variety of methods of electing County Commissioners and that the 2015 Wake County Commissioners Plan fits within these diverse election structures. See Stipulations, Ex. A [D.E. 56-1]. Accordingly, the court rejects plaintiffs' argument that the 2015 Wake County Commissioners Plan impermissibly reduces citizen representation on the Wake County Commission.

## C.

As for plaintiffs' argument that the 2015 Wake County Commissioners Plan ignores the "will" of the voters, plaintiffs cite a poll that bill opponents commissioned in 2015 during the legislative debates concerning the 2015 Wake County Commissioners Plan and cite comments within the legislative record from those who contemporaneously objected to Senate Bill 181 while the General Assembly considered it. Although the court acknowledges the sincerity of those who oppose the 2015 Wake County Commissioners Plan, the court rejects plaintiffs' argument that the 2015 Wake County Commissioners Plan ignores the "will" of the voters. The voters elected the General Assembly, and a majority of the General Assembly voted in favor of the 2015 Wake County Commissioners Plan.

## D.

Plaintiffs argue that the 2015 Wake County Commissioners Plan will not reduce election costs for those who seek to run for Wake County Commission and will not reduce administrative costs for the Wake County Board of Elections or reduce voter confusion by having the Wake County

87

Board of Elections use the same districts for the School Board and the County Commission. In support, plaintiffs rely on the testimony of legislative opponents of the bill and the testimony of one current member of the Wake County Commission who opposed the bill while it was debated.

The court gives no weight to the opinion testimony at trial of legislative opponents of Senate Bill 181 and does not credit their testimony. See, e.g., Shell Oil Co., 488 U.S. at 29; Fruit & Vegetable Packers, 377 U.S. at 66; Schwegmann Bros., 341 U.S. at 394–95; Veasey, 796 F.3d at 502. Instead, the court credits as rational the floor statements of Representative Stam concerning election costs under the 2015 Wake County Commissioners Plan. See, e.g., Tr. Ex. 13, p. 7; Beach Commc'ns, Inc., 508 U.S. at 314–15; Fritz, 449 U.S. at 178–79. The court also credits as rational the floor statements of Representative Stam that having the Wake County Board of Elections administer elections for the Wake County School Board and Wake County Commission with the same districts will reduce administrative costs and will reduce voter confusion. See, e.g., Tr. Ex. 13, p. 5; Tr. Ex. 251, p. 67; Beach Commc'ns, Inc., 508 U.S. at 314–15; Fritz, 449 U.S. at 178–79; League of Women Voters of Chi., 965 F. Supp. 2d at 1015–16; cf. Reynolds, 377 U.S. at 579; Regensburger, 278 F.3d at 595–96. Accordingly, the court rejects plaintiffs' arguments.

E.

As for plaintiffs' contention that the 2015 Wake County Commissioners Plan impermissibly favors suburban and rural voters over urban voters, plaintiffs focus on Senator Barefoot's discussion of rural, suburban, and urban communities of interest during the legislative process. Plaintiffs, however, have not proven that Senator Barefoot's references mean that the 2015 Wake County Commissioners Plan impermissibly favors rural and suburban voters over urban voters and have not proven that the 2015 Wake County Commissioners Plan substantially dilutes the voting strength of voters in the more populated districts or Wake County's urban voters.

88

Since Reynolds, the Supreme Court's one person one votes jurisprudence has focused on the substantial dilution of the votes of individual voters. See, e.g., Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64; Hadley, 397 U.S. at 54; Reynolds, 377 U.S. at 568. For example, in Reynolds, the Supreme Court discussed substantial vote dilution between urban and rural voters in Alabama's redistricting plan and found that Alabama's redistricting plan improperly favored underpopulated rural regions of Alabama by substantially diluting the individual voting strength of voters in Alabama's more populated districts. See Reynolds, 377 U.S. at 550 (noting that voters in rural Alabama counties had 15 to 20 times more voting strength than voters in highly populated Alabama counties); see also Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64; Abate, 403 U.S. at 185–86; Hadley, 397 U.S. at 52–53. Nonetheless, the Supreme Court has never held that, in formulating a redistricting plan, a state legislature must ignore communities of interest in urban areas, suburban areas, or rural areas. In fact, Supreme Court precedent suggests just the opposite. See, e.g., Cromartie II, 532 U.S. at 250; Abate, 403 U.S. at 185; Dusch, 387 U.S. at 117; see also Marylanders for Fair Representation, Inc., 849 F. Supp. at 1035 n.12. Moreover, the Supreme Court has made clear that in analyzing a redistricting plan, a court must ensure that the redistricting plan does not substantially dilute the voting strength of residents in more populated districts or otherwise invidiously discriminate against individual voters. See, e.g., Cromartie II, 532 U.S. at 250; Vera, 517 U.S. at 964; Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64; see also Marylanders for Fair Representation, Inc., 849 F. Supp. at 1035 n.12.

