**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 16-1270

_____

RALEIGH WAKE CITIZENS ASSOCIATION; JANNET B. BARNES;
BEVERLEY S. CLARK; WILLIAM B. CLIFFORD; BRIAN FITZSIMMONS;
GREG FLYNN; DUSTIN MATTHEW INGALLS; AMY T. LEE; ERWIN
PORTMAN; SUSAN PORTMAN; JANE ROGERS; BARBARA VANDENBERGH;
JOHN G. VANDENBERGH; AMYGAYLE L. WOMBLE; PERRY WOODS,

            Plaintiffs - Appellants,

      v.

WAKE COUNTY BOARD OF ELECTIONS,

            Defendant - Appellee,

      and

CHAD BAREFOOT, in his official capacity as Senator and
primary sponsor of SB 181; PHILLIP E. BERGER, in his
official capacity as President Pro Tempore of the North
Carolina Senate; TIM MOORE, in his official capacity as
Speaker of the North Carolina House of Representatives,

            Defendants.

_____

No. 16-1271

_____

CALLA WRIGHT; WILLIE J. BETHEL; AMY T. LEE; AMYGAYLE L.
WOMBLE; JOHN G. VANDENBERGH; BARBARA VANDENBERGH; AJAMU G.
DILLAHUNT; ELAINE E. DILLAHUNT; LUCINDA H. MACKETHAN;
WILLIAM B. CLIFFORD; ANN LONG CAMPBELL; GREG FLYNN; BEVERLEY
S. CLARK; CONCERNED CITIZENS FOR AFRICAN-AMERICAN CHILDREN,
d/b/a Coalition of Concerned Citizens for African-American
Children; RALEIGH WAKE CITIZENS ASSOCIATION,

            Plaintiffs - Appellants,

                    v.

WAKE COUNTY BOARD OF ELECTIONS,

            Defendant - Appellee,

        and

STATE OF NORTH CAROLINA,

            Defendant.

────────────────

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, Chief District Judge.  (5:15-cv-00156-D; 5:13-cv-00607-D)

────────────────

Argued:  May 9, 2016                    Decided:  July 1, 2016

────────────────

Before MOTZ, GREGORY, and WYNN, Circuit Judges.

────────────────

Reversed and remanded in part and affirmed in part by published opinion.  Judge Wynn wrote the majority opinion, in which Judge Gregory joined.  Judge Motz wrote a dissenting opinion.

────────────────

**ARGUED**: Anita Sue Earls, Allison Jean Riggs, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina, for Appellants.  Charles Foster Marshall, III, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellee.  **ON BRIEF**: George E. Eppsteiner, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina, for Appellants.  Matthew B. Tynan, Jessica Thaller-Moran, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellee.

────────────────

WYNN, Circuit Judge:

The right to vote is "fundamental," and once that right "is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." Bush v. Gore, 531 U.S. 98, 104-05 (2000) (quotation marks and citation omitted). "It must be remembered that" the right to vote "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise." Id. (quoting Reynolds v. Sims, 377 U.S. 533, 555 (1964)).

In these consolidated cases, Plaintiffs, registered voters and civic organizations in Wake County, North Carolina, claim that under the two (identically drawn) redistricting laws they challenge, some Wake County School Board and Wake County Board of County Commissioners districts have been over-populated, while others have been under-populated. Plaintiffs further assert that these discrepancies result in some votes counting more while others count less, and that the discrepancies stem from illegitimate redistricting factors. As explained below, we agree, hold that Plaintiffs have proven their state and federal one person, one vote claims, and therefore reverse.

Plaintiffs also claim that one discrete district was the product of racial gerrymandering. We hold that the district

3

court did not clearly err in rejecting that claim and thus affirm.

## I.

In the years leading up to 2013, the Wake County School Board ("School Board") consisted of nine members elected from single-member districts. Those districts were subject to change every ten years following the decennial census.

In 2010, the census showed that Wake County's population had grown by 43.51% over the preceding decade, causing the then-existing districting plan to have a maximum population deviation of 47.89%.[1] The School Board, at that time dominated by registered Republicans,[2] redrew its districts in light of the 2010 census.

---

[1] "[C]ourts usually analyze[] apportionment plan[s] in terms of the maximum population deviation among the districts. Generally, to calculate maximum deviation, the court first constructs a hypothetical ideal district by dividing the total population of the political unit (e.g., state or county) by the total number of representatives who serve that population. Then, the court determines how much the actual population of each district varies from the population of the ideal district. This deviation is expressed as a percentage of the ideal population. Maximum deviation is the sum of the absolute value of the deviation of the district with the smallest population and that of the district with the largest population." Daly v. Hunt, 93 F.3d 1212, 1215 n.2 (4th Cir. 1996).

[2] While the School Board is nominally non-partisan, its members are routinely registered and affiliated with the Democratic and Republican Parties, and uncontroverted trial testimony showed a high level of partisanship in "what's supposed to be a nonpartisan election." J.A. 234; see also, (Continued)

4

That effort led to a redistricting plan with geographically compact districts having a maximum population deviation of 1.75% and no district deviating from the ideal district population by even 1%. The first election under the new districting, in Fall 2011, resulted in a School Board with a Democratic majority.

In 2013, the Republican-controlled North Carolina General Assembly ("General Assembly"), over the objection of a majority of the School Board and every Democratic and African-American legislator in the General Assembly, passed a local bill, Session Law 2013-110, making numerous changes to the School Board's method of selection. Among other things, Session Law 2013-110 changed the School Board's make-up from nine single-member districts to seven single-member districts and set less geographically compact boundaries for this new set of districts. The maximum population deviation among the new single-member districts swelled to over 7%.

Additionally, Session Law 2013-110 created two "super districts" that overlaid the single-member districts. J.A. 160. One super district formed a donut of outer, more rural areas of the county, while the other formed a donut hole in the inner,

_____

e.g., J.A. 254 (noting that such local races have "become more partisan-based" due to "block candidates," the "political party machine," and "money").

5

urban area. The maximum population deviation between the super districts exceeded even that of the single-member districts—just shy of 10%. Session Law 2013-110 moved elections to even-numbered years, and limited the School Board's ability to make changes to its method of election until 2021.

In August 2013, thirteen individuals and two civic organizations filed suit in the United States District Court for the Eastern District of North Carolina, challenging the constitutionality of the districts that Session Law 2013-110 established. The complaint alleged that the plan unevenly weighted the votes of citizens in the county for impermissible reasons, thereby violating the one-person, one-vote guarantees of the federal and state constitutions. In March 2014, the district court dismissed Plaintiffs' suit for failure to state a claim. Wright v. North Carolina, 975 F. Supp. 2d 539 (E.D.N.C. 2014). Plaintiffs appealed.

In April 2015, while Plaintiffs' appeal was pending before this Court, the General Assembly enacted Session Law 2015-4, making the electoral system for the Wake County Board of County Commissioners ("Board of County Commissioners") identical to the system it had created for the School Board with Session Law

6

2013-110.[3]  With Session Law 2015-4, too, the General Assembly forced a local bill on Wake County despite opposition from the majority of the Board of County Commissioners, polled Wake County voters, nearly every Democratic state legislator, and every African-American legislator in the General Assembly. Fourteen individuals and a civic organization filed suit shortly thereafter, challenging the Board of County Commissioners' redistricting plan as violating the one person, one vote guarantees of the state and federal constitutions.

In Plaintiffs' appeal from the district court's March 2014 dismissal, this Court, in May 2015, held that "Plaintiffs' allegations in support of their claim that [Session Law 2013-110] violates the one person, one vote principle suffice to survive a motion to dismiss for failure to state a claim." Wright v. North Carolina, 787 F.3d 256, 269 (4th Cir. 2015).  We therefore reinstated Plaintiffs' complaint against the Wake County Board of Elections.

