IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Consolidated Civil Action

| | |
|---|---|
| RALEIGH WAKE CITIZENS ASSOCIATION, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>WAKE COUNTY BOARD OF ELECTIONS,<br><br>                Defendant. | No. 5:15-cv-156 |
| CALLA WRIGHT, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>THE STATE OF NORTH CAROLINA, et al.,<br><br>                Defendants. | No. 5:13-cv-607 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO STRIKE
"LEGISLATIVE LEADERS' NOTICE OF FILING"**

**I.    NATURE OF THE CASE**

These consolidated cases seek to vindicate the rights of certain Wake County voters who live in underpopulated election districts that unlawfully dilute their voting strength, in violation of the equal protection clauses of the Fourteenth Amendment to the United States Constitution

and Article 1, § 19 of the North Carolina Constitution. Session Laws 2013-110 and 2015-4 established new district systems for electing the Wake County Board of Education and the Wake County Board of County Commissioners. On July 1, 2016, the United States Court of Appeals for the Fourth Circuit ruled that Plaintiffs proved that these statutes are unconstitutional and remanded for immediate issuance of an injunction prohibiting continued effect of the unconstitutional laws. On August 2, the District Court held a status conference at which the Court invited the parties to the action, as well as the State Board of Elections and two legislative leaders—House Speaker Tim Moore and Senate President Pro Tempore Phil Berger (hereinafter "Legislators")—to submit proposals regarding potential remedies. On August 3, the Fourth Circuit issued its mandate in the consolidated cases and denied the two Legislative Leaders' Motion to Intervene in the action as moot. *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, No. 16-1270, ECF Nos. 63, 64 (hereinafter "*RWCA*").

## II. STATEMENT OF FACTS

The two legislative enactments challenged here—Session Law 2013-110 and Session Law 2015-4—superseded constitutionally valid systems for electing members to the Wake County Board of Education and Wake County Board of Commissioners. *RWCA,* No. 16-1270, 2016 U.S. App. LEXIS 12136, at *1 (4th Cir. 2016). The previous election systems were put in place following the return of the 2010 Census, were adjusted to account for population variances among districts, and remain constitutionally valid. *See id.* On July 1, 2016, the Court of Appeals held the challenged enactments unconstitutional and stated that it "saw no reason" why they should be used in the November 2016 elections. *Id.* at *38, *42 n.13.

Following the Court of Appeals' July 1 decision, the leadership of the North Carolina General Assembly the same day added a proposed committee substitute bill pertaining to Wake

2

County redistricting to the agenda for the July 1 meeting of the House Committee on Elections. Legislative Calendar, North Carolina General Assembly, http://www.ncleg.net/LegislativeCalendar/LegislativeCalendar.pl?view=month&timePeriod=7/1/2016 (including notation that the July 1, 2016 meeting of the House Committee on Elections scheduled for 5 PM was canceled and a "Wake County Redistricting" bill was on its agenda). That meeting was canceled, and the General Assembly adjourned for the year on July 1 without considering or enacting a revised redistricting plan for the Wake County Board of Education or Board of Commissioners. *See id.* No alternative plans that had been proposed during the original debate on the challenged enactments were reconsidered by the legislative leadership after Session Law 2013-110 and Session Law 2015-4 were held unconstitutional. *See* Trial Exs. 470-71 (alternative maps proposed by Rep. Rosa Gill). To date, the governor of North Carolina has not exercised his constitutional authority to convene an extra session of the legislature for the purpose of adopting new maps. *See* N.C. Const. art. III, § 5(7).

On July 14, two legislative leaders who had been originally named in Plaintiffs' Complaint in No. 5:15-cv-156, *see* ECF No. 1, filed a motion to intervene in the Court of Appeals in their official capacities. No. 16-1270, ECF No. 55-1. These two legislative offices—the Speaker of the North Carolina House and President Pro Tem of the North Carolina Senate—had been dismissed from this action following the Court of Appeals' decision on appeal from Defendants' motion to dismiss in *Wright v. North Carolina*. *See* 787 F.3d 256, 262 (4th Cir. 2015) ("[N]either Proposed Defendant had a special duty to enforce the challenged Session Law, and thus neither is amenable to suit."); *see also Wright*, No. 14-1329, ECF No. 33 at 23-28 (Brief of Appellees) (legislative leaders seeking to be dismissed from this action). On August 3, 2016, the two legislators' motion to intervene was denied. *RWCA*, No. 16-1270, ECF No. 64.

