IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Consolidated Civil Action

| | | |
|---|---|---|
| RALEIGH WAKE CITIZENS ASSOCIATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 5:15-CV-156-D |
| WAKE COUNTY BOARD OF ELECTIONS, | ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| CALLA WRIGHT, et al., | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 5:13-CV-607-D |
| STATE OF NORTH CAROLINA, | ) ) ) | |
| Defendant. | ) | |

**ORDER**

On August 2, 2016, the court held a status conference in anticipation of the mandate arising

from Raleigh Wake Citizens Association v. Wake County Board of Elections, Nos. 16-1270, 16-

1271, 2016 WL 3568147 (4th Cir. July 1, 2016). At the status conference, the court discussed with

the parties, the North Carolina State Board of Elections, and the legislative leaders of the North

Carolina General Assembly the remedial proceedings (including the nature and scope of injunctive

relief) necessary to have timely and orderly elections in Wake County in November 2016 for the

Wake County School Board and the Wake County Board of Commissioners. The court also

discussed the information that it received on July 18, 2016, and August 2, 2016. See [D.E. 81, 82, 83, 84, 87].[1] The court also received information from the North Carolina State Board of Elections about its remedial authority under North Carolina General Statute § 163-22.2.

On August 3, 2016, the mandate of the United States Court of Appeals for the Fourth Circuit issued in this case, and this court obtained jurisdiction. On August 3, 2016, plaintiffs made a supplemental filing in response to one of the court's questions at the status conference. See [D.E. 90]. On August 3, 2016, the legislative leaders submitted illustrative plans with perfect population equality in the seven single-member districts numbered 1–7 and the two super districts lettered A and B. See [D.E. 91].

On August 4, 2016, in accordance with the mandate, the court declared that the population deviations in the redistricting plans in Session Law 2013-110 for the Wake County School Board and Session Law 2015-4 for the Wake County Board of Commissioners violate the equal protection clauses of the Fourteenth Amendment to the United States Constitution and Article I, § 19 of the North Carolina Constitution. See [D.E. 93]. On August 4, 2016, the court advised the parties, the North Carolina State Board of Elections, and the legislative leaders of the General Assembly that any further information on the remedy (including the nature and scope of injunctive relief) was due no later than Friday, August 5, 2016. See id. Any responses were due no later than Saturday, August 6, 2016. See id.

On August 5, 2016, plaintiffs moved to strike the legislative leaders' notice of filing [D.E. 94] and submitted a memorandum in support [D.E. 95]. Plaintiffs also advised the court that it believed that the mandated declaratory relief included declaring all of Session Law 2013-110 and

---

[1] This order references docket entries as they appear in Civil Action No. 5:15-CV-156-D.

2

Session Law 2015-4 unconstitutional under the equal protection clauses of the United States and North Carolina Constitutions. See [D.E. 96] 2–3. Plaintiffs also advised the court that they believed that the court had no remedial authority except to order the November 2016 elections to take place under the 2011 redistricting plans and electoral scheme. See id. 2–6.

On Sunday, August 7, 2016, the court asked the Wake County Board of Elections ("defendant" or "Wake County Board of Elections") to advise the court of its best estimate of how long it would take to code revised districts under four possible remedial scenarios for the November 2016 elections. See [D.E. 97] 1–2. The court also asked the Wake County Board of Elections to rank the four options from most feasible to least feasible in order to hold timely and orderly elections. Id. 2. The court requested a response by 4:00 p.m. on Monday, August 8, 2016. See id.

On August 8, 2016, the court granted the Wake County Board of Elections a continuance until 8:00 p.m. See [D.E. 99]. On August 8, 2016, the Wake County Board of Elections advised the court that the unconstitutional redistricting plans are coded, that the 2011 redistricting plans are in saved files and could be coded in approximately three hours, that Representative Gill's plans could be coded within one business day of receiving a "shape file" of the map, and that the legislative leaders' plan could be coded within three business days. See [D.E. 103] 2–3. As for feasibility of holding timely and orderly elections, the Wake County Board of Elections ranked the four plans as follows: (1) the unconstitutional redistricting plans; (2) the 2011 redistricting plans; (3) Representative Gill's plans, and; (4) the legislative leaders' redistricting plans. See id. 3–4.

As explained below, the court construes the Fourth Circuit's mandate in its opinion of July 1, 2016, to require this court to declare the redistricting plan in Session Law 2013-110 and Session Law 2015-4 unconstitutional and to enjoin the Wake County Board of Elections from using the redistricting plan in Session Law 2013-110 or Session Law 2015-4 in any elections, including the

3

November 2016 elections. See Raleigh Wake Citizens Ass'n, 2016 WL 3568147, at *15 & n.13. Accordingly, this court declares the redistricting plan in Session Law 2013-110 and Session Law 2015-4 unconstitutional and permanently enjoins the Wake County Board of Elections from using the redistricting plan in Session Law 2013-110 or Session Law 2015-4 in any elections, including the November 2016 elections. The court denies plaintiffs' motion to strike and rejects plaintiffs' argument that the court lacks any remedial authority to do anything other than require elections under the 2011 redistricting plans and electoral scheme.

Having considered the entire record and the exigent circumstances facing the court, and as explained below, for the November 2016 Board of Commissioners elections, the court orders the Wake County Board of Elections to use the 2011 redistricting plan that was used in the 2014 Wake County Board of Commissioners elections. The Commissioner candidates will run in residency Districts 4, 5, and 6 and be elected countywide. The elected Commissioner candidates from Districts 4, 5, and 6 will serve two-year terms. The court finds that this remedy is the most equitable remedy among the constitutional plans presented for timely and orderly elections for the Board of Commissioners.

As for the November 2016 School Board elections, the court orders the Wake County Board of Elections to use the 2011 redistricting plan that was used in the 2011 and 2013 School Board elections. Candidates will be elected from the nine single-member districts under that 2011 redistricting plan. The candidates will be elected by plurality in each race. There will be no run-off elections. The elected School Board candidates will serve two-year terms. The court finds that this remedy is the most equitable remedy among the constitutional plans presented for timely and orderly elections for the School Board.

4

I.

A.

Plaintiffs challenged the North Carolina General Assembly's ("General Assembly") 2013 redistricting plan for electing the non-partisan Wake County School Board and the General Assembly's 2015 redistricting plan for electing the partisan Wake County Board of Commissioners. The redistricting plan for the Wake County School Board is contained in Session Law 2013-110. The redistricting plan for the Wake County Board of Commissioners is contained in Session Law 2015-4 and is identical to the plan in Session Law 2013-110. See Tr. Ex. 438 (S.L. 2013-110, § 5); Tr. Ex. 439 (S.L. 2015-4, § 1.(c)–.(d)).

On June 13, 2013, the General Assembly enacted Session Law 2013-110. See Tr. Ex. 438 (S.L. 2013-110). Session Law 2013-110 redistricted the Wake County School Board using seven single-member districts numbered 1–7 and two single-member super districts lettered A and B that overlap the seven numbered districts. See id. (S.L. 2013-110, § 5). Session Law 2013-110 extended the term of office of those School Board members elected in 2011 from four years to five years (i.e., service until December 5, 2016). See id. (S.L. 2013-110, § 1). Session Law 2013-110 provided that the four School Board members elected in 2013 under the districts established in 2011 by the Wake County School Board under North Carolina General Statute § 115C-37(i) would serve until December 5, 2016. See id. (S.L. 2013-110, § 1). Under Session Law 2013-110, no elections were to be held for the Wake County School Board in 2015. See id. (S.L. 2013-110, § 1). Session Law 2013-110 provided that, beginning in 2016, voters would elect School Board members in the seven single-member districts to four-year terms. See id. (S.L. 2013-110, § 2). Session Law 2013-110 provided that, in 2016, voters would elect two School Board members in the two single-member super districts lettered A and B to two-years terms. See id. (S.L. 2013-110, § 2). Session Law 2013-

5

110 provided that, beginning in 2018, voters would elect School Board members in the two single-member super districts lettered A and B to four-year terms. See id. (S.L. 2013-110, § 2).

