IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RALEIGH WAKE CITIZENS ASSOCIATION, et al. | ) ) ) | |
| *Plaintiffs,* | ) ) | No. 5:15-cv-156 |
| *v.* | ) ) | |
| WAKE COUNTY BOARD OF ELECTIONS, | ) ) | |
| *Defendant.* | ) | |

| | | |
|---|---|---|
| CALLA WRIGHT, et al. | ) ) | |
| *Plaintiffs,* | ) ) | |
| *v.* | ) ) | No. 5:13-cv-607 |
| STATE OF NORTH CAROLINA, et al. | ) ) | |
| *Defendant.* | ) ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR FEES AND COSTS**

Pursuant to Federal Rule of Civil Procedure 54(d) and Local Rules 7.1(f) and 54.1, Defendant Wake County Board of Elections ("Defendant") hereby submits this Response in Opposition to Plaintiffs' Motion for Attorney Fees, Expert Fees, and Litigation Expenses ("Fees Motion") and Bill of Costs ("Costs Motion"). Plaintiffs seek awards of $729,147.61 in their Fees Motion and $9,057.68 in their Costs Motion, a collective amount of $738,205.29.

Although Defendant did not have any interest in the outcome of the legislative redistricting process that it was forced to defend, Defendant has a significant interest in avoiding an award of attorneys' fees and costs. Special circumstances in this case should prevent an attorneys' fee award, but even if an award is proper, the Court should substantially reduce the fees requested

because (i) Plaintiffs failed to prevail on their racial gerrymandering claim and in their attempt to sue the legislative leaders of the North Carolina General Assembly, (ii) Plaintiffs obtained only partial and limited relief on their one person, one vote claim, (iii) Plaintiffs fail to show that the hourly rates and time spent by Plaintiffs' attorneys are reasonable for local lawyers in a local election case, and (iv) Plaintiffs fail to show that the costs sought by Plaintiffs are reasonable.

## BACKGROUND OF THE SCOPE OF RELIEF OBTAINED

Plaintiffs' status as prevailing parties does not automatically entitle them to fees. In fact, "[i]n some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all." *Farrar v. Hobby*, 506 U.S. 103, 114–15 (1992).

This Court has emphasized the foundational link between the degree of success and the amount of an attorneys' fee award:

> The touchstone of an attorney's fee award "is the degree of success obtained." *See Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) (quotation omitted); *Hensley*, 461 U.S. at 436. Although strict proportionality between attorney's fees and the amount of plaintiff's recovered damages is not required, *see Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 974 (4th Cir. 1987), the court is to award "some percentage of the [requested attorney's fees], depending on the degree of success enjoyed by the plaintiff." *See City of Aiken,* 278 F.3d at 337.

*O'Fay v. Sessoms & Rogers, P.A.*, No. 5:08-CV-615-D, 2010 U.S. Dist. LEXIS 80128, at * 8–9 (E.D.N.C. Aug. 9, 2010).

## I. The Proceedings Regarding the Remedies Sought by Plaintiffs in This Court

The Court's remedial order of August 9, 2016, enjoined only the use of the *population deviations* in the Board of Education ("BOE") districts and the Board of County Commissioners ("BOCC") districts contained within Session Law 2013-110 and Session Law 2015-4 (collectively,

2

"Session Laws"). [D.E. 104 at 36.[1]] The Court did not declare any of the other provisions of the Session Laws to be unconstitutional, which include, for example, replacing at-large BOCC districts with single-member districts, increasing the BOCC from seven to nine members, creating new lettered "superdistricts" for both the BOE and the BOCC, moving elections from odd to even years, and removing the authority of the BOE and the BOCC to change any of the districts until after the completion of the 2020 census. *See* S.L. 2013-110, S.L. 2015-4.

The Court also imposed a court-ordered interim election plan for 2016 rather than reinstituting the entirety of the 2011 redistricting plan and election scheme that preceded the Session Laws, despite Plaintiffs' repeated requests to the contrary. [*See* D.E. 104 at 36–37.] The court-ordered interim election plan did use the *districts* from the 2011 plan, but it fashioned an overall interim *system* of election for 2016 that largely tracked the policy decisions in the Session Laws. [*See id.*]

The Court's injunction prohibiting use of the population deviations and imposing a temporary, court-ordered redistricting plan was far more limited, narrow, and fleeting than the scope of relief Plaintiffs sought. Plaintiffs made plain in multiple submissions to the Court that they sought nothing short of an injunction that declared the Session Laws unconstitutional in their entirety and reverted to the method of election for the BOE and BOCC under the 2011 plan previously in effect. In their respective complaints, Plaintiffs requested an injunction prohibiting Defendant from giving effect to the provisions of the 2013 or 2015 Session Laws "that relate to the method of election" of the BOE and BOCC. [D.E. 1 at 22[2] (the "*Wright* Complaint"); D.E. 22 at 17 (the "*RWCA* Complaint")]. Plaintiffs further requested a declaration that, if the North

---

[1] Unless otherwise indicated, references to "D.E. __" indicate docket entries in *Raleigh Wake Citizens Association v. Wake County Board of Elections*, No. 5:15-CV-156-D.
[2] Filed in 5:13-cv-00607-D.

3

Carolina General Assembly failed to promulgate a lawful method of election, the BOE and the BOCC each had the authority to adopt its own redistricting plan. [*Wright* Complaint at 22; *RWCA* Complaint at 17.]

After the Fourth Circuit's decision, Plaintiffs argued that merely enjoining the population deviations did not provide them the full scope of their requested relief. Plaintiffs repeatedly insisted—in three different filings before the Court—that they were entitled to relief that enjoined the Session Laws in their entirety. [*See* D.E. 82 at 5, 20 (arguing that, in each case, the "entire statute is unconstitutional," and requesting that the Court "immediately enjoin the use of the election methods set out in the two unconstitutional statutes and direct the Defendants to implement the prior election methods in the 2016 elections"); D.E. 87 at 2 ("Plaintiffs urge the Court to issue an injunction barring the defendant . . . from implementing the statutes held unconstitutional by the Court of Appeals."); D.E. 96 at 3 ("Plaintiffs are entitled to a declaration that the two statutes challenged in this case are unconstitutional under the equal protection clauses of the North Carolina and United States Constitutions.").] Such a result also would have reverted redistricting authority to the BOE and the BOCC absent further action by the General Assembly.

