IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Consolidated Civil Action

| | | |
|---|---|---|
| RALEIGH WAKE CITIZENS ASSOCIATION, et al. | ) ) ) | |
| *Plaintiffs,* | ) ) | No. 5:15-cv-156 |
| *v.* | ) ) | |
| WAKE COUNTY BOARD OF ELECTIONS, | ) ) | |
| *Defendant.* | ) ) | |
| CALLA WRIGHT, et al. | ) ) | |
| *Plaintiffs,* | ) ) | |
| *v.* | ) ) | No. 5:13-cv-607 |
| STATE OF NORTH CAROLINA, et al. | ) ) ) | |
| *Defendant.* | ) ) | |

**JOINT MEMORANDUM IN SUPPORT
OF MOTION TO ENTER CONSENT DECREE**

Defendant Wake County Board of Elections ("WBOE") and Plaintiffs hereby submit this joint memorandum in support of their Joint Motion to Enter Consent Decree.

**INTRODUCTION**

On August 9, 2016, the Court adopted an interim plan for the 2016 election for the Wake County Board of Education and Board of Commissioners. That Court-ordered interim plan expired after the November 2016 election. The General Assembly had the opportunity to adopt a

new plan in 2017, but it failed to do so. That leaves the Wake County Board of Elections without a plan for election for the Board of Education and the Board of Commissioners.

All of the seats for the Board of Education and the Board of Commissioners are up for election in November 2018. The filing period for the Board of Commissioners opens in February 2018 and the filing period for the Board of Education opens in June 2018. The purpose of this proposed Consent Decree is to have this Court extend its 2016 interim plan both as to the districts and the two-year terms. By preserving the status quo until the General Assembly acts or until the return of the 2020 census, the proposed Consent Decree would promote certainty by assuring timely and orderly elections going forward, reduce the risk of continued litigation, including expenses and attorneys' fees, and preserve the maximum opportunity for the General Assembly to impose a new plan in the future. The parties therefore respectfully request that the Court extend its interim plan by entry of the proposed Consent Decree.

## RELEVANT FACTS

### A. Procedural Background Relating to the Court's Interim Redistricting Plan

Plaintiffs brought two separate actions challenging the General Assembly's redistricting plan for electing members of the Wake County Board of Education ("School Board") and the Wake County Board of Commissioners ("Board of Commissioners"). *See* Session Law 2013-110; S.L. 2015-4. The redistricting plan for both the School Board and the Board of Commissioners included seven (7) single-member electoral districts and two (2) "superdistricts." *See* S.L. 2013-110, § 5; S.L. 2015-4, § l.(c)-(d).

As part of the redistricting plan for the School Board, the General Assembly modified the terms of office for the then-existing School Board such that there would be an election for all nine School Board Districts in 2016 for four-year terms. S.L. 2013-110, § 2.(b)-(c). Prior to the General

2

Assembly's enactment of the new redistricting plans for the School Board, the School Board was elected from nine single-member districts that were part of a redistricting plan adopted by the School Board in 2011. [D.E. 56 at 9–11]. Under that 2011 plan, the members of the School Board were elected to four-year staggered terms.

As part of the redistricting plan for the Board of Commissioners, the General Assembly increased the size of the Board of Commissioners from seven to nine members. S.L. 2015-4, § 1.(a). The plan called for two members of the County of Commissioners to be elected from the two superdistricts in 2016 for four-year terms, and the remaining seven members would be elected from the seven new electoral districts in 2018. *Id.* at § 2.(c)-(d). To avoid a holdover for the three seats that were scheduled to expire in 2016, the plan allowed for those three seats to be elected under the previous districts—residency districts 4, 5, and 6—for a two-year term. *Id.* at § 1.(b). Prior to the General Assembly's enactment of the new redistricting plan for the Board of Commissioners, the Board of Commissioners were elected at large from seven single-member residency districts in four-year staggered terms under the 2011 plan. [D.E. 56 at 32–33].

After the actions were consolidated for a bench trial in December 2016, the Court issued an opinion and order on February 26, 2016. [D.E. 64]. The Court found that Plaintiffs failed to prove (i) that the nine-district plan enacted by the General Assembly violated the one-person, one-vote rule under the Equal Protection Clause, or (ii) that District 4 constituted a racial gerrymander. [D.E. 64, 65].

On July 1, 2016, the United States Court of Appeals for the Fourth Circuit reversed the Court's decision, holding that Plaintiffs had proven their state and federal one-person, one-vote claim by establishing that the population deviations in the nine-member districts reflected the predominance of an illegitimate reapportionment factor (i.e., improper partisanship) over

3

legitimate considerations.  *See Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 337, 351 (4th Cir. 2016).