In enacting the 2015 Wake County Commissioners Plan, the General Assembly permissibly considered the communities of interest within Wake County's urban, rural, and suburban areas and did not impermissibly favor suburban and rural voters over urban voters. Wake County covers 857 square miles. See Tr. Ex. 276. The legislative debates and citizen comments to the General

89

Assembly before it enacted the 2015 Wake County Commissioners Plan reflect that Wake County's urban areas face unique issues associated with such topics as urban schools, urban transportation, and urban housing, development, and land use.[33] Likewise, Wake County's rural and suburban areas face unique issues associated with rural and suburban schools, rural and suburban transportation, and rural and suburban housing, development, and land use. For example, with respect to schools, there is more space to build schools in rural and suburban areas, but decisionmakers also need to assess the viability of using existing space in urban areas to add or enhance magnet schools. Similarly, housing, development, and land use issues differ between Wake County's urban areas and rural and suburban areas given the differences in land availability, land prices, and development impacts arising from property taxes and property development regulations. As for transportation, voters in urban areas within Wake County are more likely to be concerned with bus transportation issues, urban traffic congestion, and the viability and cost of enhancing rail service from Raleigh to other cities outside Wake County (such as Durham and Chapel Hill) as compared with rural and suburban voters who are more concerned with where the I-540 Outer Loop will be located, toll roads in rural and suburban parts of Wake County, road maintenance on major thoroughfares, and enhancing transit corridors and transit options within rural and suburban areas of Wake County. Furthermore, Wake County's rural area includes a very large agricultural community, which has unique and important soil, water, conservation, and economic concerns. Additionally, the urban, rural, and suburban communities of interest in Wake County are not directly tied to municipal boundaries in Wake County. Compare Tr. Ex. 276 with Stipulations ¶ 1.

---

[33] Other portions of the record do as well. See Tr. Ex. 276.

90

In Abate, the Supreme Court recognized that "viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs." Abate, 403 U.S. at 185. Furthermore, so long as a redistricting plan does not substantially dilute the voting strength of residents in more populated portions of a county, a legislature may account for communities of interest within urban, rural, and suburban areas of a county when enacting a redistricting plan so that the resulting government reflects a "detente" among urban, suburban, and rural communities aimed at seeking to resolve "the complex problems of the modern megalopolis in relation to the city, the suburbia, and the rural countryside." Dusch, 387 U.S. at 117.

Although plaintiffs strongly disagree with the 2015 General Assembly's decision to enact the 2015 Wake County Commissioners Plan, the General Assembly rationally considered the communities of interest within Wake County's urban areas and within Wake County's rural and suburban areas in adopting the 2015 Wake County Commissioners Plan. See, e.g., Cromartie II, 532 U.S. at 250; Abate, 403 U.S. at 185; Dusch, 387 U.S. at 117; see also Marylanders for Fair Representation, Inc., 849 F. Supp. at 1035 n.12; Cosner v. Dalton, 522 F. Supp. 350, 360–61 (E.D. Va. 1981) (three-judge court). Moreover, this court has considered plaintiffs' arguments concerning Larios, has discussed Larios at length, and finds Larios distinguishable. Plaintiffs have failed to prove that the 2015 Wake County Commissioners Plan impermissibly favors suburban and rural voters over urban voters or substantially dilutes the individual voting strength of Wake County's urban voters.

F.

As for plaintiffs' contention that the 2015 Wake County Commissioners Plan impermissibly favors voters who support Republican candidates over voters who support Democratic candidates, plaintiffs again rely on the expert testimony of Dr. Chen and Anthony Fairfax. Dr. Chen's opinion

91

and analysis concerning the 2015 Wake County Commissioners Plan tracks his analysis of the 2013 Wake County School Board Plan. Because Dr. Chen's analysis and opinion, a priori, exclude any redistricting plan that exceeds a maximum population deviation of 2%, that divides any precinct, that does not preserve municipalities intact, and that does not maximize geographical compactness, the same fatal flaws exist in Dr. Chen's opinion and analysis concerning the 2015 Wake County Commissioners Plan. Accordingly, the court also rejects Dr. Chen's "partisanship" analysis and opinions concerning the 2015 Wake County Commissioners Plan. See, e.g., Joiner, 522 U.S. at 143–47; F.C. Wheat Mar. Corp., 663 F.3d at 722–25; Baptiste, 596 F.3d at 224–25.[34]

As for Fairfax's analysis and opinions concerning the 2015 Wake County Commissioners Plan, the court has considered Fairfax's opinions about the population deviations, the municipality splits, the precinct splits, and the compactness measures. See Fairfax Report, pp. 7–20. The court finds that such evidence merely reflects the ability to draw "better" plans, but "better" plans do not equate to the unconstitutionality of the 2015 Wake County Commissioners Plan. See, e.g., Tennant, 133 S. Ct. at 5–8; Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 763–64; Daly, 93 F.3d at 1221.