On remand, the district court consolidated the suits challenging Session Law 2013-110 and Session Law 2015-4 and expedited discovery.  Discovery was further limited by the state

---

[3] Previously, members of the Board of County Commissioners were elected at-large, subject to the requirement that one member had to be elected from each of the county's seven residency districts.

legislators' refusing Plaintiffs' discovery requests, claiming legislative privilege.[4]  In December 2015, the district court held a bench trial, in which Plaintiffs presented numerous witnesses, including legislators, citizens, and experts, as well as copious documentary evidence, with 481 exhibits including: expert reports and supporting data; school assignment maps; campaign finance reports; results data from various elections; excerpts of legislative transcripts; and public polling results. By contrast, Defendant, the Board of Elections that administers elections with no stake in the "political interests of the General Assembly," Trial Tr. vol. I, 13:24-25, presented none of its own.  Defendant simply cross-examined Plaintiffs' witnesses and made legal argument.

Nevertheless, the district court ruled for Defendant. Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections, No. 5:13-CV-607-D, 2016 WL 1060378 (E.D.N.C. Feb. 26, 2016).  The district court discredited every single one of Plaintiffs' witnesses, for example as "anecdotal," id. at *28-29, and "unhelpful," id. at *32.  It went on to hold, among other things, that "in order to prove a prima facie case in a one

---

[4] Pursuant to an agreement between Plaintiffs and particular legislators, certain external communications between the legislators and third parties—but no internal communications amongst the legislators—were produced.

person one vote challenge, plaintiffs must at least negate the most common legitimate reasons that could explain the legislature's action." <u>Id.</u> at *22 (quotation marks and citations omitted). The district court held that Plaintiffs failed to meet this and the other requisite burdens. Plaintiffs appealed.

II.

On appeal, "'[w]e review judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo.'" <u>Nat'l Fed'n of the Blind v. Lamone</u>, 813 F.3d 494, 502 (4th Cir. 2016) (quoting <u>Plasterers' Local Union No. 96 Pension Plan v. Pepper</u>, 663 F.3d 210, 215 (4th Cir. 2011)). Findings will be deemed clearly erroneous if, for example, "even though there is some evidence to support the finding, the reviewing court, on review of the record, is left with a definite and firm conviction that a mistake has been made," or if findings were made using "incorrect legal standards." <u>Consol. Coal Co. v. Local 1643, United Mine Workers of Am.</u>, 48 F.3d 125, 128 (4th Cir. 1995) (quotation marks and citation omitted). "Of course, if the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly

9

erroneous standard." <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844, 855 n.15 (1982).

### III.

With their primary argument on appeal, Plaintiffs contend that the district court applied the wrong legal standard for adjudicating their one person, one vote claim.  For the reasons explained below, we agree.

### A.

The right to vote is "fundamental," and once that right "is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." <u>Bush</u>, 531 U.S. at 104-05 (quotation marks and citation omitted).  Indeed, allowing, through unequal apportionment amongst districts, a vote to be "worth more in one district than in another would . . . run counter to our fundamental ideas of democratic government." <u>Reynolds</u>, 377 U.S. at 563 (quotation marks and citation omitted).  This requirement that all citizens' votes be weighted equally, known as the one person, one vote principle, applies not just to the federal government but also to state and local governments—including school boards and county governing bodies.  <u>Avery v. Midland Cty.</u>, 390 U.S. 474, 480 (1968).

Courts have recognized that "[m]athematical exactness or precision is hardly a workable constitutional requirement" and

10

thus do not require "identical numbers" in state and local government districts. Reynolds, 377 U.S. at 577. Nevertheless, governments must "make an honest and good faith effort" to construct districts as close to equal population "as is practicable." Id. To assess what is "practicable," the Supreme Court has allowed some population deviation for "legitimate considerations" such as compactness and contiguity, the integrity of political subdivisions, and balance among political parties. Harris v. Ariz. Indep. Redistricting Comm'n, 136 S. Ct. 1301, 1306 (2016).

Generally, a districting plan "with a maximum population deviation under 10% will not, **by itself**, support an equal protection claim." Wright, 787 F.3d at 264 (quotation marks omitted and emphasis added). Rather, plaintiffs in such cases "must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than" legitimate considerations such as compactness or the integrity of political subdivisions. Harris, 136 S. Ct. at 1307.

In Harris, the Supreme Court's most recent, and arguably most lucid, pronouncement as to plaintiffs' burdens in one person, one vote cases below the 10% deviation threshold, the Court unanimously noted that the plaintiffs there had claimed that the plan's deviations from "absolute equality of population

11

reflect . . . political efforts to help the Democratic party."
Id.  Crucially, however, the plaintiffs "failed to prove this
claim."  Id.  Instead, "the record b[ore] out" that the
deviations "predominantly reflected . . . efforts to achieve
compliance with the federal Voting Rights Act, not to secure
political advantage for one party."  Id.  In other words, the
plaintiffs in Harris foundered not because their one person, one
vote challenge failed as a matter of law, but because they did
not muster the evidence needed to show it to be
"more probable than not that [the] deviation of less than 10%
reflect[ed] the predominance of illegitimate reapportionment
factors."  Id.

By contrast, in Larios v. Cox, the plaintiffs succeeded in
proving their one person, one vote claims.  300 F. Supp. 2d 1320
(N.D. Ga.) (three-judge panel), aff'd, 542 U.S. 947 (2004)
(mem.).  In Larios, a federal court struck down a Georgia
redistricting plan that disproportionately favored Democrats by
under-populating districts in the urban Atlanta region and the
rural south—both Democratic strongholds—while over-populating
suburban districts with Republican-leaning voters.  The
redistricting created a maximum population deviation of 9.98%
and disproportionately protected Democratic incumbents.  Id. at
1328–31.  The Supreme Court (with only Justice Scalia

12

dissenting) affirmed the district court's rejection of the redistricting. _Larios_, 542 U.S. 947.

As the Supreme Court has explained, in _Larios_, "those attacking the plan had shown that it was more probable than not that the use of illegitimate factors significantly explained deviations from numerical equality among districts." _Harris_, 136 S. Ct. at 1310. The Supreme Court noted the "many examples showing that population deviation as well as the shape of many districts did not result from any attempt to create districts that were compact or contiguous, or to keep counties whole, or to preserve the cores of prior districts." _Id._ (quotation marks and citation omitted). The Supreme Court contrasted the _Larios_ plaintiffs' successful showing with that of the failed plaintiffs in _Harris_, stating "[i]t is appellants' inability to show that the present plan's deviations and boundary shapes result from the predominance of similarly illegitimate factors that makes [_Larios_] inapposite here." _Id._

Looking at _Larios_ and _Harris_, we conclude that, to succeed on the merits, plaintiffs in one person, one vote cases with population deviations below 10% must show by a preponderance of the evidence that improper considerations predominate in explaining the deviations. This is just such a case, and that legal standard therefore applies.

B.

13

1.

The law in this area is challenging. In the earlier appeal of this matter, we sought to clarify some points to ease the burden on the district court. Nonetheless, there were numerous instances in which the law we set out in Wright was not adhered to. For example, in evaluating Plaintiffs' one person, one vote claim, the district court did not properly characterize what Plaintiffs must show to succeed. The district court stated, for example, that "in order to prove a prima facie case in a one person one vote challenge, plaintiffs must at least negate the most common legitimate reasons that could explain the legislature's action." Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *22 (quotation marks and citation omitted). The district court indicated that "any conceivable legislative purpose is sufficient" to support the redistricting plan and that those "attacking the rationality" thereof "have the burden to [negate] every conceivable basis which might support it." Id. at 27 (alteration in original) (quotation marks and citation omitted).

Contrary to the district court's characterization, what Plaintiffs must actually show to succeed with their one person, one vote claims is that it is "more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors." Harris, 136 S. Ct. at

14

1307.  This specific, deviation-focused inquiry differs markedly from the district court's rational-basis review of whether a rational state policy could explain the redistricting generally.

### 2.

Further, in Wright, we emphasized the importance of the Supreme Court's affirmance of Larios for this case.  Thus, we made it clear that Larios was more than a mere summary affirmance holding little sway.  Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *18.  Instead, with Wright, we set forth precedent binding on the district courts of this Circuit making clear that Larios constitutes persuasive authority generally, as well as analogous authority in this concrete case.  Wright, 787 F.3d at 267.  The district court's heavy emphasis on Justice Scalia's Larios dissent—an opinion with no precedential value—is thus squarely at odds with Wright.  See, e.g., Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *18-19 ("According to Justice Scalia, 'politics as usual' is a 'traditional redistricting criterion,' and 'a constitutional one,'" and "'[f]erreting out political motives in minute population deviations seems to me more likely to encourage politically motivated litigation than to vindicate political rights.'").