3

### III. ARGUMENT

#### A. Applicable Standard

The Court should grant Plaintiffs' Motion to Strike the illustrative maps submitted by Legislators because they are not properly before the court. Under Federal Rule of Civil Procedure 12(f), parties may move to strike any pleading or filing of any "immaterial" matter. F.R.C.P. 12(f). In an analogous situation, a district court in Virginia struck a defendant's affirmative defense against two government entities who were not party to the litigation. *Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001). In upholding that ruling, the Fourth Circuit explained that striking under F.R.C.P. 12(f) was appropriate where the material sought to be stricken would "confuse the issues in the case and would not, under the facts alleged, constitute a valid defense to the action." *Id*. (citing 5A A. Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 1381, 665 (2d ed. 1990)); *see also Pigford v. Veneman*, 225 F.R.D. 54, 59 (D.D.C. 2005) (stating that only items with a legitimate litigation-related purpose should be filed and striking inappropriate filings); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 592 (N.D. Ohio 2004) (granting a motion to strike public documents that were appropriate for judicial notice where it was not proper for the court to take judicial notice of these documents to decide fact in dispute).

#### B. The Two Legislators Are Not Parties and Would Not Have Standing to Intervene As Parties, Rendering Their Involvement Inappropriate

Legislators are not parties here and "cannot step into the shoes of the original party" by participating in the case unless they independently meet the standing requirements of Article III. *Wittman v. Personhuballah*, 195 L. Ed. 2d 37, 42 (U.S. 2016) (ruling that intervening legislators did not provide sufficient evidence of injury to establish standing in a redistricting case). That is effectively what the Legislators are trying to do here, and that effort should be rejected.

4

Legislative leaders actively resisted involvement in this litigation before now. On November 19, 2013, the *Wright* Plaintiffs moved to amend their complaint to substitute Governor Patrick McCrory, President Pro Tempore of the North Carolina Senate Phillip Berger and Speaker of the North Carolina House of Representatives Thomas Tillis, each in his official capacity, as defendants—two of which, at least in their official capacity, are seeking involvement now. Because Sen. Berger and Rep. Tillis presided over the North Carolina Senate and North Carolina House, respectively, when S.L. 2013-110 was enacted on June 13, 2003, Plaintiffs sought to add them as parties in order to enjoin the Defendants from executing or enacting constitutional violations found in S.L. 2013-110 and in any subsequent legislation. The Attorney General's Office, defending the case, and on their behalf as their counsel, actively resisted joinder of the President Pro Tempore and the Speaker of the House. The Fourth Circuit agreed with them. *Wright v. North Carolina*, 787 F.3d 256, 262 (4th Cir. 2015).

Indeed, recognizing that participation by the Legislators at this late date is inappropriate, the Fourth Circuit recently denied these same legislators' motion to intervene in the Fourth Circuit appeal. *RWCA*, No. 16-1270, ECF No. 64 (4th Cir. Aug. 3, 2016). And even had the legislators' participation been timely, they would not have standing to participate as parties or been proper parties. *Wright*, 787 F.3d at 262 (holding that legislative leaders were not proper Defendants in this case); *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013) (emphasizing that standing requires a showing that the legal rights or obligations of the proposed intervenors are affected by the litigation, and where "the District Court had not ordered [intervenors] to do or refrain from doing anything," a case or controversy did not exist).

### C. The Map Proffered by The Two Legislators Is Owed No Deference

While it is true that in creating a remedy for an illegal or unconstitutional redistricting plan, a court should defer to certain state legislative goals, insofar as it can ascertain them, *Perez v. Perry*, 132 S. Ct. 934, 941 (2012), this principle is not applicable here for two reasons: first, the map submitted by two Republican legislators is due no judicial deference because the "[l]egislature" is to be given the first opportunity to remedy the issues in a state's apportionment plan, *Chapman v. Meier*, 420 U.S. 1, 27 (1975), not simply two individual legislators circumventing normal legislative processes. The court must give the governing body the chance to adopt maps, and if the governing body cannot or does not adopt remedial maps and there are no other constitutional options available, the court will draw the remedial map, not invite only select members of the legislature to draw them. Thus, this is not the procedural posture in which court deference to legislative redistricting is warranted.

Second, this Court owes no deference to the submitted map because it is not a legislatively drawn map. It is well established that one legislator, or even two in this case, cannot speak for the legislature as a whole. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131 (1810); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996) ("[A]n isolated statement by an individual legislator is not a sufficient basis from which to infer the intent of that entire legislative body."); *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968). The Legislators' involvement here is a thinly-veiled attempt by them to legislate by judge rather than through the constitutionally-mandated legislative process. N.C. Const. art. II, §§ 1, 22.