On April 2, 2015, the General Assembly enacted Session Law 2015-4. See Tr. Ex. 439 (S.L. 2015-4). Session Law 2015-4 increased the size of the Board of Commissioners from seven to nine members and redistricted the Wake County Board of Commissioners using the same seven single-members districts numbered 1–7 and the same two single-member super districts lettered A and B contained in the 2013 Wake County School Board Plan. See id. (S.L. 2015-4, § 1.(a), 1.(c)–.(d)). Under Session Law 2015-4, in November 2016, "one member each shall be elected from Districts 4, 5, and 6 of the districts used by the Wake County Board of Commissioners in the 2014 election, to serve a two-year term. The members shall reside in those 2014 districts and run at-large in" Wake County. See id. (S.L. 2015-4, § 1.(b)). In the November 2016 election and every four years thereafter, two members must reside and run in the two single-member super districts established and used in the 2013 Wake County School Board Plan. Id. (S.L. 2015-4, § 1.(c)). Those commissioners elected in the two single-member super districts in 2016 will serve four-year terms. Id. (S.L. 2015-4, § 1.(c)). In the 2018 election and every four years thereafter, seven members must reside and run in the seven single-member numbered districts. Id. (S.L. 2015-4, § 1.(d)).

In these actions, plaintiffs contended that the redistricting plan in Session Law 2013-110 and Session Law 2015-4 violates the one person one vote principle in the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, § 19 of the North Carolina Constitution. Plaintiffs conceded, however, that the maximum population deviation in the redistricting plan was below 10% and conceded that such a deviation is a "minor deviation" under governing Supreme Court precedent. Specifically, in the redistricting plan, the maximum population deviation in the seven single-member districts was 7.11% and in the two super districts was 9.8%.

6

As for the School Board redistricting plan, plaintiffs contended that the plan resulted from the General Assembly's partisan desire (1) to disadvantage incumbents on the non-partisan Wake County Board of Education ("Wake County Board of Education" or "Wake County School Board") who are registered Democrats who support "progressive" education policies and (2) to favor suburban and rural voters over urban voters. As for the Board of Commissioners redistricting plan, plaintiffs contended that the plan resulted from the General Assembly's partisan desire (1) to favor suburban and rural voters over urban voters and (2) to favor voters who favor Republican candidates over voters who favor Democratic candidates on the Wake County Board of Commissioners. Plaintiffs also contended that the 2015 General Assembly racially gerrymandered District 4 in the Board of Commissioners redistricting plan and thereby violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

The Wake County Board of Elections is the local election board responsible for administering elections in Wake County, North Carolina, including elections for the Wake County Board of Education and the Wake County Board of Commissioners. The Wake County Board of Elections had nothing to do with the General Assembly's decision to enact the challenged redistricting plan, but the United States Court of Appeals for the Fourth Circuit held that the Wake County Board of Elections is the proper defendant. See Wright v. North Carolina, 787 F.3d 256, 261–63 (4th Cir. 2015). Moreover, although the Wake County Board of Elections did not take a position on whether the General Assembly should have enacted the challenged redistricting plan, the Wake County Board of Elections defended the constitutionality of the redistricting plan as a legal and institutional matter.

On December 16–18, 2015, the court held a bench trial in this consolidated action. On February 26, 2016, the court found that plaintiffs had not proven their case, entered judgment for the Wake County Board of Elections, and declined to enjoin the Wake County Board of Elections from

7

administering elections under the challenged redistricting plan. See [D.E. 64, 65]. Plaintiffs appealed. See [D.E. 66].

On April 20, 2016, the Supreme Court of the United States decided Harris v. Arizona Independent Redistricting Commission, 136 S. Ct. 1301 (2016). In Harris, the Supreme Court clarified the standard governing one person one vote challenges where the maximum population deviation in a redistricting plan is less than 10%. See id. at 1307. "[I]n a case like this one, those attacking a state-approved plan must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the legitimate considerations to which we have referred in Reynolds [v. Sims, 377 U.S. 533 (1964)] and later cases." Id. (quotation omitted). In Harris, the Court also stated: "Given the inherent difficulty of measuring and comparing factors that may legitimately account for small deviations from strict mathematical equality, we believe that attacks on deviations under 10% will succeed only rarely, in unusual cases." Id.

On July 1, 2016, the United States Court of Appeals for the Fourth Circuit, in a 2-1 decision, resolved the appeal in this case. As for plaintiffs' racial gerrymandering claim, the Fourth Circuit unanimously rejected plaintiffs' racial gerrymandering claim. See Raleigh Wake Citizens Ass'n, 2016 WL 3568147, at *13–15. As for plaintiffs' one person one vote claim, the Fourth Circuit applied Harris and found that this case was the "rare[ ]" and "unusual" case referenced in Harris. See id. at *12. Thus, even though the maximum population deviation in the plan was below 10%, the Fourth Circuit found it more probable than not that the deviation of less than 10% reflects the predominance of an illegitimate reapportionment factor (i.e., improper partisanship) over legitimate considerations. Id. Accordingly, the Fourth Circuit held that the plan violated the one person one vote principle in the United States Constitution and the North Carolina Constitution. Id. at *12–13.

8

The Fourth Circuit remanded "with instructions to enter immediately judgment for Plaintiffs, granting both declaratory relief and a permanent injunction, as to the one person, one vote claims." Id. at *15 (footnote omitted). The Fourth Circuit added that it saw "no reason why the November 2016 elections should proceed under the unconstitutional plans we strike down today." Id. at *15 n.13.

## B.

When the Fourth Circuit issued its decision on July 1, 2016, the November 2016 elections were fast approaching. Nonetheless, the Fourth Circuit did not exercise its discretion immediately to issue its mandate. Cf. Fed. R. App. P. 41(b). "The mandate is the document by which [the appellate court] relinquishes jurisdiction and authorizes the originating district court . . . to enforce the judgment of [the appellate court]." United States v. Campbell, 168 F.3d 263, 266 n.3 (6th Cir. 1999) (quotation omitted); see United States v. DeFries, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (per curiam); see also Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982) (per curiam). Rather, under the Federal Rules of Appellate Procedure, the mandate was scheduled to issue on July 22, 2016. See Fed. R. App. P. 40(a)(1), 41(b). In anticipation of that date and in order to facilitate prompt remedial proceedings so that the November 2016 elections could take place as scheduled, this court issued an order on July 8, 2016, requesting certain information from the parties, the legislative leaders of the General Assembly, and the North Carolina State Board of Elections. See [D.E. 78].

In this court's order of July 8, 2016, this court asked the Wake County Board of Elections to notify the court of any applicable deadlines that had to be met in order to hold an election on November 8, 2016, under a new plan or plans for the Wake County School Board and the Wake County Board of Commissioners. See id. 5. The court also asked the Wake County Board of

9

Elections to advise the court whether a primary election for the Wake County Board of Commissioners would be feasible under a new plan. See id.

In this court's order of July 8, 2016, this court also asked the Speaker of the House and the President Pro Tempore of the Senate of the North Carolina General Assembly to notify the court whether the General Assembly would devise a new redistricting plan or plans and when the General Assembly would provide that new plan or plans to the court. See id.; cf. Lawyer v. Dep't of Justice, 521 U.S. 567, 575–76 (1997) (holding that a federal court should give a state a reasonable opportunity to meet constitutional requirements by adopting a substitute redistricting plan that corrects the constitutional deficiency in an invalidated plan); Growe v. Emison, 507 U.S. 25, 34–37 (1993) (same); Wise v. Lipscomb, 437 U.S. 535, 540 (1978) (same); Chapman v. Meier, 420 U.S. 1, 26–27 (1975) (same); White v. Weiser, 412 U.S. 783, 794–97 (1973) (same); Ely v. Klahr, 403 U.S. 108, 114–15 & n.6 (1971) (same). In doing so, this court took judicial notice that the General Assembly adjourned on July 1, 2016, and is not scheduled to reconvene until January 2017. See [D.E. 78] 6.

In this court's order of July 8, 2016, this court also noted that if the General Assembly is unable or unwilling to submit a new plan or plans for the Wake County School Board and Wake County Board of Commissioners, a mechanism appeared to exist under North Carolina law for the North Carolina State Board of Elections to act to remedy the constitutional violation in the unconstitutional redistricting plan. See id. Specifically, North Carolina General Statute § 163-22.2 provides:

> In the event . . . any State election law or form of election of any county board of commissioners, local board of education, or city officer is held unconstitutional or invalid by a State or federal court . . . and such ruling adversely affects the conduct and holding of any pending primary or election, the State Board of Elections shall have authority to make reasonable interim rules and regulations with respect to the

10

pending primary or election as it deems advisable so long as they do not conflict with any provisions of Chapter 163 of the General Statutes and such rules and regulations shall become null and void 60 days after the convening of the next regular session of the General Assembly. The State Board of Elections shall also be authorized, upon recommendation of the Attorney General, to enter into agreement with the courts in lieu of protracted litigation until such time as the General Assembly convenes.