Similarly, Plaintiffs repeatedly requested relief that reinstated the entirety of the election system contained within 2011 redistricting plan—including the type of districts, length of terms, and timing of elections. Plaintiffs consistently argued that the Court had no authority to implement a court-ordered election plan for 2016 but could only give effect to the 2011 plan by operation of law because, according to Plaintiffs, that was the last legally-enforceable plan. [*See* D.E. 82 at 7–8 (stating that "Plaintiffs are not asking this court 'to hold elections under a court-ordered remedial plan'" and arguing that "so long as the General Assembly does not act, the prior constitutional and legally enforceable election systems should be implemented for the school board and county

4

commission"); D.E. 87 at 2 ("[T]he Court has no power or authority to order any remedial districts and to do so could be reversible error."); *id.* at 3 ("[T]he last enacted plan for the school board and county commission simply remains in effect until such time as a new system is properly adopted pursuant to state law").]

Plaintiffs' closing submission to the Court concisely incorporated their efforts to replace the entirety of the Session Laws with the entirety of the 2011 plan by operation of law and without any court-ordered remedial plan:

> In conclusion, Plaintiffs in this consolidated action respectfully request that the Court enjoin Session Law 2013-110 and Session Law 2015-4 in their entirety and order that the constitutional election systems in effect for the Wake County Board of Commissioners and Board of Education before the unconstitutional laws were enacted be immediately re-implemented for use in the 2016 general election.

[D.E. 96 at 5–6.]

The Court entered an order that squarely rejected the sweeping scope of injunctive relief sought by Plaintiffs. The Court rejected the Plaintiffs' arguments that the Fourth Circuit invalidated the Sessions Laws in their entirety and that the provisions of the Session Laws were not severable. [D.E. 104 at 23–27.] The Court further rejected Plaintiffs' arguments that the Court lacked the authority to impose an interim election plan for 2016 and that the Court was required to give effect to the 2011 plan and electoral scheme. [*Id.* at 18–23.] In fact, the Court ruled that the Session Laws rendered the 2011 plan a "legal nullity" and that "[w]hen the Fourth Circuit invalidated the redistricting plan in Session Law 2013-110 and Session Law 2015-4 in *Raleigh Wake Citizens Association*, it did not state or intimate that it was reviving the 2011 plans and electoral scheme." [*Id.* at 19.]

The Court also rejected Plaintiffs' request that any election plan for 2016—including a court-ordered election plan—fully reflect the election scheme contained in the 2011 plan. Specifically, Plaintiffs sought (1) to delay the election of the 2013 BOE seats until 2017, (2) to impose four-year terms for those seats and (3) to impose three-year terms for BOE seats up for election in 2016—returning the BOE to 5-4 staggered terms and odd-year elections in contravention of the Session Laws. [D.E. 82 at 8–11.] Plaintiffs also sought to have four-year terms for BOCC districts 4, 5, and 6, which were up for election in 2016. *Id.*

The Court did not adopt these methods of election for 2016. Instead, the Court followed most of the policy judgments made in the Session Laws, including holding elections for all BOE members in 2016 (avoiding staggered terms), imposing even-numbered terms (avoiding odd-year elections), and keeping the two-year terms for BOCC Districts 4, 5, and 6 to "comport[] with the expectations of those candidates who filed to run in 2016." [D.E. 104 at 35–37.] The Court departed from the Session Laws only in shortening the term of election for BOE members in 2016 from four years to two years.

## II. Plaintiffs Filed an Emergency Petition for Relief in the Fourth Circuit Attempting to Replace the Relief Obtained in This Court.

Having failed to obtain the scope of the relief they sought—including invalidation of the entirety of the Session Laws and reversion to the 2011 plan in its entirety—Plaintiffs then took the extraordinary step of seeking to secure such relief by filing an Emergency Petition for Writ of Mandamus and even suggesting that, if necessary to effectuate their requested relief, the case should be remanded to another Judge in the district. [Appeal No. 16-1898 D.E. 4, 8.][3]

---

[3] Plaintiffs filed their original Petition the day before the Court entered its order and then amended the Petition in response to the order, evidencing their continued opposition to the extent and nature of the limited relief they received. *Id.*

6

In their Amended Emergency Petition, Plaintiffs argued that enjoining the population deviations was not enough. [*Id.*] Rather, Plaintiffs sought "complete relief . . . including relief from the clearly 'pretextual' fruits of the unconstitutional tree." [Appeal No. 16-1898 D.E. 4 at 12.] Plaintiffs again squarely defined the extent of the relief they sought:

> In this case it means Plaintiffs are entitled to a declaration that the two statutes challenged in this case are unconstitutional under the equal protection clauses of the North Carolina and United States Constitutions.

[*Id.* at 13.] Plaintiffs also repeated their arguments that this Court "has no power or authority to order any remedial districts," [*id.* at 17] and that "the trial court should have ordered a remedy reverting back to that plan in its entirety without any changes" [Appeal No. 16-1898 D.E. 8 at 6.]

Plaintiffs noted that the court-imposed interim election plan for 2016 "significantly differs" from the election system under the 2011 plan because it imposes different term lengths for the BOE and BOCC seats, allows for non-staggered terms, allows all BOE and BOCC seats to be vacant in 2018, and has no method of election in place after 2016. [*Id.* at 4.] Plaintiffs called staggered terms "an important feature," argued that having all of the BOE and BOCC seats up for election in 2018 "directly conflicts with the prior constitutional election methods," and declared that "[a]ll of these problems should be avoided." [*Id.* at 4-5.] Plaintiffs argued that the "only remedy" was to enjoin the Session Laws in their entirety and that the emergency petition was "necessary to assure a proper implementation of the [Fourth Circuit's] prior rulings." [*Id.* at 6.]