On remand, the Court considered the appropriate remedy for the upcoming 2016 election. The General Assembly advised the Court that it was not likely to call a special session in time to implement new districts but that it should be given a reasonable time after convening in January 2017. [D.E. 84 at 1–2].[1]  The Court, therefore, imposed an interim judicial redistricting plan for 2016 ("2016 Interim Plan").

In fashioning its 2016 Interim Plan, the Court rejected the Plaintiffs' arguments that the Court was legally obligated to enforce the districting plans in place for the School Board and Board of Commissioners immediately prior to the General Assembly's enactment of Session Laws 2013-110 and 2015-4.  [D.E. 104 at 18–23].  The Court stated that the 2011 plans were rendered a legal nullity by the Session Laws and that the Fourth Circuit's decision only invalidated the population deviations within the General Assembly's districting plan (as opposed to invalidating the entirety of the Session Laws).  [D.E. 104 at 18–19, 26].

The Court nevertheless exercised its equitable discretion to impose the districts within the 2011 plans as part of its 2016 Interim Plan.  The Court noted that given the compressed time schedule between the date it obtained jurisdiction of the case after the denial of the petition for rehearing en banc (August 3, 2016) and the date of the general election (November 8, 2016), the Court was constrained to choose between the existing plans submitted for the Court's consideration. [D.E. 104 at 29–30.] The Court noted that the 2011 plans did not reflect the General Assembly's policy choices in Session Laws 2013-110 and 2015-4, but the Court nevertheless found that, of the plans submitted by the various parties, the 2011 plan was "the most equitable

---

[1] This decree references docket entries as they appear in Civil Action No. 5:15-cv-156.

remedy among the constitutional plans presented for timely and orderly elections" in 2016. [D.E. 104 at 36]. The Court also noted that the 2011 districting plans complied with the one-person, one-vote rule. [D.E. 104 at 34].

The Court's 2016 Interim Plan did depart from the 2011 plan and the Session Laws regarding the seats up for election in 2016 and/or the length of terms of office. The 2011 plan for the School Board included odd-year elections for staggered terms, but the Court declined to extend the terms of the then-existing School Board members. Instead, the Court's 2016 Interim Plan required an election for all nine School Board seats in 2016. [D.E. 104 at 35–36]. The Court also set a two-year term for all nine School Board seats, as opposed to the four-year terms under the 2011 plan and the Session Laws. *Id*. The Court found that a two-year term was "equitable, reasonable, and equitably minimizes federal judicial intervention in term length." [D.E. 104 at 36].

As for the Board of Commissioners, the only residency districts up for election in 2016 under the 2011 districting plan were Districts 4, 5, and 6. The Court's 2016 Interim Plan shortened the term of office for those seats from four years to two years to "comport with the expectations of those candidates who filed to run in 2016 in Districts 4, 5, and 6." [D.E. 104 at 35]. As it did with the terms for the School Board, the Court found that the two-year term for the Board of Commissioners seats in Districts 4, 5, and 6 was "equitable, reasonable, and equitably minimizes federal intervention in term length." *Id*.

The Court specifically limited its 2016 Interim Plan for use only in the 2016 elections. The Court also made clear that it expected that the General Assembly would enact new redistricting plans for the School Board and the Board of Commissioners upon the General Assembly's return to session in 2017. [D.E. 104 at 37]. And, in fact, the legislative leaders requested that the Court

5

provide it with a reasonable amount of time after it reconvened on January 11, 2017 to enact new districts. [D.E. 84 at 2]. The General Assembly, however, did not take any action regarding the districting plans for the School Board or the Board of Commissioners. The General Assembly has adjourned for 2017 and is not scheduled to return until January 2018.[2]

## B.     The Upcoming 2018 Elections

All of the terms of office for the members of the School Board and the Board of Commissioners will expire in 2018. The Court's 2016 Interim Plan included two-year terms for all of the nine School Board members and the three Board of Commissioners from residency districts 4, 5, and 6, who were elected in 2016. Of the remaining four County Commissioner seats that were not up for election in 2016, the terms of office for all four of those seats also will expire in 2018.

As it stands now, there is no legal plan for elections in place for the School Board or the Board of Commissioners in 2018. The lack of an interim plan, and the potential for continued litigation and appeals over a new interim plan, could expose the WBOE to further uncertainty and additional administrative and legal burdens that could ultimately undermine the timely and orderly administration of elections in 2018 and/or 2020.