As for Fairfax's "partisanship" analysis, Fairfax again erroneously relies on the 2004 and 2008 presidential elections to purport to render opinions about how the nine districts in the 2015 Wake County Commissioners Plan will "perform." Fairfax, however, never persuasively explained how presidential election results in Wake County from 2004 and 2008 logically support an inference

_____

[34] Dr. Chen's opinion and testimony concerning the 2015 Wake County Commissioners Plan did rely on the 2012 presidential election results, the 2012 Wake County Commission election results, and the 2014 Wake County Commission election results to opine that his simulation methodology would produce two or three Republican-leaning districts in a seven-district plan, but not four Republican-leaning districts. See Chen Report 13. He also opined that District A would be Democratic-leaning and that District B would be Republican-leaning. Again, however, Dr. Chen's methodology relied on four parameters that the General Assembly was not legally required to follow. Thus, court rejects Dr. Chen's opinion and testimony.

of partisan motivation in 2015 or could rationally be used to predict voter performance in Wake County elections for the County Commission in 2016 and beyond. See, e.g., Frank, 336 F.3d at 575–76. For example, Fairfax could have reviewed County Commission election data for 2004, 2006, 2008, 2010, 2012, and 2014 and tested his hypothesis concerning the relevance of the 2004 and 2008 presidential elections to his opinion. He did not. Likewise, Fairfax could have examined state election results from 2004, 2006, 2008, 2010, 2012, and 2014 and tested his hypothesis concerning outcomes in County Commission elections. He did not. Accordingly, the court rejects as unsupported any inference from Fairfax's opinion and testimony concerning partisanship and the enactment of the 2015 Wake County Commissioners Plan. See, e.g., Joiner, 522 U.S. at 143–47; F.C. Wheat Mar. Corp., 663 F.3d at 722–25; Baptiste, 596 F.3d at 224–25.

As for Fairfax's opinions concerning incumbent residences in the 2015 Wake County Commissioners Plan, Fairfax opined that the 2015 Wake County Commissioners Plan combines "three county commissioner incumbents into a single district and no incumbents in districts 3 and 5." Fairfax Report, p. 20. The court finds Fairfax's analysis concerning incumbents incomplete and unpersuasive. Cf. Tr. Ex. 41.

Under the 2015 Wake County Commissioners Plan, Democratic incumbent Commissioner Betty Lou Ward lives in District 1.[35] Democratic incumbents Commissioner Sig Hutchinson, Commissioner John Burns, and Commissioner Caroline Sullivan live in District 2, but Fairfax ignores that Commissioner Sullivan could run in District A, Commissioner Burns could run in District 2, and Commissioner Hutchinson could run in District B. Fairfax's opinion also ignores that Commissioner Sullivan has filed to run for election to the County Commission in 2016 in District

---

[35] Fairfax's report fails to note that Commissioner Ward is not running for reelection. Cf. Consolidated Candidate Listing.

93

A. See Consolidated Candidate Listing. Thus, in 2018, Commissioner Burns and Commissioner Hutchinson each could run for reelection with the power of incumbency, one in District 2 and one in District B. As for Districts 3 and 5, Fairfax correctly notes that there is no incumbent residing in those districts. As for District 4, Commissioner James West (incumbent Democrat) lives in that district. As for District 6, Commissioner Matt Calabria (incumbent Democrat) lives in that district. As for District 7, Commissioner Jessica Holmes (incumbent Democrat) lives in that district. Accordingly, each Democratic incumbent from 2015 has the ability to run with the power of incumbency against a non-incumbent in 2016 or 2018. Thus, having reviewed how the 2015 Wake County Commissioners Plan treats incumbents and having considered Fairfax's analysis and opinion, the court declines to infer that the 2015 Wake County Commissioners Plan resulted from partisanship.[36]

Plaintiffs also argue that the one-month legislative process from introduction of Senate Bill 181 until its enactment evidences bad faith, arbitrariness, or invidious discrimination. See Vill. of Arlington Heights, 429 U.S. at 267–68. The court, however, has examined the historical background concerning the enactment of the 2015 Wake County Commissioners Plan, the sequence of events leading to the enactment, and the contemporaneous legislative history. After reviewing the entire

---

[36] The following candidates have filed to run for Wake County Commissioner in 2016. See Consolidated Candidate Listing. In District A, Commissioner Sullivan is running against Republican Craig Ralph. In District B, two Democrats (Lindy Brown and Vicki Scroggins-Johnson) are running in the Democratic primary in March 2016 while two Republicans (John Adcock and Phil Matthews) are running in the Republican primary in March 2016. The winners of Districts A and B in November 2016, will each serve four-year terms. See Tr. Ex. 439. As for Districts 4, 5, 6, in November 2016, candidates will run countywide in the residency districts under the 2011 BOCC Redistricting Plan and serve two-year terms. See id. In District 4, Erv Portman is running against Republican Kenneth Gardner. In District 5, Commissioner West is running unopposed. In District 6, Democrat Greg Ford is running against Republican John Odom. See Consolidated Candidate Listing.