Moreover, the district court misapplied the core principles of Larios.  The district court stated, for example, that, in contrast to Larios, Plaintiffs here did not prove "that the

15

General Assembly disregarded all districting principles in
creating the 2013 Wake County School Board Plan, or that the
2013 Wake County School Board Plan is not rationally related to
a permissible, rational state policy of improving School Board
representation." Raleigh Wake Citizens Ass'n, 2016 WL 1060378,
at *36. The district court thus concluded that "unlike Larios,
plaintiffs have failed to prove that the 2013 Wake County School
Board Plan resulted from a desire to favor suburban and rural
voters over urban voters." Id.

Crucially, neither the three-judge district court in
Larios, nor the Supreme Court in affirming and later discussing
Larios, ever suggested that plaintiffs in such cases need to
show that "all districting principles" were "disregarded." Id.
Further, neither court focused on the challenged redistricting
plans as a whole. Instead, the focus, in Larios as well as,
Harris, was whether "**deviation[s]** of less than 10% reflect[ed]
the **predominance** of **illegitimate** reapportionment factors."
Harris, 136 S. Ct. at 1307 (emphasis added); Larios, 300 F.
Supp. 2d at 1338 (holding that "population **deviations** . . . not
supported by . . . **legitimate interests** . . . cannot withstand
constitutional scrutiny" (emphasis added)). In Larios, the
state legislature's attempt to privilege rural and urban
Democrats at the expense of suburban Republicans explained the
deviations in population, not the redistricting plan generally,

16

did not constitute a legitimate apportionment factor, and was prohibited. <u>Larios</u>, 300 F. Supp. 2d at 1338.

3.

Additionally, in evaluating the evidence Plaintiffs proffered to support their one person, one vote claims, the district court improperly discounted every single one of Plaintiffs' fifteen trial witnesses. For example, it discredited all the testifying legislators because of their "strong legislative opposition to the 2013 Wake County School Board Plan. [The pertinent] testimony at trial fits within the line of precedent giving no weight to statements made by opponents of legislation." <u>Raleigh Wake Citizens Ass'n</u>, 2016 WL 1060378, at *29.

The only analogous case in the purported "line of precedent," <u>Veasey v. Abbott</u>, 796 F.3d 487 (5th Cir. 2015), has been vacated and is thus no longer good law, 815 F.3d 958 (5th Cir. 2016) (granting rehearing en banc and vacating the panel opinion). The other cases the district court cited—cases dealing with statutory interpretation—stand for the unremarkable and inapposite proposition that courts usually do not "accord much weight to the statements of a bill's opponents [when interpreting the words of the bill]. The fears and doubts of the opposition are no authoritative guide to the construction of legislation." <u>Shell Oil Co. v. Iowa Dep't of Revenue</u>, 488 U.S.

17

19, 29 (1988) (quotation marks, citation, and brackets omitted) (holding that one passing reference to preemption in a speech by an opponent of a law cannot properly guide the court's interpretation of that law); see also Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394 (1951) (noting that "doubts of the opposition" do not guide "the construction of legislation"); NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U.S. 58, 66 (1964) (same).

This is not a case about what a particular word in a statute means. Rather, at the heart of this case is whether illegitimate factors predominated the General Assembly's supplemental redistricting of Wake County such that illegitimate factors explain the population deviations in the redistricting plan. While we recognize that a trial judge generally may consider "bias or prejudice" when "assessing witness credibility," United States v. Muse, 83 F.3d 672, 676-77 (4th Cir. 1996), the district court discredited categorically the legislators' testimony, even regarding objective facts. Yet the district court has cited, and we see, no controlling precedent suggesting that their testimony should simply have been discounted wholesale and "giv[en] no weight." Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *29.

Similarly, the district court completely rejected as "materially flawed and unhelpful," id. at *32, the analysis of

18

Plaintiffs' expert Dr. Jowei Chen, a political science professor from the University of Michigan.    Upon closer inspection, however, it is the district court's own analysis of Dr. Chen's analysis that is materially flawed.

Dr. Chen analyzed whether the population deviations in the seven single-member district plans and the two super districts plans were motivated by a partisan purpose using computer simulation programming techniques that allow him to generate randomly a large number of alternative redistricting plans created subject to traditional redistricting criteria.    The four traditional redistricting criteria Dr. Chen used were: population equality; keeping municipalities intact; keeping precincts whole; and geographic compactness.    Dr. Chen's computer simulations are based on the logic that if a computer randomly draws five hundred redistricting plans following traditional redistricting criteria, and the actual enacted plans fall completely outside the range of what the computer has drawn, one can conclude that the traditional criteria do not explain that enacted plan.

The computer simulations led Dr. Chen to just that conclusion: that the "enacted districting plans create a partisan distribution of seats falling completely outside the range of outcomes that are possible under a non-partisan districting process that creates equally populated districts

19

while maximizing compactness and preserving precinct and municipal boundaries." J.A. 768. Dr. Chen thus concluded "with extremely high statistical certainty, beyond any sort of doubt here" that "the only way to draw districts as extreme in partisanship as the legislature's B and A districts is to use population deviations" that are high. J.A. 463. In other words, Dr. Chen testified that he could conclude with certainty from his simulations that the deviations at issue here are the result of using partisanship in apportioning the districts.

In critiquing Dr. Chen's analysis, the district court seized on the fact that certain criteria accounted for in the computer simulations—such as setting maximum population deviation at 2% or less or "completely . . . ignor[ing] partisanship," Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *30, are required by neither state nor federal law. This critique misses the point: The point is not that the simulated plans are legally required, but rather that they help demonstrate what might explain the population deviations in the enacted plan.

The district court went on to "find[] that Dr. Chen's simulations simply show that 'better' . . . redistricting plans were possible, but 'better' plans do not equate to the unconstitutionality of the 2013 Wake County School Board Plan." Id. With that finding, the district court again missed the

20

point: The import of Dr. Chen's simulations was not to produce better plans, but rather to hold several legitimate apportionment considerations constant so that Dr. Chen could assess whether the population deviations in the challenged plans could have been the product of something other than partisan bias. He concluded "with extremely high statistical certainty, beyond any sort of doubt here" that they could not have. J.A. 463. The district court clearly and reversibly erred in rejecting Dr. Chen's expert testimony. Easley v. Cromartie, 532 U.S. 234 (2001) (reversing a three-judge district court panel in a racial gerrymandering case in which the district court clearly erred in rejecting expert evidence).

4.

We could go on detailing the errors in the opinion below. Suffice it to say that the legal analysis of what Plaintiffs needed to show as well as the evaluation of the evidence Plaintiffs proffered to make that showing are fundamentally flawed.

C.

1.

When, as here, the district court applies the wrong standards, we tend to remand to allow "the trier of fact to re-examine the record" using the correct standards. Kelley v. S. Pac. Co., 419 U.S. 318, 332 (1974). However, when "the record

21

permits only one resolution of the factual issue," Pullman-Standard v. Swint, 456 U.S. 273, 292 (1982), remand is unnecessary, and we may rule based on the record before us. Thus, for example, in the recent Class v. Towson University opinion, this Court, based on the record before it, straight-out reversed the district court, which had applied the incorrect legal standard following a bench trial. 806 F.3d 236 (4th Cir. 2015). And in Cromartie, 532 U.S. 234, the Supreme Court outright reversed a three-judge district court panel in a racial gerrymandering case because, among other things, the district court had clearly erred in rejecting pertinent expert evidence.

Likewise, here, we deem remand unnecessary. At trial, in addition to copious documentary evidence, Plaintiffs presented fifteen live witnesses—two experts, four legislators, four county elected officials, and five plaintiffs and lay witnesses.[5] These witnesses and documents presented abundant support for Plaintiffs' one person, one vote claims within the nine-hour total that the district court allowed Plaintiffs for presenting their case.

Defendant, by contrast, offered not even one witness. Instead, Defendant expressly disclaimed any stake in

---

[5] The district court did not deem any of Plaintiffs' witnesses to be untrustworthy. Raleigh Wake Citizens Ass'n, 2016 WL 1060378.

"representing the political interests of the General Assembly," Trial Tr. vol. I, 13:24-25, and essentially passed on defending the General Assembly's redistricting. Even the legislative proponents of the challenged redistricting laws refused to defend their actions, instead claiming legislative immunity.