### D. If the Court Wanted to Solicit Public Input, It Needed to Do So in an Open Manner

When, only as a matter of "last resort," *Lawyer v. Dept. of Justice*, 521 U.S. 567, 586 (1997) (citing *White v. Weiser*, 412 U.S. 783 (1973)), courts are required to engage in the

6

"unwelcome obligation" of crafting an interim remedy map (which is not the case here), *Connor v. Finch*, 431 U.S. 407, 415 (1977), courts must act with the utmost caution to ensure that they are fully complying with the law and are acting in a fair and transparent manner. Yet a court is forbidden to take into account the purely political considerations that might be appropriate for legislative bodies. *Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1160 (5th Cir. 1981). This Court's actions to date do not satisfy this high bar. The only acceptable and unbiased method through which the Court may solicit submission of third-party maps for consideration in crafting a remedial plan is through an open process inviting submissions from all parties to the litigation and, indeed, to the members of the general public as a whole, including the governing bodies themselves. *See, e.g., Personhuballah v. Alcorn*, No. 3:13-cv-678, ECF No. 207 (E.D. Va. Sept. 3, 2015) (order directing that, as part of the development of a remedial congressional redistricting plan, any interested party could submit proposed remedial plans and comment upon other parties' submitted plans). By contrast, when the Court solicits illustrative maps from only certain non-parties—in this case, two Republican legislative leaders who recently supported unconstitutionally-motivated redistricting plans—the Court suggests to the public that it is not acting in a neutral, unbiased manner, and it fails to live up to the "higher standard" than legislatively enacted maps. *Perez v. Perry*, 132 S. Ct. 934, 943 (2012); *see Abrams v. Johnson*, 521 U.S. 74, 98 (1997).

Indeed, that "higher standard" imposes stronger requirements for nonpartisanship in the development of a court-drawn remedial plan. A court ordering a redistricting plan should not factor in political considerations at all, as opposed to the latitude afforded to legislative bodies to do so. "[T]he judicial remedial process in the reapportionment area — as in any area — should be a fastidiously neutral and objective one, free of all political considerations and guided only by
7

the controlling constitutional principle of strict accuracy in representative apportionment." *White*, 412 U.S. at 799 (Marshall, J., concurring in part). Moreover, a court constructing its own plan should take care not to double-bunk or draw incumbents out of their districts. *See, e.g., Arizonans for Fair Representation v. Symington*, 828 F. Supp. 684, 688-89 (D. Ariz. 1992) (three-judge court) ("The court [plan] also should avoid unnecessary or invidious outdistricting of incumbents. Unless outdistricting is required by the Constitution or the Voting Rights Act, the maintenance of incumbents provides the electorate with some continuity. The voting population within a particular district is able to maintain its relationship with its particular representative and avoids accusations of political gerrymandering."); *see also Larios v. Cox*, 314 F. Supp. 2d 1357, 1360-61 (N.D. Ga. 2004).

Additionally, the Legislators' submission did not enable a fair review of what alternatives they proposed. While they provided some maps and data for their proposed remedial plan, the files that they delivered to the office of counsel for Plaintiffs did not provide usable block assignment files. Contrary to their assertions in their cover letter, the files were not the type that could be opened in Maptitude. *See* Ex. 1, Declaration of Frederick G. McBride. Plaintiffs were thus unable to assess these plans using the metrics of their choice, and were forced to rely on the metrics as represented by the Legislators.

Finally, the process for solicitation of remedial maps was particularly inappropriate given the failure of the Court to afford the legislative bodies at issue here—the Wake County Board of County Commissioners and the Wake County Board of Education—the opportunity to enact remedial maps or offer proposed remedial maps to the Court. *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (redistricting is "a legislative task which the federal courts should make every effort not to pre-empt"). In short, while the time pressures have certainly contributed to less-than-ideal

8

circumstances for this remedial process, this process by which this Court has invited only selected input fails to meet the legal standards for a court-drawn remedial plan.

### E. The Only Legal and Practical Option on Remedy is Reversion to the Old Maps

Where the most recently used election system for the Wake County Board of Commissioners and Board of Education remains constitutional, and where the session laws superseding that election system have been struck down as unconstitutional, this Court has no authority to order use of other districts. See *Perry v. Perez*, 132 S. Ct. 934, 940 (2012) (reaffirming that a court does not have authority to order new plans where existing constitutional plans can be implemented); *Cleveland Cnty. Ass'n. for Gov't by the People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468 (D.C. Cir. 1998) (vacating court's decree entered where the existing method of election was not contrary to federal law); *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 120 F. Supp. 3d 479 (M.D.N.C. 2015) (in a one person, one vote challenge, temporarily enjoining Session Law 2015-138, a local redistricting plan, in its entirety and ordering that the county Board of Elections conduct upcoming elections under the election system the challenged session law had supplanted).