In this court's order of July 8, 2016, this court noted that, pursuant to section 163-22.2, it appeared that the North Carolina State Board of Elections could, for example, take the existing redistricting plans and equalize the population in the two single-member super districts and equalize the population in the seven single-member districts. See id. Such a remedy would appear to address the one person one vote violation, while otherwise preserving the legitimate legislative choices in Session Law 2013-110 and Session Law 2015-4. Cf. Harris, 136 S. Ct. at 1306 ("The Fourteenth Amendment's Equal Protection Clause requires States to make an honest and good faith effort to construct legislative districts as nearly of equal population as is practicable.") (alterations and quotations omitted)); Newsome v. N.C. State Bd. of Elections, 105 N.C. App. 499, 506–08, 415 S.E.2d 201, 204–06 (1992) (affirming the action of the North Carolina Board of Elections under North Carolina General Statute § 163-22.2 where its remedial plan corrected the defect in the statute, but otherwise "carried out the clear intention of the General Assembly").

In light of section 163-22.2, this court asked the North Carolina State Board of Elections to advise the court by July 18, 2016, of its willingness to act under section 163-22.2. This court also stated that, if the North Carolina State Board of Elections was willing to act, the court requested notice of when the North Carolina State Board of Elections would provide a new plan or plans to the court or provide some other proposed remedy. See [D.E. 78] 7.

Finally, in this court's order of July 8, 2016, this court noted that if neither the General Assembly nor the North Carolina State Board of Elections acted and the mandate issued, this court

11

would have to address the remedy. See id. 7–8. Furthermore, this court noted that if this court's injunction bars the use in the November 2016 elections of the redistricting plan that the Fourth Circuit invalidated, the effect of the injunction would be to cancel the votes cast in the March 2016 primary election for the Wake County Board of Commissioners and to void the primary election of March 15, 2016, to void the candidate filing for the Wake County Board of Commissioners, which closed on December 17, 2015, and to void the candidate filing for the Wake County School Board, which closed on July 1, 2016. Id. 7. Moreover, the court also would have to address the propriety of such a remedy and address whether footnote 13 in the Fourth Circuit's opinion mandated such a remedy. Id. 7–8; cf. Purcell v. Gonzalez, 549 U.S. 1, 4–5 (2006) (per curiam); Upham v. Seamon, 456 U.S. 37, 44 (1982) (per curiam); Ely, 403 U.S. at 114–15; Reynolds, 377 U.S. at 585–86; S.W. Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 919 (9th Cir. 2003) (en banc) (per curiam). Accordingly, this court asked the parties and the legislative leaders to address the mandate rule, the principles governing any court-ordered remedial plan, and a schedule for devising, considering, and adopting any court-ordered remedial plan. See [D.E. 78] 8. Any response was due no later than July 18, 2016. Id.

## C.

On July 14, 2016, the Wake County Board of Elections petitioned for rehearing en banc. On that same date, the Fourth Circuit stayed the mandate pending a ruling on the petition. On July 14, 2016, plaintiffs also asked the Fourth Circuit to issue the mandate forthwith, and the Speaker of the North Carolina House and the President Pro Tempore of the North Carolina Senate moved to intervene in the Fourth Circuit and asked the Fourth Circuit to expedite the decision on intervention. On August 3, 2016, the Fourth Circuit denied the motion to intervene and denied as moot the motion to issue the mandate forthwith.

12

D.

On July 18, 2016, the Wake County Board of Elections, the North Carolina State Board of Elections, plaintiffs, and the legislative leaders responded to this court's order of July 8, 2016. See [D.E. 81, 82, 83, 84]. In its submission of July 18, 2016, the Wake County Board of Elections provided a detailed "calendar of the applicable 2016 election deadlines, with citations to the applicable election laws in Chapter 163 of the North Carolina General Statutes." [D.E. 83] 1; accord [D.E. 83-1] (declaration of Gary Sims). The deadlines include: (1) filing periods (which have expired); (2) qualification periods (including time to determine whether a candidate qualifies and a 10-day period to challenge a candidate's qualifications); (3) when individuals must request a write-in option for a particular office (which is August 10, 2016); (4) when military, overseas, and other absentee ballots must be mailed (which is September 9, 2016); and (5) when ballots must be printed (which is scheduled to take place between August 10, 2016, and September 9, 2016). See [D.E. 83] 2–3. The Wake County Board of Elections stated that early voting is scheduled to begin on October 27, 2016. See id. 3.

As for elections to the Wake County Board of Commissioners, the Wake County Board of Elections stated that there are three seats up for election on November 8, 2016. Those three seats are residency Districts 4, 5, and 6 used in the 2014 election from which candidates were elected at large. See Tr. Ex. 439 (S.L. § 2015-4, § 1.(b)). The Wake County Board of Elections is prepared to proceed with at-large elections for those three residency districts. See [D.E. 83] 4.

As for the two single-member super districts lettered A and B for the Board of Commissioners, the Wake County Board of Elections stated that if changes are made to districts A and B, then it would not be feasible to hold a primary election for those revised districts in time for the general election on November 8, 2016. See id. 4–5.

13

As for the School Board election, the term of office for all current School Board members expires on December 5, 2016. See Tr. Ex. 438 (S.L. 2013-110, § 1). The Wake County Board of Elections stated that all of the following must be done before August 10, 2016, in order for the elections to proceed on November 8, 2016: (1) receive a revised district map from the General Assembly, the North Carolina State Board of Elections, or the court; (2) code revised districts in order to identify the addresses within each district; (3) provide a notice of a new filing period for the new districts so the individuals can assess their districts for the purposes of a potential candidacy; and, (4) open and close a candidate filing period. See [D.E. 83] 5; see also [D.E. 83-1, 83-2]. The Wake County Board of Elections stated that it "will take all necessary and feasible steps to comply with, and implement, any schedule" that the court or the North Carolina State Board of Elections adopts regarding a court-ordered remedial plan. See [D.E. 83] 5.

In its submission of July 18, 2016, the North Carolina State Board of Elections advised the court that it is a "bipartisan and independent agency tasked with overall supervision of elections administration throughout North Carolina." [D.E. 81]. As for its authority under North Carolina General Statute § 163-22.2, the North Carolina State Board of Elections acknowledged that the General Assembly "has authorized the State Board to implement temporary procedures necessary to avoid delays otherwise caused by court orders affecting elections." Id. The State Board of Elections also stated:

> While temporal limits may discourage our reliance on G.S. § 163-22.2 as a redistricting tool, the State Board stands ready to implement special procedures necessary to effectuate any remedy fashioned under the broader jurisdiction of the Court. With respect to technological capabilities, the agency does not presently possess redistricting software or expertise applying traditional redistricting principles, that may be necessary to preserve otherwise legitimate legislative choices referenced in your Order. We would, however, make every effort to seek resources as needed to comply with any order of this Court.

[D.E. 81] 1.

14

In plaintiffs' submission of July 18, 2016, plaintiffs contended that once the mandate issues, the court should enjoin the use of the statutes ruled unconstitutional. See [D.E. 82] 2. Plaintiffs also contended that once the mandate issues, "unless and until the North Carolina General Assembly enacts other redistricting plans or methods of election, the State Board of Elections and the ... Wake County Board of Elections[ ] are legally obligated to enforce the election system previously in place." Id.

In the legislative leaders' submission of July 18, 2016, the legislative leaders asserted that it is "too late for the General Assembly to enact new commissioner and board of education districts for Wake County in time for the November 2016" general election and, "therefore, reconvening for that purpose would be futile." [D.E. 84] 1-2. Furthermore, the legislative leaders asserted that, once the mandate issues, the court should enjoin elections under the unconstitutional redistricting plan after the November 2016 general election and give the General Assembly a reasonable amount of time after reconvening on January 11, 2017, to enact new districting plans that remedy the one person one vote violation that the Fourth Circuit found. Id. 2. Finally, the legislative leaders stated that if the court decided to adopt a court-ordered remedial plan, "any new districts should be based upon the challenged districts modified only to the extent necessary to cure any constitutional defects." Id. If requested, the legislative leaders "st[ood] ready to file an illustrative plan which meets all criteria required of a court-drawn plan." Id.