The Fourth Circuit summarily dismissed Plaintiffs' petition before any response was due.

## III.    The General Assembly Retains the Authority to Adopt New Districts for the Next Election.

This Court imposed the districts in the 2011 plan as part of a temporary interim election plan for 2016. That election is over, so those districts are no longer in place. This Court further

7

expressed its expectation that the General Assembly will adopt new districts when it reconvenes in 2017. [D.E. 104 at 37 ("[T]he court orders that these plans be used only in the November 2016 elections. . . . The court expects the General Assembly to enact an appropriate and constitutional system for electing the Wake County School Board and Wake County Board of Commissioners upon returning in January 2017.").]

Other than prohibiting the use of the specific population deviations contained in the districts in the Session Laws, the General Assembly retains authority to implement the provisions of the Session Laws and draw new districts for the next election. The Session Laws prohibit the BOE and the BOCC from adopting their own districts,[4] so unless and until the General Assembly adopts new districts, only the Court has the authority to do so. *See* [D.E. 104 at 37 ("This court RETAINS jurisdiction to implement, enforce, and amend this judgment.").] Nothing in the Fourth Circuit's decision or this Court's Order prohibits the General Assembly from enacting new single-member and superdistricts that contain different population deviations or even from considering some amount of politics in redistricting. *Id.* at 36–37, *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 347 (4th Cir. 2016) ("We do not doubt that some amount of partisan politics is par for the course in redistricting generally.").

## ARGUMENT

## I. Special Circumstances Exist that Support Denying a Fee Award to Prevent an Unjust Result.

The court has discretion whether to award a reasonable attorneys' fee to a prevailing party under both 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e). *See* 42 U.S.C. § 1988(b) (stating that a court, "in its discretion, *may* allow the prevailing party, other than the United States, a reasonable

---

[4] *See* S.L. 2015-4, S.L. 2013-110.

attorney's fee" (emphasis added)); 52 U.S.C. § 10310(e) (same). Consistent with the discretionary nature of a fee award, a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (citations and quotation marks omitted).

The Fourth Circuit has characterized the special circumstances exception as "narrow" and applicable only on "rare" occasions, and has specifically noted that good faith on the part of the Defendant is not sufficient to avoid an attorneys' fee award. *Lefemine v. Wideman*, 758 F.3d 551, 555–56 (4th Cir. 2014). Although the Fourth Circuit does not appear to have been confronted with whether multiple factors may, collectively, amount to special circumstances, the Fourth Circuit has not specifically foreclosed such an analysis or categorically defined the full scope of the exception. In the absence of such guidance to govern the unique procedural posture of this case, Defendant respectfully requests that this Court determine that the totality of the circumstances in this case warrants a denial of fees.

The Ninth Circuit has recognized the role of equitable considerations in determining whether a fee award is appropriate. *See ABC v. Miller*, 550 F.3d 786, 788 (9th Cir. 2008) (listing as factors whether (1) awarding attorneys' fees would further the purposes of section 1988; and (2) the balance of equities favors the denial of fees). Prior to the *ABC* decision, the Ninth Circuit had also affirmed a lower court's decision denying attorneys' fees based on multiple factors unique to that case. *See Thorsted v. Munro*, 75 F.3d 454 (9th Cir. 1996). In *Thorsted*, the district court struck down a ballot initiative adopted by voters in the State of Washington that imposed term limits on candidates for the United States Senate or House of Representatives. In denying a request for attorneys' fees under 42 U.S.C. § 1988, the district court cited the following special circumstances:

9

1. No award is needed to serve the purpose of Section 1988, which is to assure "effective access to the judicial process." *Hensley,* 461 U.S. at 429. This is not a typical civil rights case. The mere filing of suit by anyone with standing would have assured a full court test. *See* the briefs amicus curiae, which demonstrate this.

2. No relief has been won under the Section 1983 claims beyond that already awarded under the constitutional claims.

3. The legislation that prompted the suit was adopted by a voters' initiative, not by State officials. The deterrence purpose of Section 1983, *see Wyatt v. Cole,* 118 L. Ed. 2d 504, 112 S. Ct. 1827, 1830 (1992), is inapplicable.

4. The defendant officials have not yet enforced Initiative 573. Their willingness to do so if it is upheld reflects only the minimum their oaths of office require.

5. The State officials have acted in good faith. The Ninth Circuit has ruled that a defendant's good faith is one factor of several that a court may consider in applying the Attorney's Fees Act.

6. This is a case of first impression in federal court, and the public interest requires that it be adjudicated through a full adversary process. The State defendants have done nothing to increase the litigation costs beyond what would have been necessary in any event.

7. There was no way for the State officials to settle the case by agreement. Even if a stipulation of unconstitutionality had been entered (a most unlikely event), the court would have rejected it. State legislation is presumed constitutional until the contrary is shown.

*Thorsted v. Gregoire,* 841 F. Supp. 1068, 1084 (W.D. Wash. 1994) (internal quotations and citations omitted), *aff'd,* 75 F.3d 454. Defendant acknowledges that the Ninth Circuit's ruling in *ABC* limited the application of *Thorsted* to the unique facts in that case. But most of the factors cited in *Thorsted* are nevertheless present here.

First, Defendant did not enact nor enforce Session Law 2015-4, but was instead the institutional defendant required to "administer whatever redistricting plan that the General Assembly . . . enact[ed]." *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 166 F. Supp. 3d 553, 592 (E.D.N.C. 2016), *overruled in part*, 827 F.3d 333 (2016) (hereinafter "*RWCA*"). As the Fourth Circuit Court of Appeals described, "the General Assembly forced [the redistricting]

10

on Wake County," which was otherwise an involuntary participant. 827 F.3d 333, 339 (4th Cir. 2016).