---

[2] The General Assembly's failure to enact new districts in 2017 further complicates expectations for the 2018 election because of the inability of the School Board or the Board of Commissioners to enact their own districts. In Session Laws 2013-110 and 2015-4, the General Assembly canceled the authority of the School Board and the Board of Commissioners to adopt new districts prior to the return of the 2022 census. Because the Court's August 9, 2016 Order states that the entirety of the Session Laws were not invalidated, the parties understand that the Court's Order precludes the School Board or the Board of Commissioners from adopting their own districts until the return of the 2020 census. In any event, the Board of Commissioners could not adopt new districts without also holding a referendum, *see* N.C. Gen. Stat. § 153A-60—a legal impossibility before the 2018 elections unless the Court were to order the county to do so under its federal remedial powers. *See Cleveland Cnty. Ass'n for Gov't by the People v. Cleveland Cnty. Bd. of Commissioners*, 142 F.3d 468, 47–78 (D.C. Cir. 1998) (per curiam).

In order to avoid that result and secure a baseline interim plan going forward, the parties have agreed that the Court's 2016 Interim Plan—both the districts and the terms of office—remains a sufficiently equitable remedy for timely and orderly elections unless and until the General Assembly enacts new districts or the School Board and Board of Commissioners enacts new districts after the return of the 2020 census (whichever is sooner). The Plaintiffs have further agreed that, as part of the proposed Consent Decree, the Plaintiffs will waive any claim for further attorneys' fees against WBOE. The parties recognize that entry of a consent decree extending the Court's 2016 Interim Plan does nothing to prevent the General Assembly from enacting a new plan at any time.

## DISCUSSION

The United States Court of Appeals for the Fourth Circuit has stated that "a consent decree 'has elements of both judgment and contract,' and is subject to 'judicial approval and oversight' generally not present in other private settlements." *Szaller v. American Nat'l Red Cross*, 293 F.3d 148, 152 (4th Cir. 2002) (quoting *Smyth v. Rivero*, 282 F.3d 268, 280–81 (4th Cir. 2002)). "[A] court entering a consent decree must examine its terms to ensure they are fair and not unlawful." *Smyth*, 282 F.3d at 280. "In considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are encouraged." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999); *see also United States v. Patriot Coal Corp*, No. 2:09-cv-0099, 2009 U.S. Dist. LEXIS 37304, at *13–14 (S.D. W. Va. Apr. 30, 2009) (noting that this principle is especially relevant when the litigation "played out in full adversarial mode, could have consumed a significant amount of time and resources from the parties, and hence the taxpayers, along with a substantial redirection of judicial resources").

A district court is not required to determine whether the consent decree is "one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objective of the governing statute." *United States v. Am. Cyanamid Co.*, No. 2:93-cv-0654, 1997 U.S. Dist. LEXIS 4692, at *22 (S.D. W. Va. Feb. 19, 1997) (internal citation and quotation marks omitted). "[T]he court must satisfy itself that the agreement . . . is not illegal, a product of collusion, or against the public interest." *North Carolina*, 180 F.3d at 581 (internal citation and quotation marks omitted).

Entry of the proposed Consent Decree is necessary and appropriate under these circumstances. The WBOE is not a legislative body. It cannot adopt a redistricting plan of its own accord. Only the General Assembly or the Court can do so in this instance. The General Assembly recently reiterated the limitation of the WBOE's authority by amending North Carolina General Statute § 163-33 as follows:

> Nothing in this Chapter shall grant authority to county boards of elections to alter, amend, correct, impose, or substitute any plan apportioning or redistricting districts for a unit of local government other than a plan imposed by a court, a plan enacted by the General Assembly, or a plan adopted by the appropriate unit of local government under statutory or local act authority.

In light of this limitation, the parties have jointly moved this Court to enter a proposed consent decree that would effectively extend the Court's interim judicial redistricting plan for 2016 until the General Assembly enacts new plans or the return of the 2020 census, whichever is sooner.[3]

---

[3] As WBOE has previously acknowledged to this Court, it has no legal or practical authority to settle a dispute like this by adopting districts or by implementing districts other than those duly enacted by the General Assembly, the local unit of government, or the Court. The proposed Consent Decree is not intended to defend or otherwise support the political judgments or policy preferences of the underlying districting plan from 2011. Rather, it reflects an agreement that the Court's 2016 Interim Plan remains sufficient to assure timely and orderly elections. The vehicle of a proposed consent decree to frame this request in this particular circumstance afforded

The proposed Consent Decree does not deviate from the 2016 Interim Plan previously adopted by the Court as to the boundaries of the districts, the length of terms, or the schedule for elections.

By presenting the proposed plan within a consent decree for approval and entry by the Court, the Court necessarily must approve and impose the plan as its own by a Court order. If the Court approves and enters the proposed Consent Decree, the plan proposed in the Consent Decree will become "a plan imposed by a court" under North Carolina General Statute § 163-33 as opposed to a plan imposed by the WBOE. Prior to filing this proposed Consent Decree, the WBOE consulted with the officials within the office of the North Carolina State Board of Elections to confirm the WBOE's authority to enter into the proposed Consent Decree to effectively extend the 2016 Interim Plan, subject to approval and entry of the Consent Decree by the Court.