94

record, the court finds that the one-month legislative process does not evince that the General Assembly acted in bad faith, arbitrarily, or with invidious discrimination. See, e.g., Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64; League of Women Voters of Chi., 757 F.3d at 725–27; Moore, 431 F.3d at 260–61.

G.

Plaintiffs have failed to prove that the 2015 Wake County Commissioners Plan was the product of bad faith, arbitrariness, or invidious discrimination. Plaintiffs also did not prove that seeking partisan advantage predominated over rational state policy in enacting the 2015 Wake County Commissioners Plan. Nonetheless, and alternatively, assuming without deciding that partisanship played some role in enacting the 2015 Wake County Commissioners Plan, the court finds that the 2015 Wake County Commissioners Plan fits comfortably within the "rough political fairness" rationale that the Supreme Court approved in Gaffney. In Gaffney, the Supreme Court observed:

> The very essence of districting is to produce a different—a more 'politically fair'—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats. Politics and political considerations are inseparable from districting and apportionment.

Gaffney, 412 U.S. at 753.

Under Gaffney, the 2015 General Assembly was permitted to observe that, dating back to 2002, there were some elections where the countywide vote within Wake County would sweep either Republicans or Democrats into office under the countywide at-large system. See Stipulations ¶ 30. Furthermore, Gaffney permitted the General Assembly to consider that Wake County has a population of more than 900,000 people (which is larger than the population of six states), to reject an at-large election system, and to have candidates for Wake County Commission be elected from

95

single-member districts. See Gaffney, 412 U.S. at 753. Moreover, Gaffney permitted the General Assembly to consider that the party registration data in the 2015 Wake County Commissioners Plan shows that Democrats are a majority in 5 of the 9 districts. See, e.g., Tr. Ex. 252. Additionally, Gaffney permitted the General Assembly to consider that 5 of the 9 districts lean towards Republican candidates, but all are winnable by Democratic candidates, and that 4 of the 9 districts appear to be safe Democratic seats. Id. Gaffney also permitted the General Assembly to consider the large number of Unaffiliated voters in Wake County, the general independence of Wake County voters (particularly in local elections), and Wake County's voter registration data and to conclude that the 2015 Wake County Commissioners Plan reflects, at most, an attempt for "rough political fairness," leaving the ultimate outcome of who is elected to the Wake County Commission squarely in the hands of Wake County voters. See Gaffney, 412 U.S. at 740–54. Thus, under Gaffney, assuming without deciding that partisanship partially motivated the General Assembly to enact the 2015 Wake County Commissioners Plan, plaintiffs did not prove that partisanship went "too far." See id. Likewise, plaintiffs have not proven that the 2015 Wake County Commissioners Plan substantially dilutes the individual voting strength of voters in Wake County's more populated districts or voters who support Democratic candidates.

## H.

In sum, plaintiffs have failed to prove a prima facie case that the General Assembly's 2015 Wake County Commissioners Plan "was the product of bad faith, arbitrariness, or invidious discrimination." Wright, 787 F.3d at 266 (quotation omitted); Daly, 93 F.3d at 1222; see Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64. Plaintiffs also have failed to prove that the 2015 Wake County Commissioners Plan "was the product of bad faith, arbitrariness, or invidious discrimination." Wright, 787 F.3d at 266 (quotation omitted); Daly, 93 F.3d at 1222; see Gaffney,

96

412 U.S. at 740–54; Regester, 412 U.S. at 761–64. The court finds that the General Assembly acted in good faith in enacting the 2015 Wake County Commissioners Plan. See Dean, 550 F. Supp. 2d at 605. The court also finds that the General Assembly did not act arbitrarily or with invidious discriminatory intent in enacting the 2015 Wake County Commissioners Plan and that the population deviations in the 2015 Wake County Commissioners Plan were not the product of bad faith, arbitrariness, or invidious discrimination and do not substantially dilute the individual voting strength of voters in Wake County's more populated districts, of Wake County's urban voters, or of voters who support Democratic candidates.

## VI.

Plaintiffs contend that the 2013 Wake County School Board Plan and the 2015 Wake County Commissioners Plan violate the one person one vote requirement in the North Carolina Constitution and make the same arguments that they made concerning the Fourteenth Amendment.[37] North Carolina's Constitution includes a one person one vote standard. See Blankenship v. Bartlett, 363 N.C. 518, 521–22, 681 S.E.2d 759, 762–63 (2009); Stephenson v. Bartlett, 355 N.C. 354, 382–83, 562 S.E.2d 377, 396–97 (2002). Moreover, the Supreme Court of North Carolina's analysis concerning "the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause." Blankenship, 363 N.C. at 522, 681 S.E.2d at 762. Nonetheless, in Stephenson, the Supreme Court of North Carolina held that "[i]n forming new legislative districts, any deviation from the ideal population for

---

[37] Plaintiffs' state constitutional claims raise a significant Eleventh Amendment issue in this federal action. See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 103–06 (1984); Harris, 993 F. Supp. 2d at 1065–66. Given the procedural posture of the case, however, the Eleventh Amendment does not bar this court from resolving plaintiffs' state-law claims.