The resulting record, discussed in more detail below, permits only one resolution of Plaintiffs' one person, one vote claims: Plaintiffs have proven that it is more probable than not that the population deviations at issue here reflect the predominance of a illegitimate reapportionment factor, Harris, 136 S. Ct. at 13—namely an "intentional effort" to create "a significant . . . partisan advantage," Larios, 542 U.S. at 947-49 (Stevens, J., concurring). In other words, Plaintiffs have successfully made their case.

2.

First putting the challenged plans in context, the evidence at trial showed that that Wake County's population generally, and the overall population deviation amongst the School Board districts in particular, swelled significantly by the time of the 2010 decennial census. Accordingly, the School Board redrew its election maps. The resulting 2011 redistricting plan reduced maximum population deviation down to 1.75%, with no single district deviation reaching even 1% from the ideal. The districts were "vetted" by county residents and the members of

23

the School Board, and were considered relatively compact, contiguous, and respectful of communities of interest. J.A. 210. The Board of County Commissioners also redrew its residency districts after the 2010 decennial census.

Despite the fact the 2011 redistricting had been shepherded by a "Republican School Board" and that a "Republican lawyer" had drafted the districts, J.A. 420, the 2011 elections, the first administered under the new plan, resulted in a "shift[] from the Republicans to the Democrats." J.A. 200. The Republican-controlled General Assembly then intervened with the redistricting plans that are the subject of this action.

Uncontroverted testimony and evidence adduced at trial showed that the legislative process relating to Session Law 2013-110 was truncated by, for example, not having "community hearings and participation of the affected parties," J.A. 211, and failing to incorporate "any of the ideas that people . . . proffered," id., without even "discussing it amongst the [Wake County] delegation first," a "stark departure" from common practice, J.A. 419. As School Board Member Bill Fletcher, a registered Republican, put it, "nothing was discussed. There was no opportunity to provide input, to have a debate or discussion about different election strategies, it was simply drafted in a bill and presented and passed with little opportunity for rational thought." J.A. 263.

24

3.

Moving on to the showing Plaintiffs needed to make on their one person, one vote claims, uncontroverted evidence at trial showed that the deviations resulting from the latter-day redistricting more likely than not reflected the predominance of illegitimate reapportionment factors.

Plaintiffs proffered uncontroverted evidence of an illegitimate factor predominating in the skewed, unequal redistricting: an attempt to guaranty Republican victory through the intentional packing of Democratic districts. Various witnesses testified that "the true motivation[]" for the redistricting was to "ensure Republican control . . . at the expense of Democrats." J.A. 364. The "real reason" behind the redistricting was "[t]o ensure a Republican majority . . . despite the vote totals," J.A. 405, a "kind of punitive and retributive effort to punish the Democrats for winning," J.A. 392.

Plaintiffs' expert Anthony Fairfax analyzed the challenged redistricting plans and reported, among other things, that "[t]here was a marked pattern of overpopulation in Democratic-performing districts, and underpopulation in Republican-performing districts." J.A. 805. And as Mr. Fairfax noted in his testimony, "by overpopulating you obviously minimize the

25

Democratic performance in other districts, other surrounding districts." J.A. 305.[6]

Plaintiffs' second expert, Dr. Chen, conducted an analysis showing that "[t]he General Assembly's enacted districting plans create a partisan distribution of seats falling completely outside the range of outcomes that are possible under a non-partisan districting process that creates equally populated districts while maximizing compactness and preserving precinct and municipal boundaries." J.A. 768. In other words, as Dr. Chen testified at trial, "the only way to achieve a districting plan that allowed for such an extreme partisan Republican control over four districts out of seven, the only way to create such an extreme partisan plan was to deviate from population equality to a great extent." J.A. 466-67.

---

[6] The district court discounted Mr. Fairfax's testimony just as it did every single one of Plaintiffs' other witnesses. And in the case of Mr. Fairfax, as with the others, the bases for that discounting fall apart upon careful inspection. For example, the district court faulted Mr. Fairfax for using election results data, asserting that he "failed to analyze voter registration data in Wake County." Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *34. Yet in focusing on election results instead of registration data, Mr. Fairfax followed precisely what the Supreme Court has instructed those analyzing redistricting plans to do. See, e.g., Cromartie, 532 U.S. at 239 (noting its instruction that courts should look to "data showing how voters actually behave, not data showing only how those voters are registered").

The legislators who hatched the redistricting plans claimed legislative immunity. Absent from the record, therefore, is any trial testimony confirming (or denying) a partisan motive behind the redistricting and its deviations.[7] The record does, however, contain several e-mails including third parties, the only category of e-mails Plaintiffs managed to obtain, that indeed suggest a partisan motive behind the redistricting and its deviations. For example, the Wake County Republican Party Chair exchanged several e-mails with, and apparently met with, key legislators involved in the redistricting, with a focus on "how we would take 5 of the 9 seats." J.A. 1114.

We do not doubt that some amount of partisan politics is par for the course in redistricting generally. For example, in Gaffney v. Cummings, a case on which the district court relied here, the Supreme Court upheld a redistricting plan drawn based on partisan considerations. 412 U.S. 735 (1973). But the facts in and consequences of Gaffney differ markedly and tellingly

---

[7] Both the district court and Defendant make much ado of the admissions the legislators made in Larios, noting the direct evidence that legislators purposefully skewed district deviations along urban, suburban, and rural divides to achieve partisan goals. See, e.g., Appellee's Br. at 41; Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *18. Both Defendant and the district court contrast those facts with this case, with its lack of such direct evidence. But here, the lack of direct evidence may have its roots in the legislators' avoiding discovery through claims of legislative immunity. Moreover, direct evidence is simply not required.

27

from those here.  In Gaffney, a state legislature had drafted a redistricting plan following a decennial census; in doing so, it followed a "policy of 'political fairness.'"  Id. at 738.  The plan, which exhibited less than 2% overall deviation in the state senate and less than 8% overall deviation in the state house, sought "proportional representation of the two major political parties. . . . [T]he Board took into account the party voting results in the preceding three statewide elections, and, on that basis, created what was thought to be a proportionate number of Republican and Democratic legislative seats."  Id.

In this case, by contrast, rather than seeking proportional representation of the two main political parties, the evidence shows that the challenged plans under-populated Republican-leaning districts and over-populated Democratic-leaning districts in order to gerrymander Republican victories.[8]  In other words, the challenged redistricting here **subverts**

---

[8] The district court played up the fact that District 5 and District 6 constitute exceptions to the rule that Democratic-leaning districts were over-populated and Republican-leaning districts were under-populated.  Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *35.  According to the district court, "[t]his evidence belies a systematic under-population of districts to harm incumbents . . . who are registered Democrats who support 'progressive' education policies."  Id.  What the evidence actually belies is the tenuousness of the district court's analysis—because both District 5 and District 6 exhibit only negligible deviations from ideal population—both less than 0.2%.

28

political fairness and proportional representation and sublimates partisan gamesmanship. Gaffney simply cannot reasonably be read as supporting that; if anything, it does the opposite. Indeed, the Supreme Court suggested that partisanship is not a legitimate reason to weight some votes more than others, and the Gaffney Court itself underscored that redistricting so as to "minimize" the "political strength" of a party or group would be constitutionally "vulnerable." Id. at 754.

Further, the Supreme Court rejected just such partisan deviation games in Larios, 542 U.S. 947, indicating that "if a plan contains any population deviations, a court may decide that the deviations are caused by impermissible partisanship and strike the plan down . . . for failure to comply with one person, one vote." Samuel Issacharoff & Pamela S. Karlan, Where to Draw the Line?: Judicial Review of Political Gerrymanders, 153 U. Pa. L. Rev. 541, 567-68 (2004); see Larios, 300 F. Supp. 2d at 1338 (holding that pertinent "population deviations" were "not the result of an effort to further any legitimate" policy but were instead "systematically and intentionally created" to "protect Democratic incumbents" and holding that that did not "withstand[] Equal Protection scrutiny").