*City of Greensboro v. Guilford County Board of Elections* is particularly instructive here. In this one person, one vote challenge to a local redistricting plan enacted by the 2015 General Assembly, the district court for the Middle District of North Carolina found that Plaintiffs were likely to succeed on the merits and preliminarily enjoined the challenged session law in its entirety. *See City of Greensboro*, 120 F. Supp. 3d 479. In its order, issued at the end of July 2015, the court ordered the county board of elections, the lone defendant in the case, to hold municipal elections in November 2015 under the election system the challenged session law had supplanted. *Id.* The prior plans had last been adjusted for population variance after the return of

9

the 2010 Census and remained constitutional. *Id.* The election timeline, defendant, and nature of the claims and relief in this case are directly analogous to those in *City of Greensboro*. As in *City of Greensboro*, this Court can now order the county board of elections to conduct November's elections under the constitutional election system previously in place, without disrupting the election schedule or unduly confusing voters. As with the plans at issue in *City of Greensboro*, the districts for the Wake County Board of Commissioners and Board of Education were adjusted for population variance and to reflect other traditional redistricting criteria following the return of the 2010 Census, and those plans remain fully constitutional today.

To ensure constitutionally sound elections in November, this Court has no legal alternative under the circumstances other than ordering reinstatement of the previous plans. This Court has the authority to judicially impose a new map only where a full legislative body has "had an adequate opportunity" to adopt a new election system and fails to do so. *White*, 412 U.S. at 794-95. Only two legislative bodies have constitutional or statutory authority to redraw districts for Wake County: the North Carolina General Assembly and the Wake County Board of Commissioners. *See* N.C. Const. art. VII, § 1; N.C. Gen. Stat. § 153A-58. Despite the fact that the Fourth Circuit's ruling was made public July 1, 2016, and candidate names appearing on ballots in the November election need not be finalized until August 10, 2016, neither body has been given an opportunity to adopt a new redistricting plan. *See* 5:15-cv-156, ECF No. 78 (July 8, 2016 Order); ECF No. 86 (July 27, 2016 Order); ECF No. 93 (Aug. 4, 2016 Order). Before this Court could impose an "illustrative" plan or propose and adopt its own map, it would have to provide an opportunity to the appropriate full legislative bodies to adopt their own alternatives. See *White*, 412 U.S. at 794-95.

Given the impending election deadlines of which the Court has been made aware, *see* 1:15-cv-156, ECF No. 83-1 at 3-4 (Declaration of Gary Sims), there is not time for the Wake County Board of Commissioners or General Assembly to consider and adopt a new plan that could take effect for the November 2016 elections. Preliminary preparations have already begun for the 2016 general election, and August 10 represents an important but not inflexible deadline for placing candidate names on the November ballot. *Id.* Under these time constraints, not only is the most recently used election system the only legal remedial option; it is also the only practical remedial option. In addition to being the only constitutionally proven plan, the most recently used plan has already been coded by county elections staff, a detailed and time-consuming process, and it is already familiar to Wake County voters. *See id.* at 6. For those reasons, implementation of the most recently used plan would take much less time than either legislative enactment or judicial imposition of a new map, and that rapid implementation could begin immediately upon this court's order and conclude before the August 10 candidate deadline.

Given the impending election deadline detailed above, and because a constitutional alternative plan exists that has already been successfully implemented in Wake County, this Court need not entertain adoption of a third-party map and lacks the authority to adopt its own judicially imposed map without consultation from an appropriate full legislative body.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court strike from the record in this matter the "Legislative Leaders' Notice of Filing" and the exhibits to that Notice.

Respectfully submitted this 5th day of August, 2016.

/s/ Anita S. Earls
Anita S. Earls
N.C. State Bar No. 15597
Allison J. Riggs

N.C. State Bar No. 40028
SOUTHERN COALITION
FOR SOCIAL JUSTICE
1415 W. Highway 54, Suite 101
Durham, NC 27707
Telephone: (919) 323-3380
Facsimile: (919) 323-3942
Email: anita@southerncoalition.org
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO STRIKE "LEGISLATIVE LEADERS' NOTICE OF FILING" with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel and parties of record.

This the 5th day of August, 2016.

/s/ Anita S. Earls
Anita S. Earls
N.C. State Bar No. 15597
Southern Coalition for Social Justice
1415 W. Highway 54, Suite 101
Durham, NC 27707
Telephone: (919) 323-3380
Facsimile: (919) 323-3942
Email: anita@southerncoalition.org
*Counsel for Plaintiffs*