### E.

On July 26, 2016, the Fourth Circuit denied the petition for rehearing en banc. On July 27, 2016, this court notified the parties, the North Carolina State Board of Elections, and the legislative leaders that this court would hold a status conference on August 2, 2016, to discuss the remedy. See [D.E. 86]. On August 2, 2016, this court held a status conference. On August 3, 2016, the mandate

15

issued. See [D.E. 89].

II.

On August 4, 2016, in accordance with the Fourth Circuit's mandate, the court declared that the population deviations in the redistricting plan in Session Law 2013-110 and Session Law 2015-4 violate the one person one vote principle in the equal protection clauses of the Fourteenth Amendment and Article I, § 19 of the North Carolina Constitution. See [D.E. 93]. The court now must address the remedy of injunctive relief, particularly in light of the Fourth Circuit's statement in footnote 13 that it saw "no reason why the November 2016 elections should proceed under the unconstitutional plans we strike down today." Raleigh Wake Citizens Ass'n, 2016 WL 3568147, at *15 n.13.

A.

Having reflected on the parties' arguments, the record, the expedited appellate proceedings, and the Fourth Circuit's awareness of the March 2016 primary elections for the Wake County Board of Commissioners and the filing periods for the Board of Commissioners and the School Board, this court concludes that the mandate rule requires this court to enjoin the use of the unconstitutional redistricting plan in Session Law 2013-110 and Session Law 2015-4 in any elections, including the November 2016 elections. See, e.g., Doe v. Chao, 511 F.3d 461, 464–66 (4th Cir. 2007) (describing mandate rule); Stamper v. Baskerville, 724 F.2d 1106, 1107 (4th Cir. 1984) (same). In doing so, the court recognizes the drastic nature of this injunctive relief in cancelling the results of the March 2016 primary election for the Board of Commissioners and cancelling the filing periods (which have expired) for those people who filed to run for the Board of Commissioners and School Board. The court also recognizes that this injunctive relief negates the work that the Wake County Board of Elections completed to date concerning the March primary and the November elections and the

16

expectations of the candidates and voters concerning those elections. The injunctive relief also appears to be in tension with some Supreme Court precedent, but is a permissible equitable remedy. Compare, e.g., Purcell, 549 U.S. at 4–5; Upham, 456 U.S. at 44; Ely, 403 U.S. at 114–15; Reynolds, 377 U.S. at 585–86; Shaw v. Hunt, No. 92-202-CIV-5-BR, Order (E.D.N.C. July 30, 1996) (three-judge court) (declining to enjoin use of unconstitutional congressional redistricting plan for pending 1996 elections and to cancel results of already conducted 1996 primary elections, but enjoining use of the unconstitutional redistricting plan in any elections after 1996);[2] with, Hadnott v. Amos, 394 U.S. 358, 363–64, 366–67 (1969); Johnson v. Halifax Cty., 594 F. Supp. 161, 171 (E.D.N.C. 1984). Accordingly, due to the mandate rule, this court can and does order this injunctive relief.

B.

Having enjoined the use of the unconstitutional redistricting plan in Session Law 2013-110 and Session Law 2015-4 in any elections, including the November 2016 elections, the court now must address the remedy. As mentioned, once a federal court declares a redistricting plan unconstitutional, it should give the state a reasonable opportunity to meet constitutional requirements by adopting a substitute redistricting plan that corrects the constitutional deficiency in the invalidated plan. See Lawyer, 521 U.S. at 575–76; Growe, 507 U.S. at 34–37; Wise, 437 U.S. at 540; Chapman, 420 U.S. at 26–27; White, 412 U.S. at 794–97; Ely, 403 U.S. at 114–15 & n.6. Here, the court did so, and the legislative leaders advised the court that they believed reconvening in a special session was futile. See [D.E. 84] 1–2. Thus, the General Assembly would not enact a substitute redistricting plan in 2016, but was prepared to do so within a reasonable time after reconvening in January 2017. See id. Likewise, the North Carolina State Board of Elections advised the court that it would not use North Carolina General Statute § 163-22.2 to redistrict the School Board or the Board of

---

[2] For a copy of the Shaw v. Hunt order, see [D.E. 84-1].

17

Commissioners. Accordingly, this court must address the remedy. See, e.g., Perry v. Perez, 132 S. Ct. 934, 941–44 (2012) (per curiam); Abrams v. Johnson, 521 U.S. 74, 98–101 (1997); Upham, 456 U.S. at 43–44; White, 412 U.S. at 795–97; McGhee v. Granville Cty., 860 F.2d 110, 115 (4th Cir. 1988).

C.

Initially, plaintiffs argue that this court, the North Carolina State Board of Elections, and the Wake County Board of Elections "are legally obligated to enforce the election system previously in place." [D.E. 82] 2; see [D.E. 87]. Specifically, plaintiffs argue that this court has no discretion to do anything other than to order the Wake County Board of Elections to use the redistricting plans and the electoral scheme in place in 2011. See [D.E. 82] 6–8; [D.E. 87]. As part of their requested relief, plaintiffs also ask the court to have the five School Board seats elected in 2011 open for election in November 2016 for three-year terms to prevent those School Board members from holding over any longer and to prevent the entire School Board from being up for election at the same time. See [D.E. 82] 8. Plaintiffs also ask that the four School Board seats elected in 2013 not be open for election until the fall of 2017, according to the odd-year election schedule that would have occurred if the General Assembly had not enacted Session Law 2013-110. See id. 9. Furthermore, plaintiffs request an August filing period for the five School Board seats elected in 2011 and a non-partisan election by plurality rather than a run-off. See id.

First, plaintiffs essentially argue that once the redistricting plan in Session Law 2013-110 and Session Law 2105-4 was declared unconstitutional, everything in Session Law 2013-110 and Session Law 2105-4 became invalid and the repealed redistricting plans and electoral scheme from 2011 became legally enforceable and became the only permissible legal remedy. See id. 5–9. In support, plaintiffs cite Dillard v. Baldwin County Commission, 222 F. Supp. 2d 1283, 1287 (M.D. Ala.

18

2002). See [D.E. 82] 9. In Dillard, however, a federal district court dissolved its own improperly entered and legally unjustified injunction that increased the size of a county commission from four members to seven members and mandated elections from seven single-member districts. Dillard, 222 F. Supp. 2d at 1287–90. Upon dissolving the injunction, the federal court made the unremarkable observation that, once the injunction was dissolved, the previously enjoined local election statute requiring a four-member county commission elected at-large again became legally enforceable. Id.

In contrast to Dillard, no federal court in this case enjoined enforcement of the 2011 plans or electoral scheme and then lifted the injunction. Rather, the 2013 General Assembly enacted the redistricting plan in Session Law 2013-110 and thereby made the districts established in 2011 by the Wake County School Board under North Carolina General Statute § 115C-37(i) a legal nullity for elections after 2013. See Tr. Ex. 438 (S.L. 2013-110, §§ 2–6). Likewise, the 2015 General Assembly enacted the redistricting plan in Session Law 2015-4 by adopting the identical redistricting plan in Session Law 2013-110 and made the residency districts that the Wake County Board of Commissioners adopted in 2011 a legal nullity for elections in 2016, except for those Commissioners elected countywide in 2016 for a two-year term from Districts 4, 5, and 6. See Tr. Ex. 439 (S.L. 2015-4, §§ 1–4). When the Fourth Circuit invalidated the redistricting plan in Session Law 2013-110 and Session Law 2015-4 in Raleigh Wake Citizens Association, it did not state or intimate that it was reviving the 2011 plans and electoral scheme. See Raleigh Wake Citizens Ass'n, 2016 WL 3568147, at *12–13, 15 & n.13.