In arguing to add the legislative leaders as defendants before the Fourth Circuit, Plaintiffs previously acknowledged that saddling Defendant with responsibility for attorneys' fees in this action would be inequitable:

> The party that should incur the responsibility for those fees is the entity that violated Plaintiffs' rights in the first place, which is the North Carolina General Assembly. It makes no sense to leave the Wake County Board of Elections, which cannot negotiate a settlement or devise a remedy, or otherwise on its own, change the method of election, responsible for the violation of Plaintiff's rights.

> [Appeal No. 14-1329 D.E. 29 at 57.]

Second, Defendant could not practically end the litigation by settlement or consent. Plaintiff was originally sued with the State as its co-defendant, but later was exposed as the sole remaining defendant after the State obtained a dismissal.[5] Left as the lone defendant, Defendant could not practically "settle" the case given that it had no authority draw, approve, or implement different districts. Indeed, Plaintiffs admitted this very fact in prior briefing before the Fourth Circuit:

> [T]he Wake County Board of Elections has no power to change S.L. 2013-110 and therefore <u>cannot negotiate in any manner</u> whatsoever with the Plaintiffs.

> [. . . .]

> It makes no sense to leave only the Wake County Board of Elections, <u>which cannot negotiate a settlement or otherwise devise a remedy</u>, or otherwise on its own, change the method of election, responsible for the violation of Plaintiffs' rights.

---

[5] Before the State was dismissed, Defendant's previous counsel offered to Plaintiffs that Defendant would follow whatever ruling Plaintiffs obtained in exchange for a dismissal. *See* Declaration of Scott Warren ("Warren Decl."), ¶ 6.

[. . . .]

> Without the entity that has the power to change the method of election as a party, <u>there can be no meaningful discussion of any possible negotiated settlement to the case that might protect Plaintiffs' rights without the need for lengthy and costly litigation</u>.

[Appeal No. 14-1329 D.E. 29 at 56, 87 (emphases added)].

Further, because Defendant had no authority to agree to implement different districts, even a waiver of defense would have necessitated additional complex proceedings, likely involving other interested parties, for the Court to consider remedial districts and election plans. *See RWCA*, 166 F. Supp. 3d at 593 ("[I]f a County Board of Elections admits during litigation to the unconstitutionality of a redistricting plan with minor population deviations that it did not create, a federal court then (inevitably) must decide whether to enjoin the enforcement of that redistricting plan in an impending election and whether to order the legislative entity that enacted the redistricting plan to engage (again) in redistricting without stating precisely to the legislative entity how it violated the Constitution."). Indeed, the remedial phase of this case evidences the necessity and complexity of such proceedings.[6]

Given the inevitable need for a judicial ruling and remedy, Defendant sought to reduce the time and expense required to obtain a decision. Defendant asked for an expedited trial schedule, took no discovery, agreed to a number of stipulated facts and exhibits, did not object to the entry of any exhibit at trial, and limited its case to cross-examining Plaintiffs' witnesses and presenting legal argument. Defendant repeatedly emphasized that it had no position on whether the General Assembly should or should not have enacted the districts but sought an expedited decision in order

---

[6] Similarly, any attempts to waive a defense or concede an outcome risked Defendant being whipsawed with litigation by *proponents* of the districts seeking to enforce the districts, or, as here, by intervenors frustrated by the outcome. [*See*, *e.g.,* D.E. 108.]

12

to minimize any disruption and additional cost on the administration of the 2016 elections. Defendant also waited as long as possible to implement the new districts in hopes of obtaining an expedited ruling by the Fourth Circuit. [*See* Appeal No. 16-1270, D.E. 34 at 2 ("[T]o assure efficient administration of the 2016 elections . . . . the Board of Elections respectfully requests that, if the Court grants the Plaintiffs-Appellants' request, the proceedings be accelerated to ensure that they are completed before the filing period . . . .")].

As in *Thorsted*, "[t]his is a case of first impression in federal court, and the public interest requires that it be adjudicated through a full adversary process. The [Defendant] ha[s] done nothing to increase the litigation costs beyond what would have been necessary in any event." 841 F. Supp. at 1084.

Finally, as explained above (pages 2–8) and below (pages 20–25), Plaintiffs obtained a remedy that was far less than they sought. The partial and limited nature of Plaintiffs' relief further weighs against a fee award in combination with the other factors discussed above. *See Farrar*, 506 U.S. at 115 ("In some circumstances, even a plaintiff who formally "prevails" under § 1988 should receive no attorneys' fees at all.").

While acknowledging the Fourth Circuit's narrow construction of the special circumstances exception, for the reasons discussed above, this is that rare case where multiple factors, on balance, constitute special circumstances that weigh in favor of denying a fee award.

**II.    If the Court Awards a Fee, the Court Should Substantially Reduce Plaintiffs'
Attorneys' Fee Request Under the Lodestar Calculation, the Reduction for
Unsuccessful Claims, and the Limited Nature of the Ultimate Relief Obtained**.

The district court has discretion to determine the appropriate amount of attorneys' fees.

*See, e.g.*, *Hensley*, 461 U.S. at 437; *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 628 (4th Cir.

1995).

This Court calculates a reasonable attorneys' fee award by calculating the lodestar amount

(*i.e.*, a reasonable hourly rate multiplied by the hours reasonably expended), applying the twelve

*Johnson/Barber* factors,[7] subtracting the hours spent on unsuccessful claims, and adjusting the

remaining amount to account for the degree of success obtained by the plaintiffs.  *See, e.g., Beasley*

*v. Sessoms & Rogers, P.A.*, No. 5:09-CV-43-D, 2011 U.S. Dist. LEXIS 129618 (E.D.N.C. Nov. 8,

2011); *Har-Tzion v. Waves Surf & Sport, Inc.*, 7:08-CV-137-D, 2011 U.S. Dist. LEXIS 86454

(E.D.N.C. Aug. 4, 2011); *O'Fay v. Sessoms & Rogers, P.A.*, No. 5:08-CV-615-D, 2010 U.S. Dist.

LEXIS 80128 (E.D.N.C. Aug. 9, 2010); *see also Silicon Knights, Inc. v. Epic Games, Inc.*, 917 F.