Given the importance of assuring timely, efficient, and orderly elections, entry of the proposed Consent Decree to extend the Court's 2016 Interim Plan—governing districts, terms, and the schedule for elections—is a sufficiently equitable remedy that will bring finality to any continued disputes over interim districting plans and still provide ample room for the General Assembly to enact new districts if it chooses to do so.

First, by extending the Court's 2016 Interim Plan as the baseline interim plan going forward, the WBOE can avoid the complications and uncertainties that could result from further piecemeal legal challenges to an interim plan. If, for instance, the Court adopted a new and different interim plan for 2018 and/or 2020, Plaintiffs could appeal the rulings, and the WBOE, the candidates for office, and the voters of Wake County would lack certainty as to the appropriate plan for elections until such an appeal is resolved. Just as in 2016, the timing of the resolution of

---

the WBOE the additional benefit of assuring the termination of further litigation and exposure to additional attorneys' fees.

9

Case 5:15-cv-00156-D   Document 128   Filed 12/04/17   Page 9 of 12

an appeal could threaten the timely and orderly administration of elections given the statutorily-imposed election deadlines and the potential for having to open new filing periods and possibly hold new primaries. The parties recognize that such legal challenges could also always occur in the event that the General Assembly enacts new districting plans, but the proposed Consent Decree will take an important step in closing further legal challenges to *interim* plans.

Second, by terminating further legal challenges to the interim plans, the WBOE can avoid incurring additional litigation expenses, including the risk of additional attorneys' fees. Absent a proposed consent decree, the Plaintiffs could institute proceedings to pursue their own preferred interim remedy and take any appeal from an adverse ruling. In addition to creating continued uncertainty as to the proper districts for elections as described above, Plaintiffs likely would seek attorneys' fees against the WBOE on top of the $400,000 in fees that have been awarded to date. The proposed Consent Decree will provide finality and certainty to all parties by terminating the parties' litigation and avoiding further expenses to the taxpayers of Wake County.

Third, by keeping the two-year term for each office as originally imposed by the Court in its 2016 plan, the entry of the proposed Consent Decree would continue to "minimize judicial involvement" in the redistricting process and allow adequate opportunity for the General Assembly to enact a new districting plan.

Finally, to the extent that the proposed Consent Decree does not use the Session Laws as a "starting point" with respect to the districts, that fact carries less weight now than it did prior to the 2016 elections when the Court initially adopted the 2016 Interim Plan to assure timely and orderly elections. The Court clearly expressed its expectation in 2016 that the General Assembly would enact new districts upon return to session in January 2017, and the General Assembly opted not to do so. During the long legislative session that included election matters and redistricting

(including a special session in October 2017), the General Assembly had every opportunity to revise the districting plans for the School Board and the Board of Commissioners to reflect their policy decisions. Having failed to heed the Court's expectation to do so, the Court, in this particular instance, should not be constrained to follow those policy decisions, especially given the practical and equitable benefits of terminating the litigation under an interim plan previously adopted by the Court.

## CONCLUSION

For the reasons set forth above, the parties respectfully request that the Court enter the proposed Consent Decree.

Respectfully submitted, this the 4th day of December, 2017.

| | |
|---|---|
| /s/ Charles F. Marshall<br>Charles F. Marshall<br>N.C. State Bar No. 23297<br>BROOKS, PIERCE, McLENDON,<br>HUMPHREY & LEONARD, L.L.P.<br>1700 Wells Fargo Capitol Center<br>150 Fayetteville Street<br>Raleigh, NC 27601<br>Telephone: (919) 839-0300<br>Email: cmarshall@brookspierce.com<br>*Counsel for Defendant* | /s/ Allison J. Riggs, by permission<br>Allison J. Riggs<br>N.C. State Bar No. 40028<br>SOUTHERN COALITION<br>FOR SOCIAL JUSTICE<br>1415 W. Highway 54, Suite 101<br>Durham, NC 27707<br>Telephone: (919) 323-3380<br>Email: allison@southerncoalition.org<br>*Counsel for Plaintiffs* |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using the CM/ECF system to the following:

> Allison J. Riggs
> Southern Coalition for Social Justice
> 1415 West Highway 54, Suite 101
> Durham, NC 27707
> Telephone: 919-323-3380
> Fax: 919-323-3942
> allison@southerncoalition.org
> *Counsel for Plaintiffs*

Respectfully Submitted,

/s/ Charles F. Marshall
Charles F. Marshall