97

a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements." Stephenson, 355 N.C. at 383, 562 S.E.2d at 397.

One three-judge district court in this district has interpreted Stephenson to impose a "more restrictive" one person one vote standard under the North Carolina Constitution than that imposed in Brown v. Thomson, 462 U.S. 835 (1983), and "interpreted . . . in Daly v. Hunt, 93 F.3d 1212, 1216 n.2 (4th Cir. 1996)" under the United States Constitution. See Dean, 550 F. Supp. 2d at 598 n.7. The Dean three-judge court explained this conclusion concerning the one person one vote standard under the North Carolina Constitution with the following example:

> Under a state plan in which the least-populated district deviates 5.9% below the ideal, and the most-populated district deviates 3.9% above the ideal, the Brown/Daly calculation yields a maximum population deviation of 9.8%, within the 10% safe harbor absent invidious intent. Under Stephenson I, however, the same plan would violate the one-person, one-vote requirement by virtue of the least-populated district deviating more than 5% from the ideal, without reference to the percentage deviation of the most-populated district.

Id.

This court need not decide whether it agrees with the Dean court's conclusion concerning the one person one vote standard under the North Carolina Constitution.[38] Instead, this court assumes without deciding that the Dean court is correct and assumes without deciding that the standard applied in Stephenson also applies to local government districts. As a practical matter, the

---

[38] In Stephenson, the Supreme Court of North Carolina rejected as incorrect the interpretation of the North Carolina Constitution's "Whole County Provision" that a three-judge district court in this district announced in Cavanagh v. Brock, 577 F. Supp. 176 (E.D.N.C. 1983) (three-judge court). See Stephenson, 355 N.C. at 368, 374–75, 562 S.E.2d at 388, 391–92. Thus, this court acutely recognizes the peril of interpreting the North Carolina Constitution in a context that the Supreme Court of North Carolina has not squarely addressed. This court, however, lacks the ability to certify this question of North Carolina law to the Supreme Court of North Carolina. See United States v. Vinson, 805 F.3d 120, 122 n.1 (4th Cir. 2015); Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

distinction discussed in Dean does not matter in this case because no district in the 2013 Wake County School Board Plan or the 2015 Wake County Commissioners Plan deviates more than plus or minus 5% from the ideal population and the maximum population deviation in each plan is below 10%. Furthermore, for the same reasons that plaintiffs' one person one vote claims under the United States Constitution fail, so too do plaintiffs' one person one vote claims fail under the North Carolina Constitution.

## VII.

### A.

The RWCA plaintiffs contend that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan.[39] Plaintiffs' burden of proof concerning racial gerrymandering is "demanding." Cromartie II, 532 U.S. at 241. A legislature must have discretion "to balance competing interests" when redistricting; therefore, courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." Id. at 242 (emphasis and quotations omitted); Miller, 515 U.S. at 915–16. Moreover, simply because a legislature creates a majority-minority district does not trigger strict scrutiny. See Vera, 517 U.S. at 958, 962.

A plaintiff asserting a racial gerrymandering claim must prove that race was the "predominant factor" motivating the legislature to place certain voters within the challenged district.

---

[39] District 4 in the 2015 Wake County Commissioners Plan is identical to District 4 in the General Assembly's 2013 Wake County School Board Plan. In their complaint, the Wright plaintiffs did not allege that the 2013 General Assembly racially gerrymandered District 4 in the 2013 Wake County School Board Plan. Thus, the court does not address that issue. See, e.g., Wright v. Rockefeller, 376 U.S. 52, 58 (1964) (holding that where a party has not raised a claim, "the issues have not been formulated to bring it into focus, and the evidence has not been offered or appraised to decide it," and therefore a court should not decide such a potential claim.).

99

Ala. Legislative Black Caucus, 135 S. Ct. at 1265 (quotation omitted); Miller, 515 U.S. at 916. "The legislature's motivation is itself a factual question." Cromartie I, 526 U.S. at 549. "Race must not simply have been a motivation for the drawing of a majority-minority district, but the predominant factor motivating the legislature's districting decision. Plaintiffs must show that a facially neutral law is unexplainable on grounds other than race." Cromartie II, 532 U.S. at 241–42 (quotations and citations omitted). To make this showing, a plaintiff must prove that the legislature subordinated "traditional race-neutral districting principles" to race in creating the district. See Ala. Legislative Black Caucus, 135 S. Ct. at 1270 (quotation omitted). Such traditional "race-neutral districting principles" include (but are not limited to) "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." Id. (quotation and citation omitted); see Cromartie I, 526 U.S. at 549, 551–52 (suggesting that traditional race-neutral districting principles sufficient to defeat a racial gerrymandering claim include incumbency protection, creating a strong Democratic district, and preserving partisan balance in a legislative delegation); Miller, 515 U.S. at 916.