We recognize that the Supreme Court has not yet clarified when exactly partisan considerations cross the line from

29

legitimate to unlawful.  _See, e.g._, _Harris v. McCrory_, No. 1:13-CV-949, 2016 WL 3129213, at *2 (M.D.N.C. June 2, 2016) (citing _Larios_, 542 U.S. 947, for the proposition that redistricting plans may be challenged "when partisan considerations go 'too far,'" while citing _Vieth v. Jubelirer_, 541 U.S. 267 (2004), for the lack of "judicially discernible and manageable standards for adjudicating political gerrymandering claims").  Yet it is important to bear in mind that only a plurality (i.e., not a controlling majority) of the Supreme Court has suggested that partisanship-based redistricting claims should be considered nonjusticiable.[9]  _Id._  And shortly after _Vieth_, a nearly unanimous Supreme Court, including three Justices from the _Vieth_ plurality, affirmed _Larios_, in which the lower court struck down a redistricting plan with population deviations under 10% as a

_____

[9] The district court incorrectly suggested that "[i]n _Vieth_, the Supreme Court rejected as nonjusticiable a political gerrymandering claim." _Raleigh Wake Citizens Ass'n_ 2016 WL 1060378, at *19, n.11.  On the contrary, as we noted in _Wright_, "a majority of the (_Vieth_) Supreme Court refused to deem political gerrymandering claims to be per se nonjusticiable. And the Court has since recognized as much." 787 F.3d at 269 (citing _League of United Latin Am. Citizens v. Perry_, 548 U.S. 399, 414 (2006) ("A plurality of the Court in Vieth would have held [political gerrymandering] challenges to be nonjusticiable political questions, but a majority declined to do so.")).

30

blatant and unlawful attempt at partisan favoritism. <u>Larios</u>, 542 U.S. 947.[10]

4.

Not only did the uncontested record evidence demonstrate that illegitimate reapportionment factors predominated, resulting in an overall deviation of barely under 10%; the evidence also exposed the stated reasons for the redistricting as pretextual. For example, one stated goal of the School Board's redistricting was to increase the alignment between citizen's voting districts and their assigned schools. Uncontroverted testimony at trial indicated that the redistricting resulted in the opposite, "mak[ing] alignment worse." J.A. 235. Indeed, "[j]ust a perfect downtown example is Daniels Middle School and Broughton High School[, which] are in the same feeder pattern, they were in the same district under the 2011 maps . . . but they were in different districts under the [new] map" challenged here. J.A. 424. Further, even if

---

[10] Stated different, "barely two months [after <u>Vieth</u>], three of those Justices were part of an eight-Justice majority that affirmed the judgment in <u>Larios</u>, a case in which the lower court struck down a plan [with] relatively minuscule population deviations . . . because they reflected 'blatantly partisan and discriminatory' attempts to protect Democratic incumbents while undermining Republican-held seats. As Sister Maria says in The Sound of Music, 'When the Lord closes a door, somewhere He opens a window.'" Issacharoff & Karlan, 153 U. Pa. L. Rev. at 542.

31

increased alignment were indeed a goal, it need not necessarily have resulted in population deviations amongst the districts.

A second stated rationale for the redistricting debunked at trial: reducing campaign costs. As trial testimony demonstrated, "the proponents of this legislation said that they were concerned about the cost of campaigning and that these districts would make it cheaper to run. . . . That is either inaccurate or deceptive, because Wake County is a media market and if you're going to run in any of these widespread districts here or if you're going to run all in the entire county you are still going to be advertising in the Raleigh/Wake media market, [and] it's still expensive." J.A. 395-96. Further, moving down-ballot races like those for School Board members to even years that include congressional and presidential races is "going to dramatically increase the costs of running" in those elections, J.A. 420, even simply for candidates "to have any visibility in a Presidential election cycle." J.A. 258. And, again, nothing about this stated rationale, cost reduction, explains the population deviation amongst the districts.

Another stated goal of the redistricting legislation—increasing voter turnout—also has nothing to do with re-drawing districts, much less re-drawing them unequally. The district court noted that "Plaintiffs do not dispute the other legislative goal of increasing voter turnout by having . . .

32

elections in even-numbered years." <u>Raleigh Wake Citizens Ass'n</u>, 2016 WL 1060378, at *27 n.18. But they did not need to dispute that goal, because it has no logical connection to, and does not justify, re-drawing districts, much less districts with population deviations.

A further rationale given for the redistricting: allowing voters greater representation. Yet the redistricting of the County Commission arguably reduced citizens' opportunity to cast votes for their preferred commissioners by moving away from an all at-large system. As testified at trial, voters "had the ability to elect all seven members . . . . As it stands with the maps that were passed by the House and the Senate, [they] will be able to exercise [their] vote on only two of those members, so with every -- everything that I know about the word representation, that's less." J.A. 387-88. And again, nothing about this goal explains the population deviations of the districts as drawn.

Moreover, alternatives were suggested that would have achieved, even more effectively, the stated rationale of increased representation without resulting in such great population deviations. For example, Representative Darren Jackson proposed an amendment to create two purely at large districts instead of the donut and donut hole districts, while maintaining the 2011 single-member districts. Such a plan would

33

have "accomplish[ed] both of the Republicans' stated goals, to give you more representation on the School Board and to make sure that you had a School Board member who represented your child's school, and it accomplished both of those goals." J.A. 354. That amendment, which would have achieved greater representation on the School Board, was rejected—yet more evidence that the stated rationales were pretextual and fail to justify the population deviations in the challenged redistricting.

The legislators pushing the redistricting also sought to ground it in administrative ease, having the School Board and Board of County Commissioners fall under the same plan. Again, that goal is wholly unrelated to, and plainly fails to justify, the deviations in population amongst the districts. Somewhat relatedly, and certainly breathtakingly under the circumstances, the Board of County Commissioners' redistricting was ostensibly intended to "avoid litigation." Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *37. Yet the School Board redistricting was being actively litigated and was in fact pending before this Court at that time. The litigation rationale is thus utterly irrational and, further, has no logical connection to the deviations at issue.

Moving beyond the pretextual rationales, the record evidence demonstrates that traditional, legitimate apportionment

34

factors did **not** predominate.  On the contrary, the redistricting resulted in: "a total of 31 [split] precincts" (as opposed to 12 split precincts under the 2011 plan), J.A. 805; bizarrely shaped districts, including "donut[s]" and "donut munchkin[s]," J.A. 432, "crab claw[s]" and "pincer[s]," J.A. 212; and obviously non-compact districts that make it harder, for example, for School Board members "to have more detailed knowledge about [their] own districts," J.A. 280.[11]  Indeed, Plaintiffs' expert Dr. Chen considered several traditional, legitimate reapportionment criteria, i.e., population equality, community and precinct boundaries, and geographical compactness, and found that the redistricting "create[d] a partisan distribution of seats falling completely outside the range of outcomes that are possible under a non-partisan districting process that creates equally populated districts while maximizing compactness and preserving precinct and municipal boundaries." J.A. 768.

Representative Rosa Gill also proposed an alternative redistricting during the legislative process.  Her proposal demonstrated that it was entirely possible to meet all of the stated rationales for the skewed redistricting—including giving voters the opportunity to elect two school board members,

---

[11] No party has made an argument regarding Voting Rights Act compliance, also recognized as a legitimate apportionment factor.  We therefore do not address it.

providing district representation for the County Commissioners, moving school board elections to even numbered years to increase turnout, reducing voter confusion by using the same districts for both the School Board and the Board of County Commissioners, and reducing costs—while creating only miniscule deviations. Representative Gill's plan divided no precincts and had overall deviations in the single-member and super districts of less than 0.5%. J.A. 795-96.

The trial court dismissed the evidence of Representative Gill's alternative plan because it "simply shows that 'better' plans can be drawn, but 'better' plans do not equate to unconstitutionality." Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *33. In fact, what the alternative plan shows is that legitimate considerations, including the stated rationales for the redistricting, utterly failed to explain or justify the high levels of deviation in the enacted plans—because those rationales could have been accomplished by a plan with virtually no population deviations.

5.

At the end of the day, when we review the evidentiary record, we can reach only one conclusion: that Plaintiffs, the only parties to make their case at trial, successfully showed it to be more probable than not that the deviations at issue here reflect the predominance of an illegitimate reapportionment

36

factor rather than legitimate considerations. Harris, 136 S. Ct. at 1307. We recognize that, generally, "attacks on deviations under 10% will succeed only rarely, in unusual cases." Id. But after reviewing this matter closely, and for the reasons discussed above, we are convinced that these mid-decade, partisan redistricting plans constitute just such an unusual case. The district court therefore committed reversible error in granting judgment in Defendant's favor.