Plaintiffs also cite Cleveland County Association for Government by the People v. Cleveland County Board of Commissioners, 142 F.3d 468 (D.C. Cir. 1998) (per curiam), for the proposition that the court has "no power or authority to order any remedial districts and to do so could be

19

reversible error." [D.E. 87] 2. The court has reviewed Cleveland County and finds that it does not support the proposition that this court has no power or authority to order any remedial districts and must order the Wake County Board of Elections to use the redistricting plans and electoral scheme in place in 2011. First, Cleveland County involved a consent decree in which there was no finding that the county violated the Voting Rights Act. See Cleveland Cty. Ass'n for Gov't by the People, 142 F.3d at 477. In contrast, here, the Fourth Circuit held that the population deviations in the redistricting plan in Session Law 2013-110 and Session Law 2015-4 violate one person one vote under the United States Constitution and the North Carolina Constitution. See Raleigh Wake Citizens Ass'n, 2016 WL 3568147, at *12–13, 15 & n.13. Moreover, the unconstitutional redistricting plan warrants a remedy, and this court has discretion concerning that remedy. See, e.g., Perry, 132 S. Ct. at 941–44; Abrams, 521 U.S. at 79; Upham, 456 U.S. at 43–44; Connor v. Finch, 431 U.S. 407, 413–14 (1977); White, 412 U.S. at 793–97; McGhee, 860 F.2d at 115.

Second, the consent decree in Cleveland County violated North Carolina law because the Cleveland County Board of Commissioners lacked authority under North Carolina law to agree, as part of a consent decree or otherwise, unilaterally to change its structure or method of election. See Cleveland Cty. Ass'n for Gov't by the People, 142 F.3d at 478 (discussing North Carolina law). In light of the absence of a federal violation and because Cleveland County lacked legal authority under North Carolina law to agree to the changes in the remedial plan in the consent decree, the D.C. Circuit held in Cleveland County that the district court lacked authority to implement the remedial plan as part of a consent decree. See id. at 478–79. In contrast to Cleveland County, here, the Fourth Circuit found a constitutional violation and the need for a remedy. See Raleigh Wake Citizens Ass'n, 2016 WL 3568147, at *12–13, 15 & n.13. Moreover, nothing in federal or North Carolina law forbids this court from considering possible remedies. See, e.g., Perry, 132 S. Ct. at 941–44;

20

Upham, 456 U.S. at 43–44; Whitcomb v. Chavis, 403 U.S. 124, 161 (1971); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); McGhee, 860 F.2d at 115.

Next, during the status conference on August 2, 2016, plaintiffs cited McGhee v. Granville County, 860 F.2d 110 (4th Cir. 1988), for the proposition that this court has no discretion to order remedial districts and must order the Wake County Board of Elections to use the 2011 plans and electoral scheme. In McGhee, the parties stipulated to a Voting Rights Act violation. In response to the court's order to remedy the Voting Rights Act violation, the county designed and enacted a legislative remedial plan. Id. at 112–14. The county's legislative remedial plan remedied the Voting Rights Act violation, but the district court adopted the plaintiffs' proposed remedial plan as more equitable. See id. at 114–15.

In reversing the district court's decision to reject the county's legislative remedial plan and to adopt the plaintiffs' remedial plan, the Fourth Circuit stated:

> Where . . . the legislative body does respond with a proposed remedy, a court may not thereupon simply substitute its judgment of a more equitable remedy for that of the legislative body; it may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place.

Id. at 115 (citing Upham, 456 U.S. at 42). Moreover, "[i]f the remedial plan meets those standards, a reviewing court must then accord great deference to legislative judgments about the exact nature and scope of the proposed remedy, reflecting as it will a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions." Id. (citing White, 412 U.S. at 795). The Fourth Circuit then held that the legislative plan that the county enacted in response to the Voting Rights Act violation met

21

constitutional and statutory standards and that the district court erred in rejecting the county's remedial plan in favor of plaintiffs' remedial plan. See id. at 115–21.

Unlike McGhee, where the county devised and enacted a proposed legislative remedial plan in response to a Voting Rights Act violation, here, the General Assembly did not enact a legislative remedial redistricting plan in response to the Fourth Circuit's decision in Raleigh Wake Citizens Association invalidating the redistricting plan in Session Law 2013-110 and Session Law 2015-4. Moreover, unlike McGhee, the 2011 plans for the School Board and the Board of Commissioners were not legislative remedial plans enacted to address the one person one vote violation in the redistricting plan in Session Law 2013-110 and Session Law 2015-4. Rather, the 2011 plans were redistricting plans that the School Board and the Board of Commissioners enacted in 2011, and the plans and electoral scheme associated with the 2011 plans do not include some policy judgments that the General Assembly included in Session Law 2013-110 and Session Law 2015-4. For example, the 2011 electoral scheme for the School Board does not provide: (1) that each person in Wake County be represented by two School Board members (one elected from one of two single-member super districts lettered A and B and one elected from one of the seven single-member districts numbered 1–7) and (2) that the School Board elections take place in even-numbered years. Likewise, the 2011 electoral scheme for the Wake County Board of Commissioners does not provide (1) that the Commission be increased in size from seven to nine members and (2) that Wake County voters elect Commissioners from seven single-member districts numbered 1–7 and two single-member super districts lettered A and B.

Plaintiffs also argue that using the 2011 plans and electoral scheme fall within the scope of their requested relief and note that the Fourth Circuit suggested in Wright the use of the 2011 plans and electoral scheme as a remedy. See Wright, 787 F.3d at 262–63. Specifically, in Wright, the

22

Fourth Circuit wrote:

> Plaintiffs counter that if the Proposed Defendants are not party to their suit, there will be no mechanism for forcing a constitutionally valid election, should they succeed in enjoining the Session Law. This assertion is, however, incorrect. The district court could, for example, mandate that the Board of Elections conduct the next election according to the scheme in place prior to the Session Law's enactment until a new and valid redistricting plan is implemented. State law also provides, for example, that the State Board of Elections can make reasonable interim rules with respect to pending elections. N.C. Gen. Stat. § 163-22.2 ("In the event . . . any State election law . . . is held unconstitutional or invalid by a State or federal court or is unenforceable . . . , the State Board of Elections shall have authority to make reasonable interim rules and regulations with respect to the pending primary or election."). Without question, then, a valid election could take place if Plaintiffs succeed on the merits and successfully enjoin the Session Law.

Id. (footnote omitted).

The Fourth Circuit correctly observed in Wright that using the 2011 plans and electoral scheme is a permissible remedy. The Fourth Circuit did not, however, state or intimate in Wright that using the 2011 plans and electoral scheme was the only permissible remedy. See id.

D.

Next, plaintiffs discuss severability and argue that the court cannot begin the remedial process by looking to the redistricting plan or other legislative policies from either Session Law 2013-110 or Session Law 2015-4. Specifically, plaintiffs argue that "[t]he districts that were declared unconstitutional are an integral part of the election systems established by the statutes." [D.E. 82] 12. Because "there is no part of the statute that is severable," each session law failed. See id. Therefore, according to the plaintiffs, the court must begin with a wholly different redistricting plan and electoral scheme and must revert to and impose the 2011 plans and electoral scheme as the remedy. See id.

Plaintiffs fail to cite a case suggesting that severability analysis applies when a federal court considers a court-ordered interim plan due to an unconstitutional or unenforceable redistricting plan.

23

See id. Relevant Supreme Court precedent does not discuss severability in the context of court-ordered interim plans. See, e.g., Perry, 132 S. Ct. at 942; Abrams, 521 U.S. at 79; Upham, 456 U.S. at 40–43; White, 412 U.S. at 795–97; cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 508 (2010) (discussing severability of legislation generally and noting that the unconstitutionality of a portion of a statute does not necessarily invalidate the remaining statutory provisions and that the normal rule is that partial, rather than facial, invalidation is the required course).[3] Rather, the Supreme Court has instructed that a federal court acting in a remedial capacity following the federal invalidation of a state statute containing a redistricting plan should avoid overriding permissible state legislative decisionmaking in the statute containing the unconstitutional redistricting plan. See, e.g., Perry, 132 S. Ct. at 942; Upham, 456 U.S. at 40–43; White, 412 U.S. at 795–97. That principle applies whether the statute containing the redistricting plan is severable or not.