Supp. 2d 503, 519–21 (E.D.N.C. 2012).

In *O'Fay*, this Court explained how to appropriately adjust the lodestar calculation to

account for both unsuccessful claims and the degree of relief obtained on the successful claims:

> [T]he court . . . should subtract fees for hours spent on unsuccessful
> claims unrelated to successful ones.  Once the court has subtracted
> the fees incurred for unsuccessful, unrelated claims, it then awards
> some percentage of the remaining amount, depending on the degree
> of success enjoyed by the plaintiff.  In many cases, much of
> counsel's time will be devoted generally to the litigation as a whole,

---

[7]    *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974),
*overruled in part on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); *Barber v.
Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978);  *see also, e.g.*, *Grissom v. Mills Corp.*,
549 F.3d 313, 320–21 (4th Cir. 2008).  The Court may absorb the *Johnson/Barber* factors into the
calculation of the lodestar amount or consider the factors separately to determine whether the
lodestar figure is reasonable.  *Hensley*, 461 U.S. at 434 n.9.

> making it difficult to divide the hours expended on a claim-by-claim basis. In such a case, the district court focuses on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. In any event, the most critical factor in determining a fee award is the degree of success obtained. The court, in awarding attorney's fees, has discretion to attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.

2010 U.S. Dist. LEXIS at * 5–6 (citations and quotations omitted).

Here, any fee award should be reduced because the hourly rates charged by Plaintiffs are not reasonable for a local matter and the hours expended are not reasonable in light of the time spent. Further, any award must exclude the time spent on the unsuccessful racial gerrymandering claim. And, more fundamentally, the amount of fees sought relating to the injunctive relief on the one-person, one-vote claims should be further reduced to account for the lack of permanent and complete relief sought by Plaintiffs.

## A. The Hourly Rates and Time Spent Are Not Reasonable for this Local Election Dispute.

### 1. Hourly rates

The burden of proof regarding the reasonableness of the requested rate falls on the applicant requesting the fee. *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990). To do so, "the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." *Grissom v. Mills*, 549 F.3d 313, 321 (4th Cir. 2008) (quoting *Plyler*, 902 F.2d at 277). Of note, "*[t]he community in which the court sits is the first place to look to in evaluating the prevailing market rate.*" *Id.* (emphasis added) (quoting *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994)).

Here, Plaintiffs seek hourly rates for legal counsel ranging from $550 per hour for Ms. Earls to $200 per hour for unlicensed legal fellows, $225 per hour for contracted analysts, and

15

$150 per hour for unlicensed legal interns. Because Plaintiffs' brief and supporting declarations fail to account for the fact that this matter dealt with local redistricting plans to be implemented by a local elections board, Plaintiffs have not met their burden of proving that the hourly rate is reasonable.

First, Plaintiffs attempt to bolster the validity of these rates by citing to declarations of other attorneys who practice or have practiced election law. These declarations provide general assertions that the hourly rates of Ms. Earls and Ms. Riggs, in particular, are reasonable [D.E. 119-3 ¶¶ 6–7; D.E. 119-4 ¶¶ 19–23; D.E. 119-5 ¶ 7], but they fail to provide "satisfactory specific evidence" of local market rates.

- Mr. Hebert is not barred in North Carolina and purports to support Plaintiffs' counsel's rates by reference to the hourly rates for such work in Washington, D.C. D.E. 119-4 ¶¶ 2, 17, 19, 21. While Mr. Hebert acknowledges that "the appropriate hourly rate in North Carolina is lower than that in D.C.," he concludes without reference to anything specific to the North Carolina market that the rates sought are "well below the market rate." *Id.* at ¶ 19.

- Mr. Crowell's declaration states definitively that the "prevailing market rate[s]" are "equal to or in excess of" the requested hourly rates for Ms. Earls, Ms. Riggs, Mr. Eppsteiner, and Ms. Seawell, with no empirical or other evidence to support that conclusion. D.E. 119-3 ¶7.

- Mr. Speas' declaration is similarly conclusory, without any articulated basis for his opinion that Ms. Earls and Ms. Riggs are requesting reasonable rates. D.E. 119-5 ¶ 7 ("Based on my experience, these rates are comparable to rates currently requested by other similarly experienced and qualified attorneys in voting rights litigation in North Carolina . . . .").

Defendant does not doubt the qualifications of Mr. Hebert, Mr. Crowell, and Mr. Speas, but their declarations fail to sufficiently support the reasonableness of the Plaintiffs' attorneys' hourly rates in a county election law dispute in the Eastern District of North Carolina.

Second, Plaintiffs purport to support these rates by citing the litigation experience of Ms. Earls and Ms. Riggs, in addition to the "specialized expertise" of two staff attorneys billed at $250

and $300 per hour.  [D.E. 120 at 16–17.]  Ms. Earls and Ms. Riggs have stellar reputations for their area of expertise.  In this case, however, their rates should reflect those of other local attorneys.  Plaintiffs' rates stand in contrast to the local rates charged by counsel for Defendant in this action, and to the rates of other local counsel that have represented Defendant in other constitutional matters.  Warren Decl. at ¶¶ 8, 11.  Defendant's lead counsel's hourly rate was less than the hourly rates of both Ms. Earls and Ms. Riggs, and Defendant's "second chair" counsel who conducted several witness examinations at trial (including an expert witness) billed at almost $200 less than Ms. Riggs and only $10 more than unlicensed attorneys for Plaintiffs who did not appear as counsel of record.  Although not dispositive of a specific prevailing local rate, the rates of Defendant's counsel in this case reflect the availability of local attorneys with federal court experience in general constitutional matters to litigate discrete issues presented in this lawsuit.

Finally, Ms. Earls and Ms. Riggs are each experienced lawyers well-versed in election law.  They effectively served as co-lead counsel in this case, in addition to receiving support from junior lawyers.  Defendant does not question their decision to staff the case with, effectively, two lead counsels.  For purposes of a fee award, however, it is not reasonable to award a fee based on two experienced lawyers charging both $400 and $550 per hour.