A plaintiff may seek to prove a racial gerrymandering claim with direct evidence of legislative purpose, circumstantial evidence of legislative purpose, or a combination of both direct and circumstantial evidence. See, e.g., Cromartie I, 526 U.S. at 547; Shaw v. Hunt, 517 U.S. 899, 905 (1996) ("Shaw II"). Direct evidence of legislative purpose may include a state's express admission that it placed a majority of minorities within a district to "enhanc[e] the opportunity of minority voters to elect minority representatives." Vera, 517 U.S. at 960–61 (quotation omitted). Direct evidence of legislative purpose also may include a state's express admission in a preclearance submission under the Voting Rights Act to the Department of Justice that the "overriding purpose" in creating a majority-minority district was the Voting Rights Act. See Shaw II, 517 U.S. at 906

100

(quotation and emphasis omitted); see also Miller, 515 U.S. at 907–09, 917 (upholding the finding of a racially gerrymandered district where the Georgia Legislature admitted that it moved large populations of African-Americans into a newly created third majority-minority congressional district in order to obtain preclearance from the Department of Justice under the Voting Rights Act after the Department of Justice had twice denied preclearance to a redistricting plan with only two majority-minority congressional districts). Direct evidence of legislative purpose also may include statements from legislators in charge of redistricting that "a primary redistricting goal was to maintain existing racial percentages in each majority-minority district, insofar as feasible." Ala. Legislative Black Caucus, 135 S. Ct. at 1271.

In analyzing whether a legislator's statement constitutes direct evidence of the legislature's racial motive, a court must proceed very cautiously. See, e.g., Cromartie II, 532 U.S. at 253. For example, in Cromartie II, the Supreme Court examined the committee statement of then-Senator Roy Cooper (the Democratic legislative redistricting leader in the North Carolina General Assembly) that the redistricting plan (which included two majority-minority congressional districts) satisfied the "need for 'racial and partisan' balance." Id.[40] The three-judge district court in Cromartie II found that Senator Cooper's statement was direct evidence of the North Carolina General Assembly's racial motive in creating the challenged majority-minority congressional district. Id. The Supreme Court, however, rejected that finding as clearly erroneous and concluded that then-Senator Cooper's statement mentioned not only race, but also partisan and geographic considerations; "and as so read[,] it says little or nothing about whether race played a predominant role comparatively speaking." Id. at 242–43, 253 (emphasis in original).

---

[40] Roy Cooper is now the Attorney General of North Carolina.

Likewise, in Cromartie II, the Supreme Court examined an email that Gerry Cohen, "a legislative staff member responsible for drafting districting plans, [sent] to Senator Cooper and Senator Leslie Winner[, another Senate Democratic leader in the North Carolina General Assembly]." Id. at 254. In the email, Cohen wrote: "I have moved Greensboro Black community into the 12th [District], and now need to take [about] 60,000 [people] out of the 12th [District]. I await your direction on this." Id. (quotations omitted) (second alteration in original). Although the Supreme Court conceded that Cohen's reference to race—i.e., "Greensboro Black community"—"is obvious," the Supreme Court noted that Cohen's email

> does not discuss why Greensboro's African-American voters were placed in the 12th District; it does not discuss the political consequences of failing to do so; it is addressed only to two members of the legislature; and it suggests that the legislature paid less attention to race in respect to the 12th District than in respect to the 1st District, where the e-mail provides a far more extensive, detailed discussion of racial percentages.

Id. Accordingly, the Supreme Court rejected the three-judge court's finding that the General Assembly racially gerrymandered the 12th District and held that Cohen's email "is less persuasive than the kinds of direct evidence we have found significant in other redistricting cases." Id. (citing Vera, Miller, and Shaw II, where the state expressly admitted that race was the predominant factor in drawing the challenged majority-minority district). Furthermore, the Supreme Court repeatedly has warned that extrapolating from a statement by one or two legislators to find a legislature's predominant motive "is often an unsatisfactory venture" because "[w]hat motivates one legislator to vote for a statute is not necessarily what motivates . . . others to enact it." Pac. Gas & Elec. Co. v. States Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 216 (1983); see League of United Latin Am. Citizens, 548 U.S. at 418 ("Evaluating the legality of acts arising out of mixed motives can be complex, and affixing a single label to those acts can be hazardous, even when the actor is an

102

individual performing a discrete act. When the actor is a legislature and the act is a composite of manifold choices, the task can be even more daunting.") (citation omitted); League of Women Voters of Chi., 757 F.3d at 725.