6.

In addition to improper partisanship, Plaintiffs claimed improper regional favoritism as an illegitimate factor behind the deviations in the challenged reapportionments. Because we have already ruled in Plaintiffs' favor based on partisanship, we need not reach this related but separate basis. We nevertheless note that "[a] citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause." Reynolds, 377 U.S. at 568. Therefore, "[i]n Larios, a federal court struck down a [state] legislative redistricting plan . . . . The plaintiffs there alleged that the plan . . . under-populat[ed] districts in the urban Atlanta region and the rural south-Georgia area—both Democratic strongholds—while over-populating districts with Republican-leaning voters." Wright, 787 F.3d at 266-67. In Wright, we

37

left no doubt that, as in _Larios_, Plaintiffs here claim that "a state legislature designed a redistricting plan with a maximum deviation in population of just under 10%, designed to pit rural and urban voters against one another" and that "[e]ven if _Larios_ does not control this case . . ., we nevertheless find it" and its rejection of regional favoritism as a basis for deviating from ideal population by such margins "persuasive." _Id._ at 267.

Moreover, the district court held that "the General Assembly rationally considered the communities of interest within Wake County's urban areas and within Wake County's rural and suburban areas in adopting" the challenged redistricting plans. _Raleigh Wake Citizens Ass'n_, 2016 WL 1060378, at *40. But the pertinent inquiry is not whether it was "rational" to "consider" communities of interest in adopting the plans generally; instead, the proper inquiry is whether the redistricting's deviations more likely than not reflect the predominance of illegitimate reapportionment factors. _Harris_, 136 S. Ct. at 1307. The district court plainly engaged the wrong legal standard in its analysis of this factor. But because we rule on the basis of partisanship, we need go no further of the regional favoritism issue.

### D.

In addition to their federal constitutional one person, one vote claim, Plaintiffs brought a similar North Carolina state

38

claim. Under the North Carolina Constitution, "[t]he right to vote on equal terms in representative elections—a one-person, one-vote standard—is a fundamental right." <u>Blankenship v. Bartlett</u>, 681 S.E.2d 759, 762-63 (N.C. 2009). A North Carolina analysis of the state's "Equal Protection Clause generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause." <u>Id.</u> at 762. If anything, North Carolina's one person, one vote principle applies with even more force than its federal counterpart. <u>See, e.g.</u>, <u>id.</u> at 763 (deeming the one person, one vote principle applicable in North Carolina's election of superior court judges even though "federal courts have articulated that the 'one-person, one-vote' standard is inapplicable to state judicial elections"); <u>Stephenson v. Bartlett</u>, 562 S.E.2d 377, 397 (N.C. 2002) (requiring legislative districts to be within plus or minus five percent of ideal population). Accordingly, for the same reasons that Plaintiffs succeed with their federal claim, so, too, do they succeed with their North Carolina state one person, one vote claim.

IV.

In addition to their one person, one vote claim, Plaintiffs have also brought a racial gerrymandering claim regarding the

39

Board of County Commissioners' District 4.[12] Plaintiffs contend that race predominated in determining the boundaries, shape, and composition of that district without narrow tailoring to serve a compelling state interest. As explained below, the district court did not commit clear error in rejecting this claim.

### A.

To successfully challenge the constitutionality of an electoral district under the Equal Protection Clause, a plaintiff must "show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." Ala. Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1267 (2015) (quotation marks and citation omitted).

Such a showing requires proof that "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." Miller v. Johnson, 515 U.S. 900, 916 (1995). Traditional race-neutral principles include "compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests," id.,

---

[12] Even though the corresponding School Board district is identical, Plaintiffs in Wright made no such claim. We, like the district court, therefore do not address that issue.

incumbency protection, and political advantage, Bush v. Vera, 517 U.S. 952, 964, 968 (1996). And evidence that such traditional principles took a back seat to racial considerations may include direct and circumstantial evidence of legislative intent, indications that a racial percentage within a given district was non-negotiable, bizarre or non-compact district shapes, and district lines that cut through traditional geographic boundaries or election precincts. See, e.g., Vera, 517 U.S. at 970-71; Miller, 515 U.S. at 917-18; Shaw v. Reno, 509 U.S. 630, 646-48 (1993).

If a plaintiff successfully shows racial predominance in drawing the lines of a district, the court must apply "strictest scrutiny," Miller, 515 U.S. at 915, that is, it must determine whether the design of the challenged district was narrowly tailored to advance a compelling state interest—a burden the state must bear, Shaw v. Hunt, 517 U.S. 899, 908 (1996). If the answer to that question is no, the district must be struck as unconstitutional.

B.

In contrast to its one person, one vote analysis, the district court did not miscomprehend the applicable law. Accordingly, while we were "not bound by the clearly erroneous standard" regarding the one person, one vote findings, Inwood Labs., 456 U.S. at 855 n.15, the same cannot be said here.

41

Here, we must affirm if "the district court's account of the evidence is plausible," even if we are "convinced that we would have decided the question of fact differently." TFWS, Inc. v. Franchot, 572 F.3d 186, 196 (4th Cir. 2009) (quotation marks and citation omitted).

While we might have decided this matter differently in the first instance, we cannot say that the district court's account of the evidence is not plausible; it is. For example, the district court considered legislator comments indicating that race was a consideration in the redistricting process, such as a representative's observation "that at-large electoral systems submerge the views of various minorities, 'whether it's racial, gender, political, rural, urban or whatever.'" Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *46. While such comments evidence the fact that race was a consideration in the redistricting process, doing so is not unlawful. See, e.g., Miller, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."). We cannot fault the district court for determining that the comments here did not constitute direct evidence that race predominated in the drawing of District 4, i.e., of racial gerrymandering.

42

Further, in the racial gerrymandering context, partisan advantage may be considered a traditional redistricting criterion, and evidence that politics was the primary motivation for the drawing of a district can defeat an allegation that race predominated. See, e.g., Cromartie, 532 U.S. at 257–58; Vera, 517 U.S. at 968. The district court recognized this, noting that the fact that District 4 is majority-minority "alone does not mean that the General Assembly racially gerrymandered District 4," Raleigh Wake Citizens Ass'n, 2016 WL 1060378, at *47, and that evidence supports the district's having been drawn with a focus on partisanship rather than race. For example, in evaluating the expert support for Plaintiffs' racial gerrymandering claim, the district court noted that the expert's "partisan neutral" analysis did not help answer the question of whether politics or race led to District 4's boundaries. Id. Here, too, we cannot disagree.

In sum, even if we might have found otherwise in the first instance, it was not implausible for the district court to determine that Plaintiffs had fallen short of proving that traditional districting criteria were subordinated to race in the drawing of District 4. Accordingly, because the district court's analysis of Plaintiffs' racial gerrymandering claim is not clearly erroneous, we affirm on that issue.

43

V.

For the reasons discussed above, we reverse the district court's judgment in Defendant's favor as to Plaintiffs' one person, one vote claims. We remand with instructions to enter immediately[13] judgment for Plaintiffs, granting both declaratory relief and a permanent injunction, as to the one person, one vote claims. However, we affirm the district court's judgment for Defendant as to Plaintiffs' racial gerrymander claim.

<u>REVERSED AND REMANDED IN PART</u>
<u>AND AFFIRMED IN PART</u>

---

[13] We see no reason why the November 2016 elections should proceed under the unconstitutional plans we strike down today.