The Supreme Court repeatedly has explained that a federal court forced to draft or adopt a court-ordered interim plan should begin with the unconstitutional redistricting plan in crafting such a judicial remedy due to the tenuous predicament of a federal court faced with granting such equitable relief to remedy a constitutional or federal statutory violation concerning a redistricting plan. See, e.g., Perry, 132 S. Ct. at 941–42; Upham, 456 U.S. at 40–43; White, 412 U.S. at 795–97; Reynolds, 377 U.S. at 585–86. Recognizing the "unusual position of federal courts as draftsmen of [remedial] reapportionment plans," the Supreme Court first requires that a federal court give the state legislature an opportunity to rectify the constitutional violation by enacting a constitutional redistricting plan. See, e.g., Connor, 431 U.S. at 414–15. If the state legislature fails to enact a

---

[3] The Upham Court declined to address the issue of severability even where appellants raised it. See Upham, 456 U.S. at 41 n.6.

24

constitutional redistricting plan, a "federal court is left with the unwelcome obligation of performing in the legislature's stead." Id. In so doing, however, a federal court is barred from "broadly brushing aside state apportionment policy without solid constitutional or equitable grounds for doing so." Whitcomb, 403 U.S. at 161. As such, the Supreme Court repeatedly has held that, in the context of one person one vote remedies, a federal court forced to draft or adopt a court-ordered interim plan should begin its remedial process by "adher[ing] to the desires of the state legislature while attempting to achieve population equality among districts." White, 412 U.S. at 795; see Upham, 456 U.S. at 43; Whitcomb, 403 U.S. at 161–62; see also Perry, 132 S. Ct. at 941. Of course, this deference to the policy desires of the state legislature applies only where those policy desires are "consistent with constitutional norms and [are] not [themselves] vulnerable to legal challenge." White, 412 U.S. at 797; see Abrams, 521 U.S. at 79 ("When faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.").

White is particularly illustrative. In White, the Texas legislature reapportioned congressional districts and, in doing so, created districts with unconstitutional population deviations. White, 412 U.S. at 785–86, 790. At the remedial stage, the three-judge district court was faced with two, alternative remedial plans to adopt as a court-ordered interim plan. One remedial plan largely respected the district lines drawn by the state legislature and largely equalized population deviations. The other remedial plan better equalized the population deviations and was "significantly more compact and contiguous" than the first plan, but it "substantially disregarded the configuration of the [invalidated] districts." Id. at 787–88, 793–94 (quotation omitted). In its analysis, the Supreme Court did not begin with the question of severability, nor did the three-judge district court. See id.

25

at 789 n.6 (reproducing the "entire discussion of [the three-judge district court's] reasoning for selecting" the plan that it did), 793–97; cf. Seamon v. Upham, 536 F. Supp. 931, 950–59 (E.D. Tex. 1982) (not discussing severability at all in drafting the court-ordered remedial plan). Instead, out of respect for "a duly enacted statute" of the state's legislative branch, the Supreme Court held that the proper starting point for analyzing the court-ordered interim plan was the unconstitutional redistricting plan. See White, 412 U.S. at 795–96. When a district court fails to begin its remedial analysis of a proposed court-ordered interim plan with the "duly enacted" but unconstitutional redistricting plan, reversal is warranted. Id. at 797; see Perry, 132 S. Ct. at 941–44.

Plaintiffs also argue that the Fourth Circuit invalidated not only the redistricting plan in Session Law 2013-110 and Session Law 2015-4 but all of Session Law 2013-110 and Session Law 2015-4. In Raleigh Wake Citizens Association, the Fourth Circuit held that the "Plaintiffs have proven that it is more probable than not that the population deviations at issue here reflect the predominance of a[n] illegitimate reapportionment factor" and that "[a]t the end of the day . . . we can reach only one conclusion: that Plaintiffs, the only parties to make their case at trial, successfully showed it to be more probable than not that the deviations at issue here reflect the predominance of an illegitimate reapportionment factor rather than legitimate considerations." Raleigh Wake Citizens Ass'n, 2016 WL 3568147, at *8, 12; see id. at *15 n.13 (referencing the "unconstitutional plans we strike down today"). This court does not construe the Fourth Circuit's opinion to hold that all of Session Law 2013-110 and Session Law 2015-4 violate the equal protection clauses of the United States and North Carolina Constitutions. However, and in any event, even if the Fourth Circuit did invalidate all of Session Law 2013-110 and Session Law 2015-4, the Supreme Court repeatedly has held that the unconstitutional redistricting plan and permissible policy choices in the unconstitutional law remain the starting point for drafting or adopting a court-

26

ordered interim plan. See, e.g., Perry, 132 S. Ct. at 941–44; Abrams, 521 U.S. at 79; Upham, 456 U.S. at 40–43; White, 412 U.S. at 795–97.

E.

Additionally, plaintiffs cite City of Greensboro v. Guilford County Board of Elections, 120 F. Supp. 3d 479 (M.D.N.C. 2015), and argue that the court has "no authority to order use of" districts other than the "most recently used election system for the Wake County Board of Commissioners and Board of Education." [D.E. 95] 9. The plaintiffs in City of Greensboro contend (1) that the General Assembly's electoral scheme for the City of Greensboro treats the City of Greensboro differently than any other city in the state and thereby violates the equal protection clause and (2) that the redistricting plan within the legislation's electoral scheme violates one person one vote. City of Greensboro, 120 F. Supp. 3d at 482.

Plaintiffs' reliance on City of Greensboro is misplaced. That case involved the plaintiffs' request for a preliminary injunction to keep a contested "system for elections and governance" from taking effect. See id. at 486–87, 492. The district court found a likelihood of success on the equal protection challenge to the electoral scheme as applied to the City of Greensboro, granted the preliminary injunction, enjoined the electoral scheme in its entirety from taking effect, and ordered a "return to the previous system" pending a resolution on the merits. Id. at 492.[4] The district court did not address the likelihood of success of plaintiffs' one person one vote claim. Id. at 491–92. A trial on the merits in City of Greensboro is scheduled for January 2017. See Notice of Hearing, City of Greensboro v. Guilford Cty. Bd. of Elections, Case Number 1:15CV559, [D.E. 71] (M.D.N.C. Mar. 15, 2016).

---

[4] The district court in City of Greensboro considered but rejected at least one option other than returning to the previous system. See City of Greensboro, 120 F. Supp. 3d at 492. Thus, the district court believed that it had remedial discretion. See id.

27

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit . . . ." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003), abrogation on other grounds recognized by Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013). Therefore, upon entering the preliminary injunction concerning the equal protection challenge to how the General Assembly treated the City of Greensboro in the electoral scheme, the district court in City of Greensboro returned the legal landscape to the status quo before the General Assembly enacted the challenged electoral scheme pending a final determination on the merits of the constitutional challenge. See City of Greensboro, 120 F. Supp. 3d at 492.

Here, Session Law 2013-110 and Session Law 2015-4 (including the redistricting plan within the Session Laws) went into effect and were the law under which Wake County operated until the Fourth Circuit issued its decision in this case. Supreme Court precedent makes clear that where a "duly enacted" redistricting statute has taken effect and then been invalidated in a final judgment as unconstitutional, the starting point for a court-ordered interim plan is the "duly enacted" but unconstitutional statute. See White, 412 U.S. at 795-96. At this stage in this litigation, the court operates in a wholly distinct context and concerning a wholly distinct claim than the court in City of Greensboro. Accordingly, City of Greensboro does not support the proposition that this court has no remedial authority to use anything other than the 2011 redistricting plans and election system.

III.

Because the General Assembly did not enact a remedial redistricting plan and the North Carolina State Board of Elections did not create a remedial redistricting plan under section 163-22.2, "the responsibility falls on the District Court to exercise its discretion in fashioning a near optimal plan." McGhee, 860 F.2d at 115 (citations and quotations omitted). In fashioning a near optimal plan, the Supreme Court has held that "modifications of a[n invalidated] state plan are limited to

28

those necessary to cure [the] constitutional . . . defect." Upham, 456 U.S. at 43; see Perry, 132 S.

Ct. at 941–44; Abrams, 521 U.S. at 98–101; White, 412 U.S. at 795–97; McGhee, 860 F.2d at 115;

Cook v. Luckett, 735 F.2d 912, 918–20 (5th Cir. 1984). As mentioned in Perry, the Supreme Court

held that in adopting a court-ordered remedial plan:

> the state plan serves as a starting point for the district court. It provides important
> guidance that helps ensure that the district court appropriately confines itself to
> drawing interim maps that comply with the Constitution and the Voting Rights Act,
> without displacing legitimate state policy judgments with the court's own
> preferences.