### 2.    Time Billed

Plaintiffs are not entitled to automatic deference on the hours that they have expended in this matter.  *See, e.g.*, *Daly*, 790 F.2d at 1079–80.  Counsel for the prevailing party must exercise her judgment to "exclude from a fee request hours that are excessive, redundant or otherwise unnecessary," because "[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."  *Id.* (emphasis in original) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

17

Plaintiffs assert in their Memorandum that they conducted minimal discovery in this matter and had significant prior experience in this area of the law. [D.E. 120 at 16–17, 25.] Plaintiffs nonetheless seek compensation for almost 1400 billable hours, asserting that these actions have required an "above-average outlay of hours" because Plaintiffs had to "amass[] a large volume of documentary evidence and witness testimony on decades of electoral history" and conduct an extensive review of "redistricting data, documents, and case law." [*Id.* at 12.]

Plaintiffs' counsel devoted a substantial amount of time to communicating with their clients and other interested parties, drafting and receiving emails, and conducting intra-office meetings.[8] As the Fourth Circuit has noted, "commitment to work closely with . . . client[s] is certainly laudable." *Daly*, 790 F.2d at 1079. Nonetheless, the burden of proving entitlement to compensation for those hours, including "illuminat[ing] the way in which the many hours of client conferences may have aided [counsel's] preparation of the case," remains with the counsel seeking fees. *Id.*

Further, to the extent that Plaintiffs' claim for hourly rates is based on the prior expertise of Plaintiffs' counsel, this should have been reflected in the hours actually billed to the lawsuit. *See Blum v. Stenson*, 465 U.S. at 886, 898–99 (1984) ("There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates. Neither complexity nor novelty of the issues, therefore, is an appropriate factor in determining

---

[8] Some of the entries appear to reflect correspondence regarding unrelated matters affected by the time requirements of these actions. *See* D.E. 119-1 at 41 (2/23/14 entry detailing email "to law school cancelling panel presentation because of Wright hearing").

18

whether to increase the basic fee award.").  Plaintiffs produced no evidence supporting the fact

that unlicensed legal fellows—who have not yet joined the practice of law—are entitled to the

same kind of "expert" rate deference as the more senior Plaintiffs' attorneys.  *See Grissom*, 549

F.3d at 323 ("Plaintiff offered no specific evidence that the hourly rates sought for his attorneys

coincided with the then prevailing market rates of attorneys in the [district] of similar skill and for

similar work . . . .").

　　　The *Johnson/Barber* factors call for a downward adjustment in the lodestar calculation due

to the limited and fleeting relief obtained by Plaintiffs.[9]  The most relevant factor in this case is

the "results obtained."  For the reasons stated below, the limited and fleeting nature of the relief

obtained warrant a substantial reduction in any lodestar calculation.  The remaining lodestar factors

are either generally applicable to the circumstances of this unique case or may be appropriately

subsumed in the lodestar calculation.

## B.　　The Lodestar Calculation Should Be Reduced Both By the Amount of Time Spent Prosecuting Unsuccessful Claims and the Partial and Limited Success Obtained on the One Person, One Vote Claim.

　　　Once the initial lodestar amount is calculated, the Court should make two separate

reductions.  First, the Court should "subtract fees for hours spent on unsuccessful claims unrelated

to successful ones."  Second, after subtracting the fees for hours spent on unsuccessful claims, the

---

　　　[9]  The list of factors include:  (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.  *Grissom*, 549 F.3d at 321 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1402 n. 18 (4th Cir. 1987) (quotation marks omitted).

19

Court "award[] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *O'Fay v. Sessoms & Rogers, P.A.*, 2010 U.S. Dist. LEXIS 80128, at * 5–6 (quoting *Grissom,* 549 F.3d at 320–21; *Johnson v. City of Aiken*, 278 F.3d 333, 337 (4th Cir. 2002)).

### 1. The Court Should Subtract Fees Spent On the Unsuccessful Racial Gerrymandering Claim and Litigation to Add Legislative Defendants.

The Supreme Court has recognized that in certain cases, much of counsel's time "will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Hensley*, 461 U.S. at 435. This Court, therefore, may focus "on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* The Court also may "attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id*. at 436-37. This Court "necessarily has discretion in making this equitable judgment." *Id*. at 437.

In their Memorandum of Law [D.E. 120], Plaintiffs acknowledge that they did not prevail on all claims. At trial, this Court determined that Plaintiffs had not established a right to relief on any claim, and on appeal, the Fourth Circuit concluded that Plaintiffs had succeeded on their one-person, one-vote claims, but not as to their claim for racial gerrymandering. *See RWCA*, 166 F.Supp.3d 553. Plaintiffs also spent time before both the district court and Fourth Circuit Court of Appeals unsuccessfully moving to amend their complaint to add additional defendants. [D.E. 120 at 3; D.E. 119-1 40–43; Appeal No. 14-1329 D.E. 29.]

Plaintiffs argue that they have accounted for the unsuccessful racial gerrymandering claim by subtracting 10% of their hours billed to this matter since the complaint in *RWCA* was drafted. [D.E. 120 at 14.]. As the record in this matter demonstrates, however, this reduction fails to sufficiently account for time spent on this unsuccessful claim.

The state and federal one-person, one-vote claims were virtually identical in terms of type of proof required (i.e. the presence of illegitimate reapportionment factors in districts with population deviations). Plaintiffs provided the same evidence to support both of those claims. Those claims should therefore be treated as a single alleged constitutional violation for purposes of measuring the time spent on successful and unsuccessful claims.

The racial gerrymandering claim, by contrast, had nothing to do with population deviations or the legitimacy of political considerations in redistricting. Rather, that claim required proof that race was "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." 827 F.3d at 352 (citation omitted). The evidentiary proof and legal argument regarding the racial gerrymandering claim, therefore, was separate from the one-person, one-vote claims.