As for circumstantial evidence that a state legislature has drawn a district's lines predominately based on race, the Supreme Court has examined "a district's shape and demographics." Miller, 515 U.S. at 916. As for shape, in Shaw I, Miller, and Vera, the Court attached maps of the extraordinarily bizarrely shaped 12th Congressional District in North Carolina, 18th, 29th, and 30th Congressional Districts in Texas, and 11th Congressional District in Georgia. See Vera, 517 U.S. at 987–89; Miller, 515 U.S. at 928; Shaw v. Reno, 509 U.S. 630, 658 (1993) ("Shaw I"); see also Shaw II, 517 U.S. at 902–07 (describing evidence concerning shape and demographics of the 12th Congressional District). As for demographics, in Miller, the three-judge court found that, in order to create a third majority-minority congressional district, the Georgia Legislature used "narrow land bridges to incorporate within the district outlying appendages containing nearly 80% of the district's total black population." Miller, 515 U.S. at 917. The three-judge court in Miller also noted that the Georgia Legislature only created the third majority-minority congressional district after the Department of Justice had twice denied preclearance to redistricting plans that did not have three majority-minority congressional districts. Id. at 907–11, 917–20. Furthermore, in Miller, the three-judge court found that the third majority-minority congressional district connected "the black neighborhoods of metropolitan Atlanta and the poor black populace" of Augusta and Savannah, covered 6,784.2 square miles, encompassed "four discrete, widely spaced urban centers" that are hundreds of miles apart, and attached communities of people that have nothing to do with each other. Id. at 907–08, 911–21 (quotation omitted); see Vera, 517 U.S. at 959–76 (describing evidence concerning shape and demographics of Texas Congressional Districts 18, 29, and 30). More

103

generally, in evaluating circumstantial evidence, the Supreme Court has reminded courts to focus on whether a plaintiff has proven that the "legislature subordinated traditional race-neutral districting principles . . . to racial considerations." Ala. Legislative Black Caucus, 135 S. Ct. at 1270 (emphasis and quotation omitted). Such traditional race-neutral districting principles include "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." Id. (quotations and citations omitted).

B.

Plaintiffs rely on direct and circumstantial evidence in attempting to prove that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan. In support, plaintiffs claim that Representative Stam's floor statements in 2015 constitute direct evidence that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan. Plaintiffs also claim that Dr. Chen's opinion concerning District 4 in the 2015 Wake County Commissioners Plan constitutes circumstantial evidence that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan. Moreover, plaintiffs assert that District 4's shape and demographics, as well as the legislative process of enacting District 4 in 2015, circumstantially show that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan.

As for direct evidence, the court has reviewed Representative Stam's floor statements from 2015 and finds that they are not direct evidence that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan. See Cromartie II, 532 U.S. at 253–54. The court finds that Representative Stam's statements (like then-Senator Cooper's statements in Cromartie II) are much more nuanced than plaintiffs suggest. In 2015, Representative Stam spoke in support of changing the election of the Wake County Commission from a countywide

104

at-large electoral system to the election of the Wake County Commission from single-member districts. See Tr. Ex. 13, pp. 4–6. In advocating for that change, Representative Stam observed that at-large electoral systems submerge the views of various minorities, "whether it's racial, gender, political, rural, urban" or whatever. Id. p. 4. Such at-large electoral systems are "just a bad idea because they don't give the representation close to the voters." Id. Representative Stam then gave an example that, under the at-large electoral scheme long used in Wake County, it was not until 1992 that a Republican was ever elected to the Wake County Commission. Id. p. 5. Representative Stam also opined that the ACLU attacks at-large electoral systems because such electoral systems "submerge all types of minorities whether they're political, racial, or whatever." Id. p. 6; see also Tr. Ex. 251, pp. 6–8, 55–57.

Like then-Senator Cooper's comments in Cromartie II, the court finds that Representative Stam's comments about electing Commissioners from single-member districts, instead of through a countywide at-large vote system, are not direct evidence that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan. See Cromartie II, 532 U.S. at 253–54. Moreover, the court finds that plaintiffs have not presented direct evidence that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan. See id.; see also Backus v. South Carolina, 857 F. Supp. 2d 553, 563–65 (D.S.C.) (three-judge court), summarily aff'd, 133 S. Ct. 156 (2012).

As for circumstantial evidence, plaintiffs cite Dr. Chen's opinion concerning District 4 in the 2015 Wake County Commissioners Plan. To examine the predominance of racial, as opposed to partisan, motivations for District 4 in the 2015 Wake County Commissioners Plan, Dr. Chen compared the relative African-American population of District 4 against the "blackest of the seven simulated districts" that Dr. Chen created in each of Dr. Chen's 500 seven-district simulations,

105

which "represent alternative versions of how District 4 would have been drawn under a race-neutral, non-partisan districting process." Chen Report 16. In Dr. Chen's opinion, "racial packing, not partisanship motivations, predominated in the . . . drawing of District 4." Id. 2.