44

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

With respect, I dissent from the majority's holding that the district court erred in rejecting Plaintiffs' equal protection challenge to twin presumptively constitutional redistricting plans. Plaintiffs' one person, one vote claim rests on their contention that improper "partisanship" rendered the challenged redistricting plans unconstitutional, even though those plans have population deviations of less than 10%.[1] If such a claim is justiciable, and it is not clear that it is, the showing necessary to prove such a claim is extremely demanding. The Supreme Court explained only a few weeks ago that such challenges "will succeed only rarely, in unusual cases." Harris v. Ariz. Indep. Redistricting Comm'n, 136 S. Ct. 1301, 1307 (2016). The challenge here, like that in Harris, is not that

---

[1] In their amended complaint, Plaintiffs also alleged that the plans impermissibly favored rural voters over urban voters. At trial, however, they focused on assertedly improper "partisanship" and produced scant evidence that the State sought to advantage rural over urban voters. Plaintiffs did not even offer evidence as to which districts they considered "urban" or "rural." Their experts testified that assertedly illegitimate "partisan" motivations, not regional favoritism, predominately motivated the challenged plans. Unsurprisingly, the district court found that Plaintiffs "failed to prove" that either plan "impermissibly favors suburban and rural voters over urban voters or substantially dilutes the individual voting strength of Wake County's urban voters." Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections, No. 5:15-CV-156-D, 2016 WL 1060378, at *40 (E.D.N.C. Feb. 26, 2016). On appeal, Plaintiffs provide no basis on which to disturb that finding.

"unusual case." For this reason, I would affirm in its entirety the judgment of the district court rejecting Plaintiffs' challenges to the redistricting plans.


I.

The Equal Protection Clause requires a State to "make an honest and good faith effort to construct [state legislative] districts . . . as nearly of equal population as is practicable." Reynolds v. Sims, 377 U.S. 533, 577 (1964). But, the Reynolds Court itself recognized that, in determining what is "practicable," the Constitution permits some deviations from perfect population equality when justified by "legitimate considerations incident to the effectuation of a rational state policy." Id. at 579; accord Harris, 136 S. Ct. at 1306.

In a long line of cases decided in the wake of Reynolds, the Court has held that districts, like those at issue here, with a "maximum population deviation under 10%" are presumptively constitutional. See, e.g., Brown v. Thomson, 462 U.S. 835, 842 (1983); accord Harris, 136 S. Ct. at 1307 and cases cited therein. These "minor deviations from mathematical equality do not, by themselves, make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." Harris, 136 S. Ct. at 1307

46

(quoting Gaffney v. Cummings, 412 U.S. 735, 745 (1973)) (internal quotation marks omitted).

It was because of "the inherent difficulty of measuring and comparing factors that may legitimately account for small deviations from strict mathematical equality" that the Supreme Court recently reiterated that "attacks on deviations under 10% will succeed only rarely, in unusual cases." Harris, 136 S. Ct. at 1307. To prevail on such claims, the Harris Court held that a challenger "must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations'" that the Court had identified in previous cases. Id.

In earlier cases the Supreme Court had identified numerous "legitimate considerations" justifying a State's reapportionment plan. Among them are a State's valid interests in: maintaining the competitive balance among political parties, Gaffney, 412 U.S. at 752-53; accord Harris, 136 S. Ct. at 1306, avoiding contests between incumbents as long as incumbents of one party are not favored over those of another, Karcher v. Daggett, 462 U.S. 725, 740 (1983), and recognizing communities of interest, Evenwel v. Abbott, 136 S. Ct. 1120, 1124 (2016). Indeed, in League of United Latin American Citizens v. Perry, the Supreme Court characterized "avoiding the pairing of incumbents" as a

47

"'neutral' redistricting standard[ ]" and "maintaining communities of interest" as a "traditional districting principle[ ]." 548 U.S. 399, 412 (2006) (plurality opinion) ("LULAC"); Id. at 433 (majority opinion).

Thus, notwithstanding Plaintiffs' apparent belief, the Court has expressly recognized that a redistricting plan can in these ways legitimately take account of political considerations. The Court has never suggested that doing so constitutes reliance on an "illegitimate reapportionment factor." Harris, 136 S. Ct. at 1307. This approach necessarily follows from the fact that "[p]olitics and political considerations are inseparable from districting and apportionment" and so "districting inevitably has and is intended to have substantial political consequences." Gaffney, 412 U.S. at 753.

If those attacking a redistricting plan prove that a State has abused legitimate political considerations by systemically over- or under-populating districts to benefit one party at the expense another, then the challengers may be able to prevail as they did in Larios v. Cox, 300 F. Supp. 2d 1320, 1325 (N.D. Ga.), aff'd, 542 U.S. 947 (2004) (mem.). Plaintiffs lean heavily on Larios. Their reliance is misplaced.

First, Plaintiffs ignore the very different factual record developed in that case. In Larios, the challenged plan paired

48

in the same district, and thus pitted against each other, 37 of the 74 incumbent Republicans but only 9 of the 105 incumbent Democrats. 300 F. Supp. 2d at 1326. In _Larios_, Georgia legislators admitted before the district court that they had intentionally drawn legislative districts to favor incumbents of one party over those of the other. _Id._ at 1325. Thus, in _Larios_, the state legislators conceded that they had not made the "good faith effort" to draw equal districts that _Reynolds_ requires. The record in this case contains no such evidence.

In addition to ignoring the very different evidentiary record in _Larios_, Plaintiffs turn a blind eye to the Court's subsequent treatment of that case. In _LULAC_, the Court explained that _Larios_ "does not give clear guidance" in "addressing political motivation as a justification for an equal-protection violation." 548 U.S. at 423 (plurality opinion). And in _Harris_, the unanimous Supreme Court expressly reserved the question of whether the sort of abusive partisanship at issue in _Larios_ even constitutes "an illegitimate redistricting factor." _Harris_, 136 S. Ct. at 1310.[2]

---

[2] Tellingly, the Court has never addressed the alternative holding by the lower court in _Larios_ invalidating the challenged plans on the basis of regional favoritism. That alternative holding has little precedential or persuasive value given, as the Supreme Court has explained, "a summary affirmance is an affirmance of the judgment only," not the rationale of the lower court, which "should not be understood as breaking new ground." (Continued)

49

Despite Plaintiffs' protestations to the contrary, the foundations of Larios as persuasive authority rest on shaky ground.

Equally significantly, Plaintiffs take no notice of the holding in Harris that, even if abusive partisanship did constitute an illegitimate factor, those challenging the redistricting plan before it had "not carried their burden." Id. This holding is particularly significant given that the Harris plaintiffs had made a much stronger evidentiary showing than Plaintiffs do here. For example, the Harris plaintiffs offered direct evidence of a Republican-leaning district made "more competitive" at the request of a Democratic redistricting commissioner by "hyperpacking Republicans into other districts." Id. at 1309 (internal quotation marks omitted). The redistricting commission in Harris had overpopulated almost all the Republican-leaning districts in the thirty-district plan while underpopulating almost all the Democratic-leaning

---

Mandel v. Bradley, 432 U.S. 173, 176 (1977). And invalidating a redistricting plan because it allegedly favors "rural" or "urban" voters would break new ground. The Supreme Court has never before or after Larios suggested that considering the urban or rural characteristics of a district is an illegitimate apportionment factor. In fact, statements in several cases suggest that these are the quintessential types of communities of interest a State may consider when redistricting. See, e.g., Dusch v. Davis, 387 U.S. 112, 117 (1967).

districts.  Id. at 1309-10.  Even in the face of this evidence, the district court did not find the redistricting plan unconstitutional -- and the Supreme Court agreed.  Id. at 1309.

Furthermore, in explaining its rejection of the Harris plaintiffs' claims, the Supreme Court distinguished Larios in ways that apply with equal force here.  The Harris Court held that in Larios, unlike in the case before it (and unlike in the case at hand), "the district court found that those attacking the plan had shown" that no legitimate factors explained the deviations in the plan.  Id. at 1310 (emphasis added).  The Harris Court explained:  "It is appellants' inability to show" that illegitimate factors predominated "that makes [Larios] inapposite here."  Id.  Thus the Court emphasized and re-emphasized that those attacking a presumptively constitutional redistricting plan, like Plaintiffs here, must prove that illegitimate factors predominated.

In sum, even if abusive partisanship claims are justiciable, and do provide the basis for a one person, one vote claim, Plaintiffs had to prove at trial that the State relied on this consideration in redistricting, and that this reliance took precedence over all legitimate considerations, including maintaining political balance among political parties, avoiding contests between incumbents of both parties, and recognizing communities of interest.  The State, on the other hand, did not

51

need to offer any justification for its presumptively constitutional redistricting plans. See, e.g., Harris, 136 S. Ct. at 1307.