Perry, 132 S. Ct. at 941; accord Abrams, 521 U.S. at 79; Upham, 456 U.S. at 43; White, 412 U.S.

at 795–97. Additionally, a court-drawn remedial plan should employ "single-member districts over

multimember districts, absent persuasive justification to the contrary." Wise, 437 U.S. at 540; see

Connor, 431 U.S. at 414–15 (same); Mahan v. Howell, 410 U.S. 315, 333 (1973) (same); Connor

v. Johnson, 402 U.S. 690, 692 (1971) (per curiam) (same). Furthermore, a court-drawn plan "must

ordinarily achieve the goal of population equality with little more than de minimis variation."

Chapman, 420 U.S. at 26–27 (footnote omitted); see Abrams, 521 U.S. at 98–100 (same); Connor,

431 U.S. at 414 (same).

## A.

This court did not obtain jurisdiction until August 3, 2016, and the Wake County Board of

Elections needs a redistricting plan or plans by August 9, 2016. Unfortunately, with so little time

to act, this court did not have time to vet and appoint a Special Master pursuant to Rule 53 of the

Federal Rules of Civil Procedure or have time for such a Special Master to complete work before

August 9, 2016. See Fed. R. Civ. P. 53; Sixty-Seventh Minn. State Senate v. Beens, 406 U.S. 187,

191 (1972) (per curiam). Likewise, this court did not have time to vet and appoint an expert

pursuant to Rule 706 of the Federal Rules of Evidence to assist the court in drawing its own

29

redistricting plan or plans. See Fed. R. Evid. 706. Thus, necessity compels the court to choose among the constitutional plans presented in order to ensure that the Wake County voters are able to elect candidates to the School Board and to the Board of Commissioners. Wake County has a population of nearly 1,000,000 people, and the population exceeds the population of six states. Wake County voters deserve to have a timely and orderly election for the School Board and Board of Commissioners.

In this case, the court has essentially three options: (1) ordering the Wake County Board of Elections to use Representative Gill's proposed plans that the General Assembly rejected in 2015; (2) ordering the Wake County Board of Elections to use the plans contained in the illustrative maps that the leaders of the General Assembly filed on August 3, 2016; or (3) ordering the Wake County Board of Elections to use the 2011 redistricting plans.[5]

## B.

At the status conference on August 2, 2016, plaintiffs mentioned that certain other plans were in the record. This court has considered those plans. One merits specific mention. In 2015, Representative Gill submitted alternative district plans for the Board of Commissioners. See Tr. Exs. 470–74. The General Assembly did not adopt the plans. Nonetheless, Representative Gill's

---

[5] Plaintiffs move to strike the plans contained in the illustrative maps that the legislative leaders of the General Assembly referenced at the status conference on August 2, 2016, and filed on August 3, 2016. See [D.E. 94]; see also [D.E. 95]. The court has reviewed the motion to strike under the governing standard. See Fed. R. Civ. P. 12(f); Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 227 F. App'x 239, 246–47 (4th Cir. 2007) (unpublished); Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001); Hill v. Robeson Cty., 733 F. Supp. 2d 676, 690 (E.D.N.C. 2010).

   The court denies the motion to strike. The legislative leaders have an interest in the proceedings, the information is helpful in illuminating the issues, and the court (particularly in light of the exigent circumstances) may consider their submission as a submission of amici. See, e.g., Beens, 406 U.S. at 188, 191. Furthermore, although the court wishes it had more time and more options to consider, it does not. See [D.E. 83, 83-1, 83-2]; cf. Order, Personhuballah v. Alcorn, Civil Action No. 3:13CV678, [D.E. 207] (E.D. Va. Sept. 3, 2015).

plans from 2015 had the following population deviations:

| District | 2010 Population Actual | 2010 Population Ideal | Deviation | Percentage Deviation |
|----------|----------------------|----------------------|-----------|---------------------|
| 1 | 128,758 | 128,713 | 45 | 0.03% |
| 2 | 128,715 | 128,713 | 2 | 0.00% |
| 3 | 128,534 | 128,713 | -179 | -0.14% |
| 4 | 128,697 | 128,713 | -16 | -0.01% |
| 5 | 128,500 | 128,713 | -213 | -0.17% |
| 6 | 128,876 | 128,713 | 163 | 0.13% |
| 7 | 128,913 | 128,713 | 200 | 0.16% |

See Tr. Ex. 472.

| District | 2010 Population Actual | 2010 Population Ideal | Deviation | Percentage Deviation |
|----------|----------------------|----------------------|-----------|---------------------|
| A | 450,462 | 450,497 | -35 | -0.01% |
| B | 450,531 | 450,497 | 34 | 0.01% |

See Tr. Ex. 473.

In exercising its remedial discretion, the court has considered Representative Gill's plans. Representative Gill's plans from 2015 have a maximum population deviation of .33% in the seven single-member districts and .02% in the two super districts. These population deviations are constitutional under one person one vote. Moreover, the proposal does not split any precincts. Representative Gill's plans, however, arguably do not comply with the Supreme Court's court-ordered interim plan precedent because the proposal does not use the redistricting plan in Session Law 2013-110 and Session Law 2015-4 "as a starting point." Perry, 132 S. Ct. at 941; Abrams, 521 U.S. at 79; Upham, 456 U.S. at 40–42; White, 412 U.S. at 794–97. More importantly, this court finds that Representative Gill's plans are not coded and are not viable for implementation in the November 2016 elections in light of the numerous sequential deadlines that must be met. See [D.E. 83, 83-1, 83-2, 103]. Thus, the court declines to use Representative Gill's plans.

31

C.

On August 3, 2016, the legislative leaders filed illustrative redistricting plans for the seven single-member districts numbered 1–7 and the two super districts lettered A and B. See [D.E. 91]. These plans are not the enacted plans of the General Assembly and are not entitled to "legislative deference" as described in Supreme Court precedent. See, e.g., Upham, 456 U.S. at 41–42; White, 412 U.S. at 794–95; Reynolds, 377 U.S. at 585–86. Nevertheless, the court may consider them.

Under the seven single-member districts numbered 1–7, the population deviations in the illustrative plans are as follows:

| District | 2010 Population Actual | 2010 Population Ideal | Deviation | Percentage Deviation |
|---|---|---|---|---|
| 1 | 128,713 | 128,713 | 0 | 0.00% |
| 2 | 128,713 | 128,713 | 0 | 0.00% |
| 3 | 128,713 | 128,713 | 0 | 0.00% |
| 4 | 128,713 | 128,713 | 0 | 0.00% |
| 5 | 128,714 | 128,713 | 1 | 0.00% |
| 6 | 128,714 | 128,713 | 1 | 0.00% |
| 7 | 128,713 | 128,713 | 0 | 0.00% |

See [D.E. 91-2] 1. Under the two super districts lettered A and B, the population deviations are as follows:

| District | 2010 Population Actual | 2010 Population Ideal | Deviation | Percentage Deviation |
|---|---|---|---|---|
| 1 | 450,497 | 450,497 | 0 | 0.00% |
| 2 | 450,496 | 450,497 | -1 | 0.00% |

See [D.E. 91-4]. The legislative leaders also submitted illustrative maps of the redistricting plans. See [D.E. 91-1, 91-3].

The court has reviewed the illustrative redistricting plans and the statistics and compared them to the unconstitutional plan and statistics. The illustrative plans apparently used the

redistricting plan in Session Law 2013-110 and Session Law 2015-4 as a starting point and take guidance from that recently enacted, but now invalidated, plan. See Perry, 132 S. Ct. at 941; Abrams, 521 U.S. at 79; Upham, 456 U.S. at 40–42. The illustrative plans have perfect population equality and otherwise comport with the permissible legislative policy choices in Session Law 2013-110 and Session Law 2015-4. Nonetheless, this court finds that the plans are not coded and are not viable for implementation in the November 2016 elections in light of the numerous sequential deadlines that must be met. See [D.E. 83, 83-1, 83-2, 103]. Thus, the court declines to use the plans.

D.