At trial, Plaintiffs introduced a substantial amount of testimony (both lay and expert) relating to their racial gerrymandering claim. Indeed, of the thirteen lay witnesses, six testified on direct examination about the relationship between race and the districts, including but not limited to whether African-American voters were able to elect the candidate of their choice. In particular, Senator Blue and Reverend Johnson testified extensively about the racial composition of District 4. [*See generally* Trial Transcript Day 1 at 17–63.] Similarly, Commissioner West, Representative Gill, and Jannet Barnes all testified about majority-minority districts, and Commissioner Burns testified about the ability of African American candidates to be elected in Wake County. [*See, e.g.*, Trial Transcript Day 1 at 166–67; Trial Transcript Day 2 at 35–39, 106–12.] Both of Plaintiffs' expert witnesses also presented data and opinions related to the racial gerrymandering claim. [*See, e.g.*, Trial Transcript Day 1 at 135–37; Trial Transcript Day 2 at 46.]

Although the racial gerrymandering claim was only made in the *RWCA* case, the cases were consolidated for trial. There was a single presentation of evidence for all claims in both cases during a single non-bifurcated proceeding. Because there were no depositions nor any motions practice in this case, the trial transcript is a fair representation of the proportional time spent on presenting evidence regarding each claim.

Plaintiffs' proposed reduction of 10% also fails to account for the time spent unsuccessfully prosecuting a motion to amend. This included time spent in proceedings before both the district court and in the Court of Appeals.

For all of these reasons, the Court should reduce any fee award to subtract time spend on (a) Plaintiffs' racial gerrymandering claim, and (b) the unsuccessful motions practice relating to the inclusion of the State and the legislative leaders as Defendants.

> ### 2. Any Fee Award Should Be Further Substantially Reduced to Account for the Partial and Limited Relief Obtained by Plaintiffs.

After subtracting the fees attributable to the unsuccessful racial gerrymandering claim and motion to amend, the remaining fees attributable to the one person, one vote claim should be further substantially reduced because Plaintiffs obtained only partial and limited success on that claim. *See Ofay*, 2010 U.S. Dist. LEXIS 80128, at *6 ("the most critical factor in determining a fee award is the 'degree of success obtained'") (quoting *Hensley*, 461 U.S. at 436). Plaintiffs have not achieved a "degree of success" meriting the full award sought. *See Favors v. Cuomo*, 39 F. Supp. 3d 276, 293 (E.D.N.Y. 2014) ("[I]n measuring a party's level of success, a court is not confined to an examination of the pleadings but may consider the record as a whole to determine whether the fee applicant achieved its litigation objectives.").[10]

---

[10] Plaintiffs cite to *Lefemine v. Wideman*, 133 S. Ct. 9 (2012), in support of their position that obtaining an injunction is sufficient to make them a "prevailing party." Even if technically a

Plaintiffs' own submissions to the Court and the Court of Appeals demonstrate that they obtained relief far more narrow and fleeting than they desired. Plaintiffs obtained an injunction prohibiting the use of the districts containing the specific population deviations in the districts contained in the Session Laws, and the Court imposed an interim plan for election in 2016 only. Plaintiffs sought far more than this temporary substitution of districts for 2016. They defined the scope of their relief to include changes to the entire method or system of election for the BOE and BOCC. Plaintiffs argued that this could only be achieved by enjoining the entirety of the Session Laws and replacing them with the entire electoral system contained within the 2011 plan. Plaintiffs went so far as to oppose any court-ordered remedy that produced less than the full resurrection of the entire election system in place under the 2011 plan. And, at a minimum, Plaintiffs requested that any remedial plan contain the entirety of the 2011 election system, including the following:

- Staggered terms for BOE and BOCC elections;

- Four-year terms for 2016 elections for BOE;

- Four-year terms for 2016 elections for BOCC; and

- Holding over BOE members elected in 2013.

[*See generally* D.E. 82, 87; Appeal No. 16-1898 D.E. 4, 8.]

The Court rejected these further requests for relief and entered a court-ordered interim election plan for 2011. Even that plan did not result in elections in all of the 2011 districts for the BOCC, because there were only 3 BOCC districts up for election in 2016 (Districts 4, 5, and 6). And given that the 2011 plan was only in place pending expected action by the General Assembly in January 2017, nothing in the Court's order authorizes (much less guarantees) that elections will

---

"prevailing party," that fact alone does not authorize a fee award, and the Court may exercise its discretion to assure that any award is proportional to the degree of success obtained.

ever be held for those districts under the 2011 plan. In fact, now that the elections are over, the limited remedy granted by the Court regarding the use of the 2011 plan has already expired.

Plaintiffs were so unsatisfied with the Court's injunction and plan for election that they sought an Emergency Petition for Writ of Mandamus to obtain the full scope of the relief they deemed necessary. [Appeal No. 16-1898 D.E. 4, 8.] The fact that Plaintiffs opted to seek such an extraordinary remedy confirms that the relief Plaintiffs obtained was nowhere near what they expected or considered sufficient relief for the claims alleged.

Finally, the Court's injunction places the redistricting process back in the hands of the General Assembly. As the General Assembly embarks on that process, the Fourth Circuit's decision does not require that any new districts hew to a particular constitutionally-defined standard of permissible partisanship, and the Supreme Court has yet to identify or apply such a standard. If anything, the Fourth Circuit's decision encourages plaintiffs to invite courts to ascertain how much partisanship is "too much"—a fact-intensive inquiry that could spur continued litigation regardless of which political party controls the redistricting process. By making it easier to challenge de minimis population deviations on the basis of partisanship, Plaintiffs effectively won a pie-eating contest in which the prize is more pie.

For all of these reasons, after subtracting fees attributable to Plaintiffs' unsuccessful claim and motions practice, the Court should reduce any fee award attributable to the one-person, one-vote claim to reflect the fact that Plaintiffs failed to achieve certain relief they deemed to be critically important.

## III.    The Expenses Sought by Plaintiffs Are Not Reasonable.

Plaintiffs may recover litigation expenses under section 1988 if the expenses are "reasonable." *See Daly*, 790 F.2d at 1083 (quoting *Dowdell v. City of Apopka*, 698 F.2d 1181,

1190 (11th Cir. 1983)) (stating that reasonable attorneys' fees under Section 1988 include "reasonable" expenses). The pursuit of these expenses is subject to the same standard of review as attorney fees. *See id.* at 1084 n.18 ("An expense award, like an attorney's fee, must adequately compensate counsel without resulting in a windfall. Prevailing attorneys must exercise 'billing judgment'. . . ." (quoting *Hensley*, 461 U.S. at 464)). Thus, while ordinarily litigation expenses may be compensable, a prevailing party is not entitled to reimbursement for "questionable litigation expenses." *See Jones v. Danel*, 792 F.3d 395, 404 (4th Cir. 2015) (upholding arbitrator's denial of litigation costs where the plaintiffs' counsel had improperly requested reimbursement for dining at "costly restaurants" and "excessive travel and lodging costs").[11]

Similarly, Plaintiffs' requested reimbursement for expert fees is unreasonable. As with attorney fees and other expenses, expert fees must also be "reasonable" to be recovered as part of litigation expenses. 52 U.S.C. § 10310(e).

A case cited in Plaintiffs' own brief, *Favors v. Cuomo*, 39 F. Supp. 3d 276 (E.D.N.Y. 2014), makes clear that Plaintiffs have not carried their burden of proof as to the reasonableness of Dr. Chen's and Mr. Fairfax's fees. In *Favors*, the court declined to award the full amount of expert fees requested where Plaintiffs had achieved limited success and the expert time records tracked time in one-hour increments with "no indication of the nature of [the expert's] contribution." *Id.* at 309–11. Plaintiffs submitted invoices that fail to provide specific information as to how Dr. Chen and Dr. Fairfax spent their time; in fact, neither Dr. Chen nor Mr. Fairfax provide any breakdown for the bills submitted to the Plaintiffs. [D.E. 119-2 at 9 (billing for "40

---

[11]  Plaintiffs' counsel seeks reimbursements here for, among other things, "refreshments," maid service and valet gratuity, and food for the entire trial team before and during trial. [D.E. 119-2 at 5–7.]

Hours" worked by Dr. Chen), 10 (billing flat daily rates for "On-location services" before and during trial by Dr. Chen), 19–22 (reflecting flat daily rates for report preparation and travel of Mr. Fairfax)].

As a point of comparison, a 2015 opinion from the Northern District of New York found rates of $100 per hour reasonable for "a university professor who specializes in the participation of minority voters in election systems" and another "redistricting and mapping expert with decades of experience." *Pope v. County of Albany*, No. 1:11-CV-0736 (LEK/CFH), 2015 U.S. Dist. LEXIS 123379, at * 43–44 (N.D.N.Y. Sept. 16, 2015). Here, Plaintiffs seek to recover $500.00 per hour for the expert fee charged by Dr. Jowei Chen, plus another $6,000 for trial preparation and participation. [D.E. 119-2 at 9–10].

Plaintiffs also attempt to recover travel fees for Anthony Fairfax at $1,700 per day. [D.E. 119-2 at 19]. By comparison, Mr. Fairfax's bill for trial testimony was only slightly higher, at $2,000 per day. [*Id.* at 20.] Much like Plaintiffs' counsel cannot reasonably bill as "imported" counsel when serving as local counsel on a local matter, Plaintiffs should not be able to recover expert travel expenses at a rate almost as high as the expert's bill for report participation, particularly where Plaintiffs have not established a need to retain a non-local expert. *See Pope*, 2015 U.S. Dist. LEXIS 123379, at *44 (stating that expert travel time should not be reimbursed without a showing that equally competent local experts were not available).

Finally, just as Plaintiffs should not be entitled to full recoupment of attorney fees where they were only partially successful, Plaintiffs should not be able to recoup the full amount of their expenses where those expenses were not necessary to the outcome. *See Daly*, 790 F.2d at 1083–85. By example, the expert witnesses' reports and trial testimony reflect substantial work relating to the use of race in redistricting. Because Plaintiffs did not succeed on their claim for racial

26

gerrymandering, the expert witness fees should not be recoverable or, in the alternative, such fees should be reduced by half the amount of the fees dedicated to one-person, one-vote issues that the Court determines to be reasonable.

## IV.    CONCLUSION

For the reasons stated above, Defendant respectfully requests that the Court find that special circumstances exist to support the denial of attorneys' fees in this case. Alternatively, Defendant respectfully requests that the Court substantially reduce the fee award requested by Plaintiffs to account for (i) the lack of success on their claims for political gerrymandering and their unsuccessful motion to amend, (ii) the limited and partial scope of relief that Plaintiffs' obtained on their one person, one vote claim, (iii) a more reasonable hourly rate and time spent based in light of prevailing local rates, and (iv) a corresponding adjustment to the associated fees and expenses sought. Finally, Defendants seek a corresponding reduction in Plaintiffs' costs and expenses.

Respectfully submitted, this the 21st day of December, 2016.

/s/ Charles F. Marshall
Charles F. Marshall
Matthew B. Tynan
Jessica Thaller-Moran
BROOKS, PIERCE, McLENDON,
    HUMPHREY & LEONARD, L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, NC 27601
(919) 839-0300
cmarshall@brookspierce.com
mtynan@brookspierce.com
jthaller-moran@brookspierce.com
*Counsel for Wake County Board of
Elections*

27

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system and have verified that such filing was sent

electronically using the CM/ECF system to the following:

> Anita S. Earls
> Allison Jean Riggs
> Southern Coalition for Social Justice
> 1415 West Highway 54, Suite 101
> Durham, NC 27707
> 919-323-3380 x115
> Fax: 919-323-3942
> anita@southerncoalition.org
> allison@southerncoalition.org
> *Counsel for Plaintiffs*

Respectfully Submitted,

/s/ Jessica Thaller-Moran
Jessica Thaller-Moran