The court finds the same material, methodological flaws that limit the helpfulness of Dr. Chen's report and testimony concerning the one person one vote claims infect Dr. Chen's credibility and his racial-gerrymandering analysis. Cf. id. 16 ("I begin with the same 500 simulations of seven-district plans presented previously . . . ."). As discussed, the court rejects the four constraints that Dr. Chen used to build his algorithm: a maximum population deviation of 2%, maximizing geographical compactness, preserving municipal boundaries, and not splitting any precincts. Neither North Carolina law nor the Fourteenth Amendment required the General Assembly to adhere to those four constraints. See, e.g., Vera, 517 U.S. at 962; Brown, 462 U.S. at 842–43; Gaffney, 412 U.S. at 740–54; Regester, 412 U.S. at 761–64. Furthermore, the law does not require a legislature to ignore partisan concerns. See, e.g., Gaffney, 412 U.S. at 740–54. Additionally, as revealed on cross-examination, even when Dr. Chen used his "non-partisan" algorithm with his four non-mandatory parameters, Dr. Chen's algorithm produced a single-member district centered in Southeast Raleigh in a seven-member plan with an African-American population of 53%, which the court finds materially undermines his racial gerrymandering analysis and opinion. See, e.g., Joiner, 522 U.S. at 143–47; F.C. Wheat Mar. Corp., 663 F.3d at 721–25; Baptiste, 596 F.3d at 224–25.

The court also finds that, as revealed during cross-examination, Dr. Chen's failure to sample an appropriate population of alternative districting plans renders unhelpful his statistical conclusions and ultimate opinion regarding the alleged predominance of racial considerations in drawing District 4 in the 2015 Wake County Commissioners Plan. Cf. Chen Report 18. On cross-examination, Dr. Chen admitted that under a partisan neutral, race-blind districting process with less strict adherence

106

to his four alleged traditional districting criteria, a district centered in Southeast Raleigh could be drawn in a seven-district plan that is more than 53% African-American.

In sum, the court does not find Dr. Chen credible and finds Dr. Chen's testimony and report to be materially flawed. Accordingly, the court does not credit Dr. Chen's testimony or report. See, e.g., Joiner, 522 U.S. at 143–47; F.C. Wheat Mar. Corp., 663 F.3d at 721–25; Baptiste, 596 F.3d at 224–55.

As for District 4's shape and demographics, as well as the legislative process of enacting District 4 within the 2015 Wake County Commissioners Plan, District 4 is a majority-minority district, but that alone does not mean that the General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan. See, e.g., Vera, 517 U.S. at 958, 962. Moreover, District 4's shape comports with traditional districting principles of compactness and contiguity and is not remotely akin to the bizarrely-shaped districts at issue in Vera, Shaw I, Shaw II, and Miller. Furthermore, the evidence supports the finding that District 4 in the 2015 Wake County Commissioners Plan is a Democratic-performing district in a partisan election and political affiliation (including creating a safe-Democratic district) is a traditional race-neutral districting principle. See, e.g., Cromartie II, 532 U.S. at 241–42.

As for the legislative process preceding the enactment of the 2015 Wake County Commissioners Plan, the court finds that the legislative process also supports the finding that the 2015 General Assembly did not racially gerrymander District 4 in the 2015 Wake County Commissioners Plan. Both Senator Barefoot and Representative Stam stated, and the record reflects, that the 2015 General Assembly did not draw any new lines or create any new districts in the 2015 Wake County Commissioners Plan. See, e.g., Tr. Ex. 251, pp. 87–88, 91, 94–95. Rather, Senator Barefoot and Representative Stam proposed that the 2015 General Assembly adopt the same map that

107

the 2013 General Assembly had enacted concerning the Wake County School Board because the Eastern District of North Carolina had approved that map and they believed that an appeal in that case was unlikely to succeed, and because using the same map for the Wake County School Board and the Wake County Commission would reduce voter confusion and be less costly for the Board of Elections to administer. See, e.g., id. The 2015 General Assembly then enacted the 2015 Wake County Commissioners Plan, which includes District 4. See Stipulations ¶ 47; Tr. Ex. 439.

In a racial gerrymandering claim, "[t]he legislature's motivation is itself a factual question." Cromartie I, 526 U.S. at 549. Having reviewed the entire record, the court finds that plaintiffs have failed to prove that race was the predominant factor motivating the 2015 General Assembly's districting decision concerning District 4 in the 2015 Wake County Commissioners Plan. See, e.g., Ala. Legislative Black Caucus, 135 S. Ct. at 1270–71; Cromartie II, 532 U.S. at 241–42; see also Backus, 857 F. Supp. 2d at 562–65. Thus, the court rejects plaintiffs' racial gerrymandering claim concerning District 4 in the 2015 Wake County Commissioners Plan.

## VIII.

In sum, plaintiffs have failed to prove that either the 2013 Wake County School Board Plan or the 2015 Wake County Commissioners Plan violates the one person one vote requirement in the United States and North Carolina Constitutions. Plaintiffs also have failed to prove that the 2015 General Assembly racially gerrymandered District 4 in the 2015 Wake County Commissioners Plan. Accordingly, the court enters judgment in favor of the defendant Wake County Board of Elections.

SO ORDERED. This **2.6**day of February 2016.

JAMES C. DEVER III
Chief United States District Judge

Case 5:15-cv-00156-D   Document 64   Filed 02/26/16   Page 108 of 108