A fair review of the factual record seems to me to demonstrate that, as in Harris, Plaintiffs here failed to meet their burden and so, as the Supreme Court did in Harris, we should affirm the district court's rejection of their challenge.[3]

II.

In attempting to meet their substantial burden, Plaintiffs principally rely on the trial testimony of their expert, Dr. Jowei Chen. On the basis of statistical models that he had created, Dr. Chen opined that deviations in the challenged redistricting plans were motivated entirely by a desire to obtain "Republican partisan control over four of the" seven numbered districts and over one of the two lettered super-districts. But, as the district court found, Dr. Chen's model

---

[3] The district court also rejected Plaintiffs' one person, one vote claim under the North Carolina Constitution. Because North Carolina courts "generally follow[ ] the analysis of the Supreme Court of the United States" when interpreting the State's corresponding Equal Protection Clause, I would affirm the district court's finding that Plaintiffs failed to carry their burden on their state law claims for the same reasons that apply to their federal claims. Blankenship v. Bartlett, 681 S.E.2d 759, 762 (N.C. 2009).

52

simply does not prove either conclusion.  Dr. Chen's analysis suffers from two critical flaws.

First, in his model, Dr. Chen pegged the maximum tolerable level of population deviation between districts at 2%.  In doing so he held the State to a standard not required by law.  Of course, a State must make a "good faith effort" to draw equal districts.  <u>Reynolds</u>, 377 U.S. at 577.  But neutral factors may cause population deviations well above 10% without running afoul of the Constitution.  <u>See, e.g.</u>, <u>Mahan v. Howell</u>, 410 U.S. 315, 328 (1973).  Moreover, Dr. Chen's arbitrary 2% threshold seems particularly unwarranted in light of the Supreme Court's repeated characterization of deviations below 10% as "minor" and its admonition that such minor deviations <u>do not</u> "substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation."  <u>White v. Regester</u>, 412 U.S. 755, 764 (1973).

The second fatal flaw in Dr. Chen's analysis is his failure to look beyond what he considered to be the only four legitimate or "traditional" districting factors -- population equality, intact municipal boundaries, intact precincts, and geographic

compactness.[4]  Dr. Chen ignored the many apolitical and political factors States may consider during redistricting (like striking a competitive balance among political parties, avoiding contests among incumbents, and recognizing communities of interest), even if pursuing these goals causes minor population deviations.

This is particularly troubling because it is <u>undisputed</u> that two of the legitimate districting factors Dr. Chen failed to consider -- incumbency protection and grouping communities of interest -- actually motivated the legislature here.  The parties stipulated to the accuracy of transcripts of the legislative debate and those transcripts reveal that state legislators altered the district lines in the final version of the School Board redistricting bill to protect two incumbents -- one registered Democrat and one registered Republican.  Further, the Democratic incumbent, Christine Kushner, testified at trial that "Ms. Prickett, who is a registered Republican, had been placed into a Democratic leaning district," but "was moved out

---

[4]   Plaintiffs actually concede the limited reach of Dr. Chen's analysis, noting that his analysis "shows that the partisanship of the enacted districts does not happen when <u>traditional</u> redistricting criteria are followed."  <u>See</u> Plaintiffs' Rep. Br. at 21 (emphasis added).  Of course, as explained above, the Supreme Court has repeatedly recognized numerous legitimate 'redistricting criteria' other than those that Dr. Chen considers "traditional."  And in <u>LULAC</u>, 548 U.S. at 433, the Court expressly included "maintaining communities of interest" among "traditional" redistricting criteria.

of that district and put into a Republican leaning district, and
I [Ms. Kushner] was switched out of District 2 into District 5,"
which she admitted was a "more favorable district" for her.
Accommodating the legitimate interest in protecting incumbents
of both parties had a demonstrable impact on the population
deviations across four of the seven numbered districts in the
plan.  District 1 swung from 2.76% overpopulated to -0.41%
underpopulated.  District 2 swelled from -4.19% underpopulated
to just -1.05% underpopulated.  District 5 dipped from 0.19%
overpopulated to -1.53% underpopulated.  Finally, District 6
grew from -0.14% underpopulated to 1.6% overpopulated.

Dr. Chen's model does not in any way account for these
population deviations.  As a result, Dr. Chen's view that
nothing but improper "partisanship" could explain the population
deviations in the twin redistricting plans completely ignores
the undisputed impact that the legislative effort to protect the
two incumbents had on the plans.  In light of that omission, I
cannot agree that the district court clearly erred in concluding
that Dr. Chen's testimony did not demonstrate that the
legislature deviated from population equality only for the
predominant purpose of creating four safe Republican seats out
of seven.

Dr. Chen committed the same sort of analytic error in
considering the two lettered super-districts.  One of the stated

55

purposes for the super-districts was to improve representation for voters in rural areas. Without challenging the State's consideration of communities of interest generally, Plaintiffs argue that "[t]here is no possible way that [the stated] rationales explain why Super District A needs to be 44,117 people larger than Super District B." Plaintiffs' Rep. Br. at 12. According to Dr. Chen, again improper "partisanship" is the only explanation.

And again, Dr. Chen's model does not support this conclusion. To be sure, the State could have overpopulated District A, an area of the County that has historically voted for Democratic candidates, to increase a Republican candidate's odds of winning in District B. But the State also could have deviated from population equality to group more urban areas in District A based on their shared interests. This, after all, was the purpose for having the super-districts in the first place, and of course it constitutes a clearly valid State interest. See Evenwel, 136 S. Ct. at 1124. Or the State could have had the dual motivation to accomplish both. Dr. Chen's model tells us nothing about how grouping together communities of interest motivated the legislature because it a priori excludes any consideration of that legitimate redistricting consideration.

Plaintiffs' remaining evidence also falls far short of meeting their burden of proving that illegitimate partisan considerations predominated here. Plaintiffs' expert Anthony Fairfax concluded that the legislature desired to "minimize the Democratic performance" in certain districts by overpopulating the "Democratic performing districts." That opinion rests on his view that correlation between overpopulation and Democratic performance in the districts in and of itself demonstrates legislative intent -- i.e., that the numbers speak for themselves. The district court concluded that they do not.

The record here provides no basis for holding that finding clearly erroneous. Of the four districts assertedly favorable or competitive for Democrats, three are overpopulated. Of the five districts assertedly favorable or competitive for Republicans, only three are underpopulated by more than 1%. One of these three districts, District 2, is underpopulated by just -1.05%. Thus, the asserted correlation between population and Democratic performance is, to say the least, minimal. This minimal correlation limits the strength of any inference that can be drawn. Cf. Harris, 136 S. Ct. at 1309-10 (refusing to infer predominance of illegitimate partisanship over a thirty-district plan where every district underpopulated by more than 1% (nine total) favored Democrats and every district overpopulated by more than 1% (twelve total) favored

57

Republicans).   At the very least, the district court did not clearly err when it declined, as the Supreme Court did in <u>Harris</u> in the face of stronger evidence, to make an inference of unconstitutional motivation.

Plaintiffs also offered the lay testimony of members of the state legislature who opposed the redistricting plans.  I agree with the majority that the district court erred in categorically rejecting this testimony as irrelevant.   But, despite this error, the testimony does not move the needle far on the issue of intent of those voting to adopt the redistricting plans because, to a person, Plaintiffs' lay witnesses disclaimed any knowledge of the sponsors' motivations.[5]

In sum, faced with the heavy burden of proving that assertedly illegitimate "partisanship" constituted the predominant motivation for the presumptively constitutional redistricting plans, Plaintiffs failed to offer any evidence truly probative of legislative intent.   Plaintiffs' experts tendered conclusions that their analyses could not support.

---

[5] More probative are emails from Wake County Republican Chairwoman Donna Williams to Republican members of the state legislature and School Board.  Williams expressed concern that the proposed map would not be sufficiently favorable to Republicans to permit them to "take 5 of the 9 seats."  However, the record does not contain requests for information or responses from State officials or any indication that Ms. Williams' lobbying efforts had any effect on the legislation.

58

Plaintiffs' remaining evidence proved little. The district court refused to draw Plaintiffs' preferred inference. In doing so, the court did not clearly err. To the contrary, given the weakness of Plaintiffs' case, Defendants would have had strong grounds to appeal had the district court ruled otherwise.

I would affirm the judgment of the district court in its entirety.