Although this court rejected plaintiffs' argument that the law required the court to use the 2011 plans and electoral scheme as a remedy, the court possesses the equitable discretion to use the 2011 redistricting plans as a court-ordered interim plan. See Swann, 402 U.S. at 15; Wright, 787 F.3d at 262–63. Under the 2011 plans and electoral scheme applicable to the Board of Commissioners, the Board of Commissioners consists of seven members elected countywide. Candidates must file and run from one of seven residency districts. See Stipulations [D.E. 56] ¶ 33. Such an electoral scheme complies with one person one vote. See, e.g., Dallas Cty. v. Reese, 421 U.S. 477, 477–78, 481 (1975) (per curiam); Dusch v. Davis, 387 U.S. 112, 115–17 (1967). Commissioner candidates from Districts 4, 5, and 6 are up for election in 2016.

As for the School Board, in 2011, pursuant to North Carolina General Statute § 115C-37(i), the School Board redistricted the boundaries of its nine single-member districts. See Stipulations ¶ 10. The population deviations in the nine single-member districts are as follows:

| District | 2010 Population Actual | 2010 Population Ideal | Deviation | Percentage Deviation |
|---|---|---|---|---|
| 1 | 99,676 | 100,110 | -434 | -0.43% |
| 2 | 101,046 | 100,110 | 936 | 0.93% |

33

| | | | | |
|---|---|---|---|---|
| 3 | 100,880 | 100,110 | 770 | 0.77% |
| 4 | 100,126 | 100,110 | 16 | 0.02% |
| 5 | 99,419 | 100,110 | -691 | -0.69% |
| 6 | 100,309 | 100,110 | 199 | 0.20% |
| 7 | 99,294 | 100,110 | -816 | -0.82% |
| 8 | 100,206 | 100,110 | 96 | 0.10% |
| 9 | 100,037 | 100,110 | -73 | -0.07% |

See Tr. Ex. 43. The maximum population deviation is 1.75%. Under the electoral scheme in place in 2011, five School Board members were elected in 2011, and four were elected in 2013. The 2011 electoral scheme included odd-year elections.

Under Session Law 2013-110, the General Assembly extended the term of office for the School Board members elected in 2011 from 2015 until December 5, 2016, and there were no School Board elections in 2015. See Tr. Ex. 438 (S.L. 2013-110, § 1). Likewise, under Session Law 2013-110, the General Assembly shortened the terms of office for School Board members who would run in 2013 from four years to three years. See id. (S.L. 2013-110, § 1). Candidates who ran and were elected to the School Board in 2013 knew that they were running for a three-year term. The voters also knew that they were voting for candidates for a three-year term.

The 2011 redistricting plans for the Board of Commissioners and the School Board do not use the redistricting plan in Session Law 2013-110 and Session Law 2015-4 "as a starting point" and do not "take guidance from the State's recently enacted plan." Perry, 132 S. Ct. at 941; accord Abrams, 521 U.S. at 79; Upham, 456 U.S. at 40–42; White, 412 U.S. at 783. However, those 2011 redistricting plans for the Board of Commissioners and the School Board do comply with one person one vote principles.[6] Furthermore, and critically, in light of the sequential deadlines that must be

---

[6] The court finds that the maximum population deviation in the 2011 School Board redistricting plan is (barely) permissible for a court-ordered interim plan. See Connor, 431 U.S. at 414 (holding that a court-ordered interim plan "must ordinarily achieve the goal of population equality with little more than de minimis variation" (quotation omitted)); Kirkpatrick v. Preisler, 394 U.S. 526, 530 (1969) (holding that there is "no fixed numerical or percentage population variance

met, they are the only viable plans that the court has. See [D.E. 83, 83-1, 83-2, 103]. These plans are viable because they are already coded in files of the Wake County Board of Elections and can be implemented almost immediately. See [D.E. 103]. Thus, the court adopts the 2011 redistricting plans of the Board of Commissioners and of the School Board as the redistricting plans for use in the November 2016 elections.

As for the term of office for the Commissioners elected in 2016 from Districts 4, 5, and 6, the term will be two years. That term is equitable, reasonable, and equitably minimizes federal intervention in term length. It also comports with the expectations of those candidates who filed to run in 2016 in Districts 4, 5, and 6. Of course, the General Assembly retains discretion to extend the term of office of anyone elected in 2016 upon returning in 2017.

As for the School Board, the court addresses two remedial issues. First, under the 2011 odd-year electoral scheme for the School Board, elections would not take place until 2017, but the terms of office of all nine School Board members expire on December 5, 2016. At the status conference, plaintiffs proposed having the North Carolina State Board of Elections extend the terms of office of the four School Board members elected in 2013 from December 2016 to December 2017. The North Carolina State Board of Elections, however, indicated that using North Carolina General Statute § 163-22.2 or another provision in Chapter 163 to extend the term of office of an elected official did not appear to be within that Board's remedial authority. Furthermore, this court declines to use its equitable authority to continue any School Board members in office without giving the Wake County voters an opportunity to have an election. Thus, all nine School Board seats will be up for election

small enough to be considered de minimis"); Preisler v. Sec'y of State of Mo., 341 F. Supp. 1158, 1162 (W.D. Mo.) (per curiam) (three-judge court) (ordering implementation of court-ordered interim plan with maximum population deviation of .63%), aff'd sub nom. Danforth v. Preisler, 407 U.S. 901 (1972).

Case 5:15-cv-00156-D Document 104 Filed 08/09/16 Page 35 of 37

in November 2016. Second, the court adopts a two-year term for those elected in 2016. That term is equitable, reasonable, and equitably minimizes federal judicial intervention in term length. Upon returning in 2017, the General Assembly retains discretion to extend the terms of some School Board members elected in 2016 if the General Assembly chooses to have staggered terms. Cf. Tr. Ex. 438 (S.L. 2013-110, § 1).

## IV.

In sum, the court GRANTS permanent declaratory and injunctive relief, DECLARES that the population deviations in the redistricting plan in Session Law 2013-110 for the Wake County School Board and Session Law 2015-4 for the Wake County Board of Commissioners violate the equal protection clauses of the Fourteenth Amendment to the United States Constitution and Article I, § 19 of the North Carolina Constitution, and ENJOINS the use of the unconstitutional redistricting plan in Session Law 2013-110 and Session Law 2015-4 in any elections, including the November 2016 elections.

As for the remedy, the court ADOPTS the following as a court-ordered interim plan. For the November 2016 Board of Commissioners elections, the court orders the Wake County Board of Elections to use the 2011 redistricting plan that was used in the 2014 Wake County Board of Commissioners elections. The Commissioner candidates will run in residency Districts 4, 5, and 6 and be elected countywide. The elected Commissioner candidates from Districts 4, 5, and 6 will serve two-year terms. The court finds that this remedy is the most equitable remedy among the constitutional plans presented for timely and orderly elections for the Board of Commissioners.

As for the November 2016 School Board elections, the court orders the Wake County Board of Elections to use the 2011 redistricting plan that was used in the 2011 and 2013 School Board elections. Candidates will be elected from the nine single-member districts under that 2011

Case 5:15-cv-00156-D Document 104 Filed 08/09/16 Page 36 of 37

redistricting plan. The candidates will be elected by plurality in each race. There will be no run-off elections. The elected School Board candidates will serve two-year terms. The court finds that this remedy is the most equitable remedy among the constitutional plans presented for timely and orderly elections for the School Board.

In adopting these plans as a court-ordered interim remedy, the court orders that these plans be used only in the November 2016 elections. See Chapman, 420 U.S. at 11. The court also orders that the Wake County Board of Elections implement the plans immediately in order to ensure timely and orderly elections. Furthermore, the court orders the North Carolina State Board of Elections to use its authority under Chapter 163 and the remedial auspices of this court to ensure timely and orderly elections and to adjust, as needed, dates in the election schedule that the Wake County Board of Elections submitted. See [D.E. 83, 83-1, 83-2].

The court expects the General Assembly to enact an appropriate and constitutional system for electing the Wake County School Board and Wake County Board of Commissioners upon returning in January 2017. See White, 412 U.S. at 788–89.

This court RETAINS jurisdiction to implement, enforce, and amend this judgment in order to ensure timely and orderly elections and to provide other appropriate relief as needed. Plaintiffs' motion to strike [D.E. 94] is DENIED.

SO ORDERED. This __9__ day of August 2016.

JAMES C. DEVER III
Chief United